## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHRYN HIESTER and CHRISTOPHER HIESTER, | : | |
| on their Own Behalf and as Guardians for J. HIESTER, a | : | |
| minor, JEAN DANOWITZ, as Guardian for | : | |
| M. DANOWITZ, a minor, CATHERINE PARMAR and | : | CIVIL ACTION |
| RATNADEEP PARMAR, on their own behalf and as | : | |
| Guardians for M. PARMAR, a minor, | : | NO. |
| | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | |
| | : | |
| SCHOOL DISTRICT OF PHILADELPHIA, | : | |
| RICHARD GORDON, IV, KIANA THOMPSON, | : | |
| RASHIDA STAMPS, KRISTIN LUEBBERT | : | |
| And KEZIAH RIDGEWAY, | : | |
| | : | |
| | : | |
| *Defendants.* | : | **Jury Trial Demanded** |

## <u>COMPLAINT</u>

Plaintiffs, acting as guardians for their children and on their own behalf, bring this action against the School District of Philadelphia and its agents to redress violations of the First Amendment Establishment and Free Exercise Clauses of the United States Constitution, unlawful discrimination in violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*.), unlawful discrimination in violation of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq*.), deprivation of due process in violation of 42 U.S.C. § 1983, deprivation of the liberty interest in reputation, a Federal Constitutional right, and the state law right guaranteeing the right of resident children to attend public school in the district in which they reside.

# I.    INTRODUCTION

1.    This lawsuit stems from the actions and failures to act by the School District of Philadelphia

("SDP" or "the DISTRICT") and its agents in responding to Jewish boys—or boys thought to

be Jewish ("the Boys" or the "Minor Plaintiffs"[1])—who entered a room ("the Prayer Room,"

"the Muslim Prayer Room," or "the Quiet Room") within the Academy at Palumbo high

school ("Palumbo") which was clandestinely but completely reserved for one religion alone,

and the consequences that befell these Boys when the DISTRICT and its agents deprived them

of a litany of rights afforded by the U.S. Constitution, as well as federal statutes and

obligations owed to them by SDP and its agents. The violations against these Minor Plaintiffs

include:

  i.    The imposition of punishments meted out to J. HIESTER and M. PARMAR without due
        process or any process at all for allegedly committing a security breach at Palumbo.
        Defendants issued the punishment before commencing any investigation.  The alleged rule
        those boys were punished for having violated did not exist. Defendants also deliberately
        ignored evidence within the DISTRICT's control even though this evidence proved
        conclusively that the boys were innocent of this charge.

 ii.    The imposition of judgments against J. HIESTER and M. PARMAR, finding them to have
        committed racist, sexist, sexual, and anti-Islam harassment, when no credible or reliable
        evidence supported these charges, and when the written and oral statements of the
        purported "victims" included no claims that the Boys had engaged in any such conduct.
        Defendants also deliberately ignored evidence seen by SDP employees which evidence
        was entirely exculpatory.

iii.    The public dissemination of false charges against the Boys of alleged harassment of
        Muslim girls, the intentional desecration of Islamic religious accoutrements when no
        credible or reliable evidence supported these accusations including the statements from the
        girls who were present and whose accounts lacked any claim that the Boys had engaged in
        any such conduct.

---

[1] For purposes of this Complaint, J. HIESTER, M. PARMAR, and M. DANOWITZ shall be referred to as the Minor
Plaintiffs for ease of reference, although their parents and guardians are for legal purposes the actual Plaintiffs on
their behalf. These three minors may also be referred to as the Boys.

iv. The public dissemination of the names and/or identifying information of the Minor Plaintiffs by agents of the DISTRICT, including certain Defendants.

v. The conscious and willful decision to improperly and unfairly process, investigate, and thereby make a finding of harassment against J. HIESTER and M. PARMAR for the time they spent in the Palumbo Prayer Room, pursuant to the DISTRICT's anti-discrimination policies and within the DISTRICT's system for the enforcement of those policies.

vi. The conscious and willful decision to improperly and unfairly process, investigate, and reject the claims of discrimination filed by the Minor Plaintiffs, pursuant to the DISTRICT's anti-discrimination policies and within the DISTRICT's system for the enforcement of those policies.

2. As a result of Defendants' deliberate indifference to the severe, pervasive, and harmful torrent of lies about the Minor Plaintiffs described in this Complaint, as well as the threats of death and violence  directed towards these Plaintiffs, the HIESTER and PARMAR families had to flee the Philadelphia School District and relocate so that their children could safely attend public high school without the attendant fear and devastating anxiety that the repeatedly and credibly threatened physical harm was about to come to them;

3. As more fully alleged below, certain of the individual Defendants intentionally or recklessly fabricated such claims, and certain individual Defendants publicly amplified those false claims by publishing them knowing that there was no factual basis supporting them, even while they knew they would be expected to publicly state the rumors were false had that been so;

4. The baseless and summary determinations of wrongdoing and impositions of punishments of J. HIESTER and M. PARMAR by the DISTRICT without due process improperly tainted the otherwise excellent academic records of these Boys, threatening their academic and employment futures, as well as validating accusations circulating in their community which destroyed their reputation in that community and forced them and their families to uproot their

lives and flee.

5.    The Defendant SDP and its agents refused to protect these students who were minors placed in their care, from the threats of death and harm which threats were credible and were called to the attention of Defendant SDP, but Defendant ignored them and instead its agents actively promoted and validated the false and unfounded bases for those threats.

6.    Among other improper and discriminatory goals, each of these breaches of law and duty was in the service of preventing any non-Muslims from entering an exclusively Muslim Prayer Room maintained by SDP in a Philadelphia public school in clear violation of the First Amendment to the U.S. Constitution.

7.    The individual Defendants committed these acts solely because the Minor Plaintiffs are not Muslims and were—or were perceived to be—Jewish.  These discriminatory actions were permitted because of the antisemitism of the individual Defendants, which has been permitted, condoned and embraced by Defendant SDP.

## II.    FACTUAL BACKGROUND

8.    The School District of Philadelphia is an agent of the Philadelphia government, and the Academy at Palumbo is a high school within SDP.

9.    Jewish and other pro-Israel SDP students, staff, and teachers were forced to endure a hostile environment so extreme that on April 19, 2024, the U.S. Department of Education's Office of Civil Rights ("OCR") launched an investigation into the many reports of antisemitism occurring within the DISTRICT. That investigation found that SDP failed to show it protected Jewish students from harassment despite "repeated, extensive notice" that students, teachers and administrators were engaging in antisemitic behavior.

10.   The federal Department of Education's OCR investigation found that SDP school

administrators failed to adequately address such allegations as students performing Nazi salutes, drawing swastikas on school property and uttering slurs and threats against Jewish students. The OCR found that in some cases SDP did not even document the antisemitic incidents. Federal investigators also cited complaints about allegedly antisemitic social media posts by a school board member, an assistant superintendent and four teachers.

11. The Office of Civil Rights revealed in its December 18, 2024 Letter to SDP that the DISTRICT failed to consider whether a hostile environment existed in its schools, and that it had not demonstrated that it had taken steps to "eliminate any such hostile environment and prevent its recurrence.

12. Prior to the filing of this Complaint and following complaints by the Philadelphia Jewish community, SDP removed Defendant teacher KEZIA RIDGEWAY from her classroom for several months and subsequently reassigned her to a different school for posting a series of threats—including that of gun violence—directed at Jewish parents of SDP students on her social media account. RIDGEWAY remained on the SDP payroll throughout, and she remains a teacher in the DISTRICT despite her very public hostility towards Jews and the Jewish State, and her role in amplifying the false and malicious charges against the three students in this case, thereby increasing the direct harm to those students.

### III.    JURISDICTION AND VENUE

13. The Court has jurisdiction over the matter under 28 U.S.C. § 1331 in that the action arises under the laws of the United States, and supplemental jurisdiction under 28 U.S.C. § 1367.

14. Venue lies in this jurisdiction under 28 U.S.C. § 1391 in that a substantial part of the acts or omissions that gave rise to the claim occurred here and Defendant School District of Philadelphia, as well as all other Defendants reside here.

## IV.        THE PARTIES

15. Plaintiff J. HIESTER was 16 years old at the time of the June 2024 events described herein occurred J. HIESTER is here represented by his parents and guardians, KATHRYN HIESTER and CHRISTOPHER HIESTER, who are also Plaintiffs in their own rights (collectively, the "HIESTER Plaintiffs"). J. HIESTER is a student who lived within the School District of Philadelphia until late August 2024, and attended high school at Palumbo, a public high school operated by SDP, from September 2022 through June 2024. As a result of Defendants' actions detailed below, J. HIESTER and his family were forced to flee Palumbo and the DISTRICT and relocate to a Philadelphia suburb. J. HIESTER and his family now reside, and he attends public school, outside the School District of Philadelphia (although still within the Eastern District of Pennsylvania).

16. Throughout his tenure at Palumbo, J. HIESTER maintained a 4.0 or higher-grade point average and had never received any disciplinary reprimands or charges.[2] He is a member of the National Honor Society and was on the Distinguished Honor Roll from 2022-2024. Plaintiff J. HIESTER is an avid and acclaimed rower. As a result of Defendants' actions detailed in this Complaint, J. HIESTER was subject to invidious, hostile discrimination and suffered extreme damage to his liberty interest in his reputation because of the lies about him which were spread within, then well beyond the confines of his former high school. All these

---

[2] To the contrary, the only times J. HIESTER received any attention from Palumbo administrators was when he had twice been assaulted by Palumbo students during his freshman year, one of the times by Palumbo student A.B., who also waved a picture of a gun at J. HIESTER another time as a form of threat, and on yet another occasion, shortly after the Hamas massacre of October 7, 2023, A.B. wrote on and held up his whiteboard in his class the message "I [love] Hamas," with lots of hearts around it. J. HIESTER was so offended by that publicly displayed message glorifying murderous terrorists that he photographed it and showed it to his parents as evidence of publicly displayed antisemitism at Palumbo.

assaults took an enormous toll on J. HIESTER's mental and physical health and stability; these harms were the direct result of Defendants' actions and failures to act.

17. Because of the breaches of duty by SDP and the actions of its agents at issue in this case which led to the undeterred, escalating malicious lies about and threats of physical violence against the son of Plaintiffs KATHRYN HIESTER and CHRISTOPHER HIESTER, the HIESTERS concluded their son would no longer be safe if he stayed at Palumbo; at considerable expense the HIESTERs were forced to move to and rent a home in a Philadelphia suburb so that their son could safely attend and complete his high school career.

18. Plaintiffs CHRISTOPHER and KATHRYN HIESTER met and moved into a home in West Philadelphia in 1992 and had lived in West Philadelphia for 23 years, until they were forced to move to a suburb outside the DISTRICT as a direct result of the conduct described in this Complaint. The HIESTER Plaintiffs incurred significant financial expense in doing so. Ms. HIESTER works primarily in Philadelphia as a translator. The HIESTER Plaintiffs have several family members who live in the city of Philadelphia, but they have no family members in the suburb to which they were forced to move.

19. Plaintiff M. DANOWITZ was 16 years old when the June 2024 events described herein occurred. He is represented in this case by his parent and guardian, JEAN DANOWITZ (together with M. DANOWITZ, the "DANOWITZ Plaintiffs"). M. DANOWITZ, who is Jewish, believes that Israel has the right to exist as a Jewish state in the Jewish ancestral homeland. For M. DANOWITZ, Judaism is synonymous with supporting Israel. He attended Palumbo during the 2023-2023 school year, after which he left to attend another school within the DISTRICT. As a result of Defendants' actions detailed below, M. DANOWITZ was subject to invidious, hostile discrimination and suffered extreme damage to his reputation as

the direct result of Defendants' actions and omissions.

20. Plaintiff M. PARMAR, was 16 years old when the June 2024 events described herein occurred. M. PARMAR is ethnically Indian-American.  He is represented in this case by his parents and guardians, CATHERINE and RATNADEEP PARMAR (together with M. PARMAR, the "PARMAR Plaintiffs"). Plaintiff M. PARMAR is a student who lived within the DISTRICT and attended Palumbo from September 2022 through June 2024. As a result of Defendants' actions detailed below, M. PARMAR was forced to flee the DISTRICT and Palumbo and he and his family had to relocate to a Philadelphia suburb. He now resides and attends public school outside the School District of Philadelphia (although still within the Eastern District of Pennsylvania). As a direct result of Defendants' actions detailed below, M. PARMAR was subject to invidious, hostile discrimination and suffered extreme mental and physical anguish as well as damage to his liberty interest in his reputation as the direct result of Defendants' actions.

21. Because of the myriad breaches of duty by SDP and the other Defendants at issue in this case which led to the undeterred and consequently escalating malicious lies about and threats of physical violence against their son, Plaintiffs RATNADEEP and CATHERINE PARMAR concluded that M. PARMAR would no longer be safe if he stayed at Palumbo.  At considerable expense the PARMARs were forced to rent and move to a home in a Philadelphia suburb so that their son could safely attend and complete his high school career.

22. CATHERINE PARMAR was born and raised in Philadelphia. RATNADEEP PARMAR moved to Philadelphia in 2003 and since 2004, when they married, the PARMARS made their home and raised their children in Philadelphia. Both CATHERINE and RATNADEEP PARMAR spent most of their careers working in Philadelphia, and Mr. PARMAR still works

in the Philadelphia area. CATHERINE PARMAR's mother is a lifelong Philadelphian who still resides in the city. The PARMARS have no relatives in the suburb to which they have moved.

23. None of the Plaintiffs are Muslim.

24. Plaintiffs J. HIESTER and M. PARMAR are friends of M. DANOWITZ.  (Collectively, J. HIESTER, M. PARMAR, and M. DANOWITZ are referred to herein as the "Minor Plaintiffs").  Neither J. HIESTER nor M. PARMAR are Jewish, nor do they know or speak Hebrew.

25. Defendant SCHOOL DISTRICT OF PHILADELPHIA is an agency of the Philadelphia city government.

26. Defendant RICHARD GORDON, IV, at all times relevant hereto was Assistant Superintendent of the SCHOOL DISTRICT OF PHILADELPHIA for the Academy at Palumbo. Defendant GORDON is sued in his individual and official capacities.

27. Defendant KIANA THOMPSON is and was at all times relevant hereto principal of Academy at Palumbo ("Palumbo"), located at1100 Catharine Street, Philadelphia, PA 19147. Defendant THOMPSON is sued in her individual and official capacities.

28. Defendant RASHIDA STAMPS is and was at all times relevant hereto, Dean of Student Conduct at Palumbo, located at1100 Catharine Street, Philadelphia, PA 19147.  Defendant STAMPS is sued in her individual and official capacities.

29. Defendant KRISTIN LUEBBERT is and was at all times relevant a teacher working for Defendant SDP. At all times relevant hereto LUEBBERT was based at The U School, located at 2000 North Seventh Street Philadelphia, PA 19122. Defendant LUEBBERT is sued in her individual and official capacities.

30. Defendant KEZIAH RIDGEWAY is and was at all times relevant hereto, a teacher working for the defendant SCHOOL DISTRICT OF PHILADELPHIA. At all times relevant hereto RIDGEWAY was based at Northeast High School, located at 1601 Cottman Avenue, Philadelphia, PA 19111. Defendant RIDGEWAY is sued in her individual and official capacities.

**V.    FACTS**

**A.    Background: An Atmosphere of Increasingly Antisemitic, Anti-Zionist and Pro-Islam, Pro-Palestinian Bias has Pervaded SDP and Palumbo**

31. Over the past several years SDP has tolerated, endorsed, and even actively fostered an atmosphere that is increasingly intolerant of Jews and Zionists, while giving favored status to, supporting, and even promoting Islam, Muslims, and anti-Zionists. The DISTRICT itself was forced to tacitly acknowledge the hostile and discriminatory attitude towards its Jewish students pursuant to an investigation into and resolution thereof a Complaint made to the U.S. Department of Education's Office of Civil Rights, which was completed in 2024.

32. The administration and staff at Palumbo have increasingly promoted and/or tolerated an atmosphere of hostility toward Zionism, the Jewish state, and toward Zionists, including but not limited to Jewish and non-Jewish students who support Israel.

33. The administration at Palumbo has increasingly and inappropriately elevated the status of the Islamic religion by incorporating Muslim religious practices into the school's official environment.

34. During Ramadan in 2023 and 2024, a giant banner saying "Happy Ramadan" was posted on a school wall that was visible to anyone entering Palumbo through its main entrance. No similar sign was posted for the holidays of any other religion.

35. In 2024, the school allowed and encouraged mass prayers for Ramadan on the school's roof deck, during school hours. The Ramadan prayer gatherings were highly publicized, with teachers promoting them and offering excused absences for students who attended.

36. Those students not participating in the streaming in and out of the classroom by Ramadan prayer participants had their learning environment disrupted repeatedly, which made it far more difficult to concentrate on their studies.

**B.    Post-October 7, 2023**

37. Since October 7, 2023, when the terrorist[3] group Hamas slaughtered, dismembered, and raped at least 1200 people in Israel, and took hundreds—living and dead—hostage, SDP has permitted and at times even actively promoted a pro-Palestine, anti-Zionist agenda. See, esp. ¶¶ 9-10, *supra.*

38. Several of Defendant SDP's teachers have, when acting in their official capacities as teachers, openly expressed, when acting in their official capacities as teachers, their strong anti-Israel, anti-Zionist political positions. For example, Palumbo teacher Charlie McGeehan declared to his Palumbo students that Israel's war against Hamas constitutes "genocide." The School District allows its leadership to include rabidly anti-Israel and antisemitic people whose actions have repeatedly been called to the attention of the DISTRICT by the Jewish Federation of Greater Philadelphia, the Anti-Defamation League, and the U.S. Department of Education.

39. And even within Palumbo itself, there are students whose strong anti-Israel and antisemitic views and actions are tolerated by school leadership. For example, not long after the October 7, 2023 massacre of Israelis, Palumbo student A.B., whose subsequent threats to the Boys

---

[3] The U.S. State Department has recognized Hamas as a Foreign Terrorist Organization since October 8, 1997. *See* https://2017-2021.state.gov/foreign-terrorist-organizations/.

were known to Palumbo administrators, wrote "I heart Hamas" on a whiteboard and held it up in his class. An outraged student took a picture of A.B. grinning and holding up this sign in a classroom. Further, when A.B. learned another Palumbo student, J2, was Jewish, A.B. said to J2, "I will kill you and everybody in Israel."

40. In the spring of 2024, a Holocaust survivor came to speak to the students at Palumbo. Jewish students were horrified to observe other students' blatant disrespect towards the survivor.

41. In response to the lack of civility displayed towards the Holocaust survivor, a pro-peace program "Peace Assembly" was organized by a Jewish Palumbo student. This presentation included a Jewish spiritual leader—a rabbi—and a Muslim woman, both of whom spoke about co-existence and peace.  Up until the evening before this event attendance at the Peace Assembly was voluntary. But the evening before the event, students and their families were informed by Palumbo administration that in order to attend, students had to bring in a permission slip signed by a parent.

42. Some students posted negative social media messages about the upcoming Peace Assembly, including, "I hope that the building sets on fire midway through the event" and, "I HATE MY SCHOOL FOR ALLOWING THIS CORNY ZIONIST SHIT!!!" (emphasis in the original post) See Exh. 1, attached hereto.

43. On the day of the Peace Assembly, some students came to school wearing Palestinian flag capes to protest the event. There is nothing to indicate that the administrators or the staff, including Defendants, saw this as problematic in any way, or attempted to put an end to it.

**C.    Events of June 11, 2024, at the Academy at Palumbo**

44. Final exams finished at Palumbo and grades were concluded the first week of June in 2024. At that point, the grade book and attendance reports were considered closed, and no more formal classes were held even though the school year did not officially end until June 14, 2024.

45. During the last few "school" days of the school year at Palumbo, little to no formal teaching takes place and students are generally free to come and go as they please within the school building, and even to leave the school campus. However, teachers are generally present in their classrooms during these final days.

46. Upon information and belief, the only purpose of the remaining school days was to fulfill state the state law requirements that K-12 schools must be in session for 180 school days per year. 22 Pa. Code § 51.61(b).  SDP administrators apparently interpret this to require that number of days that the schools are open, not days on which academic instruction is provided.

47. On or about June 10, 2024, Plaintiff M. DANOWITZ, who attended Palumbo during the previous school year and whose own school had already shut down for the summer, decided to visit Palumbo and greet former classmates who still attended school there. J. HIESTER stayed over with M. DANOWITZ, his friend from Palumbo and rowing days, because M. Danowitz lived very nearby Palumbo, so that both could walk to Palumbo the next day.

    **a.   Entry to Palumbo**

48. As the two boys approached the school building, they passed Defendants THOMPSON and STAMPS standing just outside the entrance to the school. Neither THOMPSON nor STAMPS asked why M. DANOWITZ was there, or challenged him in any way, nor did M. DANOWITZ make any effort to evade the two school officials.

49. At approximately 8:25 a.m., J. HIESTER entered the Palumbo school building through its main entrance at 11th and Catharine Streets in South Philadelphia. J. HIESTER placed his backpack on the scanner and walked through the metal detector in front of security personnel; there were no issues. This was J. HIESTER's usual procedure on school-day mornings upon entering school.

50. M. DANOWITZ followed J. HIESTER into Palumbo. He placed his backpack on the x-ray machine belt where it was scanned. In the same entry area as the scanner there were multiple Palumbo security guards whom both boys passed. There were no issues with M. DANOWITZ's entry into Palumbo.

51. J. HIESTER checked into his first period class where he obtained a note from his teacher giving him permission to leave her classroom and go to another classroom. He took this note to the computer lab, where Plaintiff J. HIESTER encountered Plaintiff M. DANOWITZ, Plaintiff M. PARMAR, and another student, J2.

52. M. DANOWITZ and J. HIESTER spent some time socializing in the computer lab. After about 15 minutes these boys, along with M. PARMAR, and J2, plus a few other friends, decided to go downstairs to the cafeteria.

53. The computer lab teacher spoke to the boys and gave them permission to leave the classroom. As they were walking down the stairs towards the cafeteria, they noticed the library, which is located on the fourth floor. Unlike many other times when they had passed the library, this time the lights were on and there were other students there. The library bookshelves are mostly empty and the room is unstaffed. And unlike Plaintiff J. HIESTER's many experiences when he tried to spend lunchtime in the library, this time students weren't being kicked out. The group decided to enter the library.

### b.  The Muslim Prayer Room

54.  In a room adjacent to the library, Palumbo had established a Prayer Room, sometimes referred to as the Quiet Room.  Based on the exclusively Islamic imagery and prayer items within the room, as well as Defendant THOMPSON's own statement to this effect to the Police, that the room is "designated for a particular religion and having a certain flag [Palestinian] outside the room," See Exh 2, attached hereto, the Palumbo administration's official policy was to restrict access to this room to those of the Muslim faith.  The Muslim students were very much aware of the Prayer Room's existence[4] and rules, but there is no evidence that the entire school body was ever officially put on notice of the true purpose of the Prayer Room or about any rules associated with it.

55.  M. DANOWITZ had learned about the Prayer Room from his former classmates.  Plaintiff J. HIESTER believed it should be a space open to all students, but he never actually saw anyone go in there because the door was always closed and he had little access to the library.

56.  The Boys saw that the door to the Prayer Room had a sign stating it was the "quiet room." There was no indication that there was any gender or religious restriction on use or occupancy of the room when observing the room from the outside. The entire front window of the door leading to the "Quiet Room," however, was covered with a Palestinian flag. See Exh. 4a, attached. And on this day, June 11, 2024, for the first time any of the Boys had seen, the door to that room was open.

---

[4] Throughout this Complaint there are numerous examples of Muslim Palumbo students referring to and considering the Palumbo Prayer Room as their own private space with their own set of rules. In several instances Muslim students expressed outrage that non-Muslim students entered the Prayer Room, and other places where Muslim students and/or Palumbo officials indicated there were certain times of the school day set aside for females and other times for males. When various school clubs advertised their meetings, upon information and belief, it was only the Muslim Student Association that met in Palumbo's Prayer Room. See Exh. 3, and Exh.6, *passim*, attached hereto.

### i.    What the Boys Observed in the Palumbo Prayer Room

57. When the Boys entered the room through the open door, there were two or three female students present and seated at the only table in the room.  Across the room from those students, Plaintiffs M. DANOWITZ and student J2 sat down on two of the chairs scattered about the room. They were followed a few minutes later by M. PARMAR and another friend of his, and later on, by J. HIESTER.

58. The Boys observed the following inside the Prayer/Quiet Room:

59. Arabic language on signs hanging on the interior walls, including Islamic prayer instructions; student duas; and a large mural depicting a mosque with Islamic religious crescent moon symbols, indicating the direction to face for prayer. Exh.4, attached hereto.

60. A nearly floor to ceiling sign on one wall welcomed people to the "Prayer Room," along with the message, "Happy Ramadan." See Exh.4 at p. 5, attached hereto

61. There were what appeared to be Muslim prayer rugs stacked on a table in the room. Exh. See Exh. 4 at p. 1, attached hereto.

62. There were no religious items or information for any religion other than Islam, and aside from the Islamic accoutrements and signs, there was nothing else in the room other than the table at which the girls were sitting, several chairs, and a table upon which books and rugs were piled.

63. There was one table with chairs at which girls were seated, playing on their phones or laptops, and several other chairs randomly scattered about the room. See Exh. 4 at p. 6, attached hereto.

64. On the floor was a large area rug covering much of the room's floor, placed between the door from the library and wall with the Welcome sign. See Exh.4 at p. 7, attached hereto.

65. The decorations on the door and interior of the Palumbo Prayer Room are all Arabic language or imagery, along with what appeared to be English translations of some of the Arabic. See Exh.4(a), attached hereto.

### ii.    What the Boys did While in the Prayer Room

59.  After entering the Prayer Room, J2 sat down and began videoing the room[5]. M. DANOWITZ
     and J2, both of whom are Jewish, said a quick Jewish prayer in Hebrew and the three female
     students burst out laughing at the two boys. M. PARMAR and another student also entered
     the room and sat down near the other boys; both were looking at a book and speaking quietly
     to each other.

60.  When M. DANOWITZ responded to the girls' laughter by saying, "How is me exercising my
     [First] Amendment right funny to you?", one of the young women responded, "Why are you
     guys even in here?"

61.  M. DANOWITZ responded that he "has a right to religion and a right to pray, which is in the
     Bill of Rights." He added he is a "proud Zionist." J2, still videotaping what was on the walls
     of the Prayer Room and what else was in the room, began singing a Hebrew song, "Am Yisroel
     Chai," which means "The people of Israel live." While J2 was singing, M. DANOWITZ stood
     up, took a couple of steps, and did a handstand.  Immediately after this, J. HIESTER entered
     the room and sat down where the other boys were seated. Neither J. HIESTER nor M.
     PARMAR said anything out loud while they were in the Prayer Room. The Boys looked at
     their cell phones for a few minutes, talked quietly, and then all of them left the Prayer Room
     and then the library.  All this activity in the Prayer Room during the short period—fewer than
     ten minutes—while the Boys were in the room was recorded on a video taken by J2.

---

[5] J2 and his family had been communicating with Palumbo regarding the antisemitism they
perceived to be pervasive and problematic. J2 later informed SDP officials See Exh.5 at p. 26,
attached hereto, that he was filming inside the Prayer Room in order to show his parents that the
room was not inclusive of religions other than Islam.

62. At no time did any of the Boys touch or even approach any of the female students in the Prayer Room, as confirmed by the statements of the female students themselves, J2's video, and the Investigation Records created by the SDP investigator and other SDP employees. See Exh.5, attached hereto.

63. While the Boys were in the Palumbo Prayer Room, the girls were working on their laptops, playing video games,[6] and engaged in other leisure activities—none of them were praying.

64. Before exiting the Prayer Room, M. DANOWITZ removed a sign that had been hanging on the wall and gently placed it on the floor, where he left it leaning against the wall. J2 recorded this, as well.

### c. HARASSMENT FOLLOWING THE BOYS' VISIT TO PALUMBO MUSLIM PRAYER ROOM

#### i. Harassment by Muslim and other Students

65. Within moments of leaving the library, J. HIESTER began receiving a flurry of text messages from Palumbo students demanding to know whether M. DANOWITZ was in the building. When he told DANOWITZ this, the latter went downstairs and left the building.

66. Shortly after M. DANOWITZ left, J. HIESTER also left the building with another classmate, A.A., a Muslim Palumbo student. A.A. had been the friend of both J. HIESTER and M. DANOWITZ, who had spent countless hours at both the DANOWITZ and HIESTER homes, as all three boys rowed on the same team and both JEAN DANOWITZ and KATHRYN HIESTER had fed A.A. and given him rides to and from practice when all three were in the same rowing club. Eventually J. HIESTER and M. DANOWITZ ended up at the HIESTERs'

---

[6] One of the girls in the room wrote in her Statement which is in the Investigative Report that she was "playing roblox," on her phone throughout the time the Boys were in the room. See Exh. 5 at p. 57.

house. While there, J. HIESTER received 11 phone calls from A.B., a student who had previously assaulted HIESTER, see *supra,*¶39 and p. 6, fn 2. Since that assault, J. HIESTER had learned about A.B.'s death threat to J2, see, *supra* at ¶ 39.

67. J. HIESTER ignored the first eleven of A.B.'s calls. When he finally answered his phone, A.B. demanded to know where he and M. DANOWITZ were. When J. HIESTER explained that they were no longer in the school building, A.B. demanded that they return to Palumbo because he had "unfinished business" with them and wanted to fight them. A.B. threatened that if J. HIESTER and M. DANOWITZ did not return to the school, he would come to their homes. J. HIESTER hung up after A.B.'s threat, which he took very seriously, given A.B.'s physical assault history.

68. J. HIESTER also received multiple texts, phone calls, and Facetime calls from other Palumbo students, several of whom he knew were close to A.B.

69. After they left the Palumbo Prayer Room and the library, M. PARMAR and J2 returned to their computer lab classroom.

70. Student A.B. and three others congregated outside that room and confronted M. PARMAR and J2 from the hallway outside. As described earlier in this Complaint, prior to the events of June 11, 2024, A.B. had assaulted J. HIESTER and threatened J2. See, *supra,* ¶39 and p. 6, fn 2.

71. A.B. and five others entered the computer lab, surrounded and harassed M. PARMAR and J2, repeatedly asking what they had done in the Prayer Room. They falsely accused M. PARMAR and J2 of having "trashed" it.  When asked what he was doing in the Prayer Room, J2 said that he "was praying." One of A.B.'s friends yelled out: "Which religion?"

72. The Palumbo students also openly expressed fury towards M. DANOWITZ and J. HIESTER,

for whom A.B. and his friend indicated they were searching.

73. After that volatile confrontation in the Computer Room, M. PARMAR felt uncomfortable remaining at school and arranged an early dismissal with his mother who  picked up her son from school.

### ii.    Palumbo Administrators Begin Harassment of Student Plaintiffs

74. Shortly thereafter, Defendant THOMPSON contacted J. HIESTER's parents, informing them that their son had left school early without permission.  Mr. HIESTER reached his son and instructed him to return to school immediately, which J. HIESTER did., When HIESTER entered the building, he met Defendant Principal THOMPSON who escorted the boy to Dean of Conduct Defendant STAMPS' office so that he could fill out an Incident Report. J. HIESTER admitted that he had been in the Palumbo Prayer Room, but he denied any of the offensive behavior had occurred there.

75. After being released by STAMPS, J. HIESTER encountered A.B. and several of his friends in the first-floor bathroom. A.B. demanded to know why J. HIESTER and his friends "trashed the Prayer Room," and yelled that he and his friends should not have gone in there.  J. HIESTER told A.B. that there had been no trashing of the Palumbo Prayer Room, but still A.B. warned J. HIESTER that the next time he tried that, he—A.B. and friends—would "do something" to stop them. A.B. made it clear he wanted to find J. HIESTER's friends in order to fight them.

76. When J. HIESTER left the building for the day, he saw A.B. and several other students gathered on the southwest corner of 12th and Catharine Streets. Given A.B.'s ominous phone calls and antagonistic questioning, J. HIESTER felt threatened. He feared A.B. and his friends would physically attack him, as A.B. had done in the past.  To remain safe, J. HIESTER

planned out a different route to return home than he normally followed. Upon reaching his home, J. HIESTER stayed inside his house for the rest of the day and night.

### a) Principal THOMPSON Contacts JEAN DANOWITZ, asserting the Unsubstantiated Allegations as if They Were True

77. Defendant Principal THOMPSON called JEAN DANOWITZ at approximately 3:07 p.m. on June 11. After introducing herself, the principal said that her son had snuck into Palumbo that morning. THOMPSON also told her that she had received multiple complaints about her son from girls who were present in what is called the "Quiet Room," which her son and friends had entered. She told JEAN DANOWITZ that the girls claimed her son had loudly announced that he "hates Muslims," had made sexually stimulated or suggestive dances or maneuvers— including "humping the floor"—and proceeded to rip posters off the wall and trash the room. JEAN DANOWITZ told THOMPSON that she would speak to her son about the allegations and get back to her.

78. WHEN M. DANOWITZ returned home at approximately 4:00 p.m., his mother told him Palumbo principal THOMPSON had called her and she repeated to him what THOMPSON had said. Shocked, M. DANOWITZ explained to his mother that everything Defendant THOMPSON claimed had happened in the Palumbo Prayer Room was false.

### D.    JUNE 12, 2024: The Lies and Threats Continue

79. The next day, June 12, 2024, M. DANOWITZ became aware that threatening messages, along with his name, Instagram profile, and the name of his current school, were being shared again and again on social media, along with the names and profiles of his friends J. HIESTER, M. PARMAR, and J2, who were with him in the Palumbo Prayer Room the day before. Those publicly disseminated messages repeated the false and malicious allegations about the student

Plaintiffs' alleged desecrations and conduct in the Palumbo Prayer Room, as justification for the death threats and other physical threats.

80. That same day, the sister of M. DANOWITZ received a message from a former classmate who said she'd heard that her brother had supposedly ripped the head scarf off a Muslim girl and trashed the "Muslim Prayer Room" at Palumbo. See Exh. 6, attached hereto.

81. The threatening and profane social media posts about the Boys escalated throughout the day. Some of them are detailed below. See, *infra*, ¶¶ 88-95.

82. On the morning of June 12, KATHRYN HIESTER and J. HIESTER met with Defendants THOMPSON and STAMPS in a conference room at Palumbo. When J. HIESTER informed the school officials about the threats that were circulating online against him and his friends, the two school officials expressed little interest and even less concern. Instead, they interrogated J. HIESTER about why he entered the Prayer Room and, especially, why he entered during "girls time" and not "boys time." This surprised J. HIESTER who said he was not aware there were sex-segregated hours for entering the Prayer Room: that there was nothing posted outside the room, nor had he ever seen or heard reference to such a restriction, but because the library was not in use and he had been told he couldn't be in there during lunch hour, he had not been able to observe what went on in that room.

83. Also that morning, Defendant THOMPSON called RATNADEEP PARMAR, informing him that a statement from his son was needed about an alleged incident that happened the day before "in the Prayer Room," and that there were "serious accusations" including the harassment of girls.

84. When M. PARMAR arrived at school that day, he was directed to Principal THOMPSON's office and, once there, he was instructed to fill out an Incident Report about what happened

the prior day. Both before and after writing his statement, M. PARMAR tried to tell

THOMPSON about the threats that had been made towards him and the other Boys. Defendant

THOMPSON ignored the threats and instead focused solely on having him fill out the Incident

Report.

85. In the Principal's Statement, Defendant THOMPSON described her interaction with M.
PARMAR this way:

> [M. PARMAR] handed me a sheet that said 'I don't know anything' on every line. I asked
> him why he was giving me this because it didn't say anything. He then started with a bunch
> of doubletalk about how he didn't do anything. I stopped him and told him we were still
> investigating and he'd better hope it's not discovered that he's lying.

See Exh. 5 at pp. 31-32.

86. M. PARMAR insisted that his statement was true. THOMPSON responded by calling him a

liar. When M. PARMAR tried to engage her in discussion, Defendant Principal THOMPSON

abruptly dismissed him by sternly and repeatedly telling him, "Goodbye."

87. STAMPS and THOMPSON both informed the Boys while interrogating them about what

happened in the Prayer Room, that there were cameras in that Room. No footage from any

such camera has ever been produced to the Boys, nor was there any reference to it in the

Investigative Report, See Exh. 5, attached hereto. Either STAMPS's and THOMPSON's

statements were true, in which case the absence of footage in the Investigative Report is

telling, or they were not true, in which case STAMPS and THOMPSON were lying to the

Boys while they were interrogating them.

88. Defendant Principal THOMPSON was indifferent and ignored the threats made against M.

PARMAR and his friends and made clear she believed he was lying about his own conduct

and that of his friends.

23

**E.    Social Media Posts About Events of June 11**

89.    On or about June 12, 2024, an Instagram account titled Palumbo.Positivity which includes the Palumbo school logo, repeatedly provided false and salacious descriptions of what happened in the Palumbo Prayer Room on June 11, see Exh.6, including "grinding on the floor" and "exclaiming that they are openly Zionist and hate Muslims".  Within a day the names of the four Boys were added to the Palumbo.Positivity post, and so anyone who had not already known who they were could then identify them. Many more social media messages encouraged anyone who saw the posts to "keep spreading the story and hold these people accountable." Virtually every post labeled what the boys allegedly did as hate crimes, and some even referred to the "hate crime" in the context of "Palestine's population … being severely attacked by Israeli forces.

90.    On or about June 12, 2024, a student using the Instagram handle "donfrmnorf" sent this message to J. HIESTER: "don't let me catch u w your manz outside Palumbo yall niggas gon die ion play w my religion like that." HIESTER understood this to be a serious physical threat. See Exh. 6.

91.    One social media post listed all the social media accounts of the Boys. See Exh. 6.

92.    A public Instagram post by Palumbo student E.R. with the account name of "ramoswithanr" identified J. HIESTER, M. DANOWITZ, M. PARMAR, and J2 by first and last name, and added: "Only one of these students have [sic] been punished." And the instructions:"FUCK 'EM UP." See Exh. 6.

93.    "Ramoswithanr" also  posted about the "hate crime" at school and feeling "unsafe" because the school had not acted to catch the offending students and when talking about the school and its claims of diversity, "y'all make a total fucking 360 by allowing white privileged kids

who don't even attend…to destroy a sacred place during one of the most brutal genocides in

their own home."  That student urged anyone reading the post to spread the word. See Exh. 6

94. Yet another Instagram post identified the Instagram accounts and full names of the student

Plaintiffs. See Exh. 6, attached hereto.

95. On or about June 12, J. HIESTER'S erstwhile friend A.A., see, supra, ¶¶ 66 sent J. HIESTER

the following threatening message, see Exh.6, attached hereto.

> "You're so cooked
> The whole Palumbo is on your ass
> Even I'm mad too you're not supposed to be in that room
> From what I heard yeah I'm sorry [J. HIESTER] this is kind of fucked what [M.
> DANOWITZ] and [J2] did so I'm sorry, bro I can't have my representation [sic]
> being friends with somebody that did such an incident"

**F.     The Plaintiff Parents' Concerns Increase**

96. Plaintiff parents and their sons, ("the Families") became increasingly concerned by

Defendants' failure to protect their children and they conferred by conference call on the night

of June 12 to discuss the threats that the boys were receiving, as well as possible ways to stop

the false accusations and threats that were spreading on social media far beyond the Palumbo

community.

97. By email sent June 12, 2024, at 9:00 p.m., Plaintiff KATHRYN HIESTER alerted Defendants

THOMPSON and STAMPS about the threatening posts naming the students, a planned

walkout by Palumbo Muslim students in protest of what had allegedly happened in the Prayer

Room the day before, and the alarming fact that actual death threats were being sent. Ms.

HIESTER also wrote that students at other schools in Philadelphia were also talking about the

incident.  KATHRYIN HIESTER asked for reassurance of increased security and that the

administrators review any footage of the library.  See Exh. 7, attached hereto.

### G.    Palumbo Suspends Minor Plaintiffs

100. Despite the various cries for help by Plaintiffs to protect their children, Defendant THOMPSON's response was to callously ignore and even denigrate those concerns. Instead, that same evening just over an hour after having received KATHRYN HIESTER'S alarmed email, Defendant THOMPSON sent an email to Plaintiff Kathryn HIESTER informing her that she had shared "this" information with Defendant GORDON, who then instructed her to "suspend the students for violating the Code of Conduct's rule of unauthorized entry into school property."

101. Defendant THOMPSON revealed her own utter lack of empathy in a statement she wrote during the investigation. She noted that on June 12 at 9:00 p.m. she received an email from Mrs. HIESTER informing her that students were posting threats to students who were implicated in the incident, and that Palumbo students were planning a walkout in support of the Muslim students. "At this time I reached out to A[ssistant] S[uperintendent] GORDON" who "instructed me to suspend the students [the Boys] for unlawful entry into a school building." See Exh. 5 at p. 97.

102. At the time Defendant Assistant Superintendent GORDON instructed Palumbo Defendant THOMPSON to suspend the students, both THOMPSON and GORDON knew or should have known that the allegation on which the suspensions were based had not been investigated; that neither the students being punished nor their parents had been given notice of the allegation; that neither the students nor their parents had been given an opportunity to respond to the allegation; and that the rule the Boys were alleged to have violated did not exist.

103. It was not until later, when Plaintiffs' counsel wrote to a lawyer for SDP, pointing out that there are video cameras in the entry area of Palumbo. Those cameras should show that M.

DANOWITZ not only walked in through the front door of Palumbo on Jule 11, 2024, but that he placed his backpack on the x-ray scanner and passed both security personnel as well as Defendants principal THOMPSON and Dean STAMPS on his way into the building. It was suggested that Defendants ought to check those cameras. When Defendants did so, they concluded that indeed, M. DANOWITZ entered Palumbo on the morning of June 11, 2024, through the main door of the building and passed through security.

104. Although the DISTRICT and Thompson at all times had control of that video revealing that the accusations against Minor Plaintiffs of sneaking in a trespasser to the school were completely fabricated, it still took the school many weeks before the suspensions were finally removed from the students' academic records.[7]

105. Palumbo administrator STAMPS and THOMPSON had interrogated the Boys about why they entered and what happened in the Prayer Room on June 11 but never asked any questions of them about how M. DANOWITZ had obtained access to the building. Their interrogations and the Incident Reports they directed the Boys to complete made clear that the administrators' interest was solely the Boys' presence and conduct in the Prayer Room.

106. The parents of the Boys were aghast that the school's response to their fears was to summarily punish their sons, an act which would only serve to validate the lies and threats being hurled at their boys online and orally. The parents of J2 already had an appointment to meet with Principal THOMPSON on the morning of June 13 to discuss complaints of antisemitism at

---

[7] Apparently frustrated that they could not charge J. HIESTER with having illegally snuck in M. DANOWITZ to Palumbo, SDP on August 16, 2024 informed Plaintiffs' counsel that it was reducing J. HIESTER's punishment to "in-house suspension," based on, it claimed, his "awareness that Mr. DANOWITZ was an unauthorized visitor to the building, having entered at the same time, and for leaving school early without authorization." When Plaintiffs' counsel informed the DISTRICT that such a rule also did not exist in SDP's Code of Conduct, and in any event the DISTRICT could not subject the student to "double jeopardy," this charge was also eventually removed from HIESTER's disciplinary record. See Exh. 8, attached hereto.

Palumbo that they had shared earlier with the principal. The other families decided this was very much the same issue—the safety of their children at Palumbo—so they resolved that all would accompany J2 and his family the next day. They wanted Principal THOMPSON to understand that their boys were in danger and that they expected the school to send out a calming message that no facts had yet been proven and students needed to de-escalate. The Families also decided to file a police report about the cyberbullying and threats. See Exh. 9, attached hereto.

**H.    June 13: Families Seek Safety Assurances from Palumbo, Instead Endure Harassment in the School Building and are Thrown Out of School by Principal**

107. On Thursday morning, June 13, 2024, at approximately 10:30 a.m., the HIESTER Plaintiffs, DANOWITZ Plaintiffs, and PARMAR Plaintiffs and their sons, along with J2 and his family, met at Palumbo.

108. Defendant THOMPSON appeared in the Palumbo lobby and immediately asserted that she would only meet with J2 and his parents, who had a previously scheduled appointment. She told the other families that they had to leave the school building immediately. THOMPSON said that if the Plaintiff parents wanted to speak with her, they had to make an appointment for a different day—this, although the school year ended the following day—and she would only meet with them in the presence of Defendant Assistant Superintendent GORDON.

109. JEAN DANOWITZ told Defendant THOMPSON that it was essential that the parents meet with her that day to deal with the increasing number of threats the Boys were receiving on social media.

110. Defendant THOMPSON responded to DANOWITZ's urgent plea for a meeting about the boys' safety by laughing out loud, tilting her head to the side, and stating "Well, there's

*multiple* sides to that story." THOMPSON refused to meet with the HIESTER Plaintiffs, PARMAR Plaintiffs, or DANOWITZ Plaintiffs, and had called for school security and the police to remove them from the building. RATNADEEP PARMAR asked principal Thompson when they could expect to hear back from her or her office to discuss the urgent security concerns, she told him, "Within two days." That did not happen. These Plaintiffs never heard anything from Defendant THOMPSON about their urgent, documented, security concerns.

111. Defendant THOMPSON wrote in her Principal's Statement that although she had a meeting scheduled with [J2's] family," the Families of the other boys also "showed up and tried to ambush me into meeting with all of them at one time." See Exh. 5 at p. 103.

112. When the HIESTER Plaintiffs, PARMAR Plaintiffs, and DANOWITZ Plaintiffs exited the building, they were immediately approached by three Philadelphia police officers and Thomas Terry, the SDP Area Manager of the Office of School Safety. These security officials told Plaintiffs that the school had called them in earlier that morning to file a police report against them. *See* Exhibit 2. The Families explained about the death threats and hostility unleashed by a fabrication of what happened in a Prayer Room in the high school. SDP security officer Terry recommended that Plaintiffs go to SDP's main office building at 440 North Broad Street, Philadelphia, PA 19130 to file a report against the school and Principal THOMPSON.

I.    **Families File Statements with and Show Exculpatory Videos to SDP Employees at SDP Central Building**

113. The Families and that of J2, then proceeded on June 13, 2024 to the central SDP building where they met with SDP employees Victim Assistance Specialists Gina    and Victoria Trower, to whom they each gave a detailed description of everything that had occurred in the previous two days at Palumbo. The Plaintiffs all wrote Statements for Crayton and Trower to submit to the Superintendent of SDP.  See Exhibit 10, attached hereto.

114. The video of the June 11 Prayer Room Incident made by J2 was shown to Crayton and Trower that same day by the parent of J2. Crayton and Trower told the Families that an investigator would contact Plaintiffs the following morning.

115. SDP employee Gina Crayton spoke with Defendant THOMPSON on June 13. Crayton told THOMPSON that the Families had shown her J2's video of the Boys in the Prayer Room on June 11. THOMPSON responded to Crayton, "I told her I had never gotten any photos or videos and that M. PARMAR's statement only said "I don't know what happened."  See Exh.5 at p.43.

116.  THOMPSON never mentioned that an SDP employee had seen the exculpatory video, nor, apparently, did THOMPSON make an effort to see the video.

117. The false accusations against Minor Plaintiffs continued and none of the SDP leadership or any of its agents took a single step to address in any way the threats against the Boys or express concern for their safety. Defendant THOMPSON immediately and without any credible basis sided with those accusing Minor Plaintiff of various hostile acts, referring to the girls as "the victims" and making it clear she did not believe the Boys and that she did not care about the threats made against them.

118. Defendant SDP and its officers, staff, and employees did nothing to address or prevent this harassment and, indeed, as more fully addressed below, they participated in and encouraged it.

119. On June 14, 2024, Plaintiff JEAN DANOWITZ sent a letter to every member of the Philadelphia Board of Education, the Superintendent of Schools, and Palumbo Principal KIANA THOMPSON, detailing the events of the previous days and imploring them to take action to protect her son and the other Boys. See Exh. 11. Not one Philadelphia school official responded to that letter.

**J.    Parents' Anxiety Increases as Threats Increase**

120. Despite the escalating threatening and defamatory posts and comments on the "Palumbo. Positivity" and other social media accounts, and despite the repeated pleas of the Boys' parents, nobody at Palumbo, including Dean of Conduct Defendant STAMPS, acted to shut down the posts or identify the individuals posting these threatening, false, and defamatory accusations. Defendant STAMPS claimed the Palumbo.Positivity account is not an official Palumbo account and therefore she was unable to find out who is running it or how to influence that person to stop it.

121. In contradiction of her claim, Defendant STAMPS had previously demonstrated her ability to take aggressive action to shut down social media posts she deemed offensive.[8]

---

[8] Specifically, Palumbo had a school store that sold candy and other treats to students. When Instagram accounts using Palumbo in their names began surfacing during the 2023-24 school year that featured confessions of crushes images of students asleep in class, defendant Stamps had no difficulty in suppressing. She insisted that every account owner take down their account and confess to being the owner, chased down the owners of some accounts, meted out in-school suspensions for some account owners, and closed the school store as punishment.

**K.      SDP Teachers Whip up Escalating Hatred Towards the Student Plaintiffs**

122. On the evening of June 13, 2024, two days after the alleged incident in the Palumbo Prayer Room, one day after the Minor Plaintiffs were suspended, and weeks before any investigation by Defendant SDP or its agents had begun, Defendant SDP teacher KRISTIN LUEBBERT rose from her chair during the public comments section of the Philadelphia School Board meeting, and characterized with salacious and malicious theatricality, what she claimed had occurred on June 11, 2024 in the Palumbo Muslim Prayer Room as "an appalling display of sacrilegious defilement."  LUEBBERT intoned:

> Please prepare yourselves, the incident I am about to relate to you shocks the conscience and human decency in all of us:
>
> A couple of days ago, at a South Philadelphia magnet school, several male students admitted a non-student into the building.  The trespasser is a student at St. Joseph's Prep School. These students then went to a room designated as a prayer space in which several Muslim girls were gathered.  The intruders–yelling that they were "proud Zionists"-- proceeded to invade the space, rip things off the wall, throw prayer rugs around–and–in an appalling display of sacrilegious defilement, proceeded to grind and writhe on the floor in an imitation of sex acts.
>
> **Take that in**: this was a planned action that included acts which any Muslim girl or woman would be deeply offended and traumatized by.  I have to believe that these students– immature and lacking in judgment as they may be–were emboldened partly by the fact that this district and this board has not firmly spoken against hate crimes in our schools. [9]

123. Luebbert claimed the Boys had been emboldened by a failure of SDP to punish what she described as a FERPA (Family Educational Rights and Privacy Act) violation which she

---

[9] These public comments remain online at https://www.philasd.org/schoolboard/meetings/#1669753672675-05a90190-0605, beginning at approximately 2:03:09. In addition to LUEBBERT publicly repeating and characterizing in the most heinous light what she knew were uninvestigated rumors, Defendant LUEBBERT chose to post online a written                version                of                her                testimony                at https://docs.google.com/document/d/12ZJFZGt2AFG2XpuEXfjPMcIdMbK86zjvtisdQ0eLh9g/edit.

claimed had taken place at Northeast High School. The incident she described had not yet been investigated and ultimately was determined not to constitute a FERPA violation.

124. Also on June 13, more malicious and false statements were posted on the Palumbo.Positivity Instagram account in response to the post informing everyone about the alleged desecration of the Palumbo Prayer Room. The June 13 post expresses anger over the purported failure of the Palumbo staff to deal with the "hate crime," and suggests that readers write to the principal saying that they "feel unprotected, unsupported and uncared for as a Palumbo student."

125. Defendant LUEBBERT commented on the Instagram post on which the names of the Boys are provided. See, Exh. 6 at p. 26. LUEBBERT did this, although she had to know that posting uninvestigated rumors and the names of students being accused of committing wildly inappropriate and offensive conduct was wholly inappropriate and unprofessional for a school teacher. Luebbert made no investigation of the facts to determine whether the circulating rumors were true, nor did she reach out to confirm the results of anyone else's investigation, because if she had, she would have known there had not yet been an investigation. LUEBBERT seized on the rumors and fanned the flame to ensure they reached the largest possible audience, with no concern for the harm it would do to the reputation or physical health of the students.

126. That evening, at 6:07 p.m., Defendant SDP teacher RIDGEWAY promoted LUEBBERT's claims in the following Instagram message, see Exh. 12, attached hereto:

> Powerful Testimony from @teacherinphilly regarding a deeply disgusting act towards Muslim girls at a Magnet school in South Philly. This has occurred as a result of the @PHLschoolboard @PHLschools lack of response/stance on the FERPA violations and Islamophobia permeating schools.[10]

---

[10] The incident to which RIDGEWAY was referring resolved in a finding that there had been no FERPA violation, and no attendant Islamophobia.

127.Also on this day, UncommittedPA, reposted a message defendant teacher LUEBBERT posted using her @teacherinphilly handle: "@teacherinphilly shared that a prayer space for Muslim children was desecrated by self-proclaimed male 'Zionists' at a #phlEd school." Defendant RIDGEWAY reposted, republished, and further disseminated this false accusation on her then-current social media account "teachkizzyteach." See Exh. 13, attached hereto.

128.On June 14, 2024, at 11:11 a.m., Plaintiff HIESTER emailed Defendant GORDON, Gina Crayton, and Victoria Trower following up on her previous request, informing them that she had not yet been contacted by an investigator despite Crayton and Trower's assurances, and asking what the SDP was doing about the social media posts threatening and maligning the Boys. See Exh. 14, attached hereto.

**L.    Safety Transfer Request Ignored**

129.On June 19, 2024, Plaintiff KATHRYN HIESTER sent an email, see Exh. 15, to Victoria Trower requesting her child be transferred to another school for safety reasons following the ongoing threats and lies.  Plaintiff HIESTER pointed out that the threats her son had received from fellow Palumbo students, left him feeling "ostracized, alienated and …. unsafe."  She also noted the wide reach of the social media posts such that even teachers from other schools and "random adults" had repeated the malicious and false claims on social media.  She referred to the assault by A.B. and his continuing threats.  and noted that since first contacting her on June 13, 2024, she had not yet heard from investigators as promised.  Plaintiff HIESTER expressed her "urgent" concern for the physical and mental well-being of her son, as well as his academic achievements.  She pointed out the dismissive and inexcusable treatment she received from THOMPSON and STAMPS when alerting them to the threats and that their

inappropriate response was to suspend to her son.

130. Defendant SDP ignored KATHRYN HIESTER's request for a safety transfer. She never received any response.

## M.    Another Parent Weighs in

131. On June 24, 2024, at 3:16 p.m., Plaintiff CATHERINE PARMAR emailed Gina Crayton, expressing her grave dissatisfaction with the school's handling of the incident. In the email she reiterated much of what Plaintiff HIESTER had said in her June 19 email to Victoria Trower. She also addressed the fact that when her son gave his Incident Report saying nothing had happened in the Prayer Room, THOMPSON did not believe him, and ignored the threats against him, one of which was a text that he showed to her saying he "was going to get jumped." Plaintiff PARMAR went on to detail what she described as disrespectful comments made by THOMPSON when the Families went to see her, as well as the public comments falsely tarring the Boys with claims, they committed a hate crime which were shared by teacher Defendants RIDGEWAY, LUEBBERT and others. Like Plaintiff KATHRYN HIESTER, CATHERINE PARMAR expressed concern for her son's safety and his health. See Exh. 16, attached hereto. Plaintiff CATHERINE PARMAR received no response to her letter.

132. Not until June 26, 2024, did anyone from the DISTRICT follow up with the parents of any of the boys involved in the June 11 incident. On that date, Steven Jefferson, an investigator with SDP's Office of School Safety Investigations Unit, reached out to the parents of the Minor Plaintiffs. But as more fully alleged below, neither Jefferson nor any other SDP agent ever actually engaged in a competent, thorough investigation.

**N.    SDP's Sham Investigations and Disciplinary Procedures Ignored Minor Plaintiffs'
Due Process Rights**

133. On or about June 13, 2024, Defendant principal THOMPSON made a complaint to the Office

of School Safety ("OSS") regarding a possible hate crime occurring at Palumbo two days

earlier. The matter was assigned to Steven Jefferson of SDP's OSS Investigation Unit.  As

further detailed below, this investigation was a sham, was based on a complete lack of reliable

or credible evidence and ignored the exculpatory evidence that was knowable and within the

control of SDP.  Jefferson wrote an Investigator's Report which is unsigned and undated. See

Exh. 5, at p 13.

134. In his "Summary of Complaint," Jefferson wrote that on June 11, 2024, there was a

disturbance at Palumbo when "[A]t approximately 9:35 am five (5) Jewish male students

entered the Quiet Room/Prayer Room that were occupied by two (2) female Muslim's (sic)

students."  He then went on to note that these "Jewish" male students allegedly laughed at the

females, took pictures of them without their hijabs on, made obscene gestures, tore posters

from the walls and spoke Hebrew.  See Exh. 5 at p 6.

135. Either defendant THOMPSON misinformed Jefferson or Jefferson reached his own inaccurate

conclusions regarding the complaint made by THOMPSON.  Even the most basic details are

wrong, From the many inconsistent statements obtained by DEFENDANT STAMPS, it is

almost impossible to discern how many males entered the Quiet Room/Prayer Room that

morning.  Further, Defendants THOMPSON and STAMPS knew or should have known that

not all the Boys were Jewish.  These false characterizations are further evidence of the bias of

Defendants THOMPSON, STAMPS and the SDP.

136. As part of his investigation, Jefferson reviewed and summarized the Incident Reports of

approximately 11 Palumbo students which were written on June 11, regarding the alleged Prayer Room incident that had occurred earlier that morning. Of these statements, eight (8) were pure hearsay, that is to say that these students were not in the Prayer Room at the time such incident was alleged to take place. Two (2) of the statements were from the two girls (F.M. and A.V.) in the room for the duration, and one (1) was from a girl (N.M.) who was only in the Prayer Room part of the time. Much of what N.M. wrote was based on what the other two girls had told her had occurred. It appears there was a third girl in the room. N.L., but no statement by her was contained in the Investigator's Report nor was any such statement produced to the Plaintiffs in response to their request for the Investigative Materials.

137. As for N.M., who was in the Prayer Room for part of the time at issue, and in her written statement taken on June 11, 2024, she said she entered the room "after recording and hate rooted words they said to the other students." She claimed she saw the boys laughing and one of them removed a "praying/muslim poster" from the wall. She went on to say that her friends told her what had happened, including "inappropriate grinding on the floor" and laughing at the Palestinian flag. N.M. characterized the incident as a "hate crime/rooted pro-israel and passive aggressiveness." In her account of what happened which was provided on the day of the alleged incident, this "witness" personally only observed what she claims was laughter by the Boys, one of whom removed a poster from the wall. The other details she provided was what she was told by others.

138. These statements by individuals who did not witness what occurred while the Boys were in the Palumbo Prayer Room on June 11, 2024, should never have been gathered, they should not have been considered by Jefferson, nor should any of the Defendants have given any credence to those statements when considering a complaint against the Minor Plaintiffs. And

yet those statements were improperly considered and relied upon by SDP, Jefferson and Defendant THOMPSON in reaching their conclusions. They all ignored the denials by the Minor Plaintiffs.

139. Despite all the allegations of obscenity, desecration of Islamic prayers and symbols, the two girls who were in the Prayer Room on that morning never mentioned any such behavior in their statements made the day of the alleged incident. In his report, Jefferson even fails to note that A.V. had stated that she wasn't wearing her hijab when the boys entered the Prayer Room and that she herself had put it back on and couldn't really see anything.

140. Jefferson summarized the statement of Plaintiff J. HIESTER, but his summary does not mention J. HIESTER's denials of the allegations as he had written in his statement on June 11, 2024. See Exh. 5 at O, p. 11. Jefferson only mentions J. HIESTER's unexcused early absence from school.

141. Jefferson deemed it important to point out that, based on Defendant THOMPSON's statement, which is attached to his Report, M. PARMAR. had written "I don't know on every line." Although THOMPSON and therefore Jefferson ascribed a nefarious motive for M. PARMAR writing that in his "Incident Report," but M. PARMAR did not believe anything untoward had occurred, because it hadn't, and there was no evidence to the contrary. Therefore, his answers were perfectly reasonable and not meant to mislead or obfuscate as the Investigator's Report implies.

142. Jefferson—who never interviewed any of the Minor Plaintiffs—wrote in his Report that each "Subject/Target" had provided statements previously, but Jefferson failed to include any exculpatory information from those statements.

143. None of the Plaintiff parents were ever interviewed by SDP Investigator Jefferson. Although

Mr. Jefferson did initially contact the parents, they informed him that they were represented by the law firm The Deborah Project and told him he should make any arrangements by speaking directly with them.  Plaintiffs' lawyer responded to Jefferson and explained she would be willing to connect him with her clients if he would first explain what was being investigated. Plaintiffs' lawyer never heard back from Jefferson.

144. The Investigator's Report is heavily redacted, unsigned, undated, and the sections entitled "ANALYSIS" and "Conclusion" are blank.  See Exh. 5 at p.13. On the last page of the Investigator's Report, under "ACTION TAKEN," Jefferson lists an incident control number and states he interviewed Defendant THOMPSON, contacted witnesses by certified mail for an interview with "negative results, contacted suspects/targets by email and certified mail, and had photographs taken of quiet room/prayer room."

145. On September 6, 2024, Defendant THOMPSON filled out two forms, one each informing their parents that the SDP investigation found that J. HIESTER and M. PARMAR committed harassment on June 11, 2024. Those determinations were forwarded to the Families' counsel on August 29, 2024.  See  Exh. 19, attached hereto.

146. No Investigative Materials were turned over to Plaintiffs or their counsel prior to the Boys being found guilty of harassment. It was only after the verdict was rendered that the Plaintiffs finally received heavily but haphazardly redacted "Investigative" Materials, including the Investigator's Report and HIBster Report described *infra* at ¶ 152.

147. The Boys were denied not only the right to face their accusers, or to challenge the accusers' evidence, they were not even told what the charges were against them and who had made them. Plaintiffs had no opportunity to present their case or to testify on their own behalf, let alone to cross-examine any witnesses against them; and they had no chance to call others to

testify for them, or the opportunity to compel production of witnesses and evidence favorable to them, including the full video taken by J2 which is not in Plaintiffs' possession.

148. The Investigator's Report contained no findings of fact about any specific act by any named person. As previously mentioned, the sections labeled "ANALYSIS" and "Conclusion" (p. 12) are ***blank***. There are no findings identifying exactly what acts the Plaintiffs committed which allegedly constituted harassment except in the HIBster Report, where the word "Islam" appears in the "Founded" determination for J. HIESTER and for M. PARMAR. See Exhibit 5, at pp. 93-94.

149. It was not even clear who made the determination of harassment. Defendant Principal THOMPSON's letter dated August 29 stated that the "investigator has determined that your child engaged in misconduct," specifically, harassment, but the document was unsigned. See Exhibit 5 at p 13.

150. Despite the claim to the contrary in the unsigned investigator's report, neither J. HIESTER nor M. PARMAR were contacted by the investigator. Neither they nor their parents received a certified mailing or notice of a certified mailing, or any such communication by regular mail. Before the determination was made against them, they were not informed of the claims against them nor were they asked to respond to them. The pursuit and intimidation of J. HIESTER and M. PARMAR simply to fill out an "Incident Report," on or around June 11, 2024, did not constitute notice of the charges against them and in fact provided them with no information about what "incident" they were expected to report.

151. As detailed above, although the parents of the HIESTER and PARMAR Minor Plaintiffs received an initial contact from investigator Jefferson, that contact merely informed them of an interview that was to take place. The parents then immediately informed investigator

Jefferson that they were represented by counsel. Once counsel contacted the investigator to obtain details regarding the investigation, Jefferson ended that effort and ceased all communication with Plaintiffs or their counsel. See, supra, at ¶ 144.

152. The photographs Investigator Jefferson claimed to have taken of the Prayer Room[11], were never provided to M. PARMAR or J. HIESTER or their families, nor do they appear in his Report. Exh. 5, at p.12, #3(F)).

153. The belatedly produced Investigative Report materials also failed to include any information from or interview of Victim Assistance Specialists Gina Crayton or Victoria Trower, SDP employees to whom Plaintiffs had submitted statements and who had watched SDP's video of the entry of M. DANOWITZ into Palumbo through the main door of the school on June 11, 2024 and his passage through security there, as well as the video of the events inside the Prayer Room that same morning, while the Boys were in the room. Defendants knew that SDP employees Crayton and Trower had seen the two exculpatory videos. Yet SDP and the other Defendants initially acted to punish the boys as if the school entry video did not exist and further claimed they had never seen the video of the Prayer Room and did not know what was on it. The punishment imposed on the Boys on June 12, validated and stimulated the rumors circulating about the Boys' conduct. Crayton and Trower assured the Plaintiffs that their statements would be forwarded to the DISTRICT, thus Investigator Jefferson knew or should have known the two SDP employees had interacted with the Plaintiffs. The Investigator, however, either failed to speak with Crayton and Trower or failed to produce his notes/report

---

[11] Investigator Jefferson did not begin his task until several weeks after June 11, 2024, so that any photographs taken other than immediately as the Boys left the Prayer Room would fail as evidentiary proof of anything that had occurred.

of those conversations. THOMPSON revealed that she knew Crayton had seen the video, but even that did not motivate her to investigate. See, *supra*, at ¶ 115.

154. Defendants' bias against the Plaintiffs is clearly revealed by the fact that, without any examination of evidence readily available to Defendants SDP, THOMPSON, STAMPS, GORDON, and WATLINGTON, Plaintiffs J. HIESTER and M. PARMAR (and J2) were falsely accused of sneaking Plaintiff M. DANOWITZ into the Palumbo building.  This accusation was apparently made simply and only because Defendants wanted to find some wrongdoing to pin on the Plaintiffs because, as non-Muslims, they had the temerity to enter a Muslim-only space in the Palumbo taxpayer-funded public school, and to do so during what was deemed to be a "girls only" period.

155. SDP Investigator Jefferson did not seek to obtain the video taken during the June 11 alleged Palumbo Prayer Room incident or even attempt to speak with the SPD employees who had seen the video, despite the fact he knew or had reason to know of its existence.

**O.      HIBSTER Report Written by Muslim Student Association Advisor**

156. In addition to the alleged investigation by Mr. Jefferson, on August 29, 2024, a Report was issued by the SDP entitled the "HIBster Report."  ("HIB" is an acronym for Harassment, Intimidation and Bullying.)  This report was completed by Jade Tuff, a teacher at Palumbo and the faculty advisor to the Academy at Palumbo Muslim Student Association, an organization to which Palumbo administrators had granted authority over the Muslim Prayer Room, and which would not be neutral regarding non-Muslim students entering the Prayer Room. Tuff was not present in the Prayer Room when the Boys were there and had no personal knowledge of what occurred, and she made no effort to contact the Boys or their families to find out their view of what had occurred there.

157. The HIBster Report which was also provided to the Plaintiffs only after the Harassment determinations were made against them, and even then, in a heavily but sloppily redacted form, contains no evidence to indicate that Tuff contacted or spoke with any of the Boys, and in fact she did not. The report also contains "Additional Information", but it is entirely unclear who provided, wrote or read this information. This Report contained all the wild and inconsistent statements of students, most of whom were not present during the alleged incident in the Muslim Prayer Room on June 11, 2024. The only information it contains from the Boys' perspective is the acknowledgement that J. HIESTER had denied the "behaviors." Tuff, who submitted the Report, witnessed none of the events which it purports to describe.

158. The HIBster Report neglects to even mention the video of the Prayer Room taken on June 11, 2024, even though SDP and its agents, including Jade Tuff, knew or should have known of its existence and that it had been viewed by SDP personnel.

159. The HIBster Report was closed on August 29, 2024. Apparently after taking the so-called witness statements at face value and ignoring or failing to obtain all of the exculpatory evidence, the Conclusion reached by SDP, through Tuff, was that "[b]ullying was Unfounded, Harrassment Founded" as to J. HIESTER and M. PARMAR. See Exh. 5, at p.108.

160. In the "Principal's Summary," produced to Plaintiffs as part of the Investigator's Report, as well as the HIBster Report, Defendant THOMPSON wrote that the Palumbo Prayer Room events had to be viewed in the "context" of the claims of antisemitism submitted by J2's family and her rejection of those claims, which THOMPSON described as what "motivated" the bad acts allegedly engaged in by J2, M. DANOWITZ, J. HIESTER and M. PARMAR. See Exh. 5, at pp.35, 96.

161. Defendant SDP'S findings and so-called Investigative materials also failed to acknowledge

the true significance of the following:

    a.    The statements of two of the "witnesses," F.M. and N.M. :

        i.    F.M. concluded her statement this way: "I'm still shocked as a Muslim hearing others say 'I'm a proud Zionist' shows a lot [sic] so I was frozen majority of the time." (F.M. statement, 4. Student Statements, p.18).

        ii.    N.M. interpreted the mere expression of pro-Zionist sentiment as a "hate crime." (N.M. statement, 4. Student Statements, p.13 ("Hate crime/rooted pro-Israel")).

    b.    Student F.M. understood the Palumbo Prayer Room to be off-limits to boys. (F.M.'s statement, 4. Student Statements, p.17 (She was "in the prayer room with my face cover off" and it was "shocking seeing boys here")).

    c.    Jade Tuff, the person who prepared the HIBster Report for the alleged incident (GenerateReport.aspx), was the advisor to Palumbo's Muslim Student Association, which group has played an active role in ensuring that the Palumbo Prayer Room be maintained for the exclusive use of Muslim students. For example, as noted above, on October 10, 2023, just three days after Hamas' rampage into Israel that resulted in the murder of 1200 people and the rape and dismemberment of countless others, and the kidnapping of 250 people, AAPMSA posted a picture on its Instagram account proudly displaying the Prayer Room with a large Palestinian flag on the door.

**P.    Palumbo Issues Public Letter re June 11 on August 19**

162. On August 19, 2024—more than two months after the alleged incident in the Palumbo Prayer Room—Defendants SDP and THOMPSON finally sent out a communication to all Palumbo students and parents/guardians. That letter, however, rather than quelling the storm and attempting to either set out the facts or inform the community that an investigation was continuing and that it was imperative no one act on rumors, essentially provided a license for the wild speculation and threats to continue. The letter stated that *allegations of harassment and discrimination had been made at the end of the prior school year, asserting that "this type of discriminatory behavior is unacceptable by students and staff," claiming that the*

*school maintained a "zero tolerance policy for harassment or hate speech of any kind,"* (emphasis added), and cautioning them that "rumors spread on social media have exacerbated claims beyond the allegations that were reported" and "substantially disrupt[ed] our school climate." See Exh. 18, attached hereto.

163. By referring to "this type of discriminatory behavior," the letter could reasonably be and was in fact understood by the public to mean that the allegations that the Boys had harassed Muslim girls in the Palumbo Prayer Room and had trashed the room were true.

**Q.    To Protect their Sons, the PARMAR and HIESTER Families were Forced to Flee the District**

164. As a result of the Defendants' inexcusable conduct and continuous failures to act, it became untenable for Plaintiffs J. HIESTER and M. PARMAR to continue their high school education at Palumbo. As the parents of those boys made clear to the agents of Defendant SDP, they were in dire fear for their children's safety at Palumbo. KATHRYN HIESTER had sought a safety transfer for her son to which no one at SDP even had the courtesy to respond.

165. The parents of both J. HIESTER and M. PARMAR were left with no choice but to flee Philadelphia and its school district and instead move into another school district in order to enroll their children in schools there.

**R.    SDP Issues Determination Letters**

166. On September 6, 2024, SDP General Senior Counsel forwarded Defendant THOMPSON's letters of August 29, 2024, see Exh.19 to the HIESTER and PARMAR families, with the determination that their sons had committed harassment.

167. On September 24, Plaintiffs responded to SDP's determination that their complaints of harassment and bullying were unfounded. See Exh. 20, attached hereto.

168. Plaintiffs J. HIESTER and M. PARMAR appealed the harassment findings against them and the finding of nothing actionable in their own complaints on October 9, 2024. See Exh. 21. Defendants never responded to Plaintiffs' Appeals.

## COUNT I

### Violations of the Establishment and Free Exercise Clauses
### Under 42 U.S.C. § 1983
### (All Plaintiffs As to Establishment Clause, and JEAN DANOWITZ , as guardian for M. DANOWITZ as to Free Exercise Clause Against Defendants SDP, GORDON, THOMPSON, AND STAMPS)

169. Plaintiffs incorporate the allegations in paragraphs 1-168 as if fully set forth herein.

170. Defendant SDP, which operates Academy at Palumbo, is a public school district and required to be nonsectarian. SDP's officers and employees are likewise legally obligated to operate SDP schools in a nonsectarian manner.

171. Instead of operating SDP schools in a nonsectarian manner, Defendants maintained a policy within Palumbo of promoting a particular religion—Islam—and to denigrate the Jewish religion by taking the following actions:

    a. Establishing what is effectively a mosque on school property into which non-Muslims are forbidden, by SDP policy, to set foot. Specifically:

        i. The so-called "Prayer Room" is used and is permitted by Palumbo to be used exclusively by Muslims, and is decorated and furnished exclusively for Muslims in a way that reveals and is intended to reveal to non-Muslims that they are not welcome to pray in or otherwise use the space for any purpose other than as a Muslim prayer space.

        ii. When non-Muslims attempted to visit the space and use it for Jewish prayer or for simply speaking Hebrew, they were hounded and harassed by Muslim students, accused of "sacrilegious defilement" and of desecration by teachers Luebbert and Ridgeway, and punished by the school district acting through its Assistant Superintendent GORDON and Principal THOMPSON and Dean STAMPS.

    b. Acting on complaints that the "Prayer Room" had sex-segregated hours, which

segregation was motivated to satisfy a particular Muslim world view and would have (if it existed) impermissibly entangled the School District of Philadelphia with religion.

c. Conducting teacher-promoted mass Ramadan prayers during school hours and during class time, for which excused absences were provided.

172. In discussing June 11 events with police, Defendant THOMPSON admitted to police that the Prayer Room is "designated for particular religion and having a certain flag outside room." See Exh. 2, attached hereto.

173. The policy of using publicly funded resources, specifically the existence and restricted access to the "Prayer Room," and of using school time to promote the Muslim religion, violate the Establishment Clause of the First Amendment to the U.S. Constitution because they have the primary purpose and effect of advancing religion; result in indoctrination of religious belief; constitute an impermissible endorsement or appearance of endorsement or favoritism toward a religion; excessively entangle the affairs of government and religion; constitute a preference given by law to a religious establishment or mode of worship; and authorize the expenditure of public money for the support of a space devoted to the exclusive use of one religion in which the distinctive doctrines, creeds or tenets of a religious sect are promulgated.

174. Upon information and belief, Defendants SDP, GORDON, and THOMPSON were personally involved in the certification and disbursement of taxpayer funds for the Prayer Room despite its unconstitutional promotion and endorsement of religion, as well as expended taxpayer funds to enforce the ban on those of any but the preferred religion.

175. Defendants treated Plaintiff M. DANOWITZ'S religious exercises, including expressing support for Israel, less favorably than Muslim religious exercise or comparable secular activities.

176. Defendants targeted Plaintiff M. DANOWITZ's Jewish religious beliefs and practices for special disfavor in violation of the Free Exercise Clause.

177. Defendants' efforts to sanction non-Muslims who had the temerity to visit the school's Prayer Room and to recite therein a Jewish prayer, creating a chilling effect against anyone who might question the elevated status given to Islam by Defendants.

178. Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs demand judgment that:

a. The operation of the so-called "Prayer Room" or "Quiet Room" by the Defendants,
b. The conduct of mass prayers on school grounds during Ramadan, and teacher promotion of same, and

c. The Defendants' efforts to sanction J. HIESTER and M. PARMAR for their actions on June 11, 2024

all violate the Establishment Clause of the First Amendment to the Constitution of the United States, and Defendants' efforts to sanction Plaintiffs violate the Free Exercise Clause of the First Amendment to the Constitution of the United States; and Plaintiffs further demand that the court issue preliminary and permanent injunctive relief prohibiting Defendants' treatment of Plaintiffs and all other students similarly situated in violation of Plaintiffs' Constitutional rights.

## <u>COUNT II</u>

### Violation of the Liberty Interest in Reputation
### Under 42 U.S.C. §1983, and the Due Process Clause
### of the Fourteenth Amendment
### (HIESTER PLAINTIFFS and PARMAR PLAINTIFFS Against all Defendants)

179. Plaintiffs incorporate the allegations in paragraphs 1-178 as if fully set forth herein.

180. Each Minor Plaintiff has a clearly established liberty interest in his reputation protected by the Due Process clause of the Fourteenth Amendment to the United States Constitution.

Deprivation of that interest may not be caused by a person acting under color of state law unless due process is accorded.

181. The following actions of all Defendants, each of whom was personally involved and acting under the color of state law at the time of the actions set forth in the Complaint, and each of which was entirely voluntary on his or her part, damaged the reputation of each of the Minor Plaintiffs in that they falsely accused each of the Minor Plaintiffs of grievous wrongdoing. As a result of the public dissemination of each of these false accusations, each Minor Plaintiff's reputation was so gravely damaged that they were no longer able to safely attend Palumbo.

182. Those actions included

    a.  falsely accusing minor Plaintiffs J. HIESTER and M. PARMAR of sneaking M. DANOWITZ into the Palumbo school building on the morning of June 11, 2024, through a locked back door. This accusation was false, and in truth minor Plaintiff M. DANOWITZ came in the front door of the school. No minor Plaintiff was involved in sneaking anyone into the school or of being snuck into the school.

    b.  Falsely accusing each minor Plaintiff of

        i.  harassing female Muslim students in the Palumbo Muslim Prayer Room

        ii.  physically assaulting female Muslim students;

        iii.  conducting themselves as if they were justified in insulting the religion of their fellow students;

        iv.  trashing the Palumbo Muslim Prayer Room;

        v.  "sexually grinding on the floor" of Muslim prayer rugs in Palumbo's Muslim Prayer Room;

        vi.  Violating a rule requiring sex segregation of the Muslim Prayer Room, by being present in the room when they were male and, at the time period when Minor Plaintiffs entered the room, the room was reserved for females.

183. These accusations were publicly made, and publicly substantiated by each individual Defendant, even though each such individual Defendant either knew or should have known that these accusations were false.

184. The dissemination of these false statements directly caused many Palumbo students, and students at other schools, to believe that each minor Plaintiff trashed the school's Muslim Prayer Room, and sexually and otherwise harassed female Muslim students within that room.

185. Because they believed these false accusations, numerous persons threatened the lives and physical well-being of each minor Plaintiff.

186. Defendants THOMPSON, GORDON, and STAMPS had actual knowledge of these threats and did nothing to effectively address them or to protect the Minor Plaintiffs from these threatened attacks.

187. Defendants RIDGEWAY and LUEBBERT used their status as SDP teachers to bolster the perceived veracity of the accusations each of them made against the Boys.

188. Minor Plaintiff J. HIESTER requested a safety transfer to another Philadelphia Public School District high school, but this request was ignored.

189. As a result of these injuries to their reputation, each minor Plaintiff was unable to continue to attend Palumbo without exposing himself to death or serious bodily injury. Each minor Plaintiff and his family were thereby forced to leave the Philadelphia School District and Palumbo and attend school elsewhere.

190. For the foregoing reasons, minor Plaintiffs J. HIESTER and M. PARMAR and their families were forced to expend tens of thousands of dollars to move out of the Philadelphia School

District so that minor Plaintiffs J. HIESTER and M. PARMAR could safely attend public school in another school district.

191. Minor Plaintiffs J. HIESTER and M. PARMAR were forced to change high schools just before entering Eleventh Grade, thereby suffering a disruption of this crucial year in each minor Plaintiff's path toward college.

192. Pennsylvania law confers upon every school age child the categorical right "to attend the public schools of the child's district of residence." 22 Pa Code §11.11.

193. In addition, each minor Plaintiff and his parents has a right protected by the United States Constitution to choose where in the United States to live. *Shapiro v. Thompson,* 394 U.S. 618 (1969).

194. The actions of each individual Defendant not only damaged Minor Plaintiffs J. HIESTER and M. PARMAR's liberty interest in reputation but also breached his right to attend the public schools of the child's district of residence, and all Plaintiffs' rights to choose for themselves where in the United States to reside.

195. Plaintiffs have no adequate remedy at law to correct the Liberty interest in their reputation.

WHEREFORE, Plaintiffs demand judgment that Defendants be ordered

a. to pay HIESTER and PARMAR Plaintiffs the expenses they were forced to incur to move to another school district in order to have their sons be safely educated; and
b. to issue a written public statement retracting the finding of harassment against J. HIESTER and M. PARMAR.

51

## COUNT III

**Violation of Title VI of the Civil Rights Act of 1964
42 U.S.C. § 2000d et seq.
(Plaintiffs J. HIESTER and M. PARMAR Against Defendants SDP, GORDON, and
THOMPSON)**

196. Plaintiffs incorporate the allegations in paragraphs 1-195 as if fully set forth herein.

197. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

198. Defendant SCHOOL DISTRICT OF PHILADELPHIA receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

199. Discrimination against Jews—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI. *Cf. Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616 (1987) (discrimination against Jews is discrimination based on race); *see also* 34 C.F.R. § 100.3(b)(1)(iv), (vi). In addition, commitment to Israel as a Jewish state is a component of the ethnic identity and shared ancestry of many Jews, including M. DANOWITZ and J2. *Landau v. Board of Managers of Haverford College,* 2025 U.S. Dist. LEXIS 1402 at *10 n. 8 (E.D. Pa. Jan. 6, 2025).

200. Defendant SDP and individual Defendants GORDON and THOMPSON discriminated against Plaintiffs J. HIESTER and M. PARMAR on the basis of their association with Jewish students M. DANOWITZ and J2, which constitutes discrimination in violation of rights clearly established under Title VI. *Kengerski v. Harper*, 6 F.4th 531, 538 (3d Cir. 2021); *Parr*

*v. Woodmen of World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986).

201. Defendants excluded Plaintiffs J. HIESTER and M. PARMAR from participating in SDP classes, thereby denying Plaintiffs the full benefits of SDP schooling, subjected Plaintiffs to discrimination, aided and abetted and demonstrated deliberate indifference to discrimination by others, all in violation of rights clearly established under Title VI.

202. Defendants created a hostile educational environment by allowing, failing to prevent or taking any steps to prevent the persistent, pervasive, offensive, and severe lies and false allegations against Minor Plaintiffs that effectively denied Minor Plaintiffs the ability to fully partake in school activities of whatever kind. The national origin and/or religion of the Minor Plaintiffs was a substantial factor in the Defendants' actions.

203. As a result of Defendants' actions, Plaintiffs J. HIESTER and M. PARMAR have been injured by losing their statutorily conferred right to attend public high school in the district where they reside. 22 Pa. Code §11.11(a)(1).

204. As a direct and proximate result of Defendants' actions, Plaintiffs J. HIESTER, M. DANOWITZ, and M. PARMAR have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

WHEREFORE, Plaintiffs demand judgment against Defendants in the form of damages in an amount in excess of the arbitration limit, for compensatory and punitive damages, and for interest and costs.

## COUNT IV

### Deprivation of Due Process
### 42 U.S.C. § 1983
### (Plaintiffs J. HIESTER and M. PARMAR Against Defendants SDP, GORDON, STAMPS, and THOMPSON)

205. Plaintiffs incorporate the allegations in paragraphs 1-204 as if fully set forth herein.

206. Pennsylvania law prohibits suspending a student from school without notice and an opportunity to respond. 22 Pa Code § 12.6 ("A student may not be suspended until the student has been informed of the reasons for the suspension and given an opportunity to respond").

207. Defendants SDP, GORDON, and THOMPSON suspended J. HIESTER and M. PARMAR without previously notifying them of the basis for the dismissal or giving them an opportunity to respond.

208. Specifically, the parents of both J. HIESTER and M. PARMAR were notified simultaneously of the suspensions and the alleged reason for same after 10:00 p.m. on June 12, 2024, with the suspension starting the very next morning.

209. As noted above, the purported reason for the suspension was that J. HIESTER and M. PARMAR had "violat[ed] the Code of Conduct's rule of unauthorized entry into school property as they willingly walked around the building with [M. DANOWITZ], knowing he was not a Palumbo student."

210. Neither had been given any opportunity to respond, and in fact, defendant THOMPSON had *refused* the request of J. HIESTER and M. PARMAR's parents to meet with her on the morning of June 13.

211. As stated above, M. DANOWITZ's entry into Palumbo on the morning of June 11 was not "unauthorized". On the contrary, M. DANOWITZ entered Palumbo through the front door,

was processed through security, and saw and was seen or should have been seen by Defendants THOMPSON and STAMPS, the school's principal and dean of conduct, who stood at the entrance to the building, presumably to ensure that no one trespass or present a danger to the students inside.

212. Palumbo's security includes the use of video cameras recording the main entrance.

213. Plaintiff parents of J. HIESTER, M. DANOWITZ, M. PARMAR as well as the parent of J2 had an opportunity to review footage from the morning of June 11. The video clearly documented that M. DANOWITZ's entry into Palumbo was open and obvious and should have been known to the highest school officials.

214. M. DANOWITZ's entry to Palumbo on June 11 was not, despite it being the basis for J. HIESTER and M. PARMAR's summarily dispensed suspensions, "unauthorized."

215. Upon information and belief, Defendants SDP, GORDON, and THOMPSON had access to the video on the day of the alleged incident, and certainly had time to look at it between the time concerns were raised about M. DANOWITZ's presence in the building and the issuance of the suspension notices to Plaintiffs J. HIESTER and M. PARMAR.

216. Despite this, Defendants acted hastily in suspending both students without giving the accused individuals any opportunity to view the school's own evidence, explain themselves, or answer questions about it.

217. By letter dated August 16, 2024, Defendant School District belatedly agreed to rescind M. PARMAR's baseless suspension. In that same letter the District informed Plaintiff's council that it was revising J. HIESTER's suspension to "in-school suspension" based on his awareness that [M.DANOWITZ] was an unauthorized visitor to the building, having entered at the same time, and for leaving school early without authorization." See Exh. 8, attached

hereto.

218. Upon information and belief, student A.A., left Palumbo with J. HIESTER on the day in question before the end of the school day and went with J. HIESTER to M. DANOWITZ's house. A.A. was not disciplined for the same alleged infraction which J. HIESTER was, nor was he otherwise disciplined for his conduct.

219. Once counsel for Plaintiffs pointed out that the agents of SDP, including Principal THOMPSON—the person who meted out the suspensions—possessed the very evidence necessary to drop them because the video of the entrance to Palumbo clearly showed M. DANOWITZ entering the school through the front door of Palumbo. The proposed downgrading of J. HIESTER's suspension to an in-house suspension suffers from the same deficiencies as the June 12 suspension notice: it was done and decided upon without first notifying J. HIESTER of the proposed charge or giving him an opportunity to respond.

220. Furthermore, applying a new charge is equivalent to charging a Defendant with a lesser included offense after a more serious charge has been dismissed. To wit, it violates the principle of double jeopardy.

221. As for the second charge against plaintiff J. HIESTER, upon information and belief, and despite Defendant SDP's claim that "[t]his discipline is consistent with the Academy at Palumbo's past practices for other students," during the post-exam period students regularly come and go to and from Palumbo without sanction; the proposed discipline was *not* consistent with school district practices during this time period.

222. Plaintiff J. HIESTER's suspension from school without prior notice or an opportunity to respond, and the presence of that notation on his school record, constitutes a deprivation of a clearly established protected property and liberty interest without due process of law, in

violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

223. Plaintiff M. PARMAR's suspension from school without prior notice or an opportunity to respond, and the prolonged presence of that notation on his school record despite Defendant SDP's oblique admission that it was invalid, constitutes a deprivation of a protected property and liberty interest without due process of law, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

224. The ultimate withdrawal of the suspensions imposed on J. HIESTER and M. PARMAR provided no relief to the damage already incurred by the imposed punishment which validated the threats which drove these Plaintiffs out of the Philadelphia School District for fear of their physical safety.

225. Defendant SDP's purported conclusion that Plaintiffs M. PARMAR and J. HIESTER were guilty of "harassment" was made despite a total absence of due process. The procedural failings included but were not limited to the following:

   a. Despite repeated request, the school district failed to provide any of its evidence to Plaintiffs before making its conclusion.

   b. Plaintiffs had no opportunity to confront their accusers or even be informed of the charges against them; and had no opportunity to present evidence on their own behalf.

   c. The school district made no factual findings (at least, none that were turned over to Plaintiffs) in support of its decision or explained what J. HIESTER and M. PARMAR did that supposedly constituted harassment.

   d. The school district did not even identify who was the factfinder in this matter.

   e. Although Plaintiffs were given a purported opportunity to appeal and did so, the failure to inform Plaintiffs what findings were made against them rendered this right hollow.

   f. Despite the paucity of information provided to Plaintiffs, they appealed Defendant SDP's finding that J. HIESTER and M. PARMAR were guilty of harassment, an

appeal was filed with the deputy general counsel to Defendant SDP on October 9, 2024. Notice of receipt of that appeal was provided to counsel for Plaintiffs that same day. More than nine months after Plaintiffs' appeal was submitted, there has been no response from Defendant SDP.

WHEREFORE, Plaintiffs demand judgment against Defendants in the form of injunctive relief directing them to issue a public written statement revoking the findings of harassment and confirming that the suspensions previously imposed upon them were unfounded and have already been removed.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand trial by jury on all issues so triable.

THE DEBORAH PROJECT

BY:    LORI LOWENTHAL MARCUS, ESQUIRE
JEROME M. MARCUS, ESQUIRE
P.O. Box 212
Merion Station, PA 19066
610-880-0100

Dated: August 6, 2025

58