**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| HIESTER, et al, | : |
| | : |
| Plaintiffs, | : |
| | : |
| | : |
| | : CIVIL ACTION |
| v. | : |
| | : NO. 25-04502-JMY |
| THE SCHOOL DISTRICT OF | : |
| PHILADELPHIA, et al | : |
| | : |
| Defendants. | : |
| | : |

**DEFENDANTS' PARTIAL MOTION**
**TO DISMISS PLAINTIFFS' COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants the School District of Philadelphia ("School District"), Richard Gordon IV ("Gordon"), Kiana Thompson ("Thompson"), and Rashida Stamps ("Stamps") (hereinafter, collectively the "Defendants") file this Partial Motion to Dismiss the Complaint for lack of standing and failure to state a claim upon which relief can be granted, respectfully requesting that this Court grant their Motion and enter an Order substantially in the form enclosed herewith. Defendants incorporate by reference the arguments and legal authorities set forth in the accompanying Memorandum of Law as if fully set forth herein.

Date:   <u>November 17, 2025</u>          <u>*/s/ Marjorie McMahon Obod*</u>
                                      Marjorie McMahon Obod
                                      **DILWORTH PAXSON LLP**
                                      1650 Market Street, Suite 1200
                                      Philadelphia, Pennsylvania 19103

                                      *Attorney for Defendant,*
                                      *The  School District of Philadelphia*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| HIESTER, et al, | : |
|  | : |
| Plaintiffs, | : |
|  | : CIVIL ACTION |
|  | : |
| v. | : |
|  | : NO. 25-04502-JMY |
| THE SCHOOL DISTRICT OF | : |
| PHILADELPHIA, et al | : |
|  | : |
| Defendants. | : |
|  | : |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS THE SCHOOL DISTRICT OF PHILADELPHIA,
RICHARD GORDON IV, KIANA THOMPSON, AND RASHIDA STAMPS'
<u>PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>**

*/s/ Marjorie McMahon Obod*
Marjorie McMahon Obod
**DILWORTH PAXSON LLP**
1650 Market Street, Suite 1200
Philadelphia, Pennsylvania 19103

*Attorney for Defendant,*
*The School District of Philadelphia*

# TABLE OF CONTENTS

**PAGE**

I.   PRELIMINARY STATEMENT ...................................................................... 1

II.  PLAINTIFFS' ALLEGATIONS ....................................................................... 4

III  LEGAL STANDARD ...................................................................................... 8

IV.  LEGAL ARGUMENT ...................................................................................... 9

   A.  Plaintiffs' Claims Under the Establishment and Free Exercise Clauses Should Be Dismissed for Lack of Standing and Mootness ................................ 9

   B.  Plaintiffs' Establishment Clause Claim Fails as a Matter of Law Because a Neutral, Voluntary Quiet Room Open to All Students Does Not Constitute the Establishment of Religion. ............................................................. 12

   C.  Plaintiff Jean Danowitz's Free Exercise Clause Claim Fails Because the Complaint Alleges No Substantial Burden on Religious Practice and Demonstrates that the School District Acted with Neutrality and General Applicability. ............................................................................... 17

   D.  Plaintiffs Impermissibly Attempt to Expand Title VI of the Civil Rights Act Beyond Its Statutory Boundaries and Thus, This Claim Fails as a Matter of Law .......................................................................................... 19

   E.  Plaintiffs Allegations Do Not Plausibly Allege a Protected-Class Nexus and Improperly Expand Title VI to Political and Associational Grievances. ................... 20

   F.  Plaintiffs Fail to Plausibly Allege Direct Evidence of Discriminatory Animus or Deliberate Indifference, and Their Disagreement with School Discipline Cannot Salvage Their Claim. ....................................................... 23

   G.  Defendants Gordon, Stamps and Thompson are Entitled to Qualified Immunity, and Plaintiffs' Title VI Claims Against them in Their Individual and Official Capacity Should be Dismissed From this Suit ............................ 26

   H.  Plaintiffs' Title VI Claims Against Defendants Gordon and Thompson Fail Because Title VI Provides No Individual Liability, Official Capacity Claims Are Redundant, and No Clearly Established Law Shows a Violation ....................... 29

V.   CONCLUSION ............................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)............................................................................................19, 21

*Altman v. Bedford Cent. Sch. Dist.*,
   245 F.3d 49 (2d Cir. 2001)...................................................................................11, 12

*Am. Legion v. Am. Humanist Ass'n*,
   588 U.S. 29 (2019) (Gorsuch, J., concurring)......................................................13, 15

*Arizonans for Official English v. Arizona*,
   520 U.S. 43 (1997)......................................................................................................9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................8, 9

*Bd. of Educ. of Westside Cmty. Schs. v. Mergens*,
   496 U.S. 226 (1990)...................................................................................................16

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).....................................................................................................8

*Bennett v. Saint-Gobain Corp.*,
   507 F.3d 23 (1st Cir. 2007)........................................................................................26

*Bhombal v. Irving Indep. Sch. Dist.*,
   809 F. App'x 233 (5th Cir. 2020) ...................................................................19, 22, 24

*Blunt v. Lower Merion Sch. Dist.*,
   767 F.3d 247 (3d Cir. 2014).......................................................................................23

*California Parents for Equalization of Educ. Materials v. Torlakson*,
   973 F.3d 1010 (9th Cir. 2020) ...................................................................................17

*Canaan v. Carnegie Mellon Univ.*,
   760 F. Supp. 3d 306 (W.D. Pa. 2024).....................................................................20, 22

*Chandler v. Siegelman*,
   230 F.3d 1313 (11th Cir. 2000) ..............................................................................14, 28

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)................................................................................................17, 28

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983)...................................................................................................9, 10

#125327064v5

*Cole v. Oroville Union High Sch. Dist.*,
 228 F.3d 1092 (9th Cir. 2000) ........................................................11

*Cornelius-Millan v. Caribbean Univ., Inc.*,
 261 F. Supp. 3d 143 (D.P.R. 2016)................................................22, 24

*Davis v. Monroe Cty. Bd. of Educ.*,
 526 U.S. 629 (1999)...............................................................23, 24, 26

*Doe v. Bowling Green State Univ.*,
 WL 4599247 (N.D. Ohio Sept. 30, 2022)............................................29

*Doe v. Madison Sch. Dist. No. 321*,
 177 F.3d 789 (9th Cir. 1999) (*en banc*) ..............................................11

*Donovan v. Pittston Area Sch. Dist.*,
 2015 WL 3771420 (M.D. Pa. June 17, 2015).......................................29

*Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*,
 336 F.3d 211 (3d Cir. 2003).................................................10, 11, 12

*Emp. Div. v. Smith*,
 494 U.S. 872 (1990)..........................................................................17

*Engel v. Vitale*,
 370 U.S. 421 (1962)..........................................................................15

*Fisk v. Bd. of Trs. of California State Univ.*,
 2023 WL 6051381 (S.D. Cal. Sept. 15, 2023) ......................................11

*Fowler v. UPMC Shadyside*,
 578 F.3d 203 (3d Cir. 2009)..............................................................8, 9

*Freedom from Religion Foundation, Inc., v. New Kensington Arnold Sch. Dist.*,
 832 F.3d 469 (3d Cir. 2016)............................................................10, 12

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
 528 U.S. 167 (2000)............................................................................9

*Gabrielle M. v. Park Forest–Chicago Heights Sch. Dist. 163*,
 315 F.3d 817 (7th Cir. 2003) ..............................................................24

*Gazarov ex rel Gazarov v. Diocese of Erie*,
 80 F. App'x 202 (3d Cir. 2003) ...........................................................25

*Gebser v. Lago Vista Indep. Sch. Dist.*,
 524 U.S. 274 (1998)......................................................................20, 23

iii

*Groveman v. Regents of Univ. of California*,
   2025 WL 391312 (E.D. Cal. Feb. 4, 2025)............................................................................18

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982).............................................................................................................26

*Hilsenrath on behalf of C.H. v. Sch. Dist. of the Chathams  v. Sch. Dist. of the Chathams*,
   136 F.4th 484 ......................................................................................................................15

*Hoing v. Doe*,
   484 U.S. 305 (1988).............................................................................................................11

*Johnson v. Transp. Agency, Santa Clara Cnty.*,
   480 U.S. 616 (1987).............................................................................................................22

*K.Y. through Yu v. Schmitt*,
   799 F. App'x 485 (9th Cir. 2020) .......................................................................................11

*Ke v. Drexel Univ.*,
   2015 WL 5316492 (E.D. Pa. Sept. 4, 2015) .......................................................................25

*Kengerski v. Harper*,
   6. F. 4th 531, 538 (3d Cir. 2021) ........................................................................................21

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022)....................................................................................................... *passim*

*L.R. v. Sch. Dist. of Philadelphia*,
   836 F.3d 235 (3d Cir. 2016).........................................................................................26, 29

*Landau v. Corp. of Haverford*,
   780 F. Supp. 3d 548 (E.D. Pa. 2025) ......................................................................18, 19, 20

*Lee v. Weisman*,
   505 U.S. 577 (1992).............................................................................................................15

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971).................................................................................................13, 14, 27

*M.S. v. Susquehanna Twp. Sch. Dist.*,
   WL 6397827 (M.D. Pa. Dec. 15, 2017) *aff'd*, 969 F.3d 120 (3d Cir. 2020) ..........................25

*Malley v. Briggs*,
   475 U.S. 335 (1986).............................................................................................................26

*Miller v. Clinton Cnty.*,
   544 F.3d 542 (3d Cir. 2008).................................................................................................29

*Parr v. Woodmen of World Life Ins. Co.,*
    791 F. 2d 888 (11 Cir. 1986)......................................................................................21

*Pearson v. Callahan,*
    555 U.S. 223 (2009)............................................................................................26, 30

*Powell v. McCormack,*
    395 U.S. 486 (1969)..................................................................................................10

*Prince v. Jacoby,*
    303 F.3d 1074 (9th Cir. 2002) .................................................................................16

*R.F. through Fernandez v. Harrison Sch. Dist. No. 2,*
    924 F.3d 1309 (10th Cir. 2019) ...............................................................................11

*Real Alts., Inc. v. Sec'y Dep't of Health and Hum. Servs.,*
    867 F.3d 338 (3d. Cir. 2017).....................................................................................17

*Rosenberger v. Rector and Visitors of Univ. of Virginia,*
    515 U.S. 819 (1995)............................................................................................15, 16

*Russman v. Bd. of Educ. City of Watervliet,*
    260 F.3d 114 (2d Cir. 2001).....................................................................................11

*S.H. v. Lower Merion Sch. Dist.,*
    729 F.3d 248 (3d Cir. 2013).....................................................................................24

*Santiago v. Warminster Twp.,*
    629 F.3d 121 (3d Cir. 2010).......................................................................................8

*Sh.A. as Next Friend of J.A. v. Tucumcari Mun. Schs.,*
    2001 WL 37124874 (D.N.M. Sept. 12, 2001) ........................................................11

*Shurtleff v. City of Boston,*
    596 U.S. 243 (2022) (Gorsuch, J., concurring)........................................................15

*Simpson v. Kay Jewelers,*
    142 F.3d 639 (3d Cir. 1998).....................................................................................25

*Spadone v. McHugh,*
    10 F. Supp. 3d 41 (D.D.C. 2014) .............................................................................10

*Tolbert v. Queens Coll.,*
    242 F.3d 58 (2d Cir. 2001).......................................................................................20

*Town of Greece v. Galloway,*
    572 U.S. 565 (2014)..................................................................................................13

#125327064v5

*United Steelworkers of Am. v. Weber*,
    443 U.S. 193 (1979)........................................................................22

*Van Zandt v. Thompson*,
    839 F.2d 1215 (7th Cir. 1988) ...............................................14, 27

*Wax v. Trs. of Univ. of Pennsylvania*,
    2025 WL 2483973 (E.D. Pa. Aug. 28, 2025) ........................23

*Whitfield v. Notre Dame Middle Sch.*,
    412 F. App'x 517 (3d Cir. 2011) .............................................29

*Williams v. Pennridge Sch. Dist.*,
    782 F. App'x 120 (3d Cir. 2019) .............................................23

**Statutes**

42 U.S.C. § 1983 .....................................................................................1

42 U.S.C. § 2000d ...........................................................................19, 22

42 U.S.C. § 2000e-2(a) ........................................................................22

Civil Rights Act Title VI.............................................................. *passim*

**Constitutional Provision**

U.S. Const. amend. I ...................................................................... *passim*

U.S. Const. amend. XIV ..........................................................................1

**Rules and Regulations**

Exec. Ord. No. 13899, 84 Fed. Reg. 68779 (Dec. 11, 2019)....................20

Fed. R. Civ. P. 8 .......................................................................................8

Fed. R. Civ. P. 12(b)(1)...........................................................................12

Fed. R. Civ. P. 12(b)(6)............................................................................8

#125327064v5

Defendants the School District of Philadelphia ("School District"), Richard Gordon IV ("Gordon"), Kiana Thompson ("Thompson"), and Rashida Stamps ("Stamps") (hereinafter, collectively the "Defendants") submit this Memorandum of Law in support of their Partial Motion to Dismiss Plaintiffs' Complaint for lack of standing and failure to state a claim upon which relief can be granted. Plaintiffs bring claims under the Establishment and Free Exercise Clauses of the First Amendment and the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, arising from a June 2024 incident at the Academy at Palumbo ("Palumbo"), a public high school in the School District. (ECF No. 1, Compl. at 1-2 ¶ 1.) Plaintiffs include two former Palumbo students, J. Hiester and M. Parmar, and one former student who was not attending Palumbo at the time of the incident, M. Danowitz, along with their parents—Kathryn and Christopher Hiester, Jean Danowitz, and Catherine and Ratnadeep Parmar. The lawsuit names not only the School District as a Defendant but also several of its employees, including Assistant Superintendent Richard Gordon IV; Principal Kiana Thompson; Dean of Student Conduct Rashida Stamps; and two teachers from other schools, Kristin Luebbert and Keziah Ridgeway, who were not present at Palumbo during the incident.[1] For the reasons that follow, the Court should grant Defendants' Partial Motion to Dismiss on Counts I and III of Plaintiffs' Complaint.

## I.      **PRELIMINARY STATEMENT**

This case arises from an incident at the Academy at Palumbo, a public high school in the School District of Philadelphia, during a period of extraordinary tension in schools across the country following the October 7, 2023 terrorist attack by Hamas on Israel and the ensuing conflict. In the months that followed, schools nationwide became flashpoints for deeply charged debates as students expressed strong, and often opposing, views tied to the ethnic, religious, or political

---

[1] Defendants Kristin Luebbert and Keziah Ridgeway are represented by separate counsel and therefore, claims against them are not addressed in this Motion to Dismiss.

identities of those involved. The School District, like many others, was thrust into the difficult role of constitutional referee, tasked with balancing students' rights to free expression, the free exercise of religion, and freedom from governmental establishment of religion, while also maintaining safety, educational focus, and equal protection for all students in an already under-resourced environment. At the same time, because of the heightened tensions, broader debates on college campuses, and incidents of antisemitism or other discrimination occurring at other schools elsewhere, some students misperceived routine disciplinary matters or investigations—or even student spaces—as discriminatory, even when they were not. This case is one of those situations. Teachers and administrators at Palumbo acted in good faith, striving to respond promptly and fairly amid uncertainty and emotion. It was within this fraught and complex setting that the events giving rise to the Complaint occurred.

Plaintiffs' Complaint, taken as a whole, depicts a school attempting to navigate unprecedented challenges, not one engaged in constitutional or statutory wrongdoing. None of the Plaintiffs remain enrolled in the School District or reside within its boundaries. J. Hiester, M. Danowitz, and M. Parmar, now seniors set to graduate at the end of the current school year, do not allege any intent to return to the School District, that their families plan to re-enroll any of their other children in its schools, or that doing so would even be possible at this juncture. The Establishment Clause and Free Exercise Clause claims are nonjusticiable because Plaintiffs lack standing and their alleged injuries are moot—there is no live controversy or possibility of future harm that injunctive relief could redress as it relates to them.

Even if the Court were to reach the merits on this claim, the allegations fail as a matter of law. The "Quiet Room" at issue was a neutral, voluntary space open to all students for reflection or prayer, and its temporary, student-generated décor reflecting the faith practices of students who chose to use it, does not transform it into a government establishment of religion. The School

#125327064v5

District's actions reflect constitutional neutrality, not endorsement or suppression of faith. Likewise, the Free Exercise claim fails because the Complaint alleges no substantial burden on any student's religious practice, let alone establishes a claim for M. Danowitz—the only individual who brings such a claim through his parent—who was not authorized to be on campus and was not a student at the time. The School District investigated the matter and applied its neutral Code of Conduct to the students—not to M. Danowitz—and in doing so addressed M. Parmar's and J. Hiester's facilitation of M. Danowitz's unauthorized entry and the student incident in the Quiet Room. The School District did not prohibit or penalize any student's religious expression.

Plaintiffs' Title VI claim is equally deficient. Title VI prohibits discrimination based on race, color, or national origin (not religion or political ideology), and Plaintiffs J. Hiester and M. Parmer, who are not Jewish and whose own allegations refute any argument that they might have reasonably been perceived to be, cannot invoke its protections. The Complaint shows no causal connection between the discipline of students M. Parmar and J. Hiester for escorting an unauthorized individual, M. Danowitz, on Palumbo's campus—a disciplinary action that was later revoked—and any discrimination based on race, color, or national origin, let alone the deliberate indifference or comparator evidence necessary to support a discrimination claim. Their attempt to recast "associational" discrimination under Title VI simply for being friends with M. Danowitz and J2, who are Jewish, finds no support in the statute or controlling precedent.

Finally, the individual defendants—Assistant Superintendent Richard Gordon IV, Principal Kiana Thompson, and Dean of Students Rashida Stamps—are entitled to qualified immunity. In the wake of the Supreme Court's decision in *Kennedy v. Bremerton School District*, the contours of the Establishment Clause and permissible accommodation of religion in schools remain unsettled, and, if anything, the governing case law supports the conclusion that the School District's actions were constitutionally compliant. No clearly established law would have informed

3

reasonable administrators that maintaining a neutral Quiet Room or enforcing facially neutral discipline policies could violate the Constitution or Title VI. In short, the Complaint describes educators responding conscientiously in a volatile environment, not officials violating constitutional or statutory rights. Because Plaintiffs lack standing, their claims are moot, and they fail to state any claim upon which relief can be granted, Counts I and III of the Complaint should be dismissed with prejudice.

## II.    <u>PLAINTIFFS' ALLEGATIONS</u>

Plaintiffs' Complaint describes a brief student incident involving an unauthorized visitor, M. Danowitz, along with J. Hiester and M. Parmer, who entered the school and a room designated as a "Quiet Room" that Plaintiffs falsely characterize as "effectively a mosque" and who were accused by other students of inappropriate behavior. (*Id.* 46 ¶ 171, 4 ¶ 6.) However, they were ultimately cleared of any disciplinary records after an administrative investigation. (*Id.* 27 ¶ 104 n.7.) The incident occurred on June 11, 2024, during the last week of the school year, when "little to no formal teaching takes place and students are generally free to come and go as they please within the school building." (*Id.* 13 ¶ 45, 47.) Plaintiffs admit that although M. Danowitz had previously attended Palumbo, he was not a student at the time as he had transferred to another school months earlier. (*Id.* at 7 ¶ 19; ECF No. 1-14, Ex. 11.) The School District later cited his presence on school grounds as a Code of Conduct violation in its discipline and investigation of M. Parmer and J. Hiester, who accompanied him that day. (ECF No. 1, at 26 ¶ 100.) Nevertheless, Plaintiffs allege that he "entered the Palumbo school building" with J. Hiester that morning, despite not being enrolled, but they claim it was not a violation because school officials observed M. Danowitz go through the front door and security. (*Id.* at 14 ¶ 50.)

After entering the school, the boys decided to visit the library, where they saw a small adjoining space with a sign that said "Quiet Room." (*Id.* at 15 ¶ 56.) Plaintiffs claim they saw a

"Palestinian flag" on the window, which according to the attached exhibits appears to be a crude arrangement of colored craft paper, in the Palestinian flag's colors and shape. (*Id.* at 15 ¶ 56; ECF No. 1-7, Ex. 4a.) They then entered the Quiet Room, where they observed "Islamic accoutrements and signs" and "two or three female students seated at the only table in the room."  (ECF No. 1, at 16 ¶¶ 57, 16 ¶ 62; ECF No. 1-6, Ex. 4.) According to the girls' reports described in the Complaint, the boys "loudly announced that they 'hate Muslims,'" "declared that they were 'proud Zionists,'" and made inappropriate gestures—"humping the floor," "ripping posters off the wall," and "trashing the room." (*Id.* at 21 ¶ 77.) The Complaint acknowledges that this description came directly from the students who reported the incident to school officials, including Principal Kiana Thompson, that same afternoon. (*Id.*)

However, Plaintiffs dispute this account and instead allege that M. Danowitz, and a boy referred to as "J2" who is not a party to this lawsuit, both of whom identify as Jewish, "said a quick Jewish prayer in Hebrew" and that three female students in the room "burst out laughing." (*Id.* at 17 ¶ 59.) M. Parmer, who is not Jewish, then entered the Quiet Room, after which M. Danowitz responded to the girls' laughter by asking, "How is me exercising my [First] Amendment right funny to you?" to which one of the girls replied, "Why are you guys even here?" *Id.* at 17 ¶ 60-61.) M. Danowitz alleges he responded by saying he "has a right to religion and a right to pray" and added he was a "proud Zionist." (*Id.*) J2 then began singing "Am Israel Chai" a Hebrew song that means "The People of Israel Live," and M. Danowitz "stood up, took a couple of steps, and did a handstand," after which J. Hiester, who is also not Jewish, entered the room. (*Id.* at 17 ¶ 61.) Plaintiffs further allege that before exiting, one boy "removed a sign that had been hanging on the wall and gently placed it on the floor, where he left it leaning against the wall." (*Id.* at 18 ¶ 64.) The entire encounter lasted less than ten minutes and was filmed by J2. (*Id.* at 17 ¶ 61.) The Complaint admits that J2 recorded the video to show "that the room was not inclusive of religions

other than Islam." (*Id.* at 17 ¶ 59 n.5.) Nevertheless, the Complaint does not allege that any Plaintiff raised concerns about the Quiet Room to school officials prior to that date.

Plaintiffs assert that a "Quiet Room" at Palumbo served as an "exclusively. . . Muslim prayer space," despite their acknowledgment that no official policy designated it as such and Plaintiffs' lack of citation to any school rule, announcement, or written policy to that effect. (*Id.* at 46 ¶ 171, 4 ¶ 6.) Indeed, this allegation is contradicted by Plaintiffs' own admissions as the room was labeled a "Quiet Room," confirmed by a picture of the door attached as an exhibit, and, according to the Complaint, it had "no indication that there was any gender or religious restriction on use or occupancy of the room when observing the room from the outside." (*Id.* at 15 ¶ 56; ECF No. 1-7, Ex. 4a.) Even the Exhibits attached to the Complaint confirm this in an admission from a parent who is a Plaintiff in this action that "[n]owhere in the room were there signs stating that it was a Muslim-only room or that there were certain hours designated for men-only or women-only" and "the boys had mentioned that the room is available to all students who want to pray during the day." (ECF No. 1, at 30 ¶ 113; ECF No. 1-13, Ex. 10.) Thus, by the Plaintiffs' own account, the School District had no policy restricting the room's use based on religion. It was intended as a neutral space open to any student seeking privacy, reflection, or prayer. The Quiet Room's appearance or contents—such as prayer rugs or religious items—were, at most, the result of student-generated use in a school where Muslim students make up a significant portion of the population and may pray several times daily, particularly during Ramadan.

Plaintiffs claim that false rumors begin to swirl immediately as to the boys' conduct in the Quiet Room right after the June 11, 2024, incident, leading to harassment by others and alleged threats, though they acknowledge that Principal Thompson and Dean of Students Stamps began investigating immediately requesting written incident reports and contacting parents. (*Id.* at 20 ¶ 74, 22-23 ¶¶ 82–85; Ex. 5.) Given the conflicting accounts and rising tension among students,

Principal Thompson consulted Assistant Superintendent Gordon, who "instructed her to suspend" the boys while the investigation continued to proceed. (ECF No. 1, at 26 ¶ 101.) The students were informed that the incident involved their knowledge of an unauthorized visitor, M. Danowitz, who they "willingly walked around the building," and therefore, J. Hiester and M. Parmer were notified at 10 pm on June 12, 2024, of their suspension. (*Id.* at 54 ¶ 208.) This occurred during the final two days of the school year, after grades had closed. (*Id.* at 13 ¶ 44.)

Over the summer, the School District's Office of School Safety Investigations Unit continued its review. (*Id.* at 35 ¶ 132.) The students and their families were invited to submit statements and materials, including the cellphone video they claimed exonerated them. (*Id.* at 30 ¶ 113.) After review, the School District rescinded the suspensions and removed all references from their disciplinary records. (*Id.* at 27 ¶ 104 n.7.) The Complaint contains no allegation that any School District employee publicly identified the students or issued statements accusing them of harassment. To the contrary, the only referenced communication—a general letter to Palumbo families on August 19, 2024—did not name any student and simply reminded the school community that rumors circulating on social media should not be relied upon and that harassment of any kind would not be tolerated. (*Id.* at 44 ¶ 162; ECF No. 1-21, Ex. 18.)

All three students and their families now reside outside the School District. (ECF No. 1, at 6 ¶ 15, 8 ¶ 20.) While J. Hiester and M. Parmer now attend public school outside the School District, M. Danowitz was not a student at the time of the incident, having left Palumbo previously to attend St. Joseph's Preparatory School as of September of 2023. (*Id.* at 7 ¶ 19; ECF No. 1-14, Ex. 11.) J. Hiester, M. Parmer, and M. Danowitz are now all seniors in high school, and none have alleged that they wish to return as students to Palumbo or that their parents will move back into the School District. (ECF No. 1, at 51 ¶ 191.) Taken together, the allegations describe a brief, disputed encounter at the tail end of the school year involving an unauthorized visitor and

7

conflicting student accounts. The School District and its employees acted promptly to gather information, maintain order, and balance student safety and rights during an exceptionally tense period in schools nationwide. Nothing in the Complaint plausibly suggests that the School District or its staff acted with discriminatory intent or established a "Muslim-only" space; instead, the allegations reflect educators responding in good faith to a complex and fast-moving situation, when exams were done, administrators were preparing for graduation, and there were only two days left of the school year**.**

## III.   <u>LEGAL STANDARD</u>

Federal district courts are required to dismiss a complaint when the allegations fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). While Federal Rule of Civil Procedure 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," to survive a motion to dismiss, the "[f]actual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal quotations omitted). Allegations which are "no more than conclusions, are not entitled to the assumption of truth." *Santiago v. Warminster Twp.,* 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009) (internal quotations omitted)). To survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Third Circuit has reiterated that "the factual and legal elements of a claim should be separated" when district courts consider Rule 12(b)(6) motions, legal conclusions may be disregarded, and the facts alleged in the complaint must be sufficient to show plaintiff has a plausible claim for relief, i.e., a plaintiff must plead facts to show entitlement to relief. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210-11 (3d Cir. 2009) (internal quotations omitted). The Court need not consider legal conclusions, "conclusory

statements," "bare-bones allegations," or "threadbare recitals" when deciding a motion to dismiss. *Id.* at 210 (citing *Iqbal*, 556 U.S. at 678) (internal quotations omitted). Applying this standard, Counts I and III of Plaintiffs' Complaint should be dismissed as a matter of law.

## IV.   <u>LEGAL ARGUMENT</u>

### A.   **Plaintiffs' Claims Under the Establishment and Free Exercise Clauses Should Be Dismissed for Lack of Standing and Mootness.**

Plaintiffs' claims under the Establishment and Free Exercise Clauses of the First Amendment in Count I of the Complaint fail at the threshold because Plaintiffs lack standing and, even if they did have standing, those claims are now moot. Injunctive relief is the only relief Plaintiffs have sought for Count I of their Complaint. (ECF No. 1 at 48 ¶ 178.) Because Plaintiffs are not enrolled in the School District, all reside outside its boundaries, J. Hiester, M. Parmar, and M. Danowitz are all seniors set to graduate, and none have alleged an intention and ability to return, there is no ongoing or future injury that such injunctive relief could redress and thus, Count I must be dismissed with prejudice.

To establish standing, a plaintiff must show (1) a concrete and particularized injury in fact that is actual or imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the defendant's challenged conduct; and (3) that it is likely, not merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). The plaintiff has the burden of demonstrating these requirements are met at the "commencement of the litigation," will continue throughout its duration, and must do so "separately for each form of relief sought." *Id.* at 184, 189; *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997). In cases where a plaintiff seeks injunctive relief, the plaintiff must allege some likelihood of future injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983).

Plaintiffs cannot meet these requirements. The injunctive relief Plaintiffs have sought cannot redress past alleged injuries arising from the June 11, 2024, incident as none of them remain a student within the School District or reside within its boundaries. (ECF No. 1 at 6 ¶ 15, 8 ¶ 20; ECF No. 1-14, Ex. 11.) Plaintiffs J. Hiester and M. Parmar are current high school seniors who now attend public schools outside the School District, and M. Danowitz was not a student at the time of the incident, having transferred to St. Joseph's Preparatory School in September of 2023. (*Id.*) Further, because M. Danowitz had left the School District months before the alleged events, he cannot show any cognizable injury by the School District sufficient for standing, since he was not a student with a right to be in the Quiet Room and was not investigated or disciplined by Defendants. *See Spadone v. McHugh*, 10 F. Supp. 3d 41, 43–44 (D.D.C. 2014) (holding former cadet lacked standing because he was no longer enrolled); *see also Freedom from Religion Foundation, Inc., v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 478 (3d Cir. 2016) (noting "a passerby who is not a member of the community, and who faces no risk of future contact, may not have an injury in fact sufficient to confer standing."); *Lyons,* 461 U.S. at 105 (finding no standing for injunctive relief because there was no real and immediate threat that plaintiff would again be placed in a chokehold by police officers for a traffic violation). Because there is no likelihood of future injury, Count I in Plaintiffs' Complaint seeking only injunctive relief should be dismissed for lack of standing.

Even assuming the Plaintiffs had standing, their claims are now moot. A case becomes moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 216 (3d Cir. 2003) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Federal courts consistently hold that once a student graduates or otherwise leaves the school and has no interest or prospect in returning, a request for injunctive relief is rendered moot because the student will no longer be

10

affected by the challenged practice. *See Donovan,* 336 F.3d at 217 (finding a challenge to a school policy was moot when [the student] has graduated and will never again return [to the school] as a student."); *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000); *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) (*en banc*); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 71-74 (2d Cir. 2001) (concluding that student's graduation and other children's relocation outside the school district mooted plaintiffs' claims); *K.Y. through Yu v. Schmitt*, 799 F. App'x 485, 486-87 (9th Cir. 2020) (finding that claim for injunctive relief was moot because, as a senior, plaintiff could not serve in student government the following year); *R.F. through Fernandez v. Harrison Sch. Dist. No. 2*, 924 F.3d 1309, 1315 (10th Cir. 2019) (citing *Hoing v. Doe*, 484 U.S. 305, 318 (1988) (holding claims moot as to twenty-four year old who is no longer eligible to receive state educational services)); *Fisk v. Bd. of Trs. of California State Univ.*, No. 22-CV-173, 2023 WL 6051381, at *10 (S.D. Cal. Sept. 15, 2023); *Sh.A. as Next Friend of J.A. v. Tucumcari Mun. Schs.*, No. CV 00-727, 2001 WL 37124874, at *2 (D.N.M. Sept. 12, 2001).

Here, Plaintiffs have no ongoing relationship with the School District, and their anticipated graduation in the coming months only underscores the absence of any continuing harm. Plaintiffs have not alleged that they intend to return to Palumbo or that any family members will re-enroll in the School District or the ability to do so prior to their graduation. *See Russman v. Bd. of Educ. City of Watervliet*, 260 F.3d 114, 119 (2d Cir. 2001) (finding claims moot where student no longer attends school, and the parents expressed no intent to re-enroll)*; Fisk,* 2023 WL 6051381, at *10 (concluding claims were moot because there was no suggestion in the complaint that transferred students would return and be subjected to the alleged violations).

Injunctive relief could not alter their circumstances or prevent any future injury. Nor does any exception to mootness apply. The "capable of repetition, yet evading review" exception is

"extremely narrow" and requires both that the challenged action be too short in duration to be fully litigated and that the same party is likely to be subjected to it again. *Donovan*, 336 F.3d at 217. Neither condition is met here. School policies are not inherently too short-lived to be reviewed, and such policies will not always evade review as other students can challenge them. *Id.* (noting exception not met as a Bible club ban will not always evade review as a younger student could challenge it with a long window to litigate the issue). Further, there is no reasonable expectation that these Plaintiffs—who reside outside the School District and will soon graduate—will ever again encounter the alleged conduct. *See Altman*, 245 F.3d at 71 (exception inapplicable where students graduated and left district).

To the extent Plaintiffs attempt to rely on *New Kensington,* 832 F.3d 469, that case is readily distinguishable. The plaintiff in that case affirmatively stated that she intended to enroll her child in the same school if the challenged religious monument were removed—thus establishing a continuing, personal stake. *Id.* at 474, 481. Here, by contrast, none of the Plaintiffs has alleged any intent to return to the School District, and one was not even a student during the relevant period. Because there is no realistic prospect that any Plaintiff will again be affected by the School District's conduct, *New Kensington* provides no basis for jurisdiction. This Court cannot grant effective relief or adjudicate a controversy that no longer exists. Accordingly, Count I should be dismissed under Rule 12(b)(1).

> **B.    Plaintiffs' Establishment Clause Claim Fails as a Matter of Law Because a Neutral, Voluntary Quiet Room Open to All Students Does Not Constitute the Establishment of Religion.**

Plaintiffs' Establishment Clause claim fails as a matter of law because the School District's provision of a neutral, voluntary "Quiet Room" for student reflection or prayer neither endorses nor establishes religion under the Supreme Court's "history and tradition" framework. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022). The First Amendment provides that "Congress shall

make no law respecting an establishment of religion." U.S. Const. amend. I. For decades, courts applied the three-part test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971), assessing whether government action (1) had a secular purpose; (2) had as its principal or primary effect the advancement or inhibition of religion; and (3) fostered an excessive entanglement between government and religion. *Id.* at 612–13. That framework proved "a misadventure" that substituted subjective speculation for constitutional analysis and "left us only a mess." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, , 84 (2019) (Gorsuch, J., concurring). Recognizing that problem, the Supreme Court in *Kennedy v. Bremerton School District*, expressly rejected *Lemon* and its "endorsement" offshoot, holding that Establishment Clause analysis must instead be guided by "reference to historical practices and understandings." 597 U.S. at 535 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). The Court emphasized that neutrality toward religion does not "make it necessary for government to be hostile to religion" or "to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." *Id.* at 535, 541 (internal quotations omitted). Moreover, the Court emphasized that the Establishment Clause cannot be used as "a modified heckler's veto" to silence religious expression merely because others might take offense. *Id.* at 534.

Applying that standard here, Plaintiffs' allegations do not state a constitutional violation. Plaintiffs admit that the "Quiet Room" was labeled as such, bore no signage limiting entry by religion or gender, and was available to all students who wished to pray, meditate, or reflect privately. (ECF No. 1 at 15 ¶ 56; ECF No. 1-7, Ex. 4a.) They also acknowledge that the School District issued no policy or announcement designating the space as a "Muslim-only" room. (ECF No. 1 at 15 ¶ 54; ECF No. 1-13, Ex. 10.) To the contrary, even the Complaint and attached exhibits confirm that use of the space was student-driven and voluntary. (*Id.*) In a school with a substantial Muslim student population—some whom might pray multiple times each day, especially during

Ramadan—it is unsurprising that the Quiet Room's décor at any given time reflected the practices of those students who used it most frequently. Temporary student-generated items such as prayer rugs or modest posters do not transform a neutral, student-accessible space into an unconstitutional establishment of religion. To hold otherwise would require school officials to monitor and suppress student religious expression—an action that itself might be argued to conflict with the First Amendment. *See, e.g., Chandler v. Siegelman,* 230 F.3d 1313, 1316 (11th Cir. 2000) ("[t]he Free Exercise Clause does not permit the State to confine religious speech to whispers or banish it to broom closets").

While there is a lack of case law regarding the constitutionality of quiet rooms or prayer rooms in schools, the Seventh Circuit's decision in *Van Zandt v. Thompson*, 839 F.2d 1215 (7th Cir. 1988), provides particularly persuasive guidance. There, the court upheld the constitutionality of a "Prayer Room" in the Illinois State Capitol expressly designated for prayer and meditation. *Id.* at 1216. The court found that even under *Lemon*, the room served a permissible secular purpose—allowing visitors to the prayer room to set their own agenda as to prayer or meditation— and that its principal effect was not to advance religion but to recognize the place of "spiritual values in their work." *Id.* at 1219, 1221. It also concluded that no excessive entanglement existed because the room was open to people of all faiths and subject to neutral oversight. *Id.* at 1223. The court emphasized that a government's acknowledgment of religion's role in public life does not contravene the Establishment Clause because the Nation's history is replete with similar accommodations. *Id.* at 1221.

If a dedicated prayer room in a state capitol—explicitly intended for religious use—passed constitutional muster even under *Lemon*, then a school's provision of a quiet, voluntary, student-driven space for meditation and prayer cannot plausibly constitute an Establishment Clause violation under the far more historically grounded *Kennedy* standard. Moreover, this case lacks the

14

coercive elements that animated the school-prayer decisions in *Engel v. Vitale*, 370 U.S. 421 (1962), and *Lee v. Weisman*, 505 U.S. 577 (1992). Those cases turned on the government's direct sponsorship of religious exercises that compelled participation in school-sponsored prayer by captive, impressionable students. The Quiet Room, by contrast, was entirely voluntary, not part of any curriculum or event, and students could enter or avoid it freely. The Supreme Court stressed that coercion was "among the foremost hallmarks of religious establishments the framers sought to prohibit. *Kennedy*, 597 U.S. at 537. Here, no such coercion is alleged or possible.

Further, the fact that one religious group—such as Muslim students—may make greater use of the Quiet Room, or that student-generated Muslim artwork or symbols may appear more frequently, does not alter the constitutional analysis. Courts recognize that government neutrality toward religion does not mean eradicating all traces of faith from public institutions, and that they are not required to police and suppress religious expression to achieve it. *See Shurtleff v. City of Boston*, 596 U.S. 243, 287-88 (2022) (Gorsuch, J., concurring) ("no historically sensitive understanding of the Establishment Clause can be reconciled with a rule requiring governments to 'roa[m] the land, tearing down monuments with religious symbolism and scrubbing away any reference to the divine.'") (quoting *Am. Legion*, 588 U.S. at 56; *Hilsenrath on behalf of C.H. v. Sch. Dist. of the Chathams,* 136 F.4th 484, 492-93 (noting that teaching about religion or permitting religious expression in schools does not automatically violate the Establishment Clause). Further, it does not violate the Establishment Clause for a public school "to grant access to its facilities on a religion-neutral basis to a wide spectrum of student groups, including those that use meeting rooms for sectarian purposes, accompanied by some devotional exercises." *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 842 (1995) (a university violated the free speech rights of a Christian publication when it denied student activity printing funds available to other student groups because of the publication's religious viewpoint); *see also*

*Prince v. Jacoby,* 303 F.3d 1074, 1092 (9th Cir. 2002) ("[p]roviding meeting space during student/staff time, school supplies and bus transportation is not a direct payment to" a Christian student organization, World Changer's "coffers, even though it may facilitate the World Changer's own religious speech."). The *Rosenberger* Court applied this principle using a hypothetical situation analogous to that of the Quiet Room here:

> "a public university may maintain its own computer facility and give student groups access to that facility, including the use of the printers, on a religion neutral, say first-come-first-served, basis. If a religious student organization obtained access on that religion-neutral basis and used a computer to compose or a printer or copy machine to print speech with a religious content or viewpoint, the State's action in providing the group with access would no more violate the Establishment Clause than would giving those groups access to an assembly hall."

*Rosenberger,* 515 U.S. at 843. Likewise, a Quiet Room—made available on a religion-neutral basis and accessible to all students—does not violate the Establishment Clause. Just as a university computer or printer may be used by students to generate religious speech without constitutional infirmity, students praying in a Quiet Room or student artwork or decorations placed by students within the Quiet Room are no different. There is a "crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Bd. of Educ. of Westside Cmty. Schs. v. Mergens,* 496 U.S. 226, 250 (1990). Similarly, Muslim prayer in the Quiet Room and student artwork or symbols reflecting Islamic themes constitute private speech, not government endorsement, so long as the Quiet Room remains open to all students on a religion-neutral basis—which it is here.

In sum, Plaintiffs' allegations—even if assumed true—do not plausibly suggest that the School District endorsed, established, or coerced religious practice. The Quiet Room's decor was student-led, not imposed by the school and its availability for voluntary, individual reflection or prayer is consistent with the Nation's history of religious accommodation, not establishment. The

Establishment Clause does not require that public schools purge religious expression simply to maintain neutrality; rather, it forbids government establishment or compulsion of religion. The School District's neutral provision of the Quiet Room complies with those limits, so Plaintiffs' Establishment Clause claim must be dismissed with prejudice.

C.    **Plaintiff Jean Danowitz's Free Exercise Clause Claim Fails Because the Complaint Alleges No Substantial Burden on Religious Practice and Demonstrates that the School District Acted with Neutrality and General Applicability.**

Plaintiff Jean Danowitz's Free Exercise Clause claim, brought as guardian for M. Danowitz—the only Plaintiff who brings such claim in this matter—also fails as a matter of law, even assuming that M. Danowitz, as a nonstudent, had standing to assert it. The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I. Government action violates the Free Exercise Clause of the First Amendment only if it (1) is not neutral or generally applicable, and (2) imposes a substantial burden on religious exercise. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 542 (1993). Laws and actions that are facially neutral and generally applicable are subject only to rational basis review, not strict scrutiny. *Emp. Div. v. Smith*, 494 U.S. 872, 879, 886 n.3 (1990). "[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Kennedy,* 597 U.S. at 525 (internal quotations omitted). "Offensive content that does not penalize, interfere with, or otherwise burden religious exercise does not violate Free Exercise rights." *California Parents for Equalization of Educ. Materials v. Torlakson,* 973 F.3d 1010, 1020 (9th Cir. 2020). This is so even where there's conduct or material that plaintiffs may find "offensive to their religious beliefs." *Id; Real Alts., Inc. v. Sec'y Dep't of Health and Hum. Servs.,* 867 F.3d 338, 361 (3d. Cir. 2017) (holding that the

possibility others might avail themselves of services found to be offensive to plaintiffs' religious beliefs was not a burden).

The Complaint alleges no facts suggesting that the School District burdened M. Danowitz's religious exercise. To the contrary, the School District permitted students of all faiths to use the Quiet Room for voluntary reflection or prayer. Plaintiff claims that certain students mocked or disagreed with M. Danowitz's religious conduct and his support for the State of Israel inside the Quiet Room, but the First Amendment protects against governmental interference, not peer disagreement or social reaction. The allegations show that the School District responded to a disruptive incident by investigating and ensuring safety, not by restricting religious practice. The investigation and temporary suspensions of M. Parmer and J. Hiester, which were later rescinded, were based on disciplinary policy violations stemming from M. Danowitz's status as an unauthorized visitor—not on his religious expression—and, in any event, he was never subjected to the suspension because he was not a student at the time.

The School District permitted religious exercise by all students equally; it did not prohibit Plaintiffs' prayer or penalize them for their faith. Although courts have sometimes had to grapple with the complicated question of whether certain conduct or speech hostile to Zionism—a term subject to a wide variety of interpretations—or Israel is necessarily anti-Semitic or interferes with students' exercise of their religion in light of many Jews' religious, national, and ancestral connections to Israel, the court need not address that question here. *See, e.g., Landau v. Corp. of Haverford,* 780 F. Supp. 3d 548, 555 (E.D. Pa. 2025) (rejecting that anti-Israel speech is intrinsically anti-Semitic in all scenarios); *Groveman v. Regents of Univ. of California,* No 2:24-CV-01421, 2025 WL 391312, *2 (E.D. Cal. Feb. 4, 2025) (school encampment did not interfere with plaintiff's ability to express his views or exercise his religion in that setting). M. Danowitz was not a student, received no punishment from the School District for his unauthorized entry, and

his religious practices were not burdened by any conduct on campus. Because the School District's conduct was neutral, generally applicable, and did not impose any burden on religious practice, Jean Danowitz, on behalf of her son M. Danowitz, cannot establish a Free Exercise violation. Their claim should be dismissed with prejudice.

### D.    Plaintiffs Impermissibly Attempt to Expand Title VI of the Civil Rights Act Beyond Its Statutory Boundaries and Thus, This Claim Fails as a Matter of Law

Plaintiffs M. Parmer and J. Hiester—the only Plaintiffs asserting a Title VI claim, neither of whom are Jewish—base their Title VI claim not on their own racial or national origin discrimination, but on a grievance tied to campus discord over the Israel-Palestine conflict and vicarious indignation over how their Jewish friends, J2 and M. Danowitz, were treated. M. Danowitz, as a non-student during the events giving rise to the allegations in the Complaint, is ineligible to bring a Title VI claim, and J2 is not a party to this action. Nonetheless, Plaintiffs seek to stretch Title VI into a vehicle to challenge Palumbo's alleged "pro-Palestinian" and "anti-Zionist" climate and to vindicate, indirectly, alleged student mistreatment of their Jewish friends related to their Zionist views. But Title VI prohibits only intentional discrimination "on the ground of race, color, or national origin." 42 U.S.C. § 2000d. It does not protect religion, political ideology, theological viewpoints, disagreements about Israel, or against unfair disciplinary decisions without discriminatory intent. *See Alexander v. Sandoval*, 532 U.S. 275, 280–83 (2001); *Landau,* 780 F. Supp. 3d at 555 (rejecting that anti-Israel speech is intrinsically anti-Semitic); *Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 237 (5th Cir. 2020) (Title VI does not proscribe discrimination based on religion, and "allegations of subjective views. . . fail to give rise to an inference of intentional discrimination, much less to an inference of deliberate indifference to discrimination").

Nor does Title VI grant students a "vicarious" right to sue on behalf of peers who allegedly suffered student-on-student harassment. Rather, Plaintiffs must allege that they are members of a protected class and that there is a plausible causal nexus between the adverse action and Plaintiffs' actual or perceived race or national origin. *Canaan v. Carnegie Mellon Univ.*, 760 F. Supp. 3d 306, 321 (W.D. Pa. 2024) (plaintiff must plead facts establishing a "causal nexus between the harm suffered and [his] membership in a protected class"); *see also Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (Title VI plaintiff must show that intentional discrimination "on the basis of race" was a "substantial" or "motivating factor" in the defendant's actions). They also must show an "appropriate person" had (1) "actual knowledge" of discrimination and (2) responded with "deliberate indifference." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Plaintiffs do not meet this standard.

Trying to convert J. Hiester's and M. Parmer's disciplinary consequences—later revoked—for escorting an unauthorized visitor, M. Danowitz, into the school building into a federal civil-rights claim does not supply this nexus. Plaintiffs allege a Title VI theory that would stretch the statute far beyond intentional discrimination and would improperly enlarge the class of individuals who may sue for discrimination to include students who simply share the political and ideological views of their friends. That is not the law.

### E.    Plaintiffs Allegations Do Not Plausibly Allege a Protected-Class Nexus and Improperly Expand Title VI to Political and Associational Grievances.

Although discrimination against Jewish individuals may fall within Title VI when based on perceived race, ethnicity, or ancestry, Plaintiffs' own allegations foreclose any such theory here. *See* Exec. Ord. No. 13899, 84 Fed. Reg. 68779 (Dec. 11, 2019) ("Discrimination against Jews may give rise to a Title VI violation when the discrimination is based on an individual's race, color, or national origin"); *Landau*, 780 F. Supp. 3d at 557 (noting that precedent classifies "antisemitic

harassment and discrimination as tantamount to racial discrimination"). Plaintiffs expressly plead that they are not Jewish; do not speak Hebrew; and were not perceived to be Jewish, Israeli, or of Jewish ancestry. (ECF No. 1 at 9 ¶ 24.) They instead allege M. Parmar is "ethnically Indian-American," but nowhere do Plaintiffs claim that Indian ancestry had anything to do with the discipline or any alleged harassment. (*Id.* at 8 ¶ 20.) Meanwhile, J. Hiester's race or national origin is not pled at all, other than a vague and undifferentiated conclusion that Defendants committed discriminatory acts against all three minors—J. Hiester, M. Parmer, and M. Danowitz—"solely because the Minor Plaintiffs are not Muslims and were, or were perceived to be, Jewish," without specifying to whom this applied, by whom, or any factual basis. (*Id.* at 4 ¶ 7.)

Yet Plaintiffs later allege that Principal Thompson, during the Office of School Safety's investigation, "knew or should have known" that M. Parmer and J. Hiester were not Jewish, and that an unsigned and undated report prepared by SDP's OSS Investigation Unit, after the matter was assigned to "Steven Jefferson," referring to "five Jewish male students" was factually inaccurate. (*Id.* at 36 ¶¶ 133–35.) These allegations eliminate any reasonable inference that any decision maker with the School District misidentified J. Hiester or M. Parmar as Jewish or that their discipline was connected to any protected characteristic.

Recognizing these defects, Plaintiffs attempt to recast their claim as one for "associational discrimination," arguing they were discriminated against "on the basis of their association with Jewish students M. Danowitz and J2" citing *Kengerski v. Harper*, 6. F. 4th 531, 538 (3d Cir. 2021) and a case from the Eleventh Circuit, *Parr v. Woodmen of World Life Ins. Co.*, 791 F. 2d 888, 892 (11 Cir. 1986) both involving Title VII. (*Id.* 52-53 ¶ 200.) But Title VI contains no free-standing associational right, and the Supreme Court has squarely rejected efforts to create new implied Title VI causes of action beyond intentional discrimination based on the plaintiff's own race or national origin. *Sandoval*, 532 U.S. at 286, 293 ("a cause of action does not exist and courts may not create

one, no matter how desirable that might be as a policy matter, or how compatible with the statute"). Plaintiffs' reliance on Title VII associational cases only illustrates how far they seek to push Title VI beyond its text and purpose—from a statute addressing intentional race and national-origin discrimination into a catch-all remedy for political solidarity with Jewish friends and advocacy related to Zionism.[2]

Even if associational discrimination were cognizable under Title VI—or even if Plaintiffs had plausibly alleged that they themselves were perceived as members of a protected class—their claim still fails because they plead no facts establishing the required causal nexus between any alleged harm and their own race or national origin or M. Danowitz's or J2's Jewish ethnicity. *See Canaan*, 760 F. Supp. 3d at 321. They do not allege, even conclusory, that Defendants suspended them because of their relationship with a Jewish classmate. Instead, the Complaint affirmatively admits that M. Parmer and J. Hiester were disciplined for escorting an unauthorized non-student, M. Danowitz, into and around the building. (ECF No. 1 at 26 ¶ 100.)

Courts reject discrimination claims where the pleadings themselves show that discipline resulted from non-protected misconduct rather than discriminatory animus. *See Cornelius-Millan v. Caribbean Univ., Inc.*, 261 F. Supp. 3d 143, 153 (D.P.R. 2016); *see also Bhombal,* 809 F. App'x at 237. Here, even accepting Plaintiffs' disagreements with how the investigation unfolded, they allege no facts suggesting that Defendants suspended them because of their race or national origin rather than the undisputed violation of escorting an unauthorized visitor. And Plaintiffs further

---

[2] There are textual reasons to treat Title VI differently from Title VII with respect to any associational-discrimination theory. Title VI prohibits discrimination only when it occurs "on the ground of race, color, or national origin," 42 U.S.C. § 2000d, whereas Title VII employs broader language and—unlike Title VI—expressly covers discrimination based on religion**,** 42 U.S.C. § 2000e-2(a). Further, Title VI is tied to Congress's Spending Clause authority and conditions the receipt of federal funds**,** while Title VII regulates commerce and private employment decisions. *Johnson v. Transp. Agency, Santa Clara Cnty.*, 480 U.S. 616, 627 n.6 (1987) (quoting *United Steelworkers of Am. v. Weber*, 443 U.S. 193, 206 n.6 (1979)).

acknowledge that the discipline was rescinded following review—undercutting any inference of racial or national-origin bias.

Moreover, Title VI does not convert an alleged pro-Islam or anti-Zionist "atmosphere" into a race or national-origin discrimination claim, particularly where, as here, the minor Title VI Plaintiffs are expressly alleged not to be Jewish, and nowhere allege any ancestral or ethnic connection to Israel. For M. Parmer and J. Hiester—neither of whom claims to be Jewish or have Jewish ancestry—"Zionism" is a political or theological viewpoint, not a protected race or national-origin characteristic. Title VI does not allow plaintiffs to bootstrap discrimination claims by asserting third-party advocacy or ideological association when the plaintiff himself is not discriminated against "because of" his own protected trait. *See Wax v. Trs. of Univ. of Pennsylvania*, No. 25-269, 2025 WL 2483973, at *5-6 (E.D. Pa. Aug. 28, 2025) (rejecting associational Title VI claim where plaintiff attempted to reframe discipline based on the content of her speech as discrimination based on protected-class association). The tensions and student comments described in the Complaint concern political views on Israel and Palestine—not Plaintiffs M. Parmer's or J. Hiester's race or national origin. Plaintiffs therefore cannot repurpose Title VI as a vehicle to litigate ideological disputes or indirect grievances that might be tied to someone else's protected characteristics.

### F. Plaintiffs Fail to Plausibly Allege Direct Evidence of Discriminatory Animus or Deliberate Indifference, and Their Disagreement with School Discipline Cannot Salvage Their Claim.

The gravamen of Plaintiffs' Title VI theory is that the School District intentionally discriminated against them or consciously disregarded student harassment—but their own allegations foreclose either inference. Plaintiffs are required to show either (1) direct evidence of willful discrimination or (2) deliberate indifference by defendants to events adverse to the plaintiff. *Williams v. Pennridge Sch. Dist.*, 782 F. App'x 120, 127 (3d Cir. 2019) (citations omitted). To

establish deliberate indifference, Plaintiffs must plausibly allege that an "appropriate person" had actual knowledge of discrimination and responded in a manner that was clearly unreasonable in light of the known circumstances. *Gebser*, 524 U.S. at 290; *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014) (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645–49 (1999)); *see also S.H. v. Lower Merion Sch. Dist.,* 729 F.3d 248, 266 n. 26 (3d Cir. 2013) ("Deliberate indifference requires actual knowledge; allegations that one would have or 'should have known' will not satisfy the knowledge prong of deliberate indifference"). Plaintiffs do not meet this standard.

This case stems from the June 11, 2024, encounter in the Quiet Room, which triggered a dispute among students, leading to allegedly false rumors about J. Hiester's, M. Parmer's, and M. Danowitz's conduct in the room, which then spread on social media. Even taking the Complaint as true, Plaintiffs allege no conduct directed at them based on race, color, or national origin that could constitute the "severe, pervasive, and objectively offensive" discriminatory harassment required under *Davis*, 526 U.S. at 650-52. Their allegations describe student tensions over political viewpoints and social media posts falsely accusing them of improper conduct in the Quiet Room, not protected-class harassment.

Nor do Plaintiffs plausibly allege discriminatory animus by any decision maker. Title VI does not protect individuals from unfair disciplinary decisions made without discriminatory intent and a mistaken or imperfect investigation does not establish discriminatory intent or pretext. *Bhombal,* 809 F. App'x at 237; *Cornelius-Millan*, 261 F. Supp. 3d at 153 (noting that "even if the University had an incorrect perception that Cornelius, rather than Estades, was primarily responsible for the fight, this incorrect perception is insufficient to demonstrate pretext"). Plaintiffs' allegations make clear that they were disciplined for a legitimate, nondiscriminatory purpose for escorting an unauthorized non-student, not because of their race or national origin.

And their own allegations show that school officials promptly investigated the incident, interviewed students, communicated with parents, and ultimately rescinded the discipline. (ECF No. 1 at 20 ¶ 74, 22-23 ¶¶ 82-85, 27 ¶ 104 n.7, 36 ¶ 133.) Courts consistently find such responses incompatible with deliberate indifference. *See, e.g., Gabrielle M. v. Park Forest–Chicago Heights Sch. Dist. 163*, 315 F.3d 817, 825 (7th Cir. 2003) (deliberate indifference *"*does not require funding recipients to remedy peer harassment" or a "standard that would force funding recipients to suspend or expel every student accused of misconduct"; rather only that the "school not act *clearly unreasonably* in response to known instances of harassment").

Plaintiffs also reference online and off-campus speech by other students regarding Zionism or the June 11, 2024 incident, but such conduct is not within the school's control and cannot support Title VI liability. Courts "routinely dismiss" hostile-environment claims predicated on off-campus or internet commentary. *See M.S. v. Susquehanna Twp. Sch. Dist.*, No. 1:13-cv-02718, 2017 WL 6397827, at *10 (M.D. Pa. Dec. 15, 2017) (dismissing Title IX claims against school district because social media harassment did not occur under circumstances where the school district exercised substantial control over either the harasser or the context in which the harassment occurred) *aff'd*, 969 F.3d 120 (3d Cir. 2020). Plaintiffs allege no facts showing that any such commentary constituted protected-class harassment.

The claim fails for the additional reason that Plaintiffs plead no comparator evidence. To assert discriminatory discipline, a plaintiff must allege that reasonably comparable students outside their protected class engaged in nearly identical misconduct but received more favorable treatment. *Ke v. Drexel Univ.*, Civ. No. 11-6708, 2015 WL 5316492, at *19 (E.D. Pa. Sept. 4, 2015) ("mere favorable treatment of one member outside of the protected class as compared to a member of the protected class may not be sufficient to infer discrimination") (citing *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998)). Plaintiffs identify no student of another race or national origin

who escorted a non-student adult into the school. Vague references to disciplinary outcomes involving other students are legally insufficient. *Gazarov ex rel Gazarov v. Diocese of Erie*, 80 F. App'x 202, 206 (3d Cir. 2003) (plaintiff failed to establish a Title VI claim for national origin discrimination based on three-day suspension and that American born were given preferential disciplinary treatment because they were not similarly situated); *see Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007). Finally, Plaintiffs cannot convert their disagreement with school discipline into a Title VI violation. The Supreme Court has cautioned that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. Plaintiffs' own allegations show administrators responding promptly and in good faith to a volatile student incident. Nothing in the Complaint—taken as true—supports a plausible inference of discriminatory animus, deliberate indifference, or pretext. Their Title VI claim therefore fails as a matter of law.

### G. Defendants Gordon, Stamps and Thompson are Entitled to Qualified Immunity, and Plaintiffs' Title VI Claims Against them in Their Individual and Official Capacity Should be Dismissed From this Suit.

Even if Plaintiffs could state plausible claims—which they cannot—Defendants Gordon, Thompson, and Stamps are entitled to qualified immunity. The doctrine of qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The protection "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* As the Supreme Court emphasized, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To determine whether qualified immunity applies, courts ask two questions: (1)

whether the facts alleged show the violation of a constitutional or statutory right, and (2) whether that right was "clearly established" at the time of the challenged conduct. *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 241 (3d Cir. 2016). Here, neither prong is satisfied. No clearly established law recognizes a constitutional violation under the Establishment or Free Exercise Clauses of the First Amendment for a neutral, student accessible Quiet Room or enforcement of neutral school rules.

As discussed above, Plaintiffs have not alleged any constitutional violation under the Establishment or Free Exercise Clauses. But even if a violation could somehow be inferred, the law governing such a claim was not clearly established in June 2024. The Supreme Court's decision in *Kennedy,* 597 U.S. at 534, expressly overruled the *Lemon* test, discarding the analytical framework that had guided Establishment Clause jurisprudence for over fifty years. In its place, *Kennedy* directed courts to assess claims by reference to "historical practices and understandings." *Id.* at 535. That shift fundamentally altered the relevant inquiry and left unsettled the contours of permissible accommodation of religion in public schools. If anything, *Kennedy* made the law less clear—especially in the school context—because it signaled that the Constitution may permit, and indeed sometimes require, a more accommodating stance toward private religious expression in public institutions such as schools.

Given that landscape, no reasonable school administrator or teacher could have known that allowing a neutral, student-accessible Quiet Room—open to all students for reflection, meditation, or prayer—would violate the Establishment Clause. On the contrary, existing precedent would have led them to believe that such accommodation was lawful in light of *Van Zandt v. Thompson*, 839 F.2d at 1218-21, which upheld constitutionality of a prayer room in a state capital building. If a government-created prayer room in a state capitol was permissible under *Lemon* and the "endorsement" framework, then a student-accessible, voluntary, multipurpose Quiet Room at a

public high school would also be lawful under the more deferential "history and tradition" standard recognized in *Kennedy*.

Nor did Defendants have any reason to believe that the presence of student-generated religious items in a neutral, voluntary space imposed any constitutional duty to remove them. Plaintiffs' Complaint and own exhibits confirm that the Quiet Room bore no signage restricting entry, was labeled simply "Quiet Room," and was used by students of all faiths for meditation or prayer. The temporary presence of prayer rugs or similar items reflected the religion of the students who used the room most often—not any official endorsement by the school. To the extent the administrators were even aware of such items, *Kennedy* teaches that neutrality does not require hostility or "purg[ing] from the public sphere anything that an objective observer could reasonably infer endorses or partakes of the religious." *Kennedy*, 597 U.S. at 535; *see also Chandler*, 230 F.3d at 1316 ("The Free Exercise Clause does not permit the State to confine religious speech to whispers or banish it to broom closets"). Moreover, the Complaint contains no allegation that any Plaintiff ever complained about the Quiet Room's existence or contents prior to the June 2024 incident. Absent any notice, Defendants Gordon, Stamps, and Thompson could not have known to investigate it.

Likewise, no clearly established law holds that investigating or disciplining students for escorting an unauthorized visitor—or enforcing neutral conduct rules—violates the Free Exercise Clause. Only government actions that are not neutral or not generally applicable and that impose a *substantial burden* on religious exercise trigger heightened scrutiny. *Church of the Lukumi*, 508 U.S. at 531–32. Here, administrators responded to conflicting student reports, initiated an investigation, communicated with parents, and ultimately rescinded the suspensions, none of which applied to M. Danowitz. Nothing in the record or in existing law suggested that temporary discipline for escorting an unauthorized visitor—or investigating that incident—constituted a

burden on anyone's religious practice. Accordingly, even if the Court were to find some conceivable connection to religious activity, the individual Defendants could not have known that their conduct violated a clearly established Free Exercise right.

The Third Circuit has repeatedly recognized that school officials are entitled to qualified immunity when governing constitutional law is uncertain or evolving. *L.R.*, 836 F.3d at 241; *Miller v. Clinton Cnty.*, 544 F.3d 542, 547 (3d Cir. 2008). In the months following *Kennedy*, the Establishment Clause's contours remained unclear, especially in the context of schools balancing neutrality with accommodation. Given that uncertainty, and given that Plaintiffs' allegations describe only neutral administrative action during a period of extraordinary tension, Defendants Gordon, Thompson, and Stamps could not have known that their conduct violated any clearly established constitutional right. They are therefore entitled to qualified immunity.

### H. Plaintiffs' Title VI Claims Against Defendants Gordon and Thompson Fail Because Title VI Provides No Individual Liability, Official Capacity Claims Are Redundant, and No Clearly Established Law Shows a Violation.

Plaintiffs' Title VI claims against Defendants Gordon and Thompson in both their individual and official capacities must be dismissed. Under Title VI, the proper defendant is an entity rather than an individual, and "[i]ndividual liability may not be asserted under Title VI." *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011). Plaintiffs' official-capacity Title VI claims are also redundant of the claim against the School District because officials "in their official capacities, are part of the district itself" and Plaintiffs seek only damages, not prospective injunctive relief. *Donovan v. Pittston Area Sch. Dist.*, Civ. No. 3:14-1657, 2015 WL 3771420, at *5 (M.D. Pa. June 17, 2015). Even if they had sought such relief, it would be barred as the discipline is purely retrospective, has already been removed from their records, and "will not recur." *Doe v. Bowling Green State Univ.*, No. 3:22-CV-140, 2022 WL 4599247, at *6 (N.D. Ohio Sept. 30, 2022).

Moreover, Defendants Gordon and Thompson are independently entitled to qualified immunity which protects school administrators making good-faith, discretionary decisions. *Pearson*, 555 U.S. at 231. No clearly established law suggests that school administrators may be held deliberately indifferent under Title VI where, as here, they promptly investigated the incident, communicated to the parents, imposed and then rescinded discipline, and acted reasonably amid a volatile and rapidly evolving student conflict. Accordingly, Plaintiffs' individual and official-capacity claims under the Free Exercise and Establishment Clauses of the First Amendment and Title VI should be dismissed with prejudice.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' Partial Motion to Dismiss in its entirety and dismiss Counts I and III of Plaintiffs' Complaint with prejudice.

Date: November 17, 2025              */s/ Marjorie McMahon Obod*
                                                Marjorie McMahon Obod
                                                **DILWORTH PAXSON LLP**
                                                1650 Market Street, Suite 1200
                                                Philadelphia, Pennsylvania 19103

                                                *Attorney for Defendant,*
                                                *The  School District of Philadelphia*

#125327064v5

## <u>CERTIFICATE OF SERVICE</u>

I, Marjorie M. Obod, Esquire, certify that on the 17ht  day of November, 2025, I caused

the foregoing DEFENDANTS' PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT

and supporting papers thereto, to be filed, served, and made available for viewing and downloading

by the C/M ECF System.

Date: November 17, 2025                    */s/ Marjorie McMahon Obod*
                                          Marjorie McMahon Obod
                                          **DILWORTH PAXSON LLP**
                                          1650 Market Street, Suite 1200
                                          Philadelphia, Pennsylvania 19103

                                          *Attorney for Defendant,*
                                          *The  School District of Philadelphia*