## UNITED STATES DISTRICT COURT EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHRYN HIESTER and CHRISTOPHER HIESTER, : | | |
| JOHN HIESTER, JEAN DANOWITZ, as Guardian for : | | |
| M.DANOWITZ, a minor,  CATHERINE PARMAR and | | |
| RATNADEEP PARMAR, and MERU PARMAR, | : | |
| | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | 2:25-cv-04502 |
| SCHOOL DISTRICT OF PHILADELPHIA, | : | |
| RICHARD GORDON, IV, KIANA THOMPSON, | : | |
| RASHIDA STAMPS, KRISTIN LUEBBERT, | : | |
| And KEZIAH RIDGEWAY, | : | |
| | : | |
| | : | |
| *Defendants.* | : | **Jury Trial Demanded** |

## <u>COMPLAINT</u>

Plaintiffs bring this action against the School District of Philadelphia and its agents to redress violations of the First Amendment Establishment and Free Exercise Clauses of the United States Constitution, unlawful discrimination in violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*.), deprivation of due process in violation of 42 U.S.C. § 1983, deprivation of the liberty interest in reputation, a Federal Constitutional right, and the state law right guaranteeing the right of resident children to attend public school in the district in which they reside.

# I.    INTRODUCTION

1.    This lawsuit stems from the actions and failures to act by the School District of Philadelphia in responding to Jewish boys—or boys thought to be Jewish—who entered a room at the Academy at Palumbo high school which was clandestinely but exclusively reserved for one religion alone, and the consequences that befell these boys for that "transgression."  As punishment, the DISTRICT and its agents deprived these boys of a litany of rights afforded by the U.S. Constitution, as well as federal and state statutes and obligations owed to them by SDP and its agents and also imposed severe financial costs upon the parents of two of the boys.

2.    In this Complaint, School District of Philadelphia is referred to as "SDP" or "the DISTRICT"; Plaintiffs JOHN HIESTER, MERU PARMAR, and M. DANOWITZ are referred to as "the BOYS" or as "STUDENT PLAINTIFFS"; M. DANOWITZ is also referred to as the "Minor Plaintiff[1])," and the room at issue is referred to as "the Prayer Room," "the Muslim Prayer Room," or "the Quiet Room."  The Academy at Palumbo high school is referred to as "Palumbo."

3.    The BOYS were punished because each was believed by Defendants to be Jewish and non-Muslim, and the BOYS had entered into a room which had, as Defendant Thompson stated in a report to the Philadelphia Police Department, been "designated for one religion"—namely, Islam; and because the room into which the BOYS entered was  then reserved exclusively for female Muslims.

4.    The punishments to which each of the BOYS were subjected for these reasons include:

---

[1]    JOHN HIESTER and MERU PARMAR were minors during all relevant actions but in late 2025 each attained the age of majority.

a. Being charged with a series of violations, all meritless, relating to a non-student's entrance into and presence in the Palumbo school building (Plaintiffs JOHN HIESTER and MERU PARMAR);

b. Being charged with, and then found guilty of, harassment (Plaintiffs MERU PARMAR and JOHN HIESTER);

c. Being found guilty and suspended, ostensibly because of the BOYS' breach of rules relating to the presence of a non-student at Palumbo, as referenced above in subparagraph a. (Plaintiffs MERU PARMAR and JOHN HIESTER);

d. The Defendants' refusal to take any steps to address, but instead actually encouraged, threats of violence and death directed at the BOYS.

5. The charges against the BOYS were so clearly baseless that the DISTRICT subsequently reversed and abandoned all of them, albeit without informing the very students who were charged, or their parents.

6. The DISTRICT abandoned one charge, relating to its accusation that the BOYS HIESTER and PARMAR were guilty of "sneaking" a non-student into the Palumbo building after counsel for Plaintiffs in this action demanded that the DISTRICT review its own easily accessible records which proved that the charge was false.

7. The DISTRICT was so eager to punish the BOYS that after it abandoned this accusation it made up another, charging JOHN HIESTER with violation of a rule, which in fact did not exist, barring students from accompanying an unauthorized visitor in the school hallways. This charge was abandoned when Plaintiffs confronted the DISTRICT with the fact that no such rule existed.

8. The charge of harassment was so groundless that, without any formal notice to Plaintiffs, Defendants reversed the finding and removed any record of it from the file of each Student Plaintiff previously found guilty. But Defendants did so without providing any notice of this fact to Plaintiffs, who only learned of it formally when the DISTRICT's filings in this case referenced that determination—even though Plaintiffs had appealed the harassment

determination, and neither Plaintiffs nor their counsel were notified that the appeal had

ever been acted upon.

9.  These actions constitute violations of the rights of the BOYS including:

   a.  The imposition of punishments meted out to the Student Plaintiffs without due
       process or any process at all for allegedly committing a security breach at Palumbo.
       The Defendants issued the punishment before commencing any investigation, not
       even viewing its own video of the main entrance of Palumbo, through which Minor
       Plaintiff DANOWITZ had passed on June 11, thereby conclusively exonerating the
       Student Plaintiffs.  The secondarily referenced violation for which Student Plaintiff
       HIESTER was punished for having violated did not even exist.
   b.  The imposition of judgments against JOHN HIESTER and MERU PARMAR,
       finding them to have committed racist, sexist, sexual, and anti-Islam harassment,
       when no credible or reliable evidence supported these charges, and when the
       written and oral statements of the purported "victims" included no claims that these
       Boys had engaged in any such conduct. Defendants also deliberately ignored
       evidence seen by SDP employees which evidence was entirely exculpatory.
   c.  The public dissemination of false charges against the Boys of:  alleged harassment
       of Muslim girls and the intentional desecration of Islamic religious accoutrements
       when no credible or reliable evidence supported these accusations, including the
       statements from the girls who were present and whose accounts lacked any claim
       that any of the Boys had engaged in any such conduct.
   d.  The public dissemination of the names and/or identifying information of the Boys
       by agents of the DISTRICT, including certain Defendants.
   e.  The conscious and willful decision to improperly and unfairly process, investigate,
       and thereby make a finding of harassment against JOHN HIESTER and MERU
       PARMAR for the time they spent in the Palumbo Prayer Room, pursuant to the
       DISTRICT's anti-discrimination policies and within the DISTRICT's system for
       the enforcement of those policies.
   f.  The conscious and willful decision to improperly and unfairly process, investigate,
       and then reject the claims of discrimination which were filed by the Student
       Plaintiffs against those students who had threatened them, as well as the DISTRICT
       agents who permitted and encouraged those threats. See Exh. 22.

10.  As a result of Defendants' deliberate indifference to the severe, pervasive, and harmful torrent

    of lies about the BOYS described in this Complaint, as well as the threats of death and violence

    directed towards them, the HIESTER and PARMAR families were forced to flee the Philadelphia

    School District and relocate so that their children could safely attend public high school without

the attendant fear and devastating anxiety that the repeatedly and credibly threatened physical harm was about to come to them;

11. As more fully alleged below, certain of the individual Defendants intentionally or recklessly fabricated such claims, and certain individual Defendants publicly amplified those false claims by publishing them knowing that there was no factual basis supporting them or failing to conduct the most rudimentary of inquiries to make a determination of the veracity of the rumors, even while they knew they would be expected, as DISTRICT agents, to publicly state the rumors were false or at least unsubstantiated had that been so;

12. The baseless and summary determinations of wrongdoing and impositions of punishments on the Student Plaintiffs by the DISTRICT without due process improperly tainted the otherwise excellent academic records of these Boys, threatening their academic and employment futures, as well as validating accusations circulating in their community which destroyed their reputation in that community and forced them and their families to uproot their lives and flee.

13. The Defendant SDP and its agents refused to protect the Student Plaintiffs, who were minors placed in their care, from the threats of death and harm which threats were credible and were called to the attention of Defendants SDP and its agents, but which Defendants ignored, and instead several of its agents actively promoted and validated the false and unfounded bases for those threats.

14. Among other improper and discriminatory goals, each of these breaches of law and duty was in the service of preventing any non-Muslims from entering an exclusively Muslim Prayer Room maintained by SDP in a Philadelphia public school in clear violation of the First Amendment to the U.S. Constitution.

15. Among other improper and discriminatory goals, each of these breaches of law and duty was in the service of preventing any non-Muslims from entering an exclusively Muslim Prayer Room maintained by SDP in a Philadelphia public school in clear violation of the First Amendment to the U.S. Constitution.

16. The individual Defendants committed these acts solely because the Boys are not Muslims and were—or were perceived to be—Jewish. These discriminatory actions were permitted because of the hostility of the individual Defendants towards the Student Plaintiffs and the Minor Plaintiff who is and dared to say he was a proud Jew and a Zionist, which hostility has been permitted, condoned and embraced by Defendant SDP.

## II.    FACTUAL BACKGROUND

17. The School District of Philadelphia is an agent of the Philadelphia government, and the Academy at Palumbo is a high school within SDP. The DISTRICT receives federal funds to operate its schools.

18. Jewish and other pro-Israel SDP students, staff, and teachers were forced to endure a hostile environment so extreme that on April 19, 2024, the U.S. Department of Education's Office of Civil Rights ("OCR") launched an investigation into the many reports of antisemitism occurring within the DISTRICT. That investigation found that SDP failed to show it protected Jewish students from harassment despite "repeated, extensive notice" that students, teachers and administrators were engaging in antisemitic behavior.

19. The federal Department of Education's OCR investigation found that SDP school administrators failed to adequately address such allegations as students performing Nazi salutes, drawing swastikas on school property and uttering slurs and threats against Jewish students. The OCR found that in some cases SDP did not even document the antisemitic

incidents. Federal investigators also cited complaints about allegedly antisemitic social media posts by a school board member, an assistant superintendent and four teachers.

20. The Office of Civil Rights revealed in its December 18, 2024 Letter to SDP that the DISTRICT failed to consider whether a hostile environment existed in its schools, and that it had not demonstrated that it had taken steps to "eliminate any such hostile environment and prevent its recurrence."

21. Prior to the filing of this Complaint and following complaints by the Philadelphia Jewish community, SDP removed Defendant teacher KEZIA RIDGEWAY from her classroom for several months and subsequently reassigned her to a different school because she had posted on her social media account a series of threats—including that of gun violence—directed at Jewish parents of SDP students. RIDGEWAY remained on the SDP payroll throughout, and she remains a teacher in the DISTRICT despite her very public hostility towards Jews and the Jewish State, and her role in amplifying the false and malicious charges against the three students in this case, thereby increasing the direct harm to those students.

22. Prior to the filing of this Complaint and following complaints by the Philadelphia Jewish community, SDP removed Defendant teacher KEZIA RIDGEWAY from her classroom for several months and subsequently reassigned her to a different school because she had posted on her social media account a series of threats—including that of gun violence—directed at Jewish parents of SDP students. RIDGEWAY remained on the SDP payroll throughout, and she remains a teacher in the DISTRICT despite her very public hostility towards Jews and the Jewish State, and her role in amplifying the false and malicious

charges against the three students in this case, thereby increasing the direct harm to those students.

23. Prior to the filing of this Complaint and following complaints by the Philadelphia Jewish community, SDP removed Defendant teacher KEZIA RIDGEWAY from her classroom for several months and subsequently reassigned her to a different school because she had posted on her social media account a series of threats—including that of gun violence—directed at Jewish parents of SDP students. RIDGEWAY remained on the SDP payroll throughout, and she remains a teacher in the DISTRICT despite her very public hostility towards Jews and the Jewish State, and her role in amplifying the false and malicious charges against the three students in this case, thereby increasing the direct harm to those students.

### III.    JURISDICTION AND VENUE

24. The Court has jurisdiction over the matter under 28 U.S.C. § 1331 in that the action arises under the laws of the United States, and supplemental jurisdiction under 28 U.S.C. § 1367.

25. Venue lies in this jurisdiction under 28 U.S.C. § 1391 in that a substantial part of the acts or omissions that gave rise to the claim occurred here and Defendant School District of Philadelphia, as well as all other Defendants reside here.

### IV.    THE PARTIES

26. Plaintiff JOHN HIESTER was 16 years old at the time of the June 2024 events described herein occurred. This now 18-year old lived within the School District of Philadelphia until late August 2024, and attended high school at Palumbo, a public high school operated by SDP, from September 2022 through June 2024. As a result of Defendants' actions detailed below, JOHN HIESTER and his family were forced to flee Palumbo and the DISTRICT and relocate to a

Philadelphia suburb. JOHN and his family now reside, and he attends public school, outside the School District of Philadelphia (although still within the Eastern District of Pennsylvania).

27. Throughout his tenure at Palumbo, HIESTER maintained a 4.0 or higher-grade point average and had never received any disciplinary reprimands or charges.[2]  He is a member of the National Honor Society and was on the Distinguished Honor Roll from 2022-2024.   JOHN HIESTER is an avid and acclaimed rower. As a result of Defendants' actions detailed in this Complaint, JOHN HIESTER was subject to invidious, hostile discrimination and suffered extreme damage to his liberty interest in his reputation because of the lies about him which were spread within, then well beyond, the confines of his former high school.  All these assaults took an enormous toll on HIESTER's mental and physical health and stability; these harms were the direct result of Defendants' actions and failures to act.

28. Plaintiffs CHRISTOPHER and KATHRYN HIESTER met and moved into a home in West Philadelphia in 1992 and had lived in West Philadelphia for 32 years, until they were forced to move to a suburb outside the DISTRICT as a direct result of the conduct described in this Complaint.  The HIESTER Plaintiffs incurred significant financial expense in doing so. Ms. HIESTER works primarily in Philadelphia as a translator. The HIESTER Plaintiffs have

---

[2] To the contrary, the only times HIESTER received any attention from Palumbo administrators was when he had twice been assaulted by Palumbo students during his freshman year, one of the times by Palumbo student A.B., who also waved a picture of a gun at HIESTER another time as a form of threat, and on yet another occasion, shortly after the Hamas massacre of  October 7, 2023, A.B. wrote on and held up his whiteboard in the class HIESTER and A.B. shared, with the message "I [love] Hamas," adorned with hearts all around the message. Although he is not Jewish, HIESTER was so offended by that publicly displayed message glorifying murderous terrorists, that he photographed it and showed his parents the photo as evidence of publicly displayed antisemitism at Palumbo.

several family members who live in the city of Philadelphia, but they have no family members in the suburb to which they were forced to move.

29. Plaintiff M. DANOWITZ was 16 years old when the June 2024 events described herein occurred. He is represented in this case by his parent and guardian, JEAN DANOWITZ (together with M. DANOWITZ, the "DANOWITZ Plaintiffs"). M. DANOWITZ, who is Jewish, believes that Israel has the right to exist as a Jewish state in the Jewish ancestral homeland. For M. DANOWITZ, Judaism is synonymous with supporting Israel. He attended Palumbo during the 2023-2023 school year, after which he left to attend another school within the DISTRICT. As a result of Defendants' actions detailed below, M. DANOWITZ was subject to invidious, hostile discrimination and suffered extreme damage to his reputation as the direct result of Defendants' actions and omissions.

30. Plaintiff MERU PARMAR was 16 years old when the June 2024 events described herein occurred. PARMAR is ethnically Indian-American and is a student who lived within the DISTRICT and attended Palumbo from September 2022 through June 2024. As the direct result of Defendants' actions detailed below, PARMAR was forced to flee the DISTRICT and Palumbo and he and his family had to relocate to a Philadelphia suburb. He now resides and attends public school outside the School District of Philadelphia (although still within the Eastern District of Pennsylvania). As a result of  Defendants' actions detailed below, PARMAR was subject to invidious, hostile discrimination and suffered extreme mental and physical anguish as well as damage to his liberty interest in his reputation as the direct result of Defendants' actions.

31. Because of the myriad breaches of duty by SDP and the other Defendants at issue in this case which led to the undeterred and consequently escalating malicious lies about and threats of physical violence against their son, Plaintiffs RATNADEEP and CATHERINE PARMAR concluded that MERU PARMAR would no longer be safe if he stayed at Palumbo.  At considerable

expense the PARMARs were forced to rent and move to a home in a Philadelphia suburb so that their son could safely attend school and complete his high school career.

32. CATHERINE PARMAR was born and raised in Philadelphia. RATNADEEP PARMAR moved to Philadelphia in 2003 and since 2004, when they married, the PARMARS made their home and raised their children in Philadelphia. Both CATHERINE and RATNADEEP PARMAR spent most of their careers working in Philadelphia, and Mr. PARMAR still works in the Philadelphia area. CATHERINE PARMAR's mother is a lifelong Philadelphian who still resides in the city. The PARMARS have no relatives in the suburb to which they have moved.

33. None of the Plaintiffs are Muslim.

34. Plaintiffs JOHN HIESTER and MERU PARMAR are friends of M. DANOWITZ. Neither HIESTER nor PARMAR are Jewish, nor do they know or speak Hebrew.

35. Defendant SCHOOL DISTRICT OF PHILADELPHIA is an agency of the Philadelphia city government.

36. Defendant RICHARD GORDON IV, at all times relevant hereto, was Assistant Superintendent of the SCHOOL DISTRICT OF PHILADELPHIA for the Academy at Palumbo. Defendant GORDON is sued in his individual and official capacities.

37. Defendant KIANA THOMPSON is and was at all times relevant hereto principal of Academy at Palumbo ("Palumbo"), located at1100 Catharine Street, Philadelphia, PA 19147. Defendant THOMPSON is sued in her individual and official capacities.

38. Defendant RASHIDA STAMPS is and was at all times relevant hereto, Dean of Student

Conduct at Palumbo, located at1100 Catharine Street, Philadelphia, PA 19147.  Defendant STAMPS is sued in her individual and official capacities.

39. Defendant KRISTIN LUEBBERT is and was at all times relevant hereto, a teacher working for Defendant SDP. At all relevant times  LUEBBERT was based at The U School, located at 2000 North Seventh Street Philadelphia, PA 19122. Defendant LUEBBERT is sued in her individual and official capacities.

40. Defendant KEZIAH RIDGEWAY is and was at all times relevant a teacher working for the defendant SCHOOL DISTRICT OF PHILADELPHIA. At all times relevant hereto RIDGEWAY was based at Northeast High School, located at 1601 Cottman Avenue, Philadelphia, PA 19111. Defendant RIDGEWAY is sued in her individual and official capacities.

**V.      FACTS**

**A.      Background: An Atmosphere of Increasingly Antisemitic, Anti-Zionist and Pro-Islam, Pro-Palestinian Bias has Pervaded SDP and Palumbo**

41. Over the past several years SDP has tolerated, endorsed, and even actively fostered an atmosphere that is increasingly intolerant of Jews and Zionists, while giving favored status to, supporting, and even promoting Islam, Muslims, and anti-Zionists. The DISTRICT itself was forced to tacitly acknowledge the hostile and discriminatory attitude towards its Jewish students pursuant to an investigation into and resolution thereof a Complaint made to the U.S. Department of Education's Office of Civil Rights, which was completed in 2024.

42. The administration and staff at Palumbo have increasingly promoted and/or tolerated an atmosphere of hostility toward Zionism, the Jewish state, and toward Zionists, including but not limited to Jewish and non-Jewish students who support Israel.

43. The administration at Palumbo has increasingly and inappropriately elevated the status of the Islamic religion by incorporating Muslim religious practices into the school's official environment.

44. During Ramadan in 2023 and 2024, a giant banner saying "Happy Ramadan" was posted on a school wall that was visible to anyone entering Palumbo through its main entrance. No similar sign was posted for the holidays of any other religion.

45. In 2024, the school allowed and encouraged mass prayers for Ramadan on the school's roof deck, during school hours. The Ramadan prayer gatherings were highly publicized, with teachers promoting them and offering excused absences for students who attended.

46. Those students not participating in the streaming in and out of the classroom by Ramadan prayer participants had their learning environment disrupted repeatedly, which made it far more difficult to concentrate on their studies.

**B.     Post-October 7, 2023**

47. Since October 7, 2023, when the terrorist[3] group Hamas slaughtered, dismembered, and raped at least 1200 people in Israel and took hundreds—living and dead—hostage, SDP has permitted and at times even actively promoted a pro-Palestine, anti-Zionist agenda. See, esp. ¶¶ 9-10, *supra* and Exh. 4, pp. 37-38.

48. Several of Defendant SDP's teachers have, while acting in their official capacities as teachers, openly expressed their strong anti-Israel, anti-Zionist political positions. For example, Palumbo teacher Charlie McGeehan declared to his Palumbo students that Israel's war against Hamas constitutes "genocide." As demonstrated by the OCR investigation described earlier,

---

[3] The U.S. State Department has recognized Hamas as a Foreign Terrorist Organization since October 8, 1997. *See* https://2017-2021.state.gov/foreign-terrorist-organizations/.

the School District allows its leadership and teachers to include those who are rabidly anti-Israel and antisemitic, and include actors whose actions have repeatedly been called to the attention of the DISTRICT by the Jewish Federation of Greater Philadelphia, the Anti-Defamation League, and the U.S. Department of Education.

49. And even within Palumbo itself, there are students whose strong anti-Israel and antisemitic views and actions are tolerated by school leadership. For example, not long after the October 7, 2023 massacre of Israelis, Palumbo student A.B., whose subsequent threats to the Boys

were known to Palumbo administrators, wrote "I heart Hamas" on a whiteboard and held it up in his class. An outraged student took a picture of A.B. grinning and holding up this sign in a classroom. Further, when A.B. learned another Palumbo student, J2, was Jewish, A.B. said to J2, "I will kill you and everybody in Israel."

50. In the spring of 2024, a Holocaust survivor came to speak to the students at Palumbo. Jewish students were horrified to observe other students' blatant disrespect towards the survivor.

51. In response to the lack of civility displayed towards the Holocaust survivor, a pro-peace program "Peace Assembly" was organized by a Jewish Palumbo student. This presentation included a Jewish spiritual leader—a rabbi—and a Muslim woman, both of whom spoke about co-existence and peace.  Up until the evening before this event, attendance at the Peace Assembly was voluntary. But the evening before the event, students and their families were informed by Palumbo administration that in order to attend, students had to bring in a permission slip signed by a parent.

52. Some students posted negative social media messages about the upcoming Peace Assembly, including, "I hope that the building sets on fire midway through the event" and, "I HATE MY SCHOOL FOR ALLOWING THIS CORNY ZIONIST SHIT!!!" (emphasis in the original

post) See Exh. 1.

**C.     Events of June 11, 2024, at the Academy at Palumbo**

53. Final exams finished at Palumbo and grades were concluded the first week of June in 2024. At that point, the grade book and attendance reports were considered closed, and no more formal classes were held even though the school year did not officially end until June 14, 2024.

54. During the last few "school" days of the school year at Palumbo, little to no formal teaching takes place and students are generally free to come and go as they please within the school building, and even to leave the school campus. However, teachers are generally present in their classrooms during these final days.

55. On or about June 10, 2024, Plaintiff M. DANOWITZ, who attended Palumbo during the previous school year and whose own school had already shut down for the summer, decided to visit Palumbo and greet former classmates who still attended school there. The next morning he and JOHN HIESTER, his friend from Palumbo and rowing days, walked to Palumbo, located in South Philadelphia.

   **a. Entry to Palumbo**

56. As JOHN Hiester and M. Danowitz approached the school building, they passed Defendants THOMPSON and STAMPS standing just outside the entrance to the school. Neither THOMPSON nor STAMPS  asked why M. DANOWITZ was there, nor challenged him in any way, nor did M. DANOWITZ make any effort to evade the two school officials.

57. HIESTER entered the Palumbo school building through its main entrance at 11th and Catharine, and following his usual procedure, he placed his backpack on the scanner and walked through the metal detector in front of security personnel; there were no issues.

58. M. DANOWITZ entered Palumbo and also placed his backpack on the x-ray machine belt where it was scanned. In the same entry area as the scanner there were multiple Palumbo security guards whom M. Danowitz passed. There were no issues with M. DANOWITZ's entry into Palumbo.

59. HIESTER checked into his first period class where he obtained a note from his teacher giving him permission to leave and go to another classroom. He took this note to the computer lab, where he encountered Plaintiff M. DANOWITZ, Plaintiff MERU PARMAR, and another student, J2.

60. M. DANOWITZ and JOHN HIESTER spent some time socializing in the computer lab. After about 15 minutes these boys, along with MERU PARMAR, and J2, plus a few other friends, decided to go downstairs to the cafeteria.

61. The computer lab teacher spoke to the Boys and gave them permission to leave the classroom. As they were walking down the stairs towards the cafeteria, they noticed the library, which is located on the fourth floor. Unlike many other times when they had passed the library, this time the lights were on and there were other students there. The library bookshelves are mostly empty and the room is unstaffed, but it is air conditioned. There were many times when HIESTER had tried to take advantage of the library's air conditioning and eat his lunch there, but he had been routinely told he couldn't remain in there. But this time was different, and the Boys decided to enter the library.

### b. The Muslim Prayer Room

62. In a room adjacent to the library, Palumbo had established a Prayer Room, sometimes referred to as the Quiet Room. Based on the exclusively Islamic imagery and prayer items within the room, as well as Defendant THOMPSON's own statement to this effect to the Police, that the

room is "designated for a particular religion and having a certain flag [Palestinian] outside the room," See Exh 2, the Palumbo administration's official policy was to restrict access to this room to those of the Muslim faith. The Muslim students were very much aware of the Prayer Room's existence[4] and rules, but there is no evidence that the entire school body was ever officially put on notice of the true purpose of the Prayer Room or about any rules associated with it.

63. M. DANOWITZ had learned about the Prayer Room from his former classmates. Plaintiff JOHN HIESTER believed it should be a space open to all students, but he never actually saw anyone go in there because the door was always closed and he had repeatedly been denied access to the library, which was not in regular use as a space to study or check-out books.

64. The Boys saw that the door to the Prayer Room had a sign stating it was the "Quiet Room." There was no indication that there was any gender or religious restriction on use or occupancy of the room when observing the room from the outside. The entire lower half of the door leading to the "Quiet Room," however, was covered with a makeshift Palestinian flag. See Exh. 4, p. 8, attached. And on this day, June 11, 2024, for the first time any of the Boys had seen, the door to that room was open.

---

[4] Throughout this Complaint there are numerous examples of Muslim Palumbo students referring to and considering the Palumbo Prayer Room as their own private space with their own set of rules. In several instances Muslim students expressed outrage that non-Muslim students entered the Prayer Room, and other places where Muslim students and/or Palumbo officials indicated there were certain times of the school day set aside for females and other times for males. When various school clubs advertised their meetings, upon information and belief, it was only the Muslim Student Association that met in Palumbo's Prayer Room. See Exh. 3, and Exh.6, *passim*, attached hereto.

### i.    What the Boys Observed in the Palumbo Prayer Room

65. When the Boys entered the room through the open door, there were two or three female students present and seated at the only table in the room.  Across the room from those students, Plaintiffs M. DANOWITZ and student J2 sat down on two of the chairs they found scattered about the room. They were followed a few minutes later by MERU PARMAR and another friend of his, and later on, by JOHN HIESTER.

66. The Boys observed the following inside the Prayer/Quiet Room:

67. Arabic language on signs hanging on the interior walls, including Islamic prayer instructions; student duas or prayers; and a large mural depicting a mosque with Islamic religious crescent moon symbols, indicating the direction to face for prayer. Exh.4, attached hereto.

68. A nearly floor to ceiling sign on one wall welcomed people to the "Prayer Room," along with the message, "Happy Ramadan." See Exh.4 at p. 5, attached hereto

69. There were no religious items or information for any religion other than Islam, and aside from the Islamic accoutrements and signs, there was nothing else in the room other than the table at which the girls were sitting, several chairs, and a table upon which books and jackets were piled.

70. There was one table with chairs at which girls were seated, playing on their phones or laptops, and several other chairs randomly scattered about the room. See Exh. 4 at p. 6, attached hereto.

71. On the floor was a large area rug covering much of the room's floor, placed between the door from the library and wall with the Welcome sign. See Exh.4 at p. 7, attached hereto.

72. The decorations on the door and interior of the Palumbo Prayer Room are all Arabic language or imagery, along with what appeared to be English translations of some of the Arabic. See Exh.4(a), attached hereto.

73. A laminated placard on the wall entitled **Quiet Room Guidelines** containing instructions for the use of the room which begins: "The Academy at Palumbo Muslim Student Association brings to you the Quiet Room. "  See Exh. 4 at p. 2.

### ii.    What the Boys did While in the Prayer Room

74. After entering the Prayer Room, J2 sat down and using his phone, began videoing the room[5]. M. DANOWITZ said a quick Jewish prayer in Hebrew and the three female students, by their own admission, burst out laughing at the two boys. MERU PARMAR and another student also entered the room and sat down near the other boys; both were looking at a book and speaking quietly to each other.

75. When M. DANOWITZ responded to the girls' laughter by saying, "How is me exercising my [First] Amendment right funny to you?," one of the young women responded, "Why are you guys even in here?"

76. M. DANOWITZ responded that he "has a right to religion and a right to pray, which is in the Bill of Rights." He added he is a "proud Zionist." J2, who is also Jewish, continued videotaping what was on the walls of the Prayer Room and what else was in the room. He began singing a Hebrew song, "Am Yisroel Chai," which means "The people of Israel live." While J2 was singing, M. DANOWITZ stood up and did a handstand. Immediately after this, JOHN HIESTER entered the room and sat down where the other boys were seated. Neither HIESTER nor PARMAR said anything out loud while they were in the Prayer Room. These Boys looked at their cell phones for a few minutes, talked quietly, and then all of them left the Prayer Room and then the library. All this activity in the Prayer Room during the short

---

[5] J2 and his family had been communicating with Palumbo regarding the antisemitism they perceived to be pervasive and problematic. J2 later informed SDP officials See Exh.5 at p. 26, attached hereto, that he was filming inside the Prayer Room in order to show his parents that the room was not inclusive of religions other than Islam.

period—fewer than ten minutes—while the Boys were in the room was recorded on a video taken by J2. A truncated version of that video is at Exh. 6A.[6]

77.  At no time did any of the Boys touch or even approach any of the female students in the Prayer Room, as confirmed by the statements of the female students themselves, J2's video, and the Investigation Records created by the SDP investigator and other SDP employees. See Exh.5, attached hereto.

78.  While the Boys were in the Palumbo Prayer Room, the girls were working on their laptops, playing video games,[7] and engaged in other leisure activities—none of them were praying.

79.  Before exiting the Prayer Room, M. DANOWITZ removed a laminated sign that had been hanging on the wall and gently placed it on the floor, where he left it leaning against the wall. J2 recorded this, as well.

### c. HARASSMENT FOLLOWING THE BOYS' VISIT TO PALUMBO MUSLIM PRAYER ROOM

#### i.  Harassment by Muslim and other Students

80.  Within moments of leaving the library, JOHN HIESTER began receiving a flurry of text messages from Palumbo students demanding to know whether M. DANOWITZ was in the building. When M. DANOWITZ was informed of this, he went downstairs and left the building.

---

[6] The full version of the video is presently the subject of a Third Party subpoena, which is being challenged. Four of the Plaintiffs have seen the full version within hours of it being taken, as did at least two DISTRICT employees, Gina Crayton and Victoria Trower.

[7] One of the girls in the room wrote in her Statement which is in the Investigative Report that she was "playing roblox," on her phone throughout the time the Boys were in the room. See Exh. 5 at p. 57.

81. Shortly after M. DANOWITZ left, JOHN HIESTER also left the building with another classmate, A.A., a Muslim Palumbo student. Eventually JOHN HIESTER and A.A. ended up at the HIESTERs' house. While there, JOHN HIESTER received 11 phone calls from A.B., a Muslim Palumbo student who had previously assaulted him, see *supra* ¶ 39 and p. 6, fn 2.

Since that assault, HIESTER had learned about A.B.'s death threat to J2, see, *supra* at ¶ 39.

82. Although he ignored the first eleven of A.B.'s calls, when HIESTER finally answered his phone, A.B. demanded to know where he and M. DANOWITZ were and demanded that they return to Palumbo because he had "unfinished business" with them and wanted to fight them. A.B. threatened that if HIESTER and DANOWITZ did not return to the school, he would come to their homes. HIESTER took A.B. threats very seriously, given A.B.'s physical assault history.

83. HIESTER also received multiple threatening texts, phone calls, and Facetime calls from other Palumbo students, several of whom he knew were close to A.B.

84. After they left the Palumbo Prayer Room and the library, MERU PARMAR and J2 returned to their computer lab classroom.

85. Student A.B. and three others congregated outside that room and confronted PARMAR and J2 from the hallway outside. As described earlier in this Complaint, prior to the events of June 11, 2024, A.B. had assaulted HIESTER and threatened J2.

86. A.B. and five others entered the computer lab, surrounded and harassed MERU PARMAR and J2, repeatedly asking what they had done in the Prayer Room, and falsely accused them of having "trashed" it. When asked what he was doing in the Prayer Room, J2 said that he "was praying." One of A.B.'s friends yelled out: "Which religion?"

87. The Palumbo students also openly expressed fury towards DANOWITZ and HIESTER, for whom A.B. and his friend indicated they were searching.

88. Following the volatile confrontation in the Computer Room, MERU PARMAR felt uncomfortable remaining at school and arranged an early dismissal with his mother who picked up her son from school.

   ii.    **Palumbo Administrators Begin Harassment of Student Plaintiffs**

89. Shortly thereafter, Defendant THOMPSON contacted JOHN HIESTER's parents, informing them that their son had left school early without permission.  Mr. HIESTER reached his son and instructed him to return to school immediately, which JOHN HIESTER did. He encountered Defendant Principal THOMPSON upon entering Palumbo, and she escorted HIESTER to Defendant Dean of Conduct STAMPS' office in order for him to, as instructed, fill out an Incident Report. HIESTER admitted that he had been in the Palumbo Prayer Room, but he denied any offensive behavior had occurred there.

90. After being released by STAMPS, HIESTER encountered A.B. and several of his friends in the first-floor bathroom. A.B. demanded to know why HIESTER and his friends "trashed the Prayer Room," and yelled that he and his friends should not have gone in there. Although HIESTER explained that there had been no trashing of the Palumbo Prayer Room, but A.B. still warned HIESTER that the next time he tried "that," he—A.B. and friends—would "do something" to stop them. A.B. made it clear he wanted to find HIESTER's friends in order to fight them.

91. When HIESTER left Palumbo for the day, he saw A.B. and several other students gathered on the southwest corner of 12th and Catharine Streets. Given A.B.'s ominous phone calls and

antagonistic questioning, HIESTER felt threatened. He feared A.B. and his friends would physically attack him, as A.B. had done in the past. To remain safe, JOHN HIESTER planned out a different route home than he normally followed. Once he reached his home, HIESTER stayed inside his house for the rest of the day and night.

### a) Principal THOMPSON Contacts JEAN DANOWITZ, asserting the Unsubstantiated Allegations as if They Were True

92. Defendant Principal THOMPSON called JEAN DANOWITZ around 3:00 p.m. on June 11. After introducing herself, THOMPSON claimed that JEAN's son had snuck into Palumbo that morning. THOMPSON also claimed that she had received multiple complaints about her son from girls who were present in the Quiet Room, which her son and friends had entered. THOMPSON told JEAN DANOWITZ that the girls in the Prayer Room claimed that her son had loudly announced that he "hates Muslims," had made sexually simulated or suggestive dances or maneuvers— including "humping the floor"—and proceeded to rip posters off the wall and trash the room. JEAN DANOWITZ told THOMPSON that she would speak to her son about the allegations and then get back to her.

93. WHEN M. DANOWITZ returned home his mother told him about Palumbo principal THOMPSON's call. She repeated to him what THOMPSON had said, and what she claimed the girls said. Shocked, M. DANOWITZ told his mother that everything THOMPSON claimed had happened in the Palumbo Prayer Room was false.

### D.    JUNE 12, 2024: The Lies and Threats Continue

94. The next day, June 12, 2024, M. DANOWITZ learned that threatening messages, along with his name, Instagram profile, and the name of his current school, were being shared again and again on social media, along with the names and profiles of his friends JOHN HIESTER,

MERU PARMAR, and J2, who were with him in the Palumbo Prayer Room the day before. Those publicly disseminated messages–repeated false and malicious allegations about the student Plaintiffs' alleged desecrations and conduct in the Palumbo Prayer Room, as justification for the physical threats, including death threats.

95. That same day, M. DANOWITZ's sister received a message from a former classmate who said she'd heard that her brother had supposedly ripped the head scarf off a Muslim girl and trashed the "Muslim Prayer Room" at Palumbo. See Exh. 6, p. 28.

96. The threatening and profane social media posts about the Boys escalated throughout the day. Some of them are detailed below.

97. On the morning of June 12, KATHRYN HIESTER and JOHN HIESTER met with Defendants THOMPSON and STAMPS in a conference room at Palumbo. When JOHN informed the school officials about the threats that were circulating online against him and his friends, the school officials expressed little interest and even less concern. Instead, they interrogated HIESTER about why he entered the Prayer Room and, especially, why he entered during "girls time."  This surprised JOHN who said he was not aware there were sex-segregated hours for entering the Prayer Room: that there was nothing posted outside the room, nor had he ever seen or heard reference to such a restriction, but because the library was not in use and he had been told he couldn't be in there during lunch hour, he had never been able to observe what went on in that room.

98. Also that morning, Defendant THOMPSON called Plaintiff RATNADEEP PARMAR, informing him that a statement from his son was needed about an alleged incident that happened the day before "in the Prayer Room," and that there were "serious accusations" including the harassment of girls that needed to be addressed.

99. When MERU PARMAR arrived at school that day, he was directed to Principal THOMPSON's office and, once there, he was instructed to fill out an Incident Report about what happened the prior day. Both before and after writing his statement, PARMAR tried to tell Principal THOMPSON about the frightening threats and nasty claims that had been made towards and about him and the other boys who were in the Muslim Prayer Room the day before.

100.    Defendant THOMPSON ignored the threats and instead kept insisting that PARMAR fill out the Incident Report.

101.    In the Principal's Statement that she provided later to an SDP investigator, Defendant THOMPSON described her interaction with MERU PARMAR this way:

> [MERU PARMAR] handed me a sheet that said 'I don't know anything' on every line. I asked him why he was giving me this because it didn't say anything. He then started with a bunch of doubletalk about how he didn't do anything. I stopped him and told him we were still investigating and he'd better hope it's not discovered that he's lying.

> See Exh. 5 at pp. 31-32.

102.    MERU PARMAR insisted that the statement he actually made: "I don't know of any incident," was true. THOMPSON responded by calling him a liar. When PARMAR tried to engage her in discussion, she abruptly dismissed him by sternly and repeatedly telling him, "Goodbye."

103.    STAMPS and THOMPSON both informed HIESTER and PARMAR while interrogating them about what happened in the Prayer Room that there were cameras in that Room. No footage from any such camera has ever been produced to the Boys, nor was there any reference to it in the Investigative Report, See Exh. 5, attached hereto. If STAMPS' and

THOMPSON's statements were true, the absence of footage in the Investigative Report is telling.

104.    Defendant Principal THOMPSON was indifferent and ignored the threats made against PARMAR and his friends and made clear she believed he was lying about his own conduct and that of his friends.

## E.    Social Media Posts About Events of June 11

105.    On or about June 12, 2024, an Instagram account titled Palumbo.Positivity which includes the Palumbo school logo, repeatedly provided false and salacious descriptions of what happened in the Palumbo Prayer Room on June 11, see Exh.6 p. 1 including "grinding on the floor" and "exclaiming that they are openly Zionist and hate Muslims." Within a day the names of the four Boys were added to the Palumbo.Positivity post, ibid., so that anyone who had not already known who they were could then identify them. Many more social media messages encouraged anyone who saw the posts to "keep spreading the story and hold these people accountable." Virtually every post labeled what the boys allegedly did as hate crimes, and some even referred to the "hate crime" in the context of "Palestine's population … being severely attacked by Israeli forces."

106.    On or about June 12, 2024, a student using the Instagram handle "donfrmnorf" sent this message to JOHN HIESTER: "don't let me catch u w your manz outside Palumbo yall niggas gon die ion play w my religion like that." HIESTER understood this to be a serious physical threat.  See Exh. 6, p.27.

107.    One social media post listed all the social media accounts of the Boys. See Exh. 6, p. 39.

108.    A public Instagram post by Palumbo student E.R. with the account name of "ramoswithanr" identified JOHN HIESTER, M. DANOWITZ, MERU PARMAR, and J2 by first and last name, and added: "Only one of these students have [sic] been punished." And the instructions:"FUCK 'EM UP." See Exh. 6, p.38.

109.    "Ramoswithanr" also posted about the "hate crime" at school and feeling "unsafe" because the school had not acted to catch the offending students and when talking about the school and its claims of diversity, wrote "y'all make a total fucking 360 by allowing white privileged kids who don't even attend…to destroy a sacred place during one of the most brutal genocides in their own home."  That student urged anyone reading the post to spread the word. See Exh. 6. p. 35.

110.    Yet another Instagram post identified the Instagram accounts and full names of the student Plaintiffs. See Exh. 6, 39.

111.    On or about June 12, JOHN HIESTER'S erstwhile friend A.A., sent JOHN HIESTER the following threatening message, see Exh.6, p. 29.

> "You're so cooked
> The whole Palumbo is on your ass
> Even I'm mad too you're not supposed to be in that room
> From what I heard yeah I'm sorry [JOHN HIESTER] this is kind of fucked what [M. DANOWITZ] and [J2] did so I'm sorry, bro I can't have my representation [sic] being friends with somebody that did such an incident"

## F.    The Plaintiff Parents' Concerns Increase

112.    Plaintiff parents and their sons, ("the Families") became increasingly concerned by Defendants' failure to protect their children and they conferred by conference call on the night of June 12 to discuss the threats that the boys were receiving, as well as possible ways to stop the false accusations and threats that were spreading on social media far beyond the Palumbo

community.  The Families then met up physically at the home of J2's family to see the video J2 had taken in the Palumbo Prayer Room that morning.  J2's father did not want to share the video via email. The mothers recalled being relieved after seeing the video because it showed that there was no trashing of the room, no sexual simulations of any kind, and no physical contact between their sons and the girls. The video ended with the boys trooping out of the room.  The Families also called the Philadelphia Police Department at that point, because it was becoming clear that the DISTRICT would do nothing to protect their sons and the threats continued escalating.

113.   By email sent June 12, 2024, at 9:00 p.m., Plaintiff KATHRYN HIESTER alerted Defendants THOMPSON and STAMPS about the threatening posts naming the students, a planned walkout by Palumbo Muslim students in protest of what had allegedly happened in the Prayer Room the day before, see Exh. 7 and the alarming fact that actual death threats were being sent. Ms. HIESTER also wrote that students at other schools in Philadelphia were also talking about the incident.  KATHRYN HIESTER asked for reassurance of increased security and that the administrators review any footage of the library.  See Exh. 7, attached hereto.

## G. Palumbo Suspends Student Plaintiffs  JOHN HEISTER AND MENUR PARMAR

114.     Despite the various cries for help by Plaintiffs to protect their children, Defendant THOMPSON's response was to callously ignore and even denigrate those concerns.  Instead, that same evening just over an hour after having received KATHRYN HIESTER'S alarmed email, Defendant THOMPSON's response was to inform KATHRYN HIESTER that she had shared "this" information with Defendant Assistant Superintendent GORDON, who then instructed THOMPSON to "suspend the students for violating the Code of Conduct's rule of unauthorized entry into school property."  See Exh. 5 at p. 97.

115.    At the time Defendant GORDON instructed THOMPSON to suspend the students, both administrators knew or should have known that the allegation on which the suspensions were based had not been investigated; that neither the students being punished nor their parents had been given notice of the allegation; and that neither the students nor their parents had been given an opportunity to respond to the allegation, all of which are required under the DISTRICT's Rules and Pennsylvania law; and, further, that the rule the Student Plaintiffs were alleged to have violated did not exist.

116.    It was not until later, when Plaintiffs' counsel wrote to a lawyer for SDP, pointing out that there are video cameras in the entry area of Palumbo that any effort was made to see whether M. DANOWITZ had entered Palumbo through the front door. Those cameras showed that M. DANOWITZ not only walked in through the front door of Palumbo on Jule 11, 2024, but that he placed his backpack on the x-ray scanner and passed both security personnel as well as Defendants principal THOMPSON and Dean STAMPS on his way into the building.

117.    Although the DISTRICT and THOMPSON at all times had control of the video completely exonerating the BOYS and the accusations that they had snuck in a trespasser to the school were completely fabricated, it still took the school many weeks before the suspensions were finally removed from the students' academic records.[8]

118.    Palumbo administrator STAMPS and THOMPSON had interrogated the Student Plaintiffs about why they entered and what happened in the Prayer Room on June 11, but they never

---

[8] Apparently frustrated that they could not charge HIESTER with having snuck in M. DANOWITZ to Palumbo, SDP on August 16, 2024, informed Plaintiffs' counsel that it was reducing JOHN HIESTER's punishment to "in-house suspension," based on, it claimed, his "awareness that Mr. DANOWITZ was an unauthorized visitor to the building, having entered at the same time, and for leaving school early without authorization." When Plaintiffs' counsel informed the DISTRICT that such a rule also did not exist in SDP's Code of Conduct, and in any event the DISTRICT could not subject the student to "double jeopardy," this charge was also eventually removed from HIESTER's disciplinary record. See Exh. 8, attached hereto.

asked a single question about how M. DANOWITZ had obtained access to the building. Their interrogations and the Incident Reports they directed the Student Plaintiffs to complete made clear that the administrators' interest was solely the BOYS' presence and alleged conduct in the Prayer Room. The alleged trespass violation was merely a pretext to show the school community that Palumbo officials were punishing the "wrongdoers." This was apparently in response to the social media posts and emails the school administrators were receiving about the "hate crime" that had been committed in the Palumbo Prayer Room, and the failure of the school to take action. See Exh. 32-35, 41.

119.    The parents of Student Plaintiffs HIESTER and PARMAR were aghast that the school's response to their fears about the physical safety of their sons was to summarily punish them without any proof of wrongdoing, an act which served to validate the lies and threats being hurled at their sons online and orally. The parents of J2 already had an appointment to meet with Principal THOMPSON on the morning of June 13 to discuss complaints they had of antisemitism at Palumbo that they had shared earlier with principal THOMPSON. The other families decided this was very much the same issue—the safety of their children at Palumbo— so they resolved that all would accompany J2 and his family to meet with the school official the next day. They wanted Principal THOMPSON to understand that their boys were in danger and that they expected the school to send out a calming message to the school community that no facts had yet been proven and students needed to de-escalate. The Plaintiff families also decided to file a police report about the cyberbullying and threats. See Exh. 9, attached hereto.

**H.    June 13: Families Seek Safety Assurances from Palumbo, Instead Endure Harassment in the School Building and are Thrown Out of School by Principal**

120.    On Thursday morning, June 13, 2024, at approximately 10:30 a.m., the HIESTER Plaintiffs, DANOWITZ Plaintiffs, and PARMAR Plaintiffs, along with J2 and his family, met at Palumbo.

121.    Defendant THOMPSON appeared in the Palumbo lobby and immediately asserted that she would only meet with J2 and his parents, who had a previously scheduled appointment. She told the other families that they had to leave the school building immediately. THOMPSON said that if the Plaintiff parents wanted to speak with her, they had to make an appointment for a different day—this, although the school year ended the following day—and she would only meet with them in the presence of Defendant Assistant Superintendent GORDON.

122.    JEAN DANOWITZ told Defendant THOMPSON that it was essential that the parents meet with her that day to deal with the increasing number of threats the Boys were receiving on social media.

123.    Defendant THOMPSON responded to DANOWITZ's urgent plea for a meeting about the boys' safety by laughing out loud, tilting her head to the side, and stating "Well, there's *multiple* sides to that story." THOMPSON refused to meet with the other families and instead called for school security and the police to remove them from the building. These Plaintiffs never heard anything from Defendant THOMPSON about their urgent, documented security concerns.

124.    Defendant THOMPSON wrote in her Principal's Statement as part of the DISTRICT investigation that although she had a meeting scheduled with [J2's] family," the Families of

the other boys also "showed up and tried to ambush me into meeting with all of them at one time." See Exh. 5 at p. 103.

125.    When the Families exited the building, they were immediately approached by three Philadelphia police officers and Thomas Terry, the SDP Area Manager of the Office of School Safety. These security officers told Plaintiffs that the school had called them earlier that morning to file a police report against them. See Exh. 2. The Families explained about the death threats and hostility unleashed by a fabrication of what happened in a Prayer Room in the high school. SDP Security Officer Terry recommended that Plaintiffs go to SDP's main office building to file a report against the school and Principal THOMPSON.

I.    **Families File Statements with and Show Exculpatory Videos to SDP Employees at SDP Central Building**

126.    The Families and that of J2 then proceeded to the central SDP building where they met with SDP employees Victim Assistance Specialists Gina Crayton and Victoria Trower, to whom they each gave a detailed description of everything that had occurred over the previous two days at Palumbo. The Plaintiffs all wrote Statements for Crayton and Trower to submit to the Superintendent of SDP. See Exh. 10, attached hereto.

127.    The complete version of the video of the June 11 Prayer Room Incident made by J2 which showed what occurred throughout the BOYS' presence in the Palumbo Prayer Room was shown to Crayton and Trower while the Families were meeting with them. The father of J2 showed them the video, while some of the Plaintiff parents watched it with them, which was the second time they had seen it. Crayton and Trower told the Families that an investigator would contact Plaintiffs the following morning. That did not happen.

128.    SDP employee Gina Crayton spoke with Defendant THOMPSON on June 13. Crayton told THOMPSON that the Families had shown her J2's video of the Boys in the Prayer Room on June 11. THOMPSON responded to Crayton, "I told her I had never gotten any photos or videos and that MERU PARMAR's statement only said "I don't know what happened."  See Exh.5 at p. 43.

129.    THOMPSON never mentioned that an SDP employee had seen the exculpatory video, nor, apparently, did THOMPSON make an effort to obtain and see the video.

130.    The false accusations against JOHN and MERU continued, yet not one of the SDP leadership or any of its agents took a single step to address in any way the threats against them or express concern for their safety. Defendant THOMPSON immediately and without any credible basis sided with those accusing Minor Plaintiff of various hostile acts, referring to the girls as "the victims" and making it clear to the Student Plaintiffs that she neither believed them nor cared  about the threats made against them.

131.    Defendant SDP and its officers, staff, and employees did nothing to address or prevent the ongoing harassment and, indeed, as more fully addressed below, they participated in and encouraged it.

132.    On June 14, 2024, Plaintiff JEAN DANOWITZ sent a letter to every member of the Philadelphia Board of Education, the Superintendent of Schools, and Palumbo Principal KIANA THOMPSON, detailing the events of the previous days and imploring them to take action to protect her son and the other Student Plaintiffs. See Exh. 11.  Not one Philadelphia school official responded to that letter.

**Parents' Anxiety Increases as Threats Increase**

133.    Despite the escalating threatening and defamatory posts and comments on the Palumbo. Positivity Instagram account as well as other social media accounts, and despite the repeated pleas of the Boys' parents, nobody at Palumbo, including Dean of Conduct Defendant STAMPS, acted to shut down the posts or identify the individuals posting these threatening, false, and defamatory accusations. Defendant STAMPS claimed the Palumbo.Positivity account is not an official Palumbo account and therefore she was unable to find out who was running it or how to influence that person to stop it.

134.    In contradiction of her claim, Defendant STAMPS had previously demonstrated her ability to take aggressive action to shut down social media posts she deemed offensive.[9]

**K.    SDP Teachers Whip up Escalating Hatred Towards the Student Plaintiffs**

135.    On the evening of June 13, 2024, two days after the alleged incident in the Palumbo Prayer Room, one day after the Student Plaintiffs were suspended, and weeks before any investigation by Defendant SDP or its agents had begun, Defendant SDP teacher KRISTIN LUEBBERT rose from her chair during the public comments section of the Philadelphia School Board meeting, and characterized with salacious and malicious theatricality, what she claimed had occurred on June 11, 2024 in the Palumbo Muslim Prayer Room as "an appalling display of sacrilegious defilement."  LUEBBERT intoned:

> Please prepare yourselves, the incident I am about to relate to you shocks the conscience and human decency in all of us:

---

[9] Specifically, Palumbo had a school store that sold candy and other treats to students. When Instagram accounts using Palumbo in their names began surfacing during the 2023-24 school year that featured confessions of crushes images of students asleep in class, defendant Stamps had no difficulty in suppressing. She insisted that every account owner take down their account and confess to being the owner, chased down the owners of some accounts, meted out in-school suspensions for some account owners, and closed the school store as punishment.

A couple of days ago, at a South Philadelphia magnet school, several male students admitted a non-student into the building. The trespasser is a student at St. Joseph's Prep School. These students then went to a room designated as a prayer space in which several Muslim girls were gathered. The intruders–yelling that they were "proud Zionists"- proceeded to invade the space, rip things off the wall, throw prayer rugs around–and–in an appalling display of sacrilegious defilement, proceeded to grind and writhe on the floor in an imitation of sex acts.

**Take that in**: this was a planned action that included acts which any Muslim girl or woman would be deeply offended and traumatized by. I have to believe that these students– immature and lacking in judgment as they may be–were emboldened partly by the fact that this district and this board has not firmly spoken against hate crimes in our schools. [10]

136.    Luebbert claimed the Boys had been emboldened by a failure of SDP to punish what she

described as a FERPA [Family Educational Rights and Privacy Act] violation which she

claimed had taken place at the DISTRICT's Northeast High School.


137.    This claim was repeated in another social media post echoing and amplifying LUEBBERT's

by another DISTRICT employee, Defendant KEZIAH RIDGEWAY, who was then a teacher at

Northeast High School and who had initiated the FERPA violation complaint. The incident at

Northeast High School had also not yet been investigated or adjudicated, despite Defendants

RIDGEWAY and LUEBBERT posting as if it were a fact. When an investigation eventually

took place regarding the Northeast High School incident conclusion the SCHOOL DISTRICT

OF PHILADELPHIA determined that no FERPA violation had occurred.

---

[10] These public comments remain online at https://www.philasd.org/schoolboard/meetings/#166975367267505a90190-0605, beginning at approximately 2:03:09. In addition to LUEBBERT publicly repeating and characterizing in the most heinous light what she knew were uninvestigated rumors, Defendant LUEBBERT chose to post online a written version of her testimony at https://docs.google.com/document/d/12ZJFZGt2AFG2XpuEXfjPMcIdMbK86zjvtisdQ0eLh9g/edit.

138.    Also on June 13, more malicious and false statements were posted based on the information on the Palumbo.Positivity Instagram account. The June 13 post expressed anger over the purported failure of the Palumbo staff to deal with the "hate crime," and suggests that readers write to the principal saying that they "feel unprotected, unsupported and uncared for as a Palumbo student."

139.    Defendant LUEBBERT reposted and commented on her own Instagram account the Palumbo. Positivity post on which the names of the Boys were provided. See Exh. 6 at p. 1 LUEBBERT did this, although she had to know that posting uninvestigated rumors and the names of students being accused of committing wildly inappropriate and offensive conduct was wholly inappropriate and unprofessional for a school teacher. Luebbert made no investigation of the facts to determine whether the circulating rumors were true, nor did she reach out to confirm the results of anyone else's investigation, because if she had, she would have known there had not yet been any investigation. LUEBBERT seized on the rumors and fanned the flame to ensure they reached the largest possible audience, with no concern for the harm it would do to the reputation or physical health of the accused students.

140.    That evening, at 6:07 p.m., Defendant SDP teacher RIDGEWAY promoted LUEBBERT's claims in the following Instagram message, see Exh. 12, attached hereto:

> Powerful Testimony from @teacherinphilly [Kristin Luebbert] regarding a deeply disgusting act towards Muslim girls at a Magnet school in South Philly. This has occurred as a result of the @PHLschoolboard @PHLschools lack of response/stance on the FERPA violations and Islamophobia permeating schools.

141.    Also on this day, UncommittedPA, reposted a message that Defendant teacher LUEBBERT posted using her @teacherinphilly handle: "@teacherinphilly shared that a prayer space for Muslim children was desecrated by self-proclaimed male 'Zionists' at a #phlEd school."

Defendant RIDGEWAY reposted, republished, and further disseminated this false accusation on her then-current social media account "teachkizzyteach." See Exh. 13, attached hereto. Defendant Keziah Ridgeway has long used her social media accounts to activate and energize other Philadelphia school teachers, as well as Philadelphia school students to agitate against Jews and supporters of Israel.

142.    On June 14, 2024, at 11:11 a.m., Plaintiff KATHRYN HIESTER emailed Defendant GORDON, Gina Crayton, and Victoria Trower following up on her previous request, informing them that she had not yet been contacted by an investigator despite Crayton and Trower's assurances, and asking what the SDP was doing about the social media posts threatening and maligning the Boys. See Exh. 14.

**L.    Safety Transfer Request Ignored**

143.    On June 19, 2024, KATHRYN HIESTER sent an email, see Exh. 15, to Victoria Trower requesting her child be transferred to another school for safety reasons following the ongoing threats and lies.  Plaintiff HIESTER pointed out that the threats her son had received from fellow Palumbo students, left him feeling "ostracized, alienated and …. unsafe."  She also noted the wide reach of the social media posts such that even teachers from other schools and "random adults" had repeated the malicious and false claims on social media.  She referred to the assault by A.B. and his continuing threats.  and noted that since first contacting her on June 13, 2024, she had not yet heard from investigators as promised.  Plaintiff HIESTER expressed her "urgent" concern for the physical and mental well-being of her son, as well as his academic achievements.  She pointed out the dismissive and inexcusable treatment she received from THOMPSON and STAMPS when alerting them to the threats and that their inappropriate response was to suspend to her son.

144.   Defendant SDP ignored KATHRYN HIESTER's request for a safety transfer. She never received any response.

**M.   Another Parent Weighs in**

145.   On June 24, 2024, at 3:16 p.m., Plaintiff CATHERINE PARMAR emailed Gina Crayton, expressing her grave dissatisfaction with the school's handling of the incident. In the email she reiterated much of what KATHRYN HIESTER had said in her June 19 email to Victoria Trower.  She also addressed the fact that when her son gave his Incident Report saying nothing had happened in the Prayer Room, THOMPSON did not believe him and ignored the threats against him, one of which was a text that he showed to her saying he "was going to get jumped."   Plaintiff CATHERINE PARMAR went on to detail what she described as disrespectful comments made by THOMPSON when the Families went to see her on June 13, as well as the public comments falsely tarring the Boys with claims that they committed hate crimes which were shared by teacher Defendants RIDGEWAY, LUEBBERT and others.  Like KATHRYN HIESTER, CATHERINE PARMAR expressed concern for her son's safety and his health. See Exh. 16. PARMAR's letter of distress went unanswered.

146.   Not until June 26, 2024, did anyone from the DISTRICT follow up with the parents of any of the boys involved in the June 11 incident. On that date, Steven Jefferson, an investigator with SDP's Office of School Safety Investigations Unit, reached out to the parents of the non-Muslim boys who had been in the Palumbo Prayer Room on June 11. But as more fully alleged below, neither Jefferson nor any other SDP agent ever actually engaged in a competent, thorough investigation.

**N.      SDP's Sham Investigations and Disciplinary Procedures Ignored Student Plaintiffs' Due Process Rights**

147.    On or about June 13, 2024, Defendant principal THOMPSON made a complaint to the Office of School Safety ("OSS") regarding a possible hate crime occurring at Palumbo two days earlier. The matter was assigned to Steven Jefferson of SDP's OSS Investigation Unit. As further detailed below, this investigation was a sham, it was based on a complete lack of reliable or credible evidence, and it ignored the exculpatory evidence that was knowable and within the control of SDP. Jefferson wrote an Investigator's Report which is unsigned and undated. See Exh. 5, at p 13.

148.    In his "Summary of Complaint," Jefferson wrote that on June 11, 2024, there was a disturbance at Palumbo when "[A]t approximately 9:35 am five (5) Jewish male students entered the Quiet Room/Prayer Room that were occupied by two (2) female Muslim's (sic) students." He then went on to note that these "Jewish" male students allegedly laughed at the females, took pictures of them without their hijabs on, made obscene gestures, tore posters from the walls and spoke Hebrew. See Exh. 5 at p 6.

149.    Either defendant THOMPSON misinformed Jefferson or Jefferson reached his own inaccurate conclusions regarding the complaint made by THOMPSON. Even the most basic details are wrong. From the many inconsistent statements obtained by DEFENDANT THOMPSON, it is almost impossible to discern how many males entered the Quiet Room/Prayer Room that morning. Further, Defendants THOMPSON and STAMPS knew or should have known that not all the Boys were Jewish. These false characterizations are further evidence of the bias of Defendants THOMPSON, STAMPS and the SDP.

150.     As part of his investigation, Jefferson reviewed and summarized the Incident Reports of approximately 11 Palumbo students which were written on June 11, regarding the alleged Prayer Room incident that had occurred earlier that morning. Of these statements, eight (8) were pure hearsay, not one of these students were in the Prayer Room at the time the Boys were there. Two (2) of the statements were from the two girls (F.M. and A.V.) in the room for the duration, and one (1) was from a girl (N.M.) who was only in the Prayer Room part of the time. Much of what N.M. wrote was based on what the other two girls had told her had occurred. It appears from Jefferson's heavily redacted report that there might have been another  girl in the room, N.L., but no statement by her was contained in the Investigator's Report nor was any such statement produced to the Plaintiffs in response to their request for the Investigative Materials.

151.     As for N.M., who was in the Prayer Room for part of the time at issue, in her written statement taken on June 11, 2024, she said she entered the room "after recording and hate rooted words they said to the other students."  She claimed she saw the boys laughing and one of them removed a "praying/muslim poster" from the wall.  She went on to say that her friends told her what had happened, including "inappropriate grinding on the floor" and laughing at the Palestinian flag.  N.M. characterized the incident as a "hate crime/rooted pro-israel and passive aggressiveness." In her account of what happened which was provided on the day of the alleged incident, this "witness" personally only observed what she claims was laughter by the Boys, one of whom removed a poster from the wall. The other details she provided were what she was told by others.

152.     These statements by individuals who did not witness what occurred while the Boys were in the Palumbo Prayer Room on June 11, 2024, should never have been gathered, they should

not have been considered by Jefferson, nor should any of the Defendants have given any credence to those statements when considering a complaint against the Minor Plaintiffs. And yet those statements were improperly considered and relied upon by SDP, Jefferson and Defendant THOMPSON in reaching their conclusions.  They all completely ignored the denials by the Boys.

153.    Despite all the allegations of obscenity, desecration of Islamic prayers and symbols, the only two girls who were in the Prayer Room on that morning for the duration of the Boys' presence never mentioned any such behavior in their statements made the day of the alleged incident.

154.    F.M. mentioned in the Investigation Report conducted later that summer that M.DANOWITZ did a handstand in the PRAYER ROOM, but she claimed that the handstand ended with "grinding."  As can clearly be seen in the Truncated Video at Exh. 6A**,** however, DANOWITZ leapt back to his feet from the handstand and promptly returns to his seat.

155.    In his report, Jefferson even fails to note that A.V. had stated that she wasn't wearing her hijab when the boys entered the Prayer Room and that she had put it back on and couldn't really see anything.

156.    Jefferson summarized the statement given in the Incident Report by JOHN HIESTER, but his summary does not mention HIESTER's denials of the allegations as he had written in his statement on June 11, 2024.  See Exh. 5 at O, p. 11.  Jefferson only mentions HIESTER's unexcused early absence from school.

157.    Jefferson deemed it important to point out that, based on Defendant THOMPSON's statement, which is attached to his Report, MERU PARMAR had written "I don't know on every line" of the Incident Report he was induced to fill out on June 12.  THOMPSON and

therefore Jefferson ascribed a nefarious motive for MERU PARMAR in writing that in his "Incident Report," but what PARMAR actually wrote was that "I don't know about any incident," and he wrote that because he did not believe anything untoward had occurred in the Prayer Room, because it hadn't, and there was no evidence to the contrary. Therefore, his answers were perfectly reasonable and not meant to mislead or obfuscate as the Investigator's Report implies.

158.    Jefferson—who never interviewed any of the Boys—wrote in his Report that each "Subject/Target" had provided statements previously, but Jefferson failed to include any exculpatory information from those statements.

159.    None of the Plaintiff parents were ever interviewed by SDP Investigator Jefferson. Although Mr. Jefferson did initially contact the parents, they informed him that they were represented by counsel. Plaintiffs' counsel informed Jefferson that she would be willing to connect him with her clients if he would first explain what was being investigated. Plaintiffs' lawyer never heard back from Jefferson.

160.    The Investigator's Report is heavily redacted, unsigned, undated, and the sections entitled "ANALYSIS" and "Conclusion" are blank. See Exh. 5 at p.13. On the last page of the Investigator's Report, under "ACTION TAKEN," Jefferson lists an incident control number and states he interviewed Defendant THOMPSON, contacted witnesses by certified mail for an interview with "negative results, contacted suspects/targets by email and certified mail, and had photographs taken of quiet room/prayer room." Plaintiffs never received any certified mail from Jefferson and were never provided with "photographs taken of quiet room/prayer room."

161.    On September 6, 2024, Defendant THOMPSON dated two forms, one each informing parents that the SDP investigation found that JOHN HIESTER and MERU PARMAR committed harassment on June 11, 2024.

162.    No Investigative Materials were turned over to Plaintiffs or their counsel until after the Student Plaintiffs HIESTER and PARMAR were found guilty of harassment. It was only after the verdict was rendered that the Plaintiffs finally received heavily but haphazardly redacted "Investigative" Materials, including the Investigator's Report and HIBster Report described *infra*.

163.    The Student Plaintiffs were denied not only the right to face their accusers, or to challenge the accusers' evidence, they were not even told what the charges were against them and who had made them. Plaintiffs had no opportunity to present their case or to testify on their own behalf, let alone to cross-examine any witnesses against them; and they had no chance to call others to testify for them, or the opportunity to compel production of witnesses and evidence favorable to them, including the full video taken by J2 which is not in Plaintiffs' possession.

164.    The Investigator's Report contained no findings of fact about any specific act by any named person. As previously mentioned, the sections labeled "ANALYSIS" and "Conclusion" (p. 12) are blank. There are no findings identifying exactly what acts the Plaintiffs committed which allegedly constituted harassment except in the HIBster Report, where the word "Islam" appears in the "Founded" determination for JOHN HIESTER and for MERU PARMAR. See Exh. 5, at pp. 93-94.

165.    It was not even clear who made the determination of harassment. Defendant Principal THOMPSON's letter dated August 29 stated that the "investigator has determined that your

child engaged in misconduct," specifically, harassment, but the Investigator's document was unsigned. See Exh. 5 at p 13.

166.    The photographs Investigator Jefferson claimed to have taken of the Prayer Room[10], were never provided to MERU PARMAR or JOHN HIESTER or their families, nor do they appear in his Report. Exh. 5, at p.12, #3(F)).

167.    The belatedly produced Investigative Report materials also failed to include any information from or interview of Victim Assistance Specialists Gina Crayton or Victoria Trower, SDP employees with whom the Plaintiffs had met two days after the incident, and  to whom Plaintiffs had submitted statements. These two SDP employees had watched SDP's video of the entry of M. DANOWITZ into Palumbo through the main door of the school on June 11, 2024, and his passage through security there, as well as the full video of the events inside the Prayer Room that same morning, while the Boys were in the room.

168.    Defendants knew that SDP employees Crayton and Trower had seen the two exculpatory videos.  Yet SDP and the other Defendants initially acted to punish the boys as if the school entry video did not exist and further claimed they had never seen the video of the Prayer Room and did not know what was on it. The punishment imposed on the Boys on June 12 validated and further stimulated the rumors circulating about the Boys' conduct. Crayton and Trower assured the Plaintiffs that the statements they wrote while in their office on June 13, 2024, would be forwarded to the DISTRICT, thus Investigator Jefferson knew or should have known the two SDP employees had interacted with the Plaintiffs. The Investigator,

---

[10] Investigator Jefferson did not begin his task until several weeks after June 11, 2024, so that any photographs taken other than immediately as the Boys left the Prayer Room would fail as evidentiary proof of anything that had occurred.

however, either failed to speak with Crayton and Trower or failed to produce his notes/report of those conversations.

169.    THOMPSON revealed that Crayton told her she had seen the video, but even that did not motive THOMPSON to investigate.

**O.    HIBSTER Report Written by Muslim Student Association Advisor**

170.    In addition to the alleged investigation by Mr. Jefferson, on August 29, 2024, a Report was issued by the SDP entitled the "HIBster Report." ("HIB" is an acronym for Harassment, Intimidation and Bullying.) This report was completed by Jade Tuff, a teacher at Palumbo and the faculty advisor to the Academy at Palumbo Muslim Student Association, an organization to which Palumbo administrators had granted authority over the Muslim Prayer Room, as evidenced by the laminated Quiet Room Guidelines posted by the Palumbo Muslim Students Association,  and which certainly suggests a conflict of interest regarding non-Muslim students entering the Prayer Room. Tuff was not present in the Prayer Room when the Boys were there and had no personal knowledge of what occurred, and she made no effort to contact the Boys or their families to find out what they had to say about what had occurred there.

171.    The HIBster Report which was also provided to the Plaintiffs only after the Harassment determinations were made against them, and even then, in a heavily but sloppily redacted form. This report contains "Additional Information," but it is entirely unclear who provided, wrote or read this information.  This Report contained all the wild and inconsistent statements of students, most of whom were not present during the alleged incident in the Muslim Prayer Room on June 11, 2024. The only information it contains from the BOYS' perspective is the acknowledgement that JOHN HIESTER had denied the "behaviors."

172.   The HIBster Report neglects to even mention the video of the Prayer Room taken on June 11, 2024, even though SDP and its agents, including Jade Tuff, knew or should have known of its existence and that it had been viewed by SDP personnel.

173.   The HIBster Report was closed on August 29, 2024.   Apparently after taking the so-called witness statements at face value and ignoring or failing to obtain all of the exculpatory evidence, the Conclusion reached by SDP, through Tuff, was that "[b]ullying was Unfounded, Harrassment Founded" as to JOHN HIESTER and MERU PARMAR. See Exh. 5, at p.108.

174.   In the "Principal's Summary," produced to Plaintiffs as part of the Investigator's Report, as well as the  HIBster Report, Defendant THOMPSON wrote that the Palumbo Prayer Room events had to be viewed in the "context" of the claims of antisemitism submitted by J2's family and her rejection of those claims, which THOMPSON described as what "motivated" the bad acts allegedly engaged in by J2, M. DANOWITZ, JOHN HIESTER and MERU PARMAR. See Exh. 5, at pp. 35, 96. In other words, THOMPSON believed that the rumors of the "Islamophobia" and desecration of Islamic objects and Muslim women were malicious acts of revenge by hateful Jews. Instead, Jewish boys, and boys who were thought to be Jewish, were victimized by the bigotry of others.

175.   Defendant SDP'S findings and so-called Investigative materials also failed to acknowledge the true significance of the following:

      a.   The statements of two of the "witnesses," F.M. and N.M. :

           i.   F.M. concluded her statement this way: "I'm still shocked as a Muslim hearing others say 'I'm a proud Zionist' shows a lot [sic] so I was frozen majority of the time." (F.M. statement, 4. Student Statements, p.18).

ii.    N.M. interpreted the mere expression of pro-Zionist sentiment as a "hate crime." (N.M. statement, 4. Student Statements, p.13 ("Hate crime/rooted pro-Israel")).

b.    Student F.M. understood the Palumbo Prayer Room to be off-limits to boys. (F.M.'s statement, 4. Student Statements, p.17 (She was "in the prayer room with my face cover off" and it was "shocking seeing boys here")).

c.    Jade Tuff, the person who prepared the HIBster Report for the alleged incident (GenerateReport.aspx), was the advisor to Palumbo's Muslim Student Association, which group has played an active role in ensuring that the Palumbo Prayer Room be maintained for the exclusive use of Muslim students. For example, as noted above, on October 10, 2023, just three days after Hamas' rampage into Israel that resulted in the murder of 1200 people and the rape and dismemberment of countless others, and the kidnapping of 250 people, AAPMSA posted a picture on its Instagram account proudly displaying the Prayer Room with a large Palestinian flag on the door.

**P.    Palumbo Issues Public Letter re June 11 on August 19**

176.    On August 19, 2024—more than two months after the alleged incident in the Palumbo Prayer Room—Defendants SDP and THOMPSON finally sent out a communication to all Palumbo students and parents/guardians. That letter, however, rather than quelling the storm and attempting to either set out the facts or inform the community that an investigation was continuing and that it was imperative no one act on rumors, essentially provided a license for the wild speculation and threats to continue. The letter stated that *allegations of harassment and discrimination had been made at the end of the prior school year, asserting that "this type of discriminatory behavior is unacceptable by students and staff," claiming that the school maintained a "zero tolerance policy for harassment or hate speech of any kind,"* (emphasis added), and cautioning them that "rumors spread on social media have exacerbated claims beyond the allegations that were reported" and "substantially disrupt[ed] our school climate." See Exh. 18.

177.    By referring to "this type of discriminatory behavior," the letter could reasonably be and was in fact understood to mean that the allegations that the Boys had harassed Muslim girls in the Palumbo Prayer Room and had trashed the room were true.

**Q.    To Protect their Sons, the PARMAR and HIESTER Families were Forced to Flee the District**

178.    As a result of the Defendants' inexcusable conduct and continuous failures to act, it became untenable for Plaintiffs JOHN HIESTER and MERU PARMAR to continue their high school education at Palumbo. As the parents of those boys made clear to the agents of Defendant SDP, they were in dire fear for their children's safety at Palumbo. KATHRYN HIESTER had sought a safety transfer for her son to which no one at SDP even had the courtesy to respond.

179.    The parents of both JOHN HIESTER and MERU PARMAR were left with no choice but to flee Philadelphia and its school district and instead move into another school district in order to enroll their children in schools there.

**R.    SDP Issues Determination Letters**

180.    On September 6, 2024, SDP General Senior Counsel forwarded Defendant THOMPSON's letters of August 29, 2024, see Exh.19, to the HIESTER and PARMAR families, with the determination that their sons had committed harassment.

181.    On September 24, Plaintiffs responded to SDP's determination that their complaints of harassment and bullying were unfounded. See Exh. 20, attached hereto.

182.    Plaintiffs JOHN HIESTER and MERU PARMAR appealed the harassment findings against them and the finding of nothing actionable in their own complaints on October 9, 2024. See Exh. 21.

183.    Defendants never provided any response to the appeals filed by the Plaintiffs.

184.    The PARMAR family includes a child younger than MERU. The PARMARs always intended this son to attend high school within the DISTRICT. Because of the terrible treatment of their older son, the PARMARs don't know whether they will be able to have their younger son attend school there, but unless corrections occur, they know they cannot.  Each of the violations of statutory and Constitutional right at issue in this case is continuing and, unless corrected, threatens to injure this DISTRICT student in the same way that they have already injured each of the Boys.

## COUNT I

**Violations of the Establishment and Free Exercise Clauses Under 42 U.S.C. § 1983**
**(All Plaintiffs As to Establishment Clause, and JEAN DANOWITZ , as guardian for M. DANOWITZ as to Free Exercise Clause Against Defendants SDP, GORDON, THOMPSON, AND STAMPS)**

185.    Plaintiffs incorporate the allegations in paragraphs 1-184 as if fully set forth herein.

186.    Defendant SDP, which operates Academy at Palumbo, is a public school district and required to be nonsectarian. SDP's officers and employees are likewise legally obligated to operate SDP schools in a nonsectarian manner.

187.    Instead of operating SDP schools in a nonsectarian manner, Defendants maintained a policy within Palumbo of promoting a particular religion—Islam—and denigrating the Jewish religion, by taking the following actions:

    a.  Establishing what is effectively a Muslim-only zone on school property into which non-Muslims are forbidden, by SDP policy, to set foot. Specifically:

        i.  The so-called "Prayer Room" is used and is permitted by Palumbo to be used exclusively by Muslims, and is decorated and furnished exclusively for Muslims in a way that reveals and is intended to reveal to non-Muslims that they are not welcome to pray in or otherwise use the space for any purpose other than as a Muslim prayer space or Muslim-only space.

ii. When non-Muslims attempted to visit the space and use it for Jewish prayer or for simply speaking Hebrew, they were hounded and harassed by Muslim students, accused of "sacrilegious defilement" and of desecration by teachers LUEBBERT, whose lewd accusations were further amplified by RIDGEWAY, and punished by the SCHOOL DISTRICT acting through its Assistant Superintendent GORDON, Principal THOMPSON, Dean STAMPS and investigator Steven Jefferson.

b. Acting on complaints that the "Prayer Room" had sex-segregated hours, which segregation was motivated to satisfy a particular Muslim world view and would have (if it existed) impermissibly entangled the School District of Philadelphia with religion.

c. Conducting teacher-promoted mass Ramadan prayers during school hours and during class time, for which excused absences were provided.

188.    In discussing June 11 events with police, Defendant THOMPSON unabashedly stated to police that the Prayer Room is "designated for particular religion and having a certain flag" by which she referred to a Palestinian flag "outside room." See Exh. 2.

189.    The policy of using publicly funded resources, specifically the existence of and restricted access to the "Prayer Room," and of using school time to promote the Muslim religion, violate the Establishment Clause of the First Amendment to the U.S. Constitution because they have the primary purpose and effect of advancing religion; result in indoctrination of religious belief; constitute an impermissible endorsement or appearance of endorsement or favoritism toward a religion; excessively entangle the affairs of government and religion; constitute a preference given by law to a religious establishment or mode of worship; and authorize the expenditure of public money for the support of a space devoted to the exclusive use of one religion in which the distinctive doctrines, creeds or tenets of a religious sect are promulgated.

190.    Upon information and belief, Defendants SDP, GORDON, and THOMPSON were personally involved in the certification and disbursement of taxpayer funds for the Prayer

Room despite its unconstitutional promotion and endorsement of religion, as well as expended taxpayer funds to enforce the ban on those of any but the preferred religion.

191.   Defendants treated Plaintiff M. DANOWITZ'S religious exercises, including expressing support for Israel, less favorably than Muslim religious exercise or comparable secular activities.

192.   Defendants targeted Plaintiff M. DANOWITZ's Jewish religious beliefs and practices for special disfavor in violation of the Free Exercise Clause.

193.   Defendants' efforts to sanction non-Muslims who had the temerity to visit the school's Prayer Room and to recite therein a Jewish prayer, or to accompany someone who did so, created a chilling effect against anyone who might question the elevated status given to Islam by Defendants.

194.   On information and belief, all of the violations of law at issue in this Count continue to occur up to the present.

195.   Plaintiffs MERU PARMAR and JOHN HIESTER left the DISTRICT and ceased to be students there only because they were driven out by the conduct at issue in this case.  The PARMER family includes a child younger than MERU who remains a student in the DISTRICT.  For both of these reasons, the HIESTER and PARMER Plaintiffs have standing to seek injunctive relief to ensure that the violations of law at issue in this Count cease.

196.   Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs demand judgment that:

   d.   The operation of the so-called "Prayer Room" or "Quiet Room" by the Defendants,
   e.   The conduct of mass prayers on school grounds during Ramadan, and teacher promotion of same, and

     f.   The Defendants' efforts to sanction JOHN HIESTER and MERU PARMAR for their actions on June 11, 2024

all violate the Establishment Clause of the First Amendment to the Constitution of the United States, and Defendants' efforts to sanction Plaintiffs violate the Free Exercise Clause of the First Amendment to the Constitution of the United States; and Plaintiffs further demand that the court issue preliminary and permanent injunctive relief prohibiting Defendants' treatment of Plaintiffs and all other students similarly situated in violation of Plaintiffs' Constitutional rights.

197.     Finally, Defendants' violation of the Plaintiffs' First Amendment rights resulted in the HIESTER and PARMAR Plaintiffs suffering financial losses, including but limited to the need incur expense to leave the School District of Philadelphia and establish residence in another county so their children could go safely to public school in that jurisdiction. WHEREFORE the HIESTER and PARMAR families demand judgment against Defendants in the form of damages in an amount in excess of the arbitration limit, for compensatory and punitive damages, and for interest, costs and attorney's fees.

## COUNT II

**Violation of the Liberty Interest in Reputation Under 42 U.S.C. §1983, and the Due Process Clause of the Fourteenth Amendment (HIESTER PLAINTIFFS and PARMAR PLAINTIFFS Against all Defendants)**

198.    Plaintiffs incorporate the allegations in paragraphs 1-197 as if fully set forth herein.

199.    Each Minor Plaintiff has a clearly established liberty interest in his reputation protected by the Due Process clause of the Fourteenth Amendment to the United States Constitution.

200.    Deprivation of that interest may not be caused by a person acting under color of state law unless due process is accorded.

201.    The following actions of all Defendants, each of whom was personally involved and acting under the color of state law at the time of the actions set forth in the Complaint, and each of which was entirely voluntary on his or her part, damaged the reputation of Plaintiff JOHN HIESTER, Plaintiff MERU PARMAR and Minor Plaintiff in that these Defendants falsely accused each of these Plaintiffs of grievous wrongdoing. As a result of the public dissemination of each of these false accusations, the reputations of JOHN HIESTER and MERU PARMAR were so gravely damaged that they were no longer able to safely attend Palumbo. Similarly, the reputation of M. DANOWITZ, who was also clearly and even explicitly identified by Defendants as having perpetrated heinous anti-Muslim conduct as well as trespass with intent to commit such acts, was gravely damaged such that he feared physical violence and so was unable to freely move around in the City of Philadelphia.

202.    Those actions included

a.    falsely accusing JOHN HIESTER and MERU PARMAR of sneaking M. DANOWITZ into the Palumbo school building on the morning of June 11, 2024, through a locked back door. This accusation was false, and in truth Minor Plaintiff M. DANOWITZ came in the front door of the school. None of the accused students were involved in sneaking anyone into the school or of being snuck into the school.

b.    Falsely accusing each JOHN HIESTER, MERU PARMAR, and M. DANOWITZ of

        i.    harassing female Muslim students in the Palumbo Muslim Prayer Room

    ii. physically assaulting female Muslim students;

    iii. conducting themselves as if they were justified in insulting the religion of their fellow students;

    iv. trashing the Palumbo Muslim Prayer Room;

    v. "sexually grinding on the floor" of Muslim prayer rugs in Palumbo's Muslim Prayer Room;

    vi. Violating a rule requiring sex segregation of the Muslim Prayer Room, by being present in the room when they were male and, at the time period when the Boys and M. DANOWITZ entered the room, the room was reserved for females.

203.   These accusations were publicly made, and publicly substantiated by each individual Defendant, even though each such individual Defendant either knew or should have known that these accusations were false.

204.   The dissemination of these false statements directly caused many Palumbo students, and students at other schools, to believe that each minor Plaintiff trashed the school's Muslim Prayer Room, and sexually and otherwise harassed female Muslim students within that room.

205.   Because they believed these false accusations, numerous persons threatened the lives and physical well-being of each minor Plaintiff.

206.   Defendants THOMPSON, GORDON, and STAMPS had actual knowledge of these threats and callously took no action at all to  address them or to protect JOHN HIESTER, MERU PARMAR or the Minor Plaintiff from these threatened attacks.

207.   Defendants RIDGEWAY and LUEBBERT, both well known Philadelphia teachers who promote and engage in pro-Palestinian, anti-Israel activities in Philadelphia,  used their status

as SDP teachers to bolster the perceived veracity of the accusations each of them raised against the Boys.

208.    Plaintiff KATHRYN HIESTER requested a safety transfer for her son JOHN HIESTER, at that time a minor, to another DISTRICT high school because of the frightening threats, but HIESTER never even received a reply to this request.

209.    As a result of these injuries to their reputation, JOHN HIESTER and MERU PARMAR were unable to continue attending Palumbo without exposing themselves to death or serious bodily injury.    These boys and their families were thus forced to move out of the PHILADELPHIA SCHOOL DISTRICT and leave Palumbo, so that they could safety attend high school elsewhere.

210.    For the foregoing reasons, the families of JOHN HIESTER and MERU PARMAR were forced to expend tens of thousands of dollars to move from the Philadelphia School District so that their sons JOHN and MERU could safely attend and complete public school in another school district.

211.    JOHN HIESTER and MERU PARMAR were forced to change high schools just before entering Eleventh Grade, thereby suffering a disruption of this crucial year in their paths toward college.

212.    Pennsylvania law confers upon every school age child the categorical right "to attend the public schools of the child's district of residence."  22 Pa Code §11.11.

213.    In addition, school age children and their parents have a right protected by the United States Constitution to choose where in the United States to live.  *Shapiro v. Thompson,* 394 U.S. 618 (1969).

214.   The actions of each individual Defendant not only damaged the liberty interest in reputation of each of the non-Muslim students at issue in this case, but also breached the rights of JOHN HIESTER and MERU PARMAR to attend the public schools of the school district of their residence, and the rights of each HIESTER and PARMAR Plaintiff to choose for themselves where in the United States to reside.

215.   Plaintiffs have no adequate remedy at law to correct the Liberty interest in their reputation.

WHEREFORE, Plaintiffs demand judgment that Defendants be ordered

   a. to pay HIESTER and PARMAR Plaintiffs the expenses they were forced to incur to move to another school district in order to have their sons be safely educated, as well as for punitive damages, interest, costs, and attorney's fees; and
   b. to issue a written public statement retracting the finding of harassment against JOHN HIESTER and MERU PARMAR.

## COUNT III

**Violation of Title VI of the Civil Rights Act of 1964 42
U.S.C. § 2000d et seq.
(Plaintiffs JOHN HIESTER and MERU PARMAR Against Defendants SDP, GORDON, and
THOMPSON)**

216.   Plaintiffs incorporate the allegations in paragraphs 1-215 as if fully set forth herein.

217.   Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

218.    Defendant SCHOOL DISTRICT OF PHILADELPHIA receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

219.    Discrimination against Jews—including based on actual or perceived ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI. *Cf. Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616 (1987) (discrimination against Jews is discrimination based on race); *see also* 34 C.F.R. § 100.3(b)(1)(iv), (vi).    In addition, commitment to Israel as a Jewish state is a component of the ethnic identity and shared ancestry of many Jews, including M. DANOWITZ and J2. *Landau v. Board of Managers of Haverford College,* 2025 U.S. Dist. LEXIS 1402 at *10 n. 8 (E.D. Pa. Jan. 6, 2025).

220.    Defendant SDP and individual Defendants GORDON and THOMPSON discriminated against Plaintiffs JOHN HIESTER and MERU PARMAR on the basis of their association with Jewish students M. DANOWITZ and J2, and on the basis of the erroneous belief held by at least some Defendants that all of the Boys were Jewish, all of which constitutes discrimination in violation of rights clearly established under Title VI. *Kengerski v. Harper*, 6 F.4th 531, 538 (3d Cir. 2021); *Parr v. Woodmen of World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986).

221.    Defendants excluded Plaintiffs JOHN HIESTER and MERU PARMAR from participating in SDP classes not only in the final  days of 2024 school year but also for their entire junior and senior years, thereby denying Plaintiffs the full benefits of SDP schooling, subjected Plaintiffs to discrimination, aided and abetted and demonstrated deliberate indifference to discrimination by others, all in violation of rights clearly established under Title VI.

222.    Defendants created a hostile educational environment by allowing, failing to prevent or to take any steps to prevent the persistent, pervasive, offensive, and severe lies and false allegations against the Boys that effectively denied them the ability to fully partake in school activities of whatever kind. The national origin and/or religion of JOHN HIESTER and MERU PARMAR in that they were not Muslim, and that they were erroneously believed to be Jewish, and therefore unworthy of protection, were substantial factors in the Defendants' actions.

223.    As a result of Defendants' actions, Plaintiffs JOHN HIESTER and MERU PARMAR have been injured by losing their statutorily conferred right to attend public high school in the district where they reside. 22 Pa. Code §11.11(a)(1).

224.    As a direct and proximate result of Defendants' actions, Plaintiffs JOHN HIESTER, MERU PARMAR and M. DANOWITZ, and have suffered harm in the form of both general and special damages in an amount to be determined at trial, including but not limited to compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

WHEREFORE, Plaintiffs demand judgment against Defendants in the form of damages in an amount in excess of the arbitration limit, for compensatory and punitive damages, for interest, costs and attorney's fees.

## COUNT IV

**Deprivation of Due Process 42 U.S.C. § 1983 (Plaintiffs JOHN HIESTER and MERU PARMAR Against Defendants SDP, GORDON, STAMPS, and THOMPSON)**

225.    Plaintiffs incorporate the allegations in paragraphs 1-224 as if fully set forth herein.

226.    Pennsylvania law prohibits suspending a student from school without notice and an opportunity to respond. 22 Pa Code § 12.6 ("A student may not be suspended until the student has been informed of the reasons for the suspension and given an opportunity to respond").

227.    Defendants SDP, GORDON, and THOMPSON suspended JOHN HIESTER and MERU PARMAR without previously notifying them of the basis for the dismissal or giving them an opportunity to respond.

228.    Specifically, the parents of both JOHN HIESTER and MERU PARMAR were notified simultaneously of the suspensions and the alleged reason for same after 10:00 p.m. on June 12, 2024, with the suspension starting the very next morning.

229.    As noted above, the purported reason for the suspension was that JOHN HIESTER and MERU PARMAR had "violat[ed] the Code of Conduct's rule of unauthorized entry into school property as they willingly walked around the building with [M. DANOWITZ], knowing he was not a Palumbo student."

230.    Neither had been given any opportunity to respond, and in fact, defendant THOMPSON had *refused* the request of JOHN HIESTER and MERU PARMAR's parents to meet with her on the morning of June 13.

231.    As stated above, M. DANOWITZ's entry into Palumbo on the morning of June 11 was not "unauthorized". On the contrary, M. DANOWITZ entered Palumbo through the front door, was processed through security, and saw and was seen or should have been seen by Defendants THOMPSON and STAMPS, the school's principal and dean of conduct, who stood at the entrance to the building, presumably to ensure that no one trespass or present a danger to the students inside.

232.    Palumbo's security includes the use of video cameras recording the main entrance.

233.    Plaintiff parents of JOHN HIESTER, M. DANOWITZ, MERU PARMAR as well as the parent of J2 had an opportunity to review footage from the morning of June 11. The video clearly documented that M. DANOWITZ's entry into Palumbo was open and obvious and should have been known to the highest school officials.

234.    M. DANOWITZ's entry to Palumbo on June 11 was not, despite it being the basis for JOHN HIESTER and MERU PARMAR's summarily dispensed suspensions, "unauthorized."

235.    Upon information and belief, Defendants SDP, GORDON, and THOMPSON had access to the video on the day of the alleged incident, and certainly had time to look at it between the time concerns were raised about M. DANOWITZ's presence in the building and the issuance of the suspension notices to Plaintiffs JOHN HIESTER and MERU PARMAR.

236.    Despite this, Defendants acted hastily in suspending both students without giving the accused individuals any opportunity to view the school's own evidence, explain themselves, or answer questions about it.

237.    By letter dated August 16, 2024, Defendant School District belatedly agreed to rescind MERU PARMAR's baseless suspension. In that same letter the District informed Plaintiff's council that it was revising JOHN HIESTER's suspension to "in-school suspension" based on his awareness that [M. DANOWITZ] was an unauthorized visitor to the building, having entered at the same time, and for leaving school early without authorization." See Exh. 8.

238.    Upon information and belief, student A.A., left Palumbo with JOHN HIESTER on the day in question before the end of the school day and went with JOHN HIESTER to M.

DANOWITZ's house. A.A. was not disciplined for the same alleged infraction which JOHN HIESTER was, nor was he otherwise disciplined for his conduct.

239.   Counsel for Plaintiffs pointed out to counsel for SDP that the agents of SDP, including Principal THOMPSON—the person who meted out the suspensions—possessed the very evidence necessary to drop them because the video of the entrance to Palumbo clearly showed M. DANOWITZ entering the school through the front door of Palumbo. The proposed downgrading of JOHN HIESTER's suspension to an in-house suspension suffers from the same deficiencies as the June 12 suspension notice: it was done and decided upon without first notifying JOHN HIESTER of the proposed charge or giving him an opportunity to respond.

240.   Furthermore, applying a new charge is equivalent to charging a Defendant with a lesser included offense after a more serious charge has been dismissed. To wit, it violates the principle of double jeopardy.

241.   As for the second charge against plaintiff JOHN HIESTER, upon information and belief, and despite Defendant SDP's claim that "[t]his discipline is consistent with the Academy at Palumbo's past practices for other students," during the post-exam period students regularly come and go to and from Palumbo without sanction; the proposed discipline was *not* consistent with school district practices during this time period.

242.   On information and belief, the suspension of Plaintiffs JOHN HIESTER and MERU PARMAR became publicly known shortly after it was imposed and provided public support for the false accusation that Plaintiffs JOHN HIESTER and MERU PARMAR and Minor Plaintiff M. DANOWITZ had engaged in wrongful conduct at Palumbo on June 11, 2024. These false accusations drove the threats of violence and death which forced the HIESTER and PARMAR families to leave the DISTRICT and to take up residence in another county so

their children could go safely to public school in that jurisdiction. This flight forced the HIESTER and PARMAR Plaintiffs to incur tens of thousands of dollars in expenses which constitute damages caused by Defendants.

243.    Plaintiff JOHN HIESTER's suspension from school without prior notice or an opportunity to respond, and the presence of that notation on his school record, constitutes a deprivation of a clearly established protected property and liberty interest without due process of law, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

244.    Plaintiff MERU PARMAR's suspension from school without prior notice or an opportunity to respond, and the prolonged presence of that notation on his school record despite Defendant SDP's oblique admission that it was invalid, constitutes a deprivation of a protected property and liberty interest without due process of law, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

245.    The ultimate withdrawal of the suspensions imposed on JOHN HIESTER and MERU PARMAR provided no relief to the damage already incurred by the imposed punishment which validated the threats which drove these Plaintiffs out of the Philadelphia School District for fear of their physical safety.

246.    Defendant SDP's purported conclusion that Plaintiffs MERU PARMAR and JOHN HIESTER were guilty of "harassment" was made despite a total absence of due process. The procedural failings included but were not limited to the following:

    a.    Despite repeated request, the Defendant SDP failed to provide any of its evidence to Plaintiffs before making its conclusion.

    b.    Plaintiffs had no opportunity to confront their accusers or even be informed of the charges against them; and had no opportunity to present evidence on their own behalf.

    c.   The school district made no factual findings (at least, none that were turned over to Plaintiffs) in support of its decision or explained what JOHN HIESTER and MERU PARMAR did that supposedly constituted harassment.

    d.   The Defendant SDP did not even identify who was the factfinder in this matter.

    e.   Although Plaintiffs were given a purported opportunity to appeal and did so, the failure to inform Plaintiffs what findings were made against them rendered this right hollow.

    f.   Despite the paucity of information provided to Plaintiffs, they appealed Defendant SDP's finding that JOHN HIESTER and MERU PARMAR were guilty of harassment, an appeal was filed with the deputy general counsel to Defendant SDP on October 9, 2024. Notice of receipt of that appeal was provided to counsel for Plaintiffs that same day. More than nine months after Plaintiffs' appeal was submitted, there has been no response from Defendant SDP.

247.   On information and belief, all of the violations of law at issue in this Count continue to occur up to the present. In particular, the DISTRICT has taken no steps to ensure that a non-Muslim student charged with wrongdoing involving a disciplinary infraction allegedly affecting Muslim students must, before a determination of guilt is made, be given notice of the charges against him or her and an opportunity to respond; and that the parents of a minor student so charged must be given notice of such a charge.

248.   Indeed, the United States Department of Education, Office of Civil Rights entered a finding, in September of 2024, only weeks after the conduct at issue in this case, and a resolution of such violations on December 18, 2024—that, as a matter of consistent practice, the DISTRICT failed to afford procedural protections to those complaining of antisemitic harassment, and failed to maintain records on that topic as required by Title VI of the Civil Rights Act of 1964.  In this case the same bias is manifest in the DISTRICT's ongoing failure

to accord the process due to students who either are, or who are perceived to be Jewish or non-Muslim.

249.    Denials of the process due taint Defendants' treatment of both the charges of accompanying an unauthorized entrant to DISTRICT property and the charges of harassment at issue in this case.

250.    The charges relating to an unauthorized entrant were proffered in different versions, first that Plaintiffs MERU PARMAR and JOHN HIESTER "snuck" Minor Plaintiff  M. Danowitz into a back door of the school, and then later that Parmar and Hiester "accompanied" an unauthorized visitor in the building (conduct which, on June 11, 2024 was not a violation of any DISTRICT rule).

251.    This accusation was made before DISTRICT employees took any steps to examine evidence easily available to them which would have, and did in fact when it was examined, completely exculpate MERU PARMAR and JOHN HIESTER from these charges.  Defendants STAMPS, THOMPSON and GORDON knew or should have known that this evidence existed but did not consult it because, on information and belief, they were not interested in what such evidence showed.

252.    This was true because the true reason these accusations were made had nothing to do with anyone's unauthorized entry into, or presence in, the Palumbo school building, but was instead driven by the desire of Defendants STAMPS, THOMPSON and GORDON to punish the BOYS for their presence in the Muslim Prayer Room.  Indeed, these Defendants have publicly stated that, at the same time that the accusations were proffered relating to unauthorized entry or presence in the Palumbo school building, they commenced an investigation into alleged "harassment" by  of Muslim students in the Muslim Prayer Room.

253.    Plaintiffs MERU PARMAR and JOHN HIESTER left the DISTRICT and ceased to be students there only because they were driven out by the conduct at issue in this case; The PARMAR family includes a child younger than MERU who remains a student in the DISTRICT.  For both of these reasons, the HIESTER and PARMAR Plaintiffs have standing to seek injunctive relief to ensure that the violations of law at issue in this Count cease. Defendants cannot be heard to argue that, having driven JOHN HIESTER and MERU PARMAR out of the DISTRICT by a complete abdication of their responsibilities to, and repeated violations of the rights of, those young men, Defendants have also, thereby, successfully immunized themselves from Plaintiffs' claims to remedy these procedural defaults.

WHEREFORE, Plaintiffs demand judgment against Defendants in the form of injunctive relief directing them to issue a public written statement revoking the findings of harassment and confirming that the suspensions previously imposed upon them were unfounded and have already been removed.  Plaintiffs further demand judgment against Defendants in the form of damages in an amount in excess of the arbitration limit, for compensatory and punitive damages, for interest, costs, and attorney's fees.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand trial by jury on all issues so triable.

THE DEBORAH PROJECT

BY:  LORI LOWENTHAL MARCUS, ESQUIRE
JEROME M. MARCUS, ESQUIRE
P.O. Box 212
Merion Station, PA 19066
610-880-0100

Dated: January 5, 2026