**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KATHRYN HIESTER and CHRISTOPHER HIESTER; JOHN HIESTER; JEAN DANOWITZ, as Guardian for M. DANOWITZ, a minor; CATHERINE PARMAR and RATNADEEP PARMAR; and MERU PARMAR, <br><br> *Plaintiffs*, <br><br> v. <br><br> SCHOOL DISTRICT OF PHILADELPHIA; RICHARD GORDON, IV; KIANA THOMPSON; RASHIDA STAMPS; KRISTIN LUEBBERT; and KEZIAH RIDGEWAY, <br><br> *Defendants* | Civil Action No. 2:25-cv-04502-JMY <br><br> **Jury Trial Demanded** |

**PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**I. Introduction** ..........................................................................................................6

**ARGUMENT** ........................................................................................................22

**A. Legal Standard**........................................................................................................22

**B. Plaintiffs Have Adequately Alleged Claims for Violation of the First Amendment (Count I)**.....24

i. Plaintiffs' Allegations Establish Standing ...................................................................24

ii. Plaintiffs' Claims Are Not Moot..............................................................................26

iii. Plaintiffs Have Adequately Alleged a Violation of the Establishment Clause................................29

iv. Plaintiff M. Danowitz Has Adequately Alleged a Violation of the Free Exercise Clause.. .............35

v. Plaintiffs' Allegations Are Not Subject to Dismissal Under Monell .......................................36

**C. Plaintiffs Have Adequately Alleged a Violation of The Liberty Interest in Reputation (Count II)** ...................................................................................................37

**D. Plaintiffs Have Sufficiently Stated a Claim Under Title VI (Count III)** .......................................40

i. Antisemitism Is, and Plaintiffs Adequately Allege, Actionable Racism Under Title VI. ...............41

ii. Plaintiffs Adequately Allege Both Intentional Discrimination and Deliberate Indifference .........44

iii. Dismissal of Count III Against Gordon and Thompson is Unwarranted .....................................45

**E. Plaintiffs Have Sufficiently Stated a Claim for Deprivation of Due Process (Count IV)** ...........46

**F. No Individual Defendants Are Entitled to Qualified Immunity** ......................................................49

**G. Plaintiffs' Allegations Establish Grounds for Seeking Punitive Damages** ....................................52

**II. CONCLUSION** ............................................................................................................53

Cases

*Abington School District v. Schempp, 374 U.S. 203 (1963)* ....................................27, 31

*Altman v. Bedford Central School District, 245 F.3d 49 (2d Cir. 2001)* .....................................26

*Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)* .....................................................23

*Bennett v. Saint-Gobain Corp., 507 F.3d 23 (1st Cir. 2007)* ........................................45

*Board of Regents v. Roth, 408 U.S. 564 (1972)* ....................................................47

*Booker v. Bangor Area School District* .....................................................45

*Brody v. Spang, 957 F.2d 1108 (3d Cir. 1992)* .....................................................27, 28

*Brown v. Board of Education, 347 U.S. 483 (1954)* .....................................................38

*Bryant v. Pottsgrove School District, 2025 WL 415156 (E.D. Pa. Sept. 19, 2025)* ..........23, 50, 51

*Capresecco v. Jenkintown Borough, 261 F. Supp. 3d 568 (E.D. Pa. 2017)* ................................46

*Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520 (1993)* ................................35

*Cole v. Oroville Union High School District, 228 F.3d 1092 (9th Cir. 2000)* ............................26

*Dee v. Borough of Dunmore, 549 F.3d 225 (3d Cir. 2008)* .....................................................37, 48

*Detschelt v. Norwin School District* .....................................................49

*Doe v. Harrisburg School District* .....................................................52

*Doe v. Madison School District No. 321, 177 F.3d 789 (9th Cir. 1999)* ................................26, 27

*Doe v. Princeton University, 30 F.4th 335 (3d Cir. 2022)* ..........................................22

*Donovan ex rel. Donovan v. Punxsutawney Area School Board, 336 F.3d 211 (3d Cir. 2003)* ..26

*Engel v. Vitale, 370 U.S. 421 (1962)* .....................................................6, 32

*Epperson v. Arkansas, 393 U.S. 97 (1968)* .....................................................31

*Evancho v. Fisher, 423 F.3d 347 (3d Cir. 2005)* .....................................................22

*Fisk v. Board of Trustees of California State University, 2023 WL 6051381 (S.D. Cal. Sept. 15,*

*2023)* ...................................................................................................................27

*Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009)* ......................................23, 36

*Freedom From Religion Foundation, Inc. v. New Kensington Arnold School District, 832 F.3d*

*469 (3d Cir. 2016)* ...............................................................................................28

*Gazarov ex rel. Gazarov v. Diocese of Erie, 80 F. Supp. 2d 521 (W.D. Pa. 2000)* ......................45

*Goldwire v. City of Philadelphia* ...........................................................................51

*Goss v. Lopez, 419 U.S. 565 (1975)* .............................................................38, 46, 48

*Hafley v. Lohman, 90 F.3d 264 (8th Cir. 1996)* .........................................................49

*Hart v. West Mifflin Area School District, 2017 WL 1234121 (W.D. Pa. Apr. 6, 2017)* .............38

*Hill v. Borough of Kutztown, 455 F.3d 225 (3d Cir. 2006)* .........................................37

*Honig v. Doe, 484 U.S. 305 (1988)* .........................................................................27

*Jacobs v. Clark County School District, 526 F.3d 419 (9th Cir. 2008)* .......................27

*Kennedy v. Bremerton School District, 597 U.S. 507 (2022)* .....................................31

*K.Y. v. Schmitt, 799 F. App'x 485 (9th Cir. 2020)* ...................................................26

*Landau v. Corporation of Haverford College* ............................................................41

*Larson v. Valente, 456 U.S. 228 (1982)* ...................................................................30

*Lee v. Weisman, 505 U.S. 577 (1992)* ......................................................................32

*Leveto v. Lapina, 258 F.3d 156 (3d Cir. 2001)* .........................................................49

*Lynch v. Donnelly, 465 U.S. 668 (1984)* ..................................................................34

*M.S. v. Susquehanna Township School District, 969 F.3d 120 (3d Cir. 2020)* ...........46

*Monell v. New York City Department of Social Services, 436 U.S. 658 (1978)* ...........36

*Monge v. University of Pennsylvania* .......................................................................40

*Mzamane v. Winfrey, 693 F. Supp. 2d 442 (E.D. Pa. 2010)* .......................................40

*Planchard v. United States Health Care Systems* ..............................................................42

*R.F. ex rel. Fernandez v. Harrison School District No. 2, 924 F.3d 1309 (10th Cir. 2019)* ........27

*R.G. v. Chichester School District* ..............................................................52, 53

*Rivera v. New Castle County Police Department, 152 F.4th 147 (3d Cir. 2025)* ........................22

*Russman v. Board of Education of the City of Watervliet, 260 F.3d 114 (2d Cir. 2001)* .............27

*Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000)* .............................34

*Shaare Tefila Congregation v. Cobb, 481 U.S. 615 (1987)* ........................................41

*Sh.A v. Tucumcari Municipal Schools, 2001 U.S. Dist. LEXIS 27842 (D.N.M. Sept. 12, 2001)* ..27

*Shurtleff v. City of Boston, 596 U.S. 243 (2022)* ..............................................32

*Sinai v. New England Telephone & Telegraph Co., 3 F.3d 471 (1st Cir. 1993)* ....................41

*Smith v. Wade, 461 U.S. 30 (1983)* ..............................................................52

*Stoneking v. Bradford Area School District, 882 F.2d 720 (3d Cir. 1989)* ..................49

*Stringer v. County of Bucks* ....................................................................51

*T.E. v. Pine Bush Central School District, 58 F. Supp. 3d 332 (S.D.N.Y. 2014)* .........................41

*United States v. Nelson, 277 F.3d 164 (2d Cir. 2002)* ..........................................42

*Umland v. PLANCO Financial Services, Inc., 542 F.3d 59 (3d Cir. 2008)* ................................22

*Uzuegbunam v. Preczewski, 592 U.S. 279 (2021)* ..............................................25

*Van Zandt v. Thompson, 839 F.2d 1215 (7th Cir. 1988)* ..............................................33

*Weinstein v. Bradford, 423 U.S. 147 (1975)* ....................................................27

*Weinstein v. Bullick, 827 F. Supp. 1193 (E.D. Pa. 1993)* ........................................40

*Zerpol Corp. v. DMP Corp., 561 F. Supp. 404 (E.D. Pa. 1983)* ..................................40

Defendants' briefs attack the legal sufficiency of the Amended Complaint ("AC") in this case on the basis of a version of the "facts" at issue that contradicts, on virtually every issue that matters, what the Amended Complaint actually says.

The Amended Complaint alleges that that School District of Philadelphia maintained a room in a public school reserved for one religion; it quotes the school's principal describing the room using those exact words in a statement to the Philadelphia Police. ECF No. 17, AC at Exhibit No. 32-2, p. 1. And it alleges that during a meeting on June 12, 2024, with Kathryn and John Hiester, Defendants Thompson and Stamps "interrogated Hiester about why he entered the Prayer Room …during "girls time," making clear that there were sex-segregated hours for the use of the room. Defendants School District of Philadelphia ("SDP"), Gordon, Thompson and Stamps ("hereinafter referred to as "the SDP Defendants" completely ignore the fact of Thompson's statements to police and the Plaintiffs. Defendants' briefs deny this factual claim, assert the space was "neutral" and open equally to all, and then ask this Court to dismiss the case because the room was used as Defendants allege.[1]

The AC alleges that the Defendants Kristin Luebbert and Keziah Ridgeway ("the Teacher Defendants") named the Student Plaintiffs and broadcast their names. ECF No. 17, AC at ¶¶ 139–140. And it alleges that Defendants used their status as public school teachers to bolster the authority of their message and their power to broadcast it. ECF No. 17, AC at ¶¶135-142. Those Defendants deny these factual allegations and then ask the Court to dismiss the AC on the

---

[1] Interestingly, the Defendants do not refer to the Prayer Room as "religion" or "religious" neutral, as the cases cited by them in support of their positions that they did not violate the Establishment Clause in setting up the Prayer Room. The cases they rely on generally analyze spaces set aside for prayer in general, and not those set aside for one religion in particular. Although a room set aside for prayer and/or reflection in a courtroom for example, arguably might pass constitutional muster, a room set aside for one religion only would not. See. *Santa Fe Independent Sh. Dist. v. Doe,* 530 U.S. 290 (2000); *Engel v. Vitale*, 370 U.S. 410 (1962).

grounds that these Defendants did not violate the Constitutional rights of the Student Plaintiffs because these Defendants did not publicly identify the Student Plaintiffs, and because they acted only in their private capacities. The Amended Complaint, in the paragraphs cited above, says exactly the opposite.

The AC alleges that the Student Plaintiffs did nothing in the Palumbo Prayer Room that could constitute harassment: it attaches a video proving as much. ECF 17 Exhibit 6A. The statements of the Muslim girls who were in the room on June 11, 2024, and who were the only eyewitnesses to what happened during the boys' presence other than the Student Plaintiffs and J2, include none of the allegedly harassing actions the boys were found guilty of committing. ECF No. 17, AC at ¶ 9(b)–(c), ¶¶ 77–78 & n.2, ECF No. 17, AC at Exhibit No. 32-5; ¶ 151. Though the girls who witnessed the event never alleged any of the following acts, Defendant Thompson told Plaintiff Jean Danowitz her son had "loudly announced that he 'hates Muslims,'" "had made sexually simulated or suggestive dances or maneuvers … and proceeded to rip posters off the wall and trash the room." ECF No. 17, AC at ¶ 92.

The Defendants' briefs ignore the AC's allegations, and the girls' reports, that the Student Plaintiffs did none of these things. Instead, on the strength of their own version of what occurred Defendants argue that the finding of harassment should be respected because the each of J. Hiester, M. Parmar and M. Danowitz actually committed the acts with which they were charged.

The AC alleges that the Plaintiff families were forced to move out of Philadelphia because the SDP completely ignored and failed to respond to a frightening number of death threats and threats of violence directed at the Student Plaintiffs, and that not a single agent of SDP did a single thing to ensure that no harm came to the boys. It alleges that Plaintiffs repeatedly asked, and then begged, the District to respond to the threats and, among other things,

inform the community that there was an ongoing investigation and to ignore rumors and unfounded claims circulating on social media and throughout the Palumbo community. The AC alleges that the Plaintiffs requested increased security for their sons 'school, safety transfers, and other measures to protect their sons but that each and every one of these requests were completely ignored or were met with indifference and hostility. ECF No. 17, AC at ¶ 119, P. 31 ¶¶ 121, 123, p. 33 ¶ 130-131, p. 37 ¶¶ 142, 143, p. 144 ¶¶ 144, 145, ECF No. 17, AC at Exhibit No. 32-14, 32-15. Defendants' account of the facts completely ignores all these pleas and asserts, as fact, that the District responded promptly and appropriately to the Plaintiffs' needs and concerns.

The list of Defendants' contradictions of the Complaint's factual allegations goes on and on. It is reviewed, in its entirety, below at pp. 8-22. It constitutes the most flagrant possible violation of Federal Civil Rule 12, which demands that a Motion to Dismiss must begin by presuming that the factual allegations of the Complaint are true.

Defendants' briefs do the exact opposite: they start with the proposition that the Plaintiffs' factual allegations are false. They offer the Court Defendants' own version of the facts at issue, which is on every material point the opposite of the Plaintiffs' allegations. On the strength of their version of the facts, Defendants then ask the Court to dismiss the AC because, in the Defendants' version of what happened, the Defendants did nothing wrong.


THE ACTUAL FACTS ALLEGED

At the heart of this case is the AC's allegation that the Palumbo High School intentionally maintained a room that was available only for Muslim students, and that restricted access times for boys and girls in accordance with Muslim religious law, and that several non-Muslim

students were attacked, maligned and threatened because they dared to enter this space during a period restricted, as required by Muslim religious law, for girls only, and that two of the boys who are Jewish uttered several Hebrew words, sang a very brief and joyous Hebrew song during which one of the boys got up, danced forward a few steps, did a handstand and then sat down. The boys were in the Prayer Room for all of ten minutes. ECF No. 17, AC at Exhibit 5, pp. 9, 48, 63, 66. The Amended Complaint alleges this with perfect clarity, in multiple paragraphs. ECF No. 17, AC at ¶¶ 3, 14, 62, 67, 68, 69, 72, 73, 97, ECF No. 17, AC at Exhibit No. 32-2, ¶ 97. It attaches the Police Report of the school's principal, a Defendant in this case, in which she herself says that the room was "reserved for one religion." See ECF No. 17, AC at Exhibit No. 32-2, p. 1, ECF No. 17, AC at ¶ 62. It quotes and attaches message from Palumbo students and the Teacher Defendants, who were outraged that the Student Plaintiffs had violated others "religion" and committed "sacrilegious defilement" of a "prayer space for Muslim children" which they were not permitted to enter. ECF No. 17, AC at Exhibit No. 5 p. 7, 8. It alleges that Defendants Palumbo School Principal Thompson and Dean of Students Stamps reprimanded the Student Plaintiffs for being in the room at all and "especially" during "girls time." ECF No. 17, AC at ¶97, Exh. 5, p. 105. The AC alleges that the rules for the room were imposed by the Academy at Palumbo Muslim Student Association. ECF No. 17, AC at Exhibit No. 4, p. 2[2].

Defendants deny this. The School District's brief says over and over again that the room was a "neutral" space available to all. See, *e.g.,* ECF No. 43, SDP Brief at 1, 2, 3, 7, 15, and 17.

---

[2] We will not here recapitulate all of the allegations and exhibits which make this clear. As just one additional example, we refer the Court to the statement by one of the girls in the room that she was "surprised" to hear Zionism spoken about in that space, and that she was surprised that boys were in the room at all. Her surprise is no fault of hers: she was surprised because, as a Muslim student, she was among the people who had been informed that the room was "reserved for one religion only"—which is why Zionism would be off-limits there—and that certain times of day were reserved for girls. See ECF No. 17, AC at Exhibit 5, p. 58.

Defendants' legal argument is perched atop this factual claim. But the factual reality, and more important for present purposes, the Amended Complaint, says the exact opposite.

Defendants' version of the facts at issue in this case pretends to find a fatal inconsistency in the Plaintiffs' allegations because the above policy, while its existence is clearly alleged and substantiated by the Principal's police report (ECF No. 17, AC at Exhibit No. 2), was not publicly announced. The AC says exactly this, alleging in ECF No. 17, AC at ¶62 that "there is no evidence that the entire school body was ever officially put on notice of the true purpose of the Prayer Room or about any rules associated with it." Those students who used the Prayer Room knew the real purpose of that room, because of the Islamic prayer items and displays as well as the sex-segregation, about which the students knew, ECF No. 17, AC, Exh. 5, p. 79, and the girls in the Prayer Room were horrified that the boys violated that rule ECF No. 17, Exhibit 5, pp. 105. There were additional rules for use of the Prayer Room which were posted by the Palumbo Muslim Student Association on the walls of that room. See ECF No. 17, AC at ¶73, and Exh. 4, at p. 2.

Defendants' argumentative and inaccurate recasting of the Amended Complaint's clear allegations fails because, like the rest of their briefs, it violates Rule 12 by contradicting the pleading's actual allegations. Plaintiffs have alleged *both* that the policy exists *and* that it was not publicly announced to the entire school. Defendants offer no reason why both of those things cannot be true at the same time, and the Plaintiffs have alleged that they are both true. That is the controlling set of facts on this issue for purposes of the instant motion.

With that established we can turn to the rest of the Amended Complaint's allegations, and to Defendants' improper effort to get the case dismissed on the basis of their version of the facts rather than the Plaintiffs'.

The Amended Complaint recounts the facts here at issue as they occurred, and this brief proceeds the same way.

***The Student Plaintiffs arrive at Palumbo on June 11***.  In their briefs the School District Defendants' invent the "fact" that Plaintiff M. Danowitz committed the offense of an "unauthorized" entry into the school building, in violation of the Code of Conduct, and that Student Plaintiffs Parmar and Hiester were guilty of assisting in this wrongdoing.  See ECF No. 43,  SDP Br. at pp. 4-5.  But the Amended Complaint alleges exactly the opposite.  The facts of what actually occurred, as the Amended Complaint alleges, are:

- On June 11, 2024, there was no rule or Code of Conduct barring non-students from entering Palumbo without prior authorization.  ECF No. 17, AC at ¶250**.**

- That morning, Plaintiff M. Danowitz passed the school's Principal and Dean of Students, both of whom had been just outside the school's front door; he entered through that front door, passed through the metal detector, and was filmed doing all this by the school's security camera.  ECF No. 17, AC at ¶¶56-58.  Plaintiff Meru Parmar was not present when Plaintiffs Hiester and M. Danowitz entered the school.

- The Student Plaintiffs were seen by Palumbo's computer lab teacher, ECF No. 17, AC at ¶61, who "gave them permission to leave the classroom" and thus to be present elsewhere in the school.

As these allegations make clear, Defendants have no basis for their factual argument— totally inappropriate on this Motion to Dismiss—that M. Danowitz's presence in the school on

June 11, 2024 constituted wrongdoing of some kind. And the Amended Complaint clearly alleges that Danowitz's entry into, and presence in, the school were entirely innocent.

**The Student Plaintiffs enter the Muslim Prayer Room and stay for less than ten minutes.** The Amended Complaint carefully describes exactly what happened in the Prayer Room, and what did **not** happen. Those allegations control for purposes of this Motion, but Defendants tell a completely different story, flatly inconsistent with the allegations in the Amended Complaint. The AC also attaches and incorporates a video of the events. ECF No. 17, AC Exhibit 6A. Defendants ignore the video, the contents of which cannot plausibly be debated. It supports Plaintiffs' allegations in every detail.

The Amended Complaint alleges that the four boys entered the room, whose door displays a Palestinian flag while the interior of the room is completely obscured by that flag and paper covering the door's window. As the video shows, a window on the door is covered from the inside. See ECF No. 17, AC at Exhibit 4, at p. 8 and Exhibit No. 6A.

The Amended Complaint alleges that upon the boys' entrance, two girls were sitting at a table. Neither of them was praying or meditating. One reported that she was "still playing my roblox" on her phone when the boys entered the room. ECF No. 17, AC at ¶78 fn. 7, ECF No. 17, AC at Exhibit No. 5 p. 57. The boys spoke with one another, and with the girls. One of the Student Plaintiffs said a short prayer in Hebrew and another sang a song about the People of Israel, while the first joined in and did a handstand. ECF No. 17, Exhibit 6A. One of the boys examined and removed artwork from a bulletin board. ECF No. 17, AC at Exhibit No. 4 p. 2. ECF No. 17, AC at ¶ 73 reveals a poster on the board which was the Muslim Student Association's assertion of control over the room, setting forth the Association's "rules" for the

room – including a mandate to remove shoes, as is required by Muslim religious law for Muslim religious spaces. This remained undisturbed by the boys.

There were no raised voices. No physical contact of any kind between the Student Plaintiffs and the girls in the room, as verified by one of the only two girls who were in the Quiet Room the entire time the boys were present. ECF No. 17, Exhibit 5, p.105. Less than 10 minutes after they had entered, the boys left. ECF No. 17, AC Exhibit 5, pp. 48, 63, 66.

The Defendants ask this Court to proceed on the hypothesis that these are not the facts: The Defendants' version is that:

> According to the girls' reports described in the Complaint, the boys "loudly announced that they 'hate Muslims,'" "declared that they were 'proud Zionists,'" and made inappropriate gestures—"humping the floor," "ripping posters off the wall," and "trashing the room." (ECF No. 17, AC ¶ 92.)

Though the Defendants' brief cites ECF No. 17, AC at ¶92, that paragraph does not say what the District says it says. Paragraph 92 (emphasis added below) quotes *not* the girls' reports, but Defendant Thompson's inaccurate and purposefully exaggerated version of the girls' reports:

> **THOMPSON told JEAN DANOWITZ that** the girls in the Prayer Room claimed that her son had loudly announced that he "hates Muslims," had made sexually simulated or suggestive dances or maneuvers— including "humping the floor"—and proceeded to rip posters off the wall and trash the room. JEAN DANOWITZ told THOMPSON that she would speak to her son about the allegations and then get back to her.

The girls' statements appear as ECF 17 Exhibits 6 (B) (C) and (G) to the AC. In those statements, which were written by the girls approximately two hours after the event occurred, the girls said nothing about "sexually simulated dances or maneuvers," nothing about "humping" the floor, and nothing about anyone saying they "hate Muslims." They say nothing about any physical contact between any of the boys and any of the girls. They say nothing even about any raised voices. Defendant Thompson's statement, and Defendants' invocation of it in their brief as if it were true, is yet another example of the Defendants' attempts to rewrite the facts to suit

their position.  While one of the girls said a boy "grinds the floor," she said nothing about any "sexual" act, and it is unclear what she meant by her statement.  Neither of the other two girls who were in the room during any of the ten minutes when the boys were present mentioned it, nor does anything of the kind appear in the video of what transpired during the short time the boys were in the room.  See ECF No. 17, AC at Exhibit No. 6A.

*The attacks and threats begin within minutes of the boys leaving the room*.

The AC shows in detail that dozens and dozens of messages, threatening death and violent physical injury, were sent to the Student Plaintiffs in the hours and days after they left the Prayer Room.  Some were explicitly religious in nature – "*yall niggas gon die ion play w my religion like that."* ECF No. 17, AC at ¶106.  Another posted the boys' names and social media home pages and urged people to "FUCK EM UP. " ECF No. 17, AC at ¶108.  The AC's allegations regarding the threats demonstrate that they came from dozens of students, in many dozens of messages, and that they conveyed clear and explicit threats that the boys would be hurt or killed.  See ECF No. 17, AC at ¶¶105-111, Exhibit 5, pp.15, 18-20, 23-27, 33, 40, 42, 53.

*The parents begin to ask for help but Defendants pour gasoline on the flames.*  The night after the event, the Plaintiff parents got together to try to figure out how to respond to the numerous and alarming threats their sons were receiving.  They alerted the school immediately, by sending an email to Defendant Thompson at 9 pm on June 12, 2024.  ECF No. 17, AC at ¶¶112, 113.  These parents asked Thompson for increased security in the school for their sons, and they asked school administrators to review any security footage in the Prayer Room.  The parents had reviewed the complete video which is referenced in the ECF No. 17, AC at ¶76 fn.6**,** and a portion of which is attached as Exhibit 6A**,** and which completely exculpates the Student Plaintiffs of any wrongdoing. ECF No. 17, AC at ¶113, and ECF No. 17, AC at Exhibit 7.

In the hours after the event, an Instagram account denominated as Palumbo.Positivity, which features the school's insignia, also filled with threats of violence directed at the boys. The school has in the past taken steps to control the content of this page. ECF No. 17, AC at ¶134. But when the Parent Plaintiffs asked that the school address these threats, Defendant Stamps refused to do anything about the content of the page, shrugging off the parents' request for intervention by saying she had no ability or resources to discover the people who controlled the page or to do anything to affect what appeared there. *Id.* at ¶133.

***The boys are suspended for breaching a non-existent rule, without the school looking at its own evidence proving they are innocent of the act with which they are charged.*** The Amended Complaint makes clear that, without even the pretense of any due process, the boys were suspended on June 12, the day after they had all entered Palumbo. The Defendants' brief makes it appear as if they were suspended because of what occurred in the Prayer Room**,** ECF No. 37, Defendant Teachers' Brief pp. 7, 21, completely ignoring the Complaint's allegation that the basis for the suspension was an invented conspiracy, manufactured by SDP Defendants, that the Student Plaintiffs snuck Plaintiff M. Danowitz into the school building. ECF No. 17, AC at ¶117 fn.8.

Because the Defendants ignore this allegation, they cannot make a coherent factual explanation for the due process violations inherent in a school suspending students without even bothering to examine the school's own evidence about whether the students are guilty—particularly where the evidence shows conclusively that the students are ***not*** guilty**.** ECF No. 17, AC ¶¶9(b), 117, and 251. In the Amended Complaint, the Plaintiffs allege that this evidence was (a) readily available to the District; (b) not examined by anyone at the District before the suspension was imposed; (c) so completely exculpatory that when—months later, and after the

boys and their family had already fled Philadelphia, and even then only at the demand of Plaintiffs' counsel—the District did finally look at its own camera footage,  it summarily reversed the suspensions.  ECF No. 17, AC at ¶6.

Rather than taking any steps to protect the Student Plaintiffs, Defendant Thompson informed the Assistant Superintendent Defendant Gordon about "what happened" and she then informed Plaintiff Kathryn Hiester and the other parent Plaintiffs that their sons were suspended. The AC alleges clearly that this punishment was imposed ostensibly because the boys had violated a rule—which in fact did not exist—barring Plaintiff M. Danowitz's allegedly surreptitious entry to the school.  The suspension was not only for violation of a non-existent rule, but also for an act that had not occurred: Plaintiff M. Danowitz had come through the front door, and the District should have known that and could have known it in minutes because its own security camera showed it. Furthermore, Plaintiff Meru Parmar was not present when M. Danowitz entered the school and had no reason to question his presence just as the Computer Lab teacher had not.  ECF No. 17, AC at ¶¶59-61.

The AC alleges that the suspension was in fact imposed because Defendant Thompson wanted to punish the boys for their alleged desecration of the Prayer Room. Surprisingly, the Defendants' brief, at pp. 1-2 of the Preliminary Statement, also suggests that this was the case—surprising because when the suspension was imposed there had been no adjudication, or even investigation, of any wrongdoing by the boys in the Prayer Room.  Months later, the Defendants concluded that the boys had committed harassment.

That was the last official communication from the District to the Hiester and Parmar families.  Somehow and in some way completely unknown to the Plaintiffs, at some point that

conclusion was undone and the harassment findings against J. Hiester and M. Parmar were mysteriously dropped without any notice to any of the Plaintiffs. ECF No. 17, AC at ¶8.

But the suspensions were imposed at a crucial moment, and it validated the rumors and false accusations against the boys—as anyone would have realized, and as the Parents informed the Defendants within hours after the suspension had been imposed. The District and the other Defendants Gordon, Thompson and Stamps, not only did not care; they *wanted* to punish the boys for this non-existent offense.

***Plaintiff parents beg for help and the District calls the Police on them***. The Parent Plaintiffs followed up their emails and phone calls to the school by going to Palumbo the following day, June 13, in an effort to meet with Defendant Thompson. She absolutely refused to meet with them, or to schedule an appointment for them at another time. Instead she called school security and the Philadelphia Police to have the Parents removed from the school. ECF No. 17, AC at ¶123. Upon exiting the building, the Parents were approached by three Philadelphia police officers and school security officers who informed them "that the school had called them earlier that morning to file a police report against them." When the Parents explained why they were present at Palumbo and why there were no longer in the building, the police not only did not take action against the Parents but "SDP Security Officer Terry recommended that Plaintiffs go to SDP's main office building to file a report against the school and Principal THOMPSON." ECF No. 17, AC at ¶125.

***The SDP sees video proving the boy's innocence and completely ignores it***. The next day the Parent Plaintiffs met with SDP Victim Assistance Specialists Gina Crayton and Victoria Trower, and showed them the complete video, which exculpated the boys. ECF No. 17, AC at ¶¶126-127. Crayton told Defendant Thompson about the video, but Thompson made no effort to

17

see it herself.  ECF No. 17, AC at ¶129. No one at SDP took any action after seeing or hearing about the video to do anything about what the video clearly reveals as false statements regarding what happened in the Prayer Room.

***Ridgeway and Luebbert use their authority as District teachers to doxx the boys and lie about what they did.***  The teacher Defendants set their legal attacks on this case atop a version of the "facts" according to which they did not identify the Student Plaintiffs by name and because, they claim, they were acting in their personal capacities and not in their professional roles as teachers of the School District of Philadelphia. See Teachers Br. at pp. 5-6   This "fact" is the exact opposite of what the Amended Complaint alleges.  The actual fact alleged in the Amended Complaint shows clearly that these teachers did name the boys.  It says:

> 139.  Defendant LUEBBERT reposted and commented on her own Instagram account the Palumbo. Positivity post on which the names of the Boys were provided. See ECF No. 17, AC at Exhibit No. 32-6 at p. 1. See also Teachers Br. At p. 5.

Within hours, Defendant Ridgeway adopted and promoted Luebbert's post of the boys' names. ECF No. 17, AC ¶140.

The Teacher Defendants also assert, as a fact, that that the teachers were acting in their private capacity, and not as public school teachers, when they publicly and shamelessly lied about what the boys had done**.**  See ECF No. 37, Teachers Brief. at pp.5-6.  But yet again, the Complaint alleges exactly the contrary, stating at ¶207 that "Defendants RIDGEWAY and LUEBBERT, both well-known Philadelphia teachers * * * used their status as SDP teachers to bolster the perceived veracity of the accusations each of them raised against the Boys."

That factual allegation is bolstered by the fact, alleged in ECF No. 17, AC at ¶¶36 and 37**,** that both of the Instagram accounts used to convey these messages are formally denominated as coming from Philadelphia School District teachers:  Luebbert's account is @teacherinphilly and

Ridgeway's is @teachkizzyteach. Both use their social media accounts as a megaphone powered by their authority as teachers in the School District of Philadelphia, and the access to information that that status confers. Both attract followers precisely through their work, and by virtue of their status, as Philadelphia School District teachers.

The AC alleges that Ridgeway abused that claim of access to information on her Instagram account, where she repeated a lurid and false account of what had happened in the Prayer Room and she repeated Luebbert's false accusations that the boys committed "deeply disgusting acts towards Muslim girls." Because Luebbert and Ridgeway were both employees of the District, their false accounts of what happened were accorded a level of credibility outsiders would not have. It would be difficult for an outsider to imagine that teachers in the District would spread such malicious lies if they did not know for a fact that what they said and published was true.

But Luebbert and Ridgeway did far more than simply identify the Student Plaintiffs. Using her status as a District teacher to convey what she claimed was new and sensational information, Luebbert announced at an SDP Board meeting that she was disclosing a new outrage: "Please prepare yourselves, the incident I am about to relate to you shocks the conscience and human decency in all of us." ECF No. 17, AC at ¶135. She then described the boys who had engaged in the by then rumored events, clearly referring to the Palumbo June 11 Palumbo Prayer Room incident, by naming the so called perpetrators as students at a magnet school in South Philly and a former student currently enrolled at St. Joe's Prep. Defendant Luebbert falsely described the action of those students' as :"appalling display of sacrilegious defilement, [which included the boys' grind[ing] and writh[ing] on the floor in an imitation of sex acts." ECF No. 17, AC at ¶135.

Ridgeway promoted Leubbert's lies in her own teacher-denominated Instagram account, characterizing it as "[p]owerful Testimony from @teacherinphilly [Kristin Luebbert] regarding a deeply disgusting act towards Muslim girls."  ECF No. 17, AC ¶140.  Ridgeway also reposted the statement that "a prayer space for Muslim children was desecrated by self-proclaimed male 'Zionists' at a #phlED school."  ECF No. 17 AC ¶141.

***The Defendants "investigate" and find the boys guilty of harassment, only to abandon that finding months later when it was too late to protect the boys.***  Weeks after the incident, and after the threats, and after the Defendants' refusal to do anything about the threats, the Defendants conducted what they claimed was an investigation of what happened in the Prayer Room, ostensibly in response to a charge against the boys of harassing the Muslim girls in the Prayer Room.  The investigation did not include an examination of the video that the Defendants knew existed and that some District employees had seen, which showed exactly what happened. It did not include any testimony from any of the accused, whom the investigator did not even speak to.  ECF No. 17, AC at ¶159.  Instead the "investigator" took and relied upon evidence from numerous people who had not even been present in the room when the incident at issue had occurred.  ECF No. 17, AC at ¶150. He also ignored the evidence of those who had been present. He ignored the testimony of the boys, who in reports they wrote at the time, ECF No. 17, AC ¶¶89, 99, said they had done nothing wrong.  See also ECF No. 17, Exhibit 10 (in which the boys also detail what occurred and made clear they had done nothing wrong).  He ignored the reports of the girls who were in the Palumbo Prayer Room at the time at issue—although they were part of his own Investigation Report—who did not report any "trashing" of the room; any raised voices; any physical contact; or any sexual acts; or anyone saying they "hated Muslims."  He ignored the fact that the girls reported being uncomfortable with boys in the room because they

believed they were in a space then reserved for girls. He ignored the fact that the girls reported being uncomfortable because Zionism was mentioned in the room. He ignored the fact that the Complaint initiating the investigation, filed by Defendant Thompson, accused all of the boys of being "Jewish."

On the strength of this "investigation" the District sent the Hiester and Parmer Plaintiffs a formal determination that their sons had been found guilty of harassment on September 6, 2024. EFC. No. 17, Exhibit 19, ECF No. 17, AC ¶180. The formal Appeal filed on October 9, 2024 regarding these determinations, ECF No. 17, AC ¶ 182, Exh. 21, received no response. ECF No. 17, AC ¶183. Not denied; just ignored.

Months after this case was filed, the District mysteriously "disappeared" the harassment determinations issued against the boys. With no notice and no explanation, the findings of harassment based on this investigation were simply erased. This fact was disclosed for the first time to Plaintiffs by Defense counsel in a brief filed in this case. ECF No. 17, AC at ¶8.

***Parents ask for protection, and for safety transfer, and are not even answered***. As previously stated, the Amended Complaint shows in detail that the Parents repeatedly asked and then begged for help from the School. They were not answered other than to be told their sons were suspended. ECF No. 17, AC at ¶28. They asked that the school address the lies and threats of death and violence appearing on a school Instagram account. The school refused. They sought to meet with the school's Principal. She refused to speak to them and instead called the police to have them removed from the school building. Even the police apparently realized this was ridiculous and rather than taking any action against them, the police recommended that the Parents file a Police Report against the Principal. ECF No. 17, AC at ¶125. They met with other school district officials and showed them evidence of their sons' innocence, but nothing

21

happened as a result of that meeting. ECF No. 17, AC at ¶¶126-127. The Parents wrote to the School Board. ECF No. 17, AC at ¶132. No response. The parents even asked for safety transfers to some other public school in the District. ECF No. 17, AC at ¶143, and Exhibit 15. Again, no response. ¶144.

So the parents were left with a simple choice: they could send their sons back to Palumbo, where a mob of students were clearly waiting to attack their sons and where the school administration had made its complete indifference to this fact crystal clear. Or they could send their children to school somewhere other than in the Philadelphia School District. They spent tens of thousands of dollars to do the latter, and left homes they had lived in for years, because they could not in good conscience expose their sons to the prospect of being assaulted, or worse, if they went back to Palumbo.

## I.   ARGUMENT

### A. __Legal Standard__.

On a Motion to Dismiss, a court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff." *Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022) (quoting *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)); *see also Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005) (a court is "required to accept as true all allegations in the complaint" when deciding a Rule 12(b)(6) motion).

In accepting the pled facts as true at the Rule 12 stage, the Court must also "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Rivera v. New Castle Cty. Police Dep't*, 152 F.4th 147, 153 (3d Cir. 2025) (finding that district court "improperly resolved" a factual

dispute to grant motion to dismiss) (quotations omitted). The facts alleged in a complaint are treated as true for purposes of determining a motion to dismiss "even when facts in judicially noticed documents conflict with those in the complaint." *Id*. (citing *Doe*, 30 F.4th at 342); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 214 (3d Cir. 2009) (the "standards of pleading are not the same as standards of proof. … We express no opinion on whether [plaintiff] will ultimately be able to prove her claims.").

Ultimately, it is Defendants' burden at the Rule 12 stage. *Bryant v. Pottsgrove Sch. Dist.*, No. 25-3140, 2025 LX 415156, at *20 (E.D. Pa. Sep. 19, 2025) ("Merely repeating keywords from *Twombly* and stating the due process standard, coupled with a bare assertion that it is unmet, does not satisfy Defendants' burden of showing the Amended Complaint fails to state a claim.").

These principles are black letter law, and lawyers routinely include it in brief on motions brought pursuant to Rule 12(b)(6). But in this case the principles are more than boilerplate, because Defendants have thoroughly violated them. As the Fact section of this brief makes clear, Defendants' submissions in support of their Motions to Dismiss do the exact opposite of what these rules require: they deny the Plaintiffs' allegations; insert their own, which contradict those of the Plaintiffs; and then argue that because the facts are the way Defendants say they are, the case must be dismissed. This is completely wrong and cannot be countenanced.

**B. Plaintiffs Have Adequately Alleged Claims for Violation of the First Amendment (Count I).**

### i. Plaintiffs' Allegations Establish Standing.

Plaintiffs allege constitutional and federal statutory violations and allege—and seek—remedies for the pled injuries caused thereby. Among the remedies sought is injunctive relief. But that is not the only remedy Plaintiffs seek: Defendants' acts caused very substantial financial injury, and Plaintiffs seek money damages. In addition, Constitutional claims give rise to claims for nominal damages, and Plaintiffs seek those as well.

Throughout the Amended Complaint, Plaintiffs also allege several concrete injuries, including both financial injury in the form of the expenses the Plaintiff Parents were forced to incur to protect their sons, and nominal damages for Constitutional violations, which the Supreme Court's cases make clear are sufficient to confer standing.

The SDP Defendants deny or ignore the detailed allegations of the Amended Complaint. Critically, in contradicting the allegations of injury pled in the Amended Complaint, the SDP Defendants attempt to recast the thrust of Plaintiffs' case, *e.g.*, suggesting that, according to their pleading, Plaintiffs chose to leave the District "because of the existence of a Quiet Room." SDP MTD at 11-13.

Of course, the Amended Complaint advances no such legal claim. Rather, the Amended Complaint pleads that because the Defendants ignored every single request made by Parent Plaintiffs to take action to protect their sons, John Hiester and Meru Parmar "were unable to continue attending Palumbo without exposing themselves to death or serious bodily injury" and "[t]hese boys and their families were thus forced to move out of the [District] and leave Palumbo, so that they could safety attend high school elsewhere." ECF No. 17, AC at ¶ 209; *see also* ¶¶178-179. And, as Plaintiffs show, Plaintiffs Kathryn Hiester and Catherine Parmar even requested

24

safety transfers for their sons to attend another high school in the District on the basis of the escalating, unabated threats, but received no reply. *Id*. ¶ 208; ECF No. 17, Exhibit 15.

Rather than tackle head-on the allegations Plaintiffs *do* make, the SDP Defendants harp on what Plaintiffs did *not* plead. *E.g.* ECF No. 43, SDP MTD at 13 ("The Complaint does not allege Plaintiffs were coerced to participate in religious activity, [or] were disciplined for declining religious activity"). Plaintiffs' claim is based on injuries incurred which were caused by lies about the boys' violation of an exclusively Muslim space that should not have existed. If the exclusively Muslim space had not existed, Plaintiffs would not have incurred these injuries. Their saying a Hebrew prayer, and singing a Hebrew song, would not have been a violation of this room that was maintained by the District Defendants as an exclusively Muslim prayer space.

The SDP Defendants would have the Court simply ignore the detailed allegations leveled against them in the Amended Complaint, and instead focus squarely on the argument that M. Danowitz cannot show an injury because he ceased being an enrolled student at Palumbo prior to the June 2024 incident in question and that no injunctive relief could remedy any alleged injuries to John Hiester and Meru Parmar who departed Palumbo after the events in question. (ECF No. 43, SDP MTD at 11-12.) But, by making these arguments, the SDP Defendants attempt to benefit from the very misconduct they are alleged to have committed, to wit: implementing and permitting an educational environment so hostile to Student Plaintiffs that their families were forced to leave the District. (ECF No. 17, AC at ¶¶ 178, 179).

Moreover, Plaintiffs seek not only injunctive relief, but damages. The Supreme Court has held that even nominal damages are sufficient to support standing where a plaintiff alleges a completed constitutional violation. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021) ("We conclude that a request for nominal damages satisfies the redressability element of standing where

a plaintiff's claim is based on a completed violation of a legal right."). And the SDP Defendants themselves concede that, "[a]t most, Plaintiffs may pursue nominal damages for an alleged constitutional violation." (ECF No. 43, SDP MTD at 13) (citing *Freedom From Religion Found., Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 480 (3d Cir. 2016)). Thus, even if the Court were to find that Plaintiffs lacked standing with respect to the claimed injunctive relief they seek and it ignored the damages incurred because Plaintiffs had to flee the District, their claims nevertheless remain live.

### ii. Plaintiffs' Claims Are Not Moot.

The SDP Defendants argue that the passage of time—in particular, the fact that, within several months, the student plaintiffs will have completed high school—renders Plaintiffs' claims moot. But the SDP Defendants' mootness argument is based on the incorrect premise that Plaintiffs seek (or *may* only seek) injunctive relief; as is made clear in the Amended Complaint, ECF No. 17, AC, Count II, at ¶210, Count IV, ¶242, Plaintiffs also seek money damages, and those claims are not moot—even according to the very cases that the SDP Defendants cite to support their argument. In *Donovan ex rel. Donovan v. Punxsutawney Area School Board*, for example, while the Third Circuit "conclude[d] that [the plaintiff's] request for injunctive and declaratory relief [wa]s moot," it expressly found that ***"her claims for damages and attorney's fees remain[ed] viable***." 336 F.3d 211, 214 (3d Cir. 2003) (emphasis added).[3]

---

[3]     *See also Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1105 (9th Cir. 2000) (finding that the plaintiffs' case was moot only with respect to the injunctive relief they sought but ***not*** as to their claim for damages); *Doe v. Madison Sch. Dist.* No. 321, 177 F.3d 789, 792 (9th Cir. 1999) ("The complaint requested declaratory and injunctive relief, ***but did not request damages***." (emphasis added)); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 56 (2d Cir. 2001) ("Plaintiffs brought the present action in October 1996 principally under 42 U.S.C. § 1983, ***seeking injunctive relief***" (emphasis added)); *K. Y. v. Schmitt*, 799 F. App'x 485, 486, n.2 (9th Cir. 2020) (court found the case moot where "Plaintiff sought injunctive and declaratory relief" but expressly noted that "[a] live ***claim for damages, including nominal damages, "will prevent dismissal for mootness."***)

Moreover, with respect to the injunctive relief sought, the mootness doctrine does not bar review where the dispute presented is "capable of repetition, yet evading review." For the "capable of repetition, yet evading review" exception to apply: "(1) the challenged action [must be] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [must be] a reasonable expectation that the same complaining party would be subjected to the same action again." *Brody v. Spang*, 957 F.2d 1108, 1113 (3d Cir. 1992) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149, 46 L. Ed. 2d 350, 96 S. Ct. 347 (1975)).

In *Brody v. Spang*, high school seniors and some of their parents claimed that planned prayer at a high school graduation would violate the Establishment Clause. 957 F.2d at 1111. Though recognizing that the "[t]hese same students [would] never again graduate from Downingtown Senior High School," the Third Circuit acknowledged that the plaintiff group included parents "who assert their claims on the basis of their children's interest." *Id*. at 1114. As the Court explained, "[t]heir inclusion is significant because these parents independently have standing to bring constitutional challenges to the conditions in their children's schools." *Id*. at 1114 (citing *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 224 (1963)). The Court concluded that, as to those parents, the dispute at issue was capable of repetition. *Id*. Similarly,

---

(emphasis added) (quoting *Jacobs v. Clark Cty. Sch. Dist.*, 526 F.3d 419, 425 (9th Cir. 2008)); *R.F. through Fernandez v. Harrison Sch. Dist.* No. 2, 924 F.3d 1309, 1315 (10th Cir. 2019) (finding the *school district's appeal* moot); *Honig v. Doe*, 484 U.S. 305, 314, 108 S. Ct. 592, 599 (1988) (plaintiff sought injunctive relief); *Fisk v. Bd. of Trs. of California State Univ.*, No. 22-CV-173, 2023 WL 6051381, at *10 (S.D. Cal. Sept. 15, 2023) (dismissing as moot only *some* of the claims for injunctive relief and quoting *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) for the rule that "[a student's graduation moots claims for declaratory and injunctive relief, *but it does not moot claims for monetary damages*" (emphasis added)); *Sh.A v. Tucumcari Mun. Sch.*, 2001 U.S. Dist. LEXIS 27842, at *3 (D.N.M. Sep. 12, 2001) ("the claim *for injunctive relief* is moot" (emphasis added)); *Russman v. Bd. of Educ. City of Watervliet*, 260 F.3d 114, 119 (2d Cir. 2001) (finding—*on a summary judgment record*—that the case was moot as to plaintiff's requested school accommodations).

in *Freedom From Religion Foundation Inc. v. New Kensington Arnold School District*, the Third Circuit found that a parent's claim against a school district for violation of the Establishment Clause was not moot where she had a child in the district notwithstanding that the child was not then a student at that school. 832 F.3d 469, 481 (3d Cir. 2016).

Here, Plaintiffs include at least two individuals—Catherine Parmar and Ratnadeep Parmar—who, like the parents in *Brody*, have a younger child who will be a student eligible for admission to Palumbo in the Philadelphia School District, and who would be expected to attend school there. (ECF No. 17, AC at ¶¶ 184, 195, 253.). The child, who has special educational needs, currently attends a private school that can address those needs, but the child resides in the Philadelphia School District and it had always been the Parmar family's intention to send this child to high school at Palumbo. *Ibid.* The SDP Defendants simply offer up their own version of the facts and, posit that the Parmars' son will not be eligible to attend Palumbo when he attains the appropriate age. ECF No. 43 ¶194 . In fact, the Parmars continue to maintain a home within the District boundaries so that the younger son is closer to his current school. Elsewhere, the SDP Defendants flatly ignore the Parmars' allegation relating to their younger child, falsely claiming— in an attempt to preemptively avoid *FFRF v. New Kensington*—that Plaintiffs as a group have not "pled that they are eligible to enroll in the school district and would do so." (ECF No. 43, SDP MTD at 15.). Moreover, as articulated above, the SDP Defendants' attempt to avoid judicial review of their unconstitutional conduct and statutory violations on the basis of the passage of time would enable and entice Defendants, and others, to simply "wait it out."

Plaintiffs' allegations stand and, at the Rule 12 stage, are to be accepted as true. The SDP Defendants are welcome to deny Plaintiffs' factual allegations in an answer and to test the truth of those allegations in discovery.

28

### iii. Plaintiffs Have Adequately Alleged a Violation of the Establishment Clause.

On the basis of their own version of the facts rather than the Plaintiffs, and so in clear violation of Rule 12(b)(6), the SDP Defendants argue that the Amended Complaint fails to adequately allege an Establishment Clause violation because the "Quiet Room" served as a "neutral" space "available to all students who wished to pray, meditate, or reflect privately." (SDP MTD at 16.) This argument rests entirely on the *SDP Defendants'* characterization of the facts, not on the well-pled allegations in the Amended Complaint. The argument fails because, at the Rule 12 stage, the Court must accept *Plaintiffs'* factual allegations as true and draw all reasonable inferences in their favor. When accepted as true—which they must be at this juncture—the Amended Complaint plausibly alleges that SDP and District and school administrators and officials maintained and enforced a religiously exclusive and exclusionary space in a public school and punished non-Muslim students who entered it.

Among other things, Plaintiffs have alleged that the entire lower half of the Prayer Room was covered with a makeshift Palestinian Flag. ECF No. 17, AC at ¶64, ECF No. 17, AC at Exhibit No. 32-4 p.8. The Boys observed, among other things, the following inside the Prayer Room: ECF No. 17, AC at ¶¶66-69, and 72-73.

- Arabic language on signs hanging on the walls, Islamic prayer instructs, student duas or prayers; and a large mural depicting a mosque with Islamic religious crescent moon symbols indicating the direction to face for prayer. ECF No. 17, AC at Exhibit No. 4.

- A nearly floor to ceiling sign on one wall welcomed people to the "Prayer Room," along with the message, "Happy Ramadan." ECF No. 17, AC at Exhibit No. 4 p.5

- The lack of religious items or information for any religion other than Islam

- Decorations on the door and interior of the Prayer Room were all Arabic language or imagery, along with what appeared to be English translations of some of the Arabic. ECF No. 17, AC at Exhibit No. 4.

- A laminated placard on the wall entitled Quiet Room Guidelines containing instructions for the use of the room which begins: "The Academy at Palumbo Muslim Student Association brings to you the Quiet Room." ECF Exhibit No. 4 p. 2.

The Plaintiffs further alleged the Defendants themselves described the room as dedicated to one religion, Islam, including, among other things:

- The Police Report filed in response to Defendant Thompson's complaint wherein she stated that the room is "designated for a particular religion and having a certain flag [Palestinian] outside the room." ECF No. 17, AC at ¶62, ECF No. 17, AC at Exhibit No. 2.

- Statements made to Plaintiffs Kathryn and John Hister during a meeting on the morning of June 12, 2024, with Defendants Thompson and Stamps, when Defendant Thompson "interrogated HIESTER about why he entered the Prayer Room, and especially, why he entered during 'girls time.'" ECF No. 17, AC ¶97.

The SDP Defendants' repeated characterization of the room as a "neutral" space directly conflicts with the allegations of the Complaint and presents a factual dispute that cannot be resolved on a motion to dismiss.

The Establishment Clause prohibits the government (and by extension public schools) from favoring one religion over another or endorsing a particular faith. *Larson v. Valente*, 456 U.S. 228, 244, (1982) ("The clearest command of the Establishment Clause is that one religious

30

denomination cannot be officially preferred over another.").  "While study of religions and of [a religious text] from a literary and historic viewpoint, presented objectively as part of a secular program of education, need not collide with the First Amendment's prohibition, the State may not adopt programs or practices in its public schools or colleges which 'aid or oppose' any religion." *Epperson v. Arkansas*, 393 U.S. 97, 106 (1968) (quoting *Abington School District* v. *Schempp*, 374 U.S. 203, 225 (1963)).  The Amended Complaint provides detailed allegations plausibly making the case that SDP and its administrators and officials—in policy and practice—preferred one religion over others; aided one religion over others.  For instance:

- Establishment and maintenance of the Prayer Room for the use of one religion-Islam;

- The encouragement and promotion of mass prayers for Ramadan on the school property during school hours with excused absences only for those attending; ECF No. 17, AC at ¶45

- Display off Islamic messaging, such as a giant banner saying Happy Ramadan and posted on a school wall confronting everyone entering the school; ECF No. 17, AC at ¶44

- Excusing students from class for in-school Ramadan observances, often to the detriment of other students; ECF No. 17, AC at ¶¶45-46

- The punishment of non-Muslim students for entering the Prayer Room, especially during "girls" time.  ECF No. 17, AC at ¶3

The SDP Defendants rely heavily on *Kennedy v. Bremerton School District*, arguing the Constitution protects religious activity in public schools and that neutrality toward religion does not require *hostility* toward religion. (*See, e.g.*, ECF No. 43, SDP MTD at 16-18) (citing *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022)).  But that misses the mark.  While those propositions are correct, they do not support the SDP Defendants' arguments for dismissal here. At issue in *Kennedy* was the private religious expression by a public-school employee who prayed

31

midfield on the gridiron after high school football games. 597 U.S. at 535–37. The Court in that case emphasized that the Constitution protects private religious speech and that the school district could not suppress that speech simply on the basis that it occurred in a public setting. *Id*. The case at bar is fundamentally different. Plaintiffs are not challenging the private student prayer—Muslim, Christian, Hindu, Buddhist, or otherwise.[4] Rather, Plaintiffs allege that SDP and its officials and administrators—including Gordon, Thompson, and Stamps—enforced physical and temporal religious boundaries within the school and punished students perceived to be Jewish for entering a space reserved for use by, and overseen and controlled by, Muslim students. ECF No. 17, AC at ¶¶3, 62, 73, ECF No. 17, AC at Exhibit No. 2).

The SDP Defendants also attempt to argue that Plaintiffs' Establishment Clause claims fail because, the SDP Defendants assert, "this case lacks the coercive elements that animated the school-prayer decisions in *Engel v. Vitale*, 370 U.S. 421 (1962), and *Lee v. Weisman*, 505 U.S. 577 (1992)." (ECF No. 43, SDP MTD at 17). But in attempting to contrast the facts of this case with *Engel* and *Lee*, the SDP Defendants again insert their own factual allegations: "The Quiet Room . . . was entirely voluntary, not part of any curriculum or event, and students could enter or avoid it freely." (ECF No. 43, SDP MTD at 18.). This (false) "factual" assertion flies directly in the face of Plaintiffs' entire case, which is predicated on the fact that the Student Plaintiffs could ***not*** "enter . . . it freely"; as alleged throughout the Amended Complaint, as a consequence of entering the Muslim Prayer Room, the student Plaintiffs were met with a barrage of attacks, threats, and administrative ramifications.

---

[4]     Nor, as a plain review of the Amended Complaint would make clear, are Plaintiffs seeking the "eradicate[ion of] all traces of faith from public institutions," (ECF No. 43, SDP MTD at 18) (citing *Shurtleff v. City of Boston*, 596 U.S. 243, 287–88 (2022)).

Similarly, the SDP Defendants' reliance on *Van Zandt v. Thompson*, 839 F.2d 1215 (7th Cir. 1988) is misplaced. There, the Seventh Circuit found that the existence of a non-denominational prayer and meditation room in the Illinois State Capital Building, for use by state adult legislators and statehouse visitors, did not run afoul of the Establishment Cause. 839 F.2d at 1219-21. Unlike the non-denominational prayer and meditation room in the Illinois State Capitol Building at issue in *Van Zandt*, the Muslim Prayer Room in this case, as alleged by Plaintiffs in the Amended Complaint, was maintained as an exclusive prayer space for use by Muslim students to the exclusion of others. ECF No. 17, AC at ¶62, ECF No. 17, AC at Exhibit No. 32-2) Moreover, the *Van Zandt* court found it significant that those to whom the room would be accessible were adult legislators at their place of work and statehouse visitors—not school children in a public educational setting. 839 F.2d at 1223 ("We are not talking here about dictating prayers or moments of silence **to school children**. We are merely allowing the legislature to set aside a room in which **individual legislators** may engage in private prayer or meditation as they choose, and presumably in the interests of a saner legislative process.") (emphasis added).

The SDP Defendants also urge that the *Van Zandt* court found that the non-denominational prayer room did not violate the Establishment Clause where it was "subject to neutral oversight." (ECF No. 43, SDP MTD at 17) (citing *Van Zandt*, 839 F.2d at 1223). Here again the SDP Defendants substitute their strawman facts for Plaintiffs' allegations. Far from "neutral oversight," Plaintiffs have alleged that SDP and its administrators and officials effectively ceded governance of the Prayer Room to the Academy at Palumbo Muslim Students Association. (*See, e.g.,* ECF No. 17, AC at ¶ 170 ("…the Academy at Palumbo Muslim Student Association, an organization to which Palumbo administrators had granted authority over the Muslim Prayer Room"); *see also* ECF No. 17, AC at ¶ 73 (noting the presence of a laminated "Guidelines" placard on the wall of

the Prayer Room, opening with: "The Academy at Palumbo Muslim Student Association brings to you the Quiet Room.")).

The Supreme Court's decision in *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000), further demonstrates why Plaintiffs have plausibly alleged an Establishment Clause violation. In *Santa Fe*, the Court held that a public school violated the Establishment Clause by permitting student-led prayer over the public address system at football games because the policy permitting such student-led prayer in that manner effectively resulted in the public school endorsing a particular religious practice within the school environment. *Id*. at 305–10. Even though the prayers were delivered by students, the Court emphasized that the school's involvement in allowing and facilitating the religious practice created the appearance of official endorsement. *Id.* at 310–12. Where an electoral system determined the nature of content of the prayer to be delivered, the Court found that the school district, in maintaining the practice, "empower[ed] the student body majority with the authority to subject students of minority views to constitutionally improper messages." *Id*. at 319 ("The award of that power alone, regardless of the students' ultimate use of it, is not acceptable.").[5]

Similar concerns are present in this case. Plaintiffs allege that SDP and school officials and administrators maintained or permitted to be maintained a room that functioned as an exclusively Muslim space within a public high school and treated entry by non-Muslim students (especially those of a particular sex during particular times) as impermissible. ECF No. 17, AC at

---

[5]  The fact that Muslims may comprise a large percentage of the student body at Palumbo therefore does not suggest the absence of an Establishment Clause violation here. *Santa* Fe, 530 U.S. at 319; *see also Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.").

¶¶ 3,15,97.   Accepting those allegations as true, the SDP Defendants did more than simply accommodate private religious speech—they structured and administered, directly or by delegation to a religious student group, a religious space in a manner that favored one faith and led to discipline when students of another faith entered and sought to utilize the space for their own religious purposes. Under *Santa Fe*, such government involvement in organizing or endorsing religious activity within the public-school environment—or the "perceived endorsement of the message," *Santa* Fe, 520 U.S. at 307—raises serious Establishment Clause concerns. Plaintiffs have sufficiently stated a claim for violation of the Establishment Clause.

### iv.   Plaintiff M. Danowitz Has Adequately Alleged a Violation of the Free Exercise Clause.

The government runs afoul of the First Amendment where it "prohibit[s] the free exercise" of religion.  U.S. Const. amend. I.  A violation of the Free Exercise clause may be shown by allegations that government action imposed a substantial burden on religious exercise. *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993).  Government punishment imposed in response to religious expression plausibly constitutes a burden on the exercise of religion. See *Lukumi*, 508 U.S. at 533–34. ("The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause 'forbids subtle departures from neutrality' . . . and 'covert suppression of particular religious beliefs'" (internal quotation marks and citations omitted)).

Here, the Amended Complaint plausibly alleges that the SDP Defendants treated students differently based on their actual or perceived religion. Plaintiffs allege that Muslim students were permitted to use the Muslim Prayer Room for religious prayer, whereas student Plaintiffs who were or were perceived to be Jewish were disciplined after entering that same space and when some engaged in Jewish religious expression. (ECF No. 17, AC at ¶¶74,76.) Accepting these allegations

as true, the SDP Defendants' conduct demonstrates discriminatory enforcement of school authority on the basis of religion, which is forbidden by the Free Exercise clause. *Lukumi*, 508 U.S. at 534.

At the pleading stage, Plaintiffs need not prove that religious discrimination actually motivated Defendants' conduct; they need only allege facts supporting a plausible inference of discriminatory treatment. *E.g.*, *Fowler*, 578 F.3d at 214 (the "standards of pleading are not the same as standards of proof.") Plaintiffs have plausibly stated a claim under the Free Exercise Clause.

### v. Plaintiffs' Allegations Are Not Subject to Dismissal Under *Monell*.

The SDP Defendants argue that Plaintiffs' claims under the First Amendment fail to establish municipal liability because such liability may not be proven under a theory of respondeat superior. ECF No. 43, SDP MTD at 32 (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A school district, like any entity, can act only through individuals. Consequently, throughout the Amended Complaint, Plaintiffs allege conduct by various District and school administrators and officials. But Plaintiffs also—and expressly—plead the existence of particular school policies giving rise to their claims. (*See, e.g.,* ECF No. 17, AC at ¶¶62 ("the Palumbo administration's official policy was to restrict access to this room to those of the Muslim faith"); 187 ("Defendants maintained a policy within Palumbo of promoting a particular religion— Islam—and denigrating the Jewish religion . . ."); 189 ("The policy of using publicly funded resources, specifically the existence of and restricted access to the "Prayer Room," and of using school time to promote the Muslim religion . . .")).

In response to these allegations, SDP argues that no such policy or custom existed. But this denial is not grounds for dismissal of Plaintiffs' claims. Disputed issues of fact must be hashed out during discovery.

**C. Plaintiffs Have Adequately Alleged a Violation of The Liberty Interest in Reputation (Count II).**

A plaintiff may support "a claim for deprivation of a liberty interest in reputation by showing a stigma to his reputation plus deprivation of some additional right or interest." *Dee v. Borough of Dunmore*, 549 F.3d 225, 233-34 (3d Cir. 2008). This is referred to, in the Third Circuit, "as the 'stigma-plus' test." *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006). Here, the Hiester and Parmar Plaintiffs who bring these claims plausibly allege both elements, and neither the SDP Plaintiffs' nor Luebbert and Ridgeway show otherwise in their respective Motions.

First, although Defendants entirely ignore the allegations in their Motions to Dismiss, Plaintiffs allege that government actors acting under color of state law publicly disseminated stigmatizing accusations that Plaintiffs engaged in heinous misconduct, including physical, sexual harassment and religious bigotry and desecration, in addition to committing the crime of trespass. (*See, e.g.*, ECF No. 17, AC at ¶¶ 135-140; *see also* ECF No. 17, AC at Exhibit No. 6 p 2 of 34.) Luebbert's social media post of Wednesday, June 12, identifies the student Plaintiffs by name and grade. (ECF No. 17, AC at Exhibit No. 6 p. 2 of 34) The post also describes how, as of that day, "only one of these boys has been punished" in connection with the June 11 incident in the Prayer Room, during which the boys were assailed for, *inter alia*, "exclaiming about how they are ***openly zionist* . . .**") (emphasis added). These communications occurred at public district meetings and in written posts on social media, some of which identified the accused student Plaintiffs ***by name***. (*Id.*)

Plaintiffs further allege that these unfounded, lurid accusations were amplified publicly and associated directly with Plaintiffs, causing reputational harm within the school community, in their

homes, and beyond. (*See, e.g.*, ECF No. 17, AC at ¶¶ 135-140; harassment by other students (ECF No. 17, AC at ¶¶ 80–88), threats (ECF No. 17, AC at ¶¶ 105–111), and ultimately forcing the family to flee the School District of Philadelphia for their safety (ECF No. 17, AC at ¶¶ 178–179). Accepting these allegations as true, the Amended Complaint sufficiently pleads the "stigma" component of a stigma-plus claim. *Hart v. W. Mifflin Area Sch. Dist.*, 2017 U.S. Dist. LEXIS 52638, at *10 (W.D. Pa. Apr. 6, 2017) (plaintiff's clear allegations that one or both defendants published accusations that plaintiff had "made racist comments," "abused drugs," and "stole money" were sufficient to satisfy the "stigma" component of the "stigma-plus" test at the pleading stage).[6]

Second, the Amended Complaint plausibly alleges the required "plus" factor. Recognizing that "'education is perhaps the most important function of state and local governments,'" the Supreme Court has held that "exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child. Neither the property interest in educational benefits temporarily denied ***nor the liberty interest in reputation***, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary." *Goss v. Lopez*, 419 U.S. 565, 576 (1975) (emphasis added) (quoting *Brown* v. *Board of Education*, 347 U.S. 483, 493 (1954)). *Here,* Plaintiffs allege that Defendants imposed suspensions and adverse disciplinary findings against them in connection with the stigmatizing accusations. (*See* ECF No. 17, AC at ¶4.) Plaintiffs' allegations demonstrate that the initially offered rationale for the

---

[6] In *Hart*, some of the stigmatizing comments were allegedly made on an anonymous website. *Hart*, 2017 U.S. Dist. LEXIS 52638, at *6, *11. Though the court "wonder[ed] how Plaintiff will meet his ultimate burden of proof given the anonymity of the website," it found "the allegation is sufficient at this stage to establish a 'publication.'" *Id*. at *10-11.

suspension of John Hiester and Meru Parmar—in connection with an alleged trespass violation—was mere pretext to punish to punish the students who had been publicly and falsely accused of a "hate crime." (*E.g.*, ECF No. 17, AC at ¶119.) The Complaint further alleges that these disciplinary actions carried concrete consequences affecting Plaintiffs' educational status and reputation (*see* ECF No. 17, AC at ¶¶201, 214), *in addition to* threats of violence and consequent financial costs (borne primarily by Hiester and Parmar parent Plaintiffs) associated with extricating themselves from a hostile, dangerous situation that could have been, and should have been, remedied by Defendants (*see* ECF No. 17, AC at ¶¶ 201, 205, 209, 210, 211) Furthermore, Plaintiffs allege that the harm to John Hiester and Meru Parmar included their inability to continue their high school education in the District in which they (then) lived, (*see* ECF No. 17, AC at ¶¶ 178-179[7]), and, as alleged, the financial costs borne by the Hiester and Parmar parent Plaintiffs' effectively forced relocation out of the District. (*see, e.g.*, ECF No. 17, AC at ¶¶ 1, 28, 197.) These allegations satisfy the "plus" requirement because the stigmatizing accusations were accompanied by official disciplinary action taken by school authorities.

At the pleading stage, Plaintiffs need only allege facts supporting a plausible inference that Defendants publicly stigmatized them in connection with a deprivation of a protected interest. The Amended Complaint does so by alleging that SDP and its agents—Gordon, Thompson, Stamps, Luebbert, and Ridgeway—disciplined John Heister and Meru Parmar and publicly accused them of, and associated them with, serious misconduct, thereby damaging their reputations and altering their educational status. These allegations are sufficient to state a claim for violation of Plaintiffs'

---

[7]     The Amended Complaint also includes the efforts by Plaintiffs Kathryn Hiester and Catherine Parmar to obtain safety transfers for their sons because of the threats he faced at Palumbo, and that her requests were simply ignored. (*Id*. ¶¶ 143-144, 208, ECF No. 17, Exhibit 15.)

liberty interest in reputation. Accordingly, Defendants' factual disputes notwithstanding, dismissal of this claim is unwarranted.

These communications occurred at a public SDP school board meeting and in written posts on social media, some of which identified the accused student Plaintiffs **by name,** or with sufficient identifying information to ensure that members of the community understood who was meant. (*Id*.) In determining whether a claimed defamatory statement was made "concerning" the plaintiff, "the test to be applied is whether the 'defamatory communication may reasonably be understood as referring to the plaintiff.'" *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 479 (E.D. Pa. 2010) (quoting *Zerpol Corp. v. DMP Corp.*, 561 F. Supp. 404, 410 (E.D. Pa. 1983)); *see also Weinstein v. Bullick*, 827 F. Supp. 1193, 1199 (E.D. Pa. 1993 ("[A] defamed party need not be specifically named in a defamatory statement in order to recover, if she is pointed to by description or circumstances tending to identify her."). Moreover, in assessing whether a communication was defamatory in nature, courts may look to the context in which the statement was made. *Monge v. Univ. of Pa.*, LX 71758, at *14 (E.D. Pa. Jan. 23, 2023) (quoting *Mzamane*, 693 F. Supp. 2d at 477 (E.D. Pa. 2010)) (explaining that defamation claim may be viable "where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, i.e., defamation by innuendo").[8]

### D. <u>Plaintiffs Have Sufficiently Stated a Claim Under Title VI (Count III)</u>.

In Count III, John Heister and Meru Parmar bring a claim of discrimination under Title VI against Defendants SDP, Gordon, and Thompson.

---

[8]	Courts assessing whether a plaintiff has pled the "stigma" portion of a claim based on the liberty interest in reputation consider the elements of a claim for defamation. *See, e.g., Paterno v. Pa. State Univ.*, 688 F. App'x 128, 131 (3d Cir. 2017)

### i. Antisemitism Is, and Plaintiffs Adequately Allege, Actionable Racism Under Title VI.

For decades, discrimination against Jews has been treated as actionable as discrimination based on race or national origin for purposes of federal antidiscrimination laws. In *Shaare Tefila Congregation v. Cobb*, the Supreme Court considered a claim of racial discrimination under 42 U.S.C. § 1982, which "forbids both official and private racially discriminatory interference with property rights." 481 U.S. 615, 616 (1987). There, the Court rejected the argument that Jews could not state a § 1982 claim against other "white" defendants, finding it "evident from the legislative history" of the federal statute there at issue "that Jews and Arabs were among the peoples then considered to be distinct races and hence within the protection of the statute." *Id.* at 617–18. This principle has been extended to other antidiscrimination laws, including Title VI. *See Landau v. Corp. of Haverford Coll.*, 780 F. Supp. 3d 548, 557 (E.D. Pa. 2025) ("On its face, Title VI does not address discrimination on the basis of religion. But there is ample precedent classifying antisemitic harassment and discrimination as tantamount to racial discrimination") (collecting cases); *StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 15 n.12 (1st Cir. 2025) ("For purposes of reviewing plaintiffs' complaint, we assume that antisemitic harassment constitutes actionable racial harassment under Title VI") (citing, *inter alia*, *Sinai v. New England Tel. & Tel. Co.*, 3 F.3d 471, 474 (1st Cir. 1993)); *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 355 (S.D.N.Y. 2014) (Jewish "Plaintiffs [we]re within their rights to assert a claim under Title VI based on anti-Semitic discrimination" where "the harassment alleged is rooted in Plaintiffs' ***actual or perceived*** national origin or race" (emphasis added));[9] *United States*

---

[9] In *Pine Bush*, the court noted that "courts have regularly found that anti-Semitic harassment and discrimination amount to racial discrimination," and cited, *inter alia*, letter from the Office for Civil Rights which "made clear that 'anti-Semitic harassment can trigger responsibilities under Title VI . . . when the harassment is based on the group's ***actual or perceived*** shared ancestry

*v. Nelson*, 277 F.3d 164, 177 (2d Cir. 2002) (holding that "Jews count as a 'race under certain civil rights statutes enacted pursuant to Congress's power under the Thirteenth Amendment"); *see also Planchard v. United States Health, LLC*, 2023 LX 88106, at *42 (S.D. Ala. Oct. 13, 2023) (noting a lack of analysis on whether "Jews are encompassed by Title VII" and resolving therefore not to dismiss the complaint).[10] The SDP Defendants simply ignore this bevy of case law and mischaracterize Plaintiffs' allegations.

The SDP Defendants would have the Court believe that Plaintiffs seek to expand Title VI's applicability to cover John Heister and Meru Parmer simply because they "share the political and ideological views of their friends." (ECF No. 43, SDP MTD at 25.). But that is a glaring misrepresentation of the Amended Complaint. Plaintiffs have alleged that John Heister and Meru Parmer—along with other boys who entered the Prayer Room—were perceived to be Jewish (and that M. Danowitz *is* Jewish), (*E.g.*, ECF No. 17, AC at ¶¶ 16, 148, 149, 174), and were punished because they were so perceived. Plaintiffs also allege that Defendants' belief that John Heister and Meru Parmer were Jewish was a substantial factor in Defendants' discriminatory actions[11], which included creating and maintaining a hostile educational environment by allowing and failing to prevent or to take any steps to prevent the persistent, pervasive, offensive, and severe lies and false allegations against the Boys that effectively denied them the ability to fully partake in school

---

or ethnic characteristics, rather than solely on its members' religious practices" (emphasis added)). 58 F. Supp. 3d at 354 –55.

[10] "All inferences and doubts must be resolved in favor of the Plaintiff, particularly in a case where discovery has not yet occurred on an unsettled area of law." *Planchard*, 2023 LX 88106, at *42.

[11] Indeed, Defendant Thompson went so far as to include in her Statement for the SDP Investigator that the father of one of the Boys "had emailed me last week with concerns of safety and antisemitism, and that email, in my personal opinion, lends context to this incident." ECF No. 17, Exhibit 5, at p. 29.

activities, and indeed forced them to leave the District entirely. *See, e.g.*, ECF No. 17, AC at ¶ 220; 222; *see also,* ¶¶ 80,-87, 112-114, 118-123, 130-133, 14-145).

The SDP Defendants simply ignore all the allegations detailing the harassment, bullying, and threats to which the student Plaintiffs were subjected and instead mischaracterize a sliver of the Amended Complaint to suggest the only fallout for John Heister and Meru Parmar was a suspension handed down for escorting a non-student into the building. (ECF No. 43, SPD MTD at 27.) Yet, as the Amended Complaint's detailed and extensive allegations makes clear, that is simply not what the Amended Complaint alleges and it is not what this case is about. The facial rationale for the suspension was mere pretext to punish the students who had been publicly and falsely accused of a "hate crime," (*e.g.*, ECF No. 17, AC at ¶ 119)—the students who, perceived to be Jewish, "had the temerity to visit the school's Prayer Room and to recite therein a Jewish prayer" therein (*id*. ¶ 193.). Plaintiffs plead detailed allegations regarding the information provided to school administrators regarding exculpatory evidence that would exonerate the Student Plaintiffs, which information was inexplicably ignored. (*Id*. ¶ 127) Moreover, even in their Motion to Dismiss brief, the SDP Defendants try to justify Plaintiffs' predicament on the basis that "[t]he allegations against Plaintiffs"—presumably the unfounded *rumors* perpetrated and fueled by Defendants themselves—"were that they had in fact discriminated and defamed a minority group." (ECF No. 43, SDP MTD at 26.[12]). In doing so, Defendants tip their hand and demonstrate what in fact motivated the disciplinary actions taken against the student Plaintiffs.

The SDP Defendants also unconvincingly suggest that the fact that the suspensions and harassment charges were ultimately dropped as against John Heister and Meru Parmer "undercut[s]

---

[12]     Curiously, the SDP Defendants attempt to suggest that Muslim students constituted a "minority group" (ECF No. 43, SDP MTD at 26) despite elsewhere arguing that Palumbo was "a school with a substantial Muslim student population" (*id*. at 16).

any inference of racial or national-origin bias." (ECF No. 43, SDP MTD at 27.). Far from it. The only reasonable inference to be drawn from a later-withdrawn or scaled-back punishment is that the punishment, as initially handed down, was—as Plaintiffs allege—without merit. (ECF No. 17, AC at ¶ 5 ("The charges against the BOYS were so clearly baseless that the DISTRICT subsequently reversed and abandoned all of them, albeit without informing the very students who were charged, or their parents."). And, at this stage, all reasonable inferences should be drawn in Plaintiffs' favor.

### ii. Plaintiffs Adequately Allege Both Intentional Discrimination and Deliberate Indifference.

This is not a case in which student Plaintiffs simply have a gripe about a punishment meted out at their high school. Throughout the Amended Complaint, Plaintiffs detail the various ways in which they were victimized by both discriminatory, punitive measures taken against them as well as SDP's (and its officials' and administrators') conscious disregard or deliberate indifference to the targeting and harassment of them (*see* ECF No. 17, AC at ¶¶ 80,-87, 112-114, 118-123, 130-133, 14-145, and 206), as well as their purposeful and reckless decision to cover their eyes and ears to exculpatory information repeatedly handed to them (*id.* ¶¶ 9(b), 116, 129, 147, 152, 168, 235, 251). The SDP Defendants argue that Plaintiffs' allegations demonstrate "that school officials promptly investigated the incident, interviewed students, communicated with parents, and ultimately rescinded the discipline." (ECF No. 43, SDP MTD at 28.) But that is an utterly misleading portrayal of Plaintiffs' allegations, which the Court is urged to view for itself. Plaintiffs' detailed allegations demonstrate that Defendants callously ignored a frenzy of hysteria and baseless, heinous allegations against the Student Plaintiffs, and conducted an "investigation" with blinders on and a refusal to view irrefutable evidence vindicating the student Plaintiffs. (See

*supra* at 20-21.) Plaintiffs' allegations demonstrate that the SDP Defendants' conduct was fueled by animus and was patently unreasonable in the face of the information in its possession.

Here, at a minimum, Plaintiffs' "allegations are enough to show deliberate indifference by the [SDP Defendants] at the motion to dismiss stage." *Booker v. Bangor Area Sch. Dist.*, Lexis 71090, at *6 (E.D. Pa. Mar. 24, 2015) (denying motion to dismiss Title VI claim where parents of minor alleged that school administrator brushed off complaints of other students' taunting based on membership in protected class).

Plaintiffs also allege comparator evidence, which the SDP Defendants entirely ignore in their Motion to Dismiss. (ECF No. 43, SDP MTD at 29-30.) Among other things, Plaintiffs plead allegations regarding "A.A., a Muslim Palumbo student," who engaged in the same alleged infractions that were the pretext for the suspensions handed down to John Heister and Meru Parmar and yet received no discipline. (*E.g.*, ECF No. 17, AC at ¶¶ 81, 238.) Moreover, the cases relied on by the SDP Defendants to support their argument that Plaintiffs' claims fail at this stage with respect to comparator evidence are inapposite. (SDP MTD at 29-30.) Both *Gazarov ex rel Gazarov v. Diocese of Erie*, 80 F. App'x 202, 206 (3d Cir. 2003) and *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007) address rulings at the summary judgment stage—after discovery and a weighting of what evidence did (and did not) exist.

### iii. Dismissal of Count III Against Gordon and Thompson is Unwarranted.

Defendants Gordon and Thompson separately seek dismissal of Count III as against them on the basis that Title VI provides no individual liability, claims against them in their official capacities are redundant, and no clearly established law shows a violation. (ECF No. 43, SDP MTD at 38.). First, the Amended Complaint alleges clearly established violations of constitutional and federal statutory rights, including but not limited to the right to be free from discrimination

45

and the rights to due process. (AC, *passim*.) Although Title VI does not provide for individual liability, Plaintiffs have asserted claims against both Gordon and Thompson (and Stamps, Luebbert, and Ridgeway) in their individual capacities. As discussed in <u>Section</u> <u>III.F.</u> below, the various Defendants' assertions of qualified immunity to escape individual liability claims are meritless in light of the allegations in the Amended Complaint. Consequently, dismissal of Count III as against Gordon and Thompson in their *official* capacities is not required on the basis that such claims would be redundant of those against SDP or because they might accomplish some efficiency; "some district courts in this Circuit have declined to dismiss the official capacity claims as redundant where there are also individual capacity claims against those defendants." *M.S. v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412, 419 (M.D. Pa. 2014); *Capresecco v. Jenkintown Borough*, 261 F. Supp. 2d 319, 322 (E.D. Pa. 2003) ("Here, [defendants] also must answer charges against them in their individual capacities, and so dismissing the official capacity claims against them will serve no laudable purpose.").

### E. <u>Plaintiffs Have Sufficiently Stated a Claim for Deprivation of Due Process (Count IV).</u>

In Count IV, Plaintiffs John Heister and Meru Parmar state a claim for deprivation of due process under 42 U.S.C § 1983 based on the imposition of administrative punishment without proper notice and an opportunity to be heard. (ECF No. 17, AC at ¶¶225-253.) "[T]he claimed right of the State to determine unilaterally and without process whether [claimed] misconduct has occurred immediately collides with the [Due Process] requirements of the Constitution." *Goss v. Lopez*, 419 U.S. 565, 575, (1975) ("A 10-day suspension from school is not *de minimis* in our view and may not be imposed in complete disregard of the Due Process Clause.").

The "incident" in the Muslim Prayer Room occurred on June 11, 2024; late at night the following evening, Plaintiffs allege, the Hiester and Parmar parents were advised that SDP, Gordon, and Thompson had ordered and would implement a suspension of the boys from Palumbo which would take effect the very next morning (*i.e.*, hours later). (ECF No. 17, AC at ¶¶ 227-228.) The SDP Defendants claim in their brief that Plaintiffs admit that the requisite notice and opportunity to be heard actually was provided, (ECF No. 43, SDP MTD at 31) but that is a complete mischaracterization of the facts and the allegations as Plaintiffs have pled them. In the Amended Complaint, Plaintiffs allege limited instances in which school administrators reached out to one or more parents of the student Plaintiffs within the 24-36 hours following the alleged incident in the Prayer Room and the rumors swirling within the school community (and exacerbated by Defendants). (ECF No. 17, AC at ¶¶ 89, 92, 98, 114.)

What came down the pike was a suspension which purported to be based on John Hiester and Meru Parmar's having assisted a non-Palumbo student (M. Danowitz) trespass on campus by sneaking him around through the back of the school. (*Id*. ¶¶ 4,114.) This despite the fact that, as Plaintiffs allege—and as security footage confirms—M. Danowitz walked in through the front door of the school, through the security threshold, right in front of school officials. (*Id*. ¶¶ 56-58.) Neither suspended Plaintiff was given notice that this suspension was coming, let alone given an opportunity to be heard about it. (*Id*. ¶115.)

To comport with due process, notice and an opportunity for hearing must come *before* the deprivation of a right or adverse administrative action, and the notice and opportunity for hearing must be "***appropriate to the nature of the case.***" *Board of Regents v. Roth*, 408 U.S. 564, 570 n.7 (1972) (emphasis added). The lack of notice and an opportunity to be heard was particularly detrimental in this case, as the suspension of two students then the targets of a social media rumor

47

furor, alleged to have committed heinous anti-Muslim acts in a Muslim Prayer Room, was seen as a vindication of these baseless allegations. Defendants' conduct simply failed to satisfy constitutional requirements.

"Only in 'extraordinary situations where some valid government interest is at stake' is it permissible to postpone the hearing until after the deprivation has already occurred." *Dee v. Borough of Dunmore*, 549 F.3d 225, 232-33 (3d Cir. 2008) (quoting *Roth*, 408 U.S. at 570 n.7).[13] In *Dee*, the Third Circuit concluded that, in the case before it, "it [wa]s undisputed that the Borough provided Dee with neither notice nor a hearing prior to being suspended. Certainly, when an individual is not provided with any form of pre-deprivation process, as in this case, the risk of an erroneous deprivation of his constitutionally protected interest . . . is heightened considerably." *Dee*, 549 F.3d at 232. The Court noted that the existence or lack of sufficient reasons for postponing the opportunity for hearing until after the suspension—including, as the Borough argued, public safety—were "issues of disputed fact" and remanded the case to the District Court. At a minimum, Plaintiffs' allegations survive a motion to dismiss.

The SDP Plaintiffs also attempt to treat as entirely separate (1) the order suspending John Hiester and Meru Parmar and (2) the harassment investigation regarding their presence in the Prayer Room. (ECF No. 43, SDP MTD at 31.) But that disjunction, while convenient for the SDP Defendants attempting to sweep this case under the rug, ignores the facts pled in the Amended

---

[13] The SDP Defendants' citation to *Meyer v. Austin Independent School District*, 161 F.3d 271, 275 (5th Cir. 1998) for the proposition that "pre-suspension hearings are not always required to conform with Due Process requirements" (SDP Defendants' words) is not convincing. In *Meyer*, the court underscored the importance of hearing the accused students' side of the story— *before* handing out a punishment. *Meyer*, 161 at 275 ("While [the principal] was free to suspend the students ***after hearing their stories***, *Goss [v. Lopez]* unambiguously required him to allow them to present those stories, and if he did not do so, he violated the students' due process rights." (emphasis added)).

Complaint, including that the listed reasons for the suspension were in fact pretext for the subject matter of the harassment investigations. ECF No. 17, AC at ¶¶ 118, 252   The punishment of the boys was always about the presence of Jews (or those perceived as Jewish) in the Muslim Prayer Room.  That the trespassing excuse was mere pretext for the suspension is evidenced not only by the fact that Defendants only sought information from Plaintiffs regarding their time in the Prayer Room (ECF No. 17, AC ¶118 but also that the rule that the student Plaintiffs were alleged to have broken given rising to the suspension did not even exist when the suspensions were handed down. (*E.g.*, ECF No. 17, AC ¶¶ 7, 115.)

### F.  <u>No Individual Defendants Are Entitled to Qualified Immunity.</u>

Qualified immunity is a defense, and "it is the defendants' burden to establish that they are entitled to such immunity."  *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir. 1989).  To justify dismissal at this stage, the Defendants must demonstrate that the allegations in the Amended Complaint, taken as true, "make clear that the conduct" of which they are accused "did not violate a constitutional right (or that such right was not clearly established)."  *Detschelt v. Norwin Sch. Dist.*, 2025 LX 157628, at *38 (W.D. Pa. May 29, 2025) ("Because the Amended Complaint does not show that Dr. Taylor's actions did not violate a clearly established constitutional right, dismissal on qualified immunity grounds is still premature at this juncture."). Qualified immunity "will be upheld on a 12(b)(6) motion ***only*** when the immunity is established on the face of the complaint." *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001) (emphasis added) (quoting *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996)).

Here, Plaintiffs' allegations demonstrate that each of the individual Defendants were personally involved in the conduct they described and that as well as the fact that they acted under color of state law with respect to such conduct, as discussed herein.  Moreover, the allegations of

the Amended Complaint, taken as true, demonstrate the clearly established nature of the constitutional and federal statutory violations at issue. Defendants make no argument, nor can they, that is consistent with Due Process, to punish anyone for violation of a rule that does not exist. Similarly, Defendants' insistence on rewriting Plaintiffs' allegations about the Palumbo Prayer Room is necessary because Defendants make no attempt, nor can they, to defend the constitutionality of a public school prayer room designated for one religion only, and then for punishing the Student Plaintiffs for intruding into that space because they are not of the favored faith. The Motions to Dismiss overwhelmingly conflict with Plaintiffs' allegations on a factual level. In seeking dismissal based on qualified immunity, the individual SDP Defendants again substitute their own version of the facts, (*e.g.*, ECF No. 43, SDP MTD at 35 ("neutral, voluntary space" ; "temporary presence of prayer rugs") at 37 ("Defendants acted reasonably"); at 38 ("Defendants acted reasonably given those specific circumstances"), rather than grapple with Plaintiffs' actual, specific allegations of constitutional and statutory violations as pled throughout the Amended Complaint. Luebbert and Ridgeway do much of the same, though they also attempt to "flip the qualified immunity burden," *Bryant v. Pottsgrove Sch. Dist.*, 2025 LX 415156, at *27 (E.D. Pa. Sep. 19, 2025), by putting the onus on *Plaintiffs* to have pled the elements necessary to avoid qualified immunity dismissal, (*e.g.* ECF No. 37, Teachers MTD at 12 ("Plaintiffs have failed to demonstrate . . .".).

As discussed throughout this brief, Plaintiffs have stated claims under each of the Counts. Try as they might, based on the well-pled allegations, Defendants cannot seriously contend that there was reasonable uncertainty as to the propriety of their conduct; failing to provide notice and opportunity for a hearing before handing down administrative punishments; punishing the boys for violating non-existent rules; engaging in antisemitic discrimination and failing to take any

reasonable steps to calm the enflamed tensions targeting student Plaintiffs; and circulating, promoting, and allowing to spread unabated factually inaccurate and demonstrably false rumors of heinous crimes by Student Plaintiffs. As to the Teacher Defendants, no argument can be made that falsely accusing students who are minors of outrageous, sacrilegious defilement and harassment of Muslim girls is permissible. Everyone knows that lying is wrong. When the lie is broadcast through a megaphone powered by the speakers' status as public school teachers, no serious argument can be made that such teachers have not abused their power as public employees.

Defendants argue that there is no Third Circuit case finding the precise conduct alleged here to be unconstitutional (*e.g.*, ECF No. 37, Teachers MTD at 12; *see also* SDP MTD at 34-35), but "the law may be clearly established . . . even if no court has previously held the specific conduct in question to be unlawful," *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377, (2009). "Sometimes, the very action in question will not have been previously held unlawful because some outrageous conduct is ***so obviously unconstitutional*** that the 'easiest cases don't even arise.'" *Goldwire v. City of Phila.*, 130 F. Supp. 3d 936, 941-42 (E.D. Pa. 2015) (emphasis added) (quoting *Safford*, 577 U.S. at 377, and denying qualified immunity defense despite defendants' argument that "the Third Circuit has never held" that the specific misconduct alleged was unlawful).

Even so, as "recently reaffirmed by the Third Circuit, 'a plaintiff 'has no pleading burden to anticipate or overcome a qualified immunity defense.'" *Bryant*, 2025 LX 415156, at *27 (quoting *Stringer v. Cnty. of Bucks*, 141 F.4th 76, 86 (3d Cir. 2025)). The individual Defendants fail to carry their burden of establishing entitlement to qualified immunity in this case.

### G. **Plaintiffs' Allegations Establish Grounds for Seeking Punitive Damages.**

"Punitive damages are recoverable against a school district employee in her individual capacity 'where the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *R.G. v. Chichester Sch. Dist.*, 2025 LX 268132, at *4-5 (E.D. Pa. Feb. 13, 2025) (quoting *Smith v. Wade*; 461 U.S. 30, 56 (1983)); *Sec. & Data Techs., Inc. v. Sch. Dist. of Phila.*, 145 F. Supp. 3d 454, 469 (E.D. Pa. 2015); *see also Doe v. Harrisburg Sch. Dist.*, 2020 U.S. Dist. LEXIS 142130, at *16 (M.D. Pa. Aug. 10, 2020) ("The policy safeguards protecting the District, however, do not extend to its employees sued in their individual capacities.").

Gordon, Thompson, and Stamps seek dismissal of Plaintiffs' punitive damages claims against them individually. (ECF No. 43, SDP MTD at 39-40.) As with their attacks on the rest of Plaintiffs' pleading, these Defendants rely on mischaracterizations and avoidance of Plaintiffs' allegations, simply asserting that Plaintiffs have not met the pleading standard. (*E.g.*, ECF No. 43, SDP MTD at 40 (citing a grand total of two paragraphs of the 253-paragraph amended complaint)). They also take the opportunity to offer their own take on how the events at issue transpired. (*E.g.*, id. ("Defendants acted promptly to investigate serious allegations . . .")). But Defendants' factual characterizations directly conflict with the allegations of the Amended Complaint, including that Defendants acted with "deliberate indifference to the severe, pervasive, and harmful torrent of lies" being spread about them and "callously ignored" repeated reports about the harassment and targeting of the student Plaintiffs as well as evidence that would have exonerated John Hiester and Meru Parmar at a time of enflamed passions and heated rhetoric, much of which was engendered

and promoted by Defendants.  (*E.g.*, ECF No. 17, AC at ¶¶ 9, 10, 13, 100, 104, 114, 144; *see also id*. ¶¶ 144-169.)

Ultimately, "[w]hether a defendant has acted with this requisite mental state is a fact-intensive issue usually reserved for the trier of fact." *R.G. v. Chichester Sch. Dist.*, No. 24-5333, 2025 LX 268132, at *5 (E.D. Pa. Feb. 13, 2025); *see also Doe*, 2020 U.S. Dist. LEXIS 142130, at *17 ("In light of the fact-intensive nature of the inquiry, courts in this district often defer punitive damages questions until after discovery.")

The Court should reject the Motion to Dismiss in this respect as well.

## II.      CONCLUSION

For all the foregoing reasons, the Motions to Dismiss should be denied.

Dated:  March 10, 2026.                                THE DEBORAH PROJECT

BY:  LORI LOWENTHAL MARCUS, ESQUIRE
JEROME M. MARCUS, ESQUIRE
P.O. Box 212
Merion Station, PA 19066
610-880-100

**CERTIFICATE OF SERVICE**

I, Lori Lowenthal Marcus, hereby certify that on this 10th day of March, 2026, I caused a copy of the foregoing Plaintiffs' March 10, 2026 Consolidated Response In Opposition To Defendants' Motions To Dismiss to be served upon Marjorie M. Obod, Esq, Lee C. Durivage, Esq. of Marshall Dennehey, at lcdurivage@mdwcg.com, and Margaret Spitzer, Esq of Dilworth Paxson LLP, counsel for Defendants, at moboc@dilworthlaw.com and mperisco@dilworthlaw.com.