

July 13, 2026

SENT VIA EMAIL
Nathan_Miller@paed.uscourts.gov
Chambers_Younge@paed.uscourts.gov

The Honorable John Milton Younge 15613 U.S.
Courthouse
601 Market Street
Philadelphia, PA 19106

   **Re:**       ***Hiester, et al. v. School District of Philadelphia, et al.*, 25-cv-04502**

Dear Judge Younge:

During the Motion to Dismiss argument in the above-captioned case held in your courtroom on Thursday, July 9, 2026, Your Honor asked Plaintiffs' counsel to provide you with support for representations made to you in the course of that argument.

In response, we attach to this letter Exhibit (1): evidence that Defendant School District of Philadelphia issued findings of harassment against our two clients who were charged with that violation, John Hiester and Meru Parmar, which were attached to the Amended Complaint in this matter as Exhibit 18; and Exhibit (2) extensive examples showing that it is sufficient for a Title VI complainant to show that he was "perceived" to be a member of a protected class under the categories of "shared ancestry" and "ethnic characteristics" which are the classes under which Jews and certain other religious minorities are protected from discrimination under Title VI of the Civil Rights Act of 1964.  Both of the then-Palumbo students who are Plaintiffs, John Hiester and Meru Parmar, were perceived to be Jewish by the complainant SDP principal Kiana Thompson, as described in her complaint to the SDP investigator regarding alleged conduct occurring in the Palumbo Prayer/Quiet Room on June 11, 2024.

In particular, we direct the court's attention to the language used by the U.S. Department of Education's Office of Civil Rights' Voluntary Resolution Agreement entered to address antisemitism charges against the School District of Philadelphia, dated December 18, 2024, agreed to by, of course, the School District of Philadelphia.

On page 2, under the heading "LEGAL STANDARD", and sub-heading "Title VI Harassment" that Agreement provides:

THE DEBORAH PROJECT
Page 2 of 2


Title VI's protection from national origin discrimination extends to students who experience discrimination, including harassment, *based on their actual or perceived shared ancestry or ethnic characteristics, such as students of Jewish,* Palestinian, Muslim, Arab, and/or South Asian descent, or citizenship or residency in a country with a dominant religion or distinct religious identity, or their association with this national origin/ancestry. The existence of a hostile environment based on national origin that is created, encouraged, accepted, tolerated, or left uncorrected by a recipient constitutes discrimination on the basis of national origin in violation of Title VI.  (Emphasis added.)

We hope the information provided sufficiently addresses the requests made to Plaintiffs' counsel.


Respectfully,

Lori Lowenthal Marcus, Esq.
Jerome M. Marcus, Esq.
The Deborah Project

Counsel for Plaintiffs
Direct dial: (610) 742-5226

# EXHIBIT 1

Date: 8/29/24

Dear Parents/Guardians of ▮▮▮ Parmar:

The Academy at Palumbo received a complaint alleging that your child engaged in conduct that constitutes bullying or harassment. In accordance with Board of Education policies 248 and 249, any form of bullying or harassment is expressly prohibited.

Bullying is fully defined in Board Policy 249, but is generally characterized as an intentional, aggressive behavior that is carried out repeatedly over time which occurs within an interpersonal relationship where there is an imbalance of power.

Harassment is fully defined in Policy 248, but is generally defined as unwelcome verbal, nonverbal, written, graphic or physical conduct relating to an individual's known or perceived race, color, ethnicity, age, religion, sex, sexual orientation, gender identity or expression, ancestry, national origin, marital status, pregnancy, English language proficiency, veteran status, disability, or other protected classification.

The purpose of this letter is to notify you that a thorough investigation was conducted and the investigator has determined that that your child engaged in misconduct which constitutes:

☐ Bullying/cyber bullying

☒ Harassment

As a result of these findings any disciplinary actions taken will be consistent with the Code of Conduct, Board of Education policies and administrative procedures, and state and federal laws. To protect student privacy, any interventions, supports or discipline implemented for other involved students cannot be shared or discussed with you.

You have the right to appeal this determination. Appeal forms must be filed in writing and submitted, along with all relevant documentation, either in person at 440 N. Broad Street, Suite 243 or by email (parentappeals@philasd.org) no later than 15 calendar days from the date of this letter. For more information on the appeal process and to access the appeal form, please visit https://www.philasd.org/studentrights

Thank you,

Kiana Thompson,

Principal

Date: 8/29/24

Dear Parents/Guardians of ██ Hiester:

The Academy at Palumbo received a complaint alleging that your child engaged in conduct that constitutes bullying or harassment. In accordance with Board of Education policies 248 and 249, any form of bullying or harassment is expressly prohibited.

Bullying is fully defined in Board Policy 249, but is generally characterized as an intentional, aggressive behavior that is carried out repeatedly over time which occurs within an interpersonal relationship where there is an imbalance of power.

Harassment is fully defined in Policy 248, but is generally defined as unwelcome verbal, nonverbal, written, graphic or physical conduct relating to an individual's known or perceived race, color, ethnicity, age, religion, sex, sexual orientation, gender identity or expression, ancestry, national origin, marital status, pregnancy, English language proficiency, veteran status, disability, or other protected classification.

The purpose of this letter is to notify you that a thorough investigation was conducted and the investigator has determined that that your child engaged in misconduct which constitutes:

☐ Bullying/cyber bullying

☒ Harassment

As a result of these findings any disciplinary actions taken will be consistent with the Code of Conduct, Board of Education policies and administrative procedures, and state and federal laws. To protect student privacy, any interventions, supports or discipline implemented for other involved students cannot be shared or discussed with you.

You have the right to appeal this determination. Appeal forms must be filed in writing and submitted, along with all relevant documentation, either in person at 440 N. Broad Street, Suite 243 or by email (parentappeals@philasd.org) no later than 15 calendar days from the date of this letter. For more information on the appeal process and to access the appeal form, please visit https://www.philasd.org/studentrights

Thank you,

Kiana Thompson,

Principal

# EXHIBIT 2



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

**REGION III**
DELAWARE
KENTUCKY
MARYLAND
PENNSYLVANIA
WEST VIRGINIA

THE WANAMAKER BUILDING, SUITE 515
100 PENN SQUARE EAST
PHILADELPHIA, PA 19107-3323

December 18, 2024

**IN RESPONSE, PLEASE REFER TO: OCR Case Number 03-24-1286**

**Sent via email only to:** lrauch@philasd.org

Lynn R. Rauch, Esq.
General Counsel
Office of General Counsel
The School District of Philadelphia
440 N. Broad Street
Philadelphia, PA 19130

Dear Ms. Rauch:

This letter is to advise you that the U.S. Department of Education (Department), Office for Civil Rights (OCR) has resolved the above-referenced complaint filed against the School District of Philadelphia (the District). The Complainant alleges that the District discriminated against students on the basis of national origin (shared Jewish ancestry) by failing to respond to incidents of harassment during the 2023-2024 school year.

OCR enforces Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. Section 2000d *et seq.*, and its implementing regulation at 34 C.F.R. Part 100, which prohibit discrimination on the basis of race, color, and national origin, including shared ancestry, in any program or activity receiving federal financial assistance from the Department. Because the District receives federal financial assistance from the Department, OCR has jurisdiction over it pursuant to Title VI.

OCR opened the following issue for investigation:

> Whether the District failed to respond to alleged harassment of students based on national origin (shared Jewish ancestry) in a manner consistent with the requirements of Title VI.

At the Complainant's request, OCR attempted mediation to resolve this complaint. Mediation was not successful, and as a result, OCR opened this complaint against the District on April 9, 2024. During the course of OCR's investigation, the Complainant provided OCR with documentation and information, as did a community organization of approximately 250 Jewish families in the District, with which the Complainant is affiliated (community organization 1). Additionally, on July 23, 2024, a Jewish advocacy organization (advocacy organization 2) submitted a report to OCR to supplement and update the complaint filed by the Complainant.

To investigate this complaint, OCR reviewed the complaint, documentation provided by the Complainant, community organization 1 and advocacy organization 2, the District's response to

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Page 2 – OCR Complaint Number 03-24-1286

the complaint, and publicly available information, including relevant Board policies. OCR also interviewed the District's Title IX Coordinator and Chief, Employee and Labor Relations.

## SUMMARY OF CONCERNS

Based upon OCR's review of the evidence produced to date, OCR identified Title VI compliance concerns regarding: (1) the District's fulfillment of its obligation under Title VI to respond to notice of alleged harassment based on shared ancestry during the 2022-2023 and 2023-2024 school years by assessing whether a hostile environment existed and if so to take steps reasonably designed to redress it; (2) the District's maintenance of records as required under Title VI; and (3) the District's apparent retaliation against the Complainant and community organization 1 for their advocacy regarding Title VI.

Prior to the completion of OCR's investigation, the District expressed interest in resolving the complaint in accordance with Section 302 of OCR's *Case Processing Manual* (CPM) and OCR determined that a Section 302 agreement is appropriate in this case because OCR's investigation has identified concerns that can be addressed through a resolution agreement. The District signed a resolution agreement that resolves the compliance concerns that OCR identified in its investigation to date. This letter discusses OCR's compliance concerns below.

## LEGAL STANDARDS

### Title VI Harassment

The regulation implementing Title VI, at 34 C.F.R. § 100.3, provides that no person shall, on the basis of race, color, or national origin, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program to which Title VI applies.

Title VI's protection from national origin discrimination extends to students who experience discrimination, including harassment, based on their actual or perceived shared ancestry or ethnic characteristics, such as students of Jewish, Palestinian, Muslim, Arab, and/or South Asian descent, or citizenship or residency in a country with a dominant religion or distinct religious identity, or their association with this national origin/ancestry. The existence of a hostile environment based on national origin that is created, encouraged, accepted, tolerated, or left uncorrected by a recipient constitutes discrimination on the basis of national origin in violation of Title VI.

To establish a violation of Title VI under the hostile environment theory, OCR must find that: (1) a hostile environment based on race, color, or national origin existed; (2) the recipient had actual or constructive notice of the hostile environment; and (3) the recipient failed to take prompt and effective action to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

OCR interprets Title VI to mean that the following type of harassment creates a hostile environment: unwelcome conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from a recipient's education program or activity. Harassing acts need not

Page 3 – OCR Complaint Number 03-24-1286

be targeted at the complainant to create a hostile environment. The acts may be directed at anyone, and the harassment may also be based on association with others of a different national origin (the harassment might be referencing the national origin of a sibling or parent, for example, that is different from the national origin of the person being harassed whose access to the school's program is limited or denied).

The harassment must in most cases consist of more than casual or isolated incidents based on national origin to establish a Title VI violation. Whether harassing conduct creates a hostile environment must be determined from the totality of the circumstances. OCR will examine the context, nature, scope, frequency, duration, and location of the harassment, as well as the identity, number, and relationships of the persons involved. If OCR determines that the harassment was sufficiently severe or pervasive that it would have limited the ability of a reasonable person, of the same age and national origin as the victim, under the same circumstances, from participating in or benefiting from some aspect of the recipient's education program or activity, OCR will find that a hostile environment existed.

A recipient may be found to have violated Title VI if it has effectively caused, encouraged, accepted, tolerated, or failed to correct a hostile environment based on national origin harassment of which it has actual or constructive notice. A recipient is charged with constructive notice of a hostile environment if, upon reasonably diligent inquiry in the exercise of reasonable care, it should have known of the discrimination. In other words, if the recipient could have found out about the harassment had it made a proper inquiry, and if the recipient should have made such an inquiry, knowledge of the harassment will be imputed to the recipient.

If the alleged harasser is an agent or employee of a recipient, acting within the scope of their official duties, then the individual will be considered to be acting in an agency capacity and the recipient will be deemed to have constructive notice of the harassment.

Once a recipient has actual or constructive notice of a hostile environment, the recipient has a legal duty to take reasonable steps to eliminate it. OCR evaluates the appropriateness of the responsive action by assessing whether it was reasonable, timely, and effective. The appropriate response to a hostile environment based on national origin must be tailored to redress fully the specific problems experienced as a result of the harassment.

The regulation implementing Title VI, at 34 C.F.R. § 100.6(b), requires recipients to collect, maintain, and provide to OCR such records, including school discipline information and investigation records, that will enable OCR to ascertain whether the District's response to student harassment complies with the nondiscrimination requirements of Title VI. This includes accurate and complete student discipline data, including suspensions or other disciplinary actions, and investigation records, including records of communications with students' parents concerning harassment-related incidents and documentation related to investigations into student harassment.

Page 4 – OCR Complaint Number 03-24-1286

### Title VI Retaliation

In order for OCR to make a finding that prohibited retaliation occurred, OCR must determine whether: (1) an individual experienced an adverse action caused by the recipient; (2) the recipient knew that the individual engaged in a protected activity; and (3) there is some evidence of a causal connection between the protected activity and the adverse action. If any of these elements is not present, then OCR cannot make a finding of prohibited retaliation. If all of these elements are present, OCR would then consider whether the recipient has a legitimate, non-retaliatory reason for taking the action, and whether or not the recipient's reasons are a pretext for retaliation.

## FACTUAL SUMMARY

### Background Information

The District is the largest school district in Pennsylvania and the eighth-largest district in the nation. The Civil Rights Data Collection (CRDC) shows for the 2020-2021 school year, there were 121,202 students enrolled in the District. According to the CRDC data, 47.5% of students enrolled were Black, 23% were Hispanic, 14% were white, 9.8% were Asian, and 4.7% were two or more races.

### The District's Reporting Process

The District told OCR that the Compliance Officer/Title IX Coordinator (the Title IX Coordinator) is responsible for responding to Title VI complaints involving students, while the Chief, Employee and Labor Relations (the Chief) is responsible for responding to Title VI complaints involving employees.

During an August 28, 2024 interview with OCR, the Title IX Coordinator said that she oversees the investigation and resolution of Title IX complaints from start to finish. Conversely, however, the Title IX Coordinator does not have a direct role in the investigation and resolution of Title VI complaints. That is, her role for Title VI student complaints is to assign the complaint to the principal or his/her designee at the school level, and to an assistant superintendent or outside counsel at the District level for investigation. The investigators at the school and District level are then responsible for determining whether the incident is substantiated or not, and appropriate discipline, if relevant. The Title IX Coordinator informed OCR that, after the investigators at the school and district level conclude an investigation, and if harassment is determined to be substantiated, neither the Title IX Coordinator nor the investigators at the school or District level make any determination as to whether the incident created or contributed to a hostile environment.

During an August 28, 2024 interview with OCR, the Chief said that her department – including four investigators who report to her - is responsible for investigating and resolving all complaints involving employees. Initially, she consults with each investigator to determine if the allegations rise to the level of discrimination based on a protected category, and if so, the investigator will open an investigation.

Page 5 – OCR Complaint Number 03-24-1286

**Policy 248 and 348 (Harassment and Discrimination – Students/Employees)**

The District provided OCR with Policy 248 (Harassment and Discrimination - Students) (Last revised June 23, 2022, last accessed July 3, 2024), addressing harassment and discrimination of students. Policy 248, and Policy 348, which applies to employees, prohibits discrimination on the bases of ethnicity, religion and national origin, among other protected bases. It defines harassment as "unwelcome conduct… that may be harmful or humiliating or interfere with a person's school or school-related performance when (1) such conduct is sufficiently severe, persistent, or pervasive; and (2) a reasonable person in the complainant's position would find that it creates an intimidating, threatening, or abusive educational environment such that it deprives or adversely interferes with or limits an individual or group of the ability to participate in or benefit from the services, activities, or opportunities offered by the school."

Pursuant to Policy 248, harassment does not have to include intent to harm, be directed at a specific target, or involve repeated incidents, and a single incident of harassment may implicate more than one protected class. Per Policy 248, the Title IX Coordinator is also responsible for tracking and monitoring the completion of all complaints, investigation materials and resolutions from harassment and discrimination complaints District-wide and by school.

Verbal complaints of an incident or incidents shall be accepted and documented via the HIBster Online Reporting Page (last accessed August 19, 2024). The Online Reporting Page allows the complainant to select the basis for the bullying, harassment and discrimination, including, among other bases, race/ethnic origin and ancestry. According to Policy 248, it applies to students in connection with all of the academic, educational, extracurricular, athletic, and other programs of the school, whether those programs take place in a school's facilities, on a school bus, in transit to and from school, at a class or training program sponsored by the school at another location, or elsewhere. The policy also applies to any off campus conduct that has a continuing effect on campus.

Upon receipt of a report, the Title IX Coordinator shall conduct an assessment to determine the appropriate process for handling the report. If the conduct invokes non-sexual harassment or discrimination, it will be addressed through Administrative Procedure A: Bullying, Harassment, and Discrimination - Students (effective June 23, 2022, last accessed July 3, 2024). The Title IX Coordinator will assign an investigator to conduct an investigation and determine whether the alleged conduct is in violation of Board policies. Using the preponderance of the evidence standard, the investigator will make a determination and document the determination in the District's online reporting system.

If the respondent is found in violation of Policy 248, they may be subject to disciplinary action. Supportive measures will also be offered to the parties and Policy 248 provides examples of the supportive measures that may be offered.

**Policy 316 (Staff Use of Social Media)**

Policy 316 (adopted November 16, 2017) addresses staff use of social media. It states: "School District staff is expected to conduct activities in full compliance with all District policies, the

Page 6 – OCR Complaint Number 03-24-1286

Employee Code of Ethics, and other applicable Federal, State and local laws. Disciplinary action, up to and including termination, is warranted when the conduct: (1) endangers the health, safety and image of the School District of Philadelphia as an educational institution, (2) Damages the reputation and image of the School District of Philadelphia as an educational institution, (3) Has a negative impact on a staff member's ability to effectively perform his/her duties, (4) Results in the disclosure of sensitive, inaccurate, confidential, or otherwise non-public information; and/or (5) is a violation of law or District policy.

### Policy 320 (Freedom of Speech and Political Activities)

Policy 320 governs employee freedom of speech and political activities. It states that employees are protected by the First Amendment when speaking on a matter of public concern that is not part of their job duties, but also provides guidelines to help clarify and avoid situations in which such expression could conflict with the District's interests. The policy states that employees should state clearly that their expression represents their personal views and not those of the District, should not direct their expression towards any individual with whom they would normally be in contact in the performance of duties to avoid the disruption of cooperative staff relationships, refrain from expressions that would interfere with the maintenance of discipline by school officials, refrain from making public expressions which they know to be false or without regard for truth or accuracy, and not make threats against coworkers, supervisors or district officials. The policy also states that school property and school time may not be used for political purposes. Further, the policy states that the discussion and study of politics and political issues only when such discussion and study are appropriate to classroom studies, such as history, current events and political science, and voter registration efforts, are exempt from the provisions of the policy.

### Record-keeping

In OCR's data request letter to the District, OCR asked for copies of all formal and informal reports/complaints, including records of oral reports/complaints, concerning alleged harassment and/or discrimination based on national origin, including shared ancestry, during the 2022-2023 and 2023-2024 academic years.

In response, the District explained that it documents complaints of discrimination and harassment in a database management system called HIBster. Although the HIBster Online Reporting Page allows the complainant to select the basis for the bullying, harassment and discrimination, including, among other bases, race/ethnic origin and ancestry, the District told OCR that the system does not require the complainant to indicate the basis for the complaint. Thus, the District told OCR that the only way it can identify complaints responsive to this request is to "read each of the well over 800-1500 complaints logged into the system." Instead, the District offered to run a report of keywords contained in the narrative of the complaint or in emails sent to the District, and pull those complaints and emails for OCR. In response, OCR provided the District with a set of keywords to conduct a search in the database and email repository. The District provided OCR with a supplemental data response on July 1, 2024, in response to a keyword search, but it did not capture all of the incidents reported to OCR by the Complainant, community organization 1 and advocacy organization 2. On August 19, 2024,

Page 7 – OCR Complaint Number 03-24-1286

OCR sent another data request regarding specific incidents reported by these parties. The District provided this supplemental documentation on September 12, 2024; however, it still does not include many of the incidents which were reported to OCR by the Complainant and others, and for which documents OCR received from the Complainant and others reflect the District's receipt and responses, as described in more detail below.

The Title IX Coordinator explained to OCR that HIBster may be accessed by almost all District administrators. She told OCR that all incidents of shared ancestry discrimination or harassment should be logged into HIBster by the individual who received the complaint but conceded that it doesn't always happen. According to the Title IX Coordinator, after the complaint has been investigated and resolved, the findings should be entered into HIBster and the parties should receive a determination letter.

The Chief told OCR that complaints involving employees are received by her office via email or through an automated form. The Chief told OCR that she tracks all complaints through the use of a shared drive and a tracking spreadsheet. When complaints are investigated and resolved, her office is supposed to issue an investigative report to the parties. The Chief told OCR that once a complaint of discrimination or harassment is substantiated against an employee, the Chief will make a determination as to whether the conduct alleged, created, or contributed to a hostile environment. However, as detailed below, with the exception of the Director [redacted content], the District did not provide OCR with any documentation showing that the Chief made this determination for any of the other complaints raised against any of the other employees discussed in this letter.

### Proactive Efforts

The District told OCR that it has taken significant steps toward preventing and addressing any hostile environment that might exist at its schools. For example, in March 2024, the Office of Talent, Strategy and Culture sent an email to all staff reminding them of various Employee Code of Ethics and related policies, including the policies addressing Harassment and Discrimination, Internet and Media Presence, Staff Use of Social Media and Freedom of Speech and Political Activities. The email reminded staff of their rights regarding political speech, but also reminded staff that they must refrain from sharing personal political views or otherwise engaging in political activity in the course of their job duties.

On August 1 and 2, 2024, the District provided professional development to school leaders regarding implementing equity-centered policies. The District provided OCR with the PowerPoint slides that were used during the presentation, reflecting that District leaders were provided with an overview of seven Board policies and engaged in a discussion regarding best practices for policy implementation, and how to report a violation of a policy. While the slides reflect that the presentation addressed racism and racial equity, there is no evidence that it specifically addressed shared ancestry discrimination or harassment other than a review of Board Policy 248, which addresses harassment and discrimination of students, and includes national origin as a protected basis.

Page 8 – OCR Complaint Number 03-24-1286

In addition, beginning in August 2024, all employees were notified of the requirement to take an Anti-Harassment and Anti-Discrimination Overview training, which includes training on harassment based on shared ancestry and national origin. OCR reviewed the training which shows that a portion of the training addresses harassment based on shared ancestry/national origin, and provides examples of such conduct. The District provided OCR with documentation showing the names and titles of each employee who completed the training. As of October 8, 2024, nearly 16,000 employees had completed the training and over 5000 employees still had not yet completed the training.

The District also reported that on August 22, 2024, the Board of Education approved a three-year contract with "Facing History and Ourselves, Inc." to provide professional development to schools, to assist in engaging in controversial discourse. OCR reviewed the contract, which shows that the organization contracted to provide a two-day workshop for up to 30 employees on strategies for confronting antisemitism and racism in June 2024.

The documentation also shows that the District coordinated listening sessions starting in the summer 2024 to address concerns raised during Board meetings about students feeling "unsupported, devalued, and unsafe in some of our schools." The advertising materials for the listening sessions stated that the sessions were developed in response to speakers at Board meetings, and while the speakers initially referenced Palestinian students, the District "also heard similar sentiments referencing other student groups, including but not limited to Jewish, Muslim, Congolese, Haitian and Sudanese students." The first session was scheduled for July 25, with tentative sessions also scheduled for September 25 and October 3, 2024. However, the documentation also shows that community organization 1 sent an email to District administrators on [Redacted content], expressing concern that Teacher 1, Teacher 3, and other community organizations were circulating advertisements for the listening sessions on social media that excluded all reference to Jewish students.

The District also told OCR that on September 17, 2024, it presented Assistant Superintendents with a high-level overview of the District's policies and procedures regarding investigations of complaints of bullying and harassment. Additionally, at a Board Meeting on September 19, 2024, the Superintendent made a public commitment to address concerns related to conduct related to the conflict in the Middle East.

On October 1, 2024, in partnership with the University of Pennsylvania, the District kicked off a learning series with "What is Islamophobia? What is Anti-racism?" which will be open to Central Office staff, principals, school-based equity leads and culture climate leads.

The District requested and received technical assistance on shared ancestry discrimination and harassment from OCR on September 11, 2024. The training was provided by OCR to District administrators, with additional sessions on October 8 and 10, 2024, geared towards school leaders and additional central office leaders. A total of 80 employees completed the training.

Last, the District reported that its Advocacy Circle provided community members with an opportunity to share equity concerns on October 22, 2024. The District provided OCR with a flyer for the event, in which it is described as "a restorative justice model, community advocate

Page 9 – OCR Complaint Number 03-24-1286

circles provide community members with an opportunity to share equity concerns, while engaging in thought-partnership to cultivate greater equity outcomes within the School District of Philadelphia."

As explained in more detail below, the documentation provided by the District also shows that several schools took steps in response to incidents of shared ancestry discrimination and harassment, including restorative circles, antisemitism and hate symbol training, letters home to families addressing incidents and more.

### Shared Ancestry Incidents

The Complainant, community organization 1, and advocacy organization 2 provided OCR with documentation regarding incidents of shared ancestry discrimination and harassment at individual schools, and also provided OCR with information and documentation regarding complaints about several District staff members, including the Assistant Superintendent, the Director [redacted content], and Teachers 1, 2, 3 and 4. As described above, after multiple attempts, OCR obtained some documentation regarding these incidents from the District, but not all. Below is a summary of information obtained by OCR.

1. Incidents Reported to OCR by the Complainant and Other Organizations

In several incidents, the Complainant and/or community organization 1 and advocacy organization 2 provided OCR with documentation of the incident, but despite OCR's request for all reported incidents of shared ancestry discrimination and harassment, the District provided no responsive documentation. For example, advocacy organization 2 provided OCR with an email showing that another Jewish advocacy organization (advocacy organization 3) wrote an email to District administrators on [Redacted content], addressing concerns regarding a [Redacted content] altercation involving a Jewish student and a classmate at [Redacted content] School. The email described shared Jewish ancestry harassment the Jewish student experienced when a classmate made statements to the Jewish student such as, "fuck you," "Free Palestine," "Praise Hitler," and did a Hitler salute in front of the Jewish student. According to the email, an altercation ensued when the classmate approached the Jewish student in the hallway in [Redacted content], said "Free Palestine," and pushed the Jewish student, who pushed the classmate back. Advocacy organization 2 informed OCR that the Jewish student was disciplined as a result of the incident, and because he did not feel safe at school, he never returned. In the email to District administrators, advocacy organization 3 explained that the Jewish student had been the "target of bullying due to his Jewish identity," that the Jewish student feared for his safety, so he was not returning to school, and asked that the District investigate the matter. The District did not provide OCR with any documentation of this incident.

Similarly, OCR obtained information regarding swastika graffiti at District schools from the Complainant and others, which the District did not report to OCR. For example, the Complainant provided OCR with a photograph of a swastika that was drawn on the doors at Masterman High School in November 2023. Similarly, community organization 1 provided OCR with a copy of an email from an unidentified teacher to school staff at [Redacted content] School, in which the

Page 10 – OCR Complaint Number 03-24-1286

teacher referred to a student drawing a swastika on a white board in [Redacted content]. The District did not provide OCR with any documentation of these incidents.

In several other incidents, while the District provided no responsive documentation, the Title IX Coordinator and/or District counsel recalled the incident during an interview with OCR. For example, the Complainant told OCR that a student at [Redacted content] School posted an image on social media of an Israeli flag with "trash" written on it in [Redacted content]. The Title IX Coordinator recalled this incident and remembered that someone from the school spoke with the alleged perpetrator, but the alleged perpetrator denied making the post, there were no witnesses, and so the case was closed. Similarly, the Complainant told OCR that, at the same school, on [Redacted content], a student dressed in a [Redacted content] costume as a "Palestinian Freedom Fighter," with Palestinian flags and a bloody face. While the Title IX Coordinator recalled this incident, she could not recall what steps were taken in response.

Community organization 1 also provided OCR with a copy of a [Redacted content] email from an unidentified teacher at [Redacted content] School to District staff complaining about the [Redacted content] white board incident described above, in addition to other incidents such as "Nazi salutes, Hail [sic] Hitler, calling my students slaves, told to pick cotton til there [sic] hands bleed! The N word and Jewish Slurs." The teacher wrote that they were traumatized and felt sick and asked who was going to help the students. They also wrote they "feel scared now and hope no other students find out I'm Jewish…Students were crying for themselves and scared for me." The District did not provide OCR with a copy of this email or any documentation of incidents that occurred at [Redacted content] School. However, during interviews, District counsel informed OCR that she believed that the incidents at [Redacted content] School were reported by a group of teachers at the school.

 2.  Incidents with Supporting Documentation from the District

As noted above, after repeated attempts and requests, the District provided some documentation responsive to the incidents reported to OCR by the Complainant, community organization 1 and advocacy organization 2. The District's response also included documentation of incidents not reported to OCR by the Complainant, community organization 1 and advocacy organization 2. In most incidents, the documentation provided by the District was limited. In all incidents, the District did not provide any documentation showing that anyone at the school or at the District assessed whether the incident created or contributed to a hostile environment on the basis of shared ancestry, which was confirmed to OCR during an interview with the Title IX Coordinator. Below is a summary of the incidents in which the District provided limited documentation.

*[Redacted content] School*

The District's email documentation shows that on [Redacted content], a parent emailed school staff to report a concern "regarding videos that a teacher is showing in your school." The Complainant and advocacy organization 2 clarified for OCR that the teacher posted a YouTube video to her online classroom platform that portrayed Israelis as making Palestinians homeless, and also posted an article that claimed that Israelis were killing Palestinian journalists. The parent wrote in her email that she was "crushed" that the video was shown to students in the

Page 11 – OCR Complaint Number 03-24-1286

classroom. The District told OCR that the next day the Principal asked the teacher to remove the video. After reviewing its contents, the Principal met with the teacher that day [Redacted content] to explain how the posted materials were biased and did not offer a balanced view of the conflict. According to the District, the teacher recognized her mistake and suggested doing a restorative circle with the class. That same day, the Principal met on Zoom with the parents.

On [Redacted content], the parent emailed the Principal to state that students were messaging her child, asking if the teacher was going to get fired as the teacher told the entire class she might get fired. The parent also said that the student had an uncomfortable interaction with the teacher. The Principal responded that he spoke with the teacher, who acknowledged that she approached the student, asked if they were ok, and told them that she harbored no ill will towards them or the people of the Jewish faith, and at that moment, a student in the class who overheard the conversation asked if the teacher was getting fired. The Principal told the parent that the teacher "batted away the question." The Principal also shared the steps that the teacher planned to take, which included a restorative circle in which she would explain to the class why she removed the materials from the online platform. The parent responded that having the teacher speak to the class made her uneasy and would lead to more singling out of the student as the only Jewish student in the class. She wrote, "I feel disappointed that this situation has put [her child] in an uncomfortable space." The emails show that eventually she agreed to the restorative circle. The emails also show that the Principal checked in again with the student in [Redacted content] and that they stated they were doing well and did not feel as if their classmates treated them differently because they are Jewish.

*[Redacted content] School*

The District provided OCR with a HIBster Incident report from [Redacted content], regarding an incident that occurred on [Redacted content], in which Student 23 wrote, "kill the jews!" on a white board in class. He also wrote on the cover of a journal book, "Osama Bin Laden, my hero," and drew pictures depicting 9/11 on several assignments. In another incident, he wrote, "[N-word]-Monkey Syndrome," on a paper at school. The internal emails reflect that the District recommended a [redacted content] assessment of Student 23 and attempted to coordinate counseling for Student 23 [redacted content], but the family refused.

*[Redacted content] School (grades [redacted content])*

The District told OCR that in early [Redacted content], it discovered swastikas in a few areas of the school but the school was unable to identify the perpetrator(s). However, in response to the incident, the school held a professional development session with staff that was titled, "We Stand Against Hate." The school also held community meetings with students to discuss the meaning of symbols and the Principal sent a letter to the school community on [Redacted content] informing families about the incident, the school's response, and what to do if a student experiences discrimination or harassment.

Page 12 – OCR Complaint Number 03-24-1286

*[Redacted content] School (grades [Redacted content])*

The Complainant told OCR that in [Redacted content], a parent emailed school staff to report that students were circulating a Blooket quiz that contained antisemitic content. Blooket is a gamified learning platform where teachers and students host games through question sets and students answer on their own devices. OCR obtained screenshots of the quiz from community organization 1, showing that the quiz asked: "What do we hate? Two right answers," with the correct responses being pork and Israel. In another question, it asked, "who's god?" with Allah as the correct answer, and Buddha, Jesus and cows listed as incorrect answers. In another question it asked, "what's the holy book" with the correct answer noted as the Quran and the wrong answer noted as the Bible.

The District acknowledged that a parent emailed the Principal and a teacher in [Redacted content] to report the incident and told OCR that the Principal investigated and determined that Blooket was not a District resource, and a request was put into the Information Technology department to block the site. Further, the District told OCR that its investigation revealed that the quiz was not created by someone at the school, but that students had circulated it to each other. The District told OCR that the Principal met with the student whose parent reported the incident, and the student "did not say that any student directed the conduct at [them]." The District told OCR that the Principal held a restorative circle for students in the class to "address the issue globally," and the Principal checked in again with the student, who said that things were better. The District also told OCR that the Principal held a professional development for teachers, and hosted the same session for parents, which 70 parents attended. Lastly, the District provided OCR with documentation showing that the Principal sent a community message addressing "incidents of ethnic targeting and harassment at school."

*[Redacted content] School*

### [Redacted content] Incident

The District provided OCR with documentation showing that in [Redacted content], three teachers received an [Redacted content] report for their conduct involving the posting of flyers and flags with students in the common area of the school. Specifically, the documentation shows that on [Redacted content], two teachers notified school administration at approximately 7:30am that several pro-Palestinian posters were displayed along with the Palestinian flag directly behind and adjacent to the Israeli flag in the common area of the school, which also coincided with the National Day of Action designed to "Shut It Down for Palestine." The posters displayed the following phrases: "End Apartheid," "Free Gaza!" "End The Blockade," "From the River to the Sea, Palestine will be free," "This is not war, this is genocide," "It is not a 'conflict' if one side has the gun & the other is praying," "Antizionisim is not antisemitism," and listed the names and ages of children killed in Gaza since October 7. The posters also displayed the Palestinian flag and red handprints. The District told OCR that the Principal had the materials removed that same morning, but throughout the day, she "received texts and calls regarding how upset the staff were over the incident," with the complaints continuing through the next week.

Page 13 – OCR Complaint Number 03-24-1286

The report reflects that the District reviewed video footage and identified Teachers 8, 9 and 10 as the individuals who put up the posters and flags. The Principal and Assistant Principal also conducted interviews of staff and students, which revealed that a group of students stayed after school in Teacher 8's classroom to create the posters. This occurred without prior notification to administration and staff, and in violation of established practice of students requiring written permission to stay after school.

The report reflects that Teachers 8, 9 and 10 each had an investigatory conference with the Principal on [Redacted content]. The documentation shows that the Principal discussed at that time how their conduct created a hostile, contentious and/or strained work environment, leading to a complaint filed with advocacy organization 2 against the school. The report noted the "negative and profound impact on Israeli and non-Israeli staff and students causing feelings of alienation and outrage." As a result, the Principal recommended for each teacher [redacted content]. The Principal also recommended that Teacher 8 receive [redacted content].

### [Redacted content] Incident

The District provided OCR with a HIBster Incident report from [Redacted content], about a student who sent messages to a Jewish student on discord calling her "[f-slur]" and telling her to kill herself. Discord is an instant messaging and social gaming application. The report also shows that the student threw chunks of ice at the Jewish student as she was walking home from school and told her to kill herself. The documentation shows that the student was suspended for bullying and harassing a student over religion and sexuality, and the school held a parent meeting with his parents. It is not clear from the documentation provided what was said or done by the perpetrator that amounted to religious discrimination.

### [Redacted content] Incident

Community organization 1 provided OCR with documentation showing that a teacher at the school removed Israel from a map during a geography lesson in [Redacted content], which was reported to the school. Specifically, community organization 1 told OCR that the [Redacted content] teacher handed out an assignment that required [redacted content] students to write the name of each country on a map and at the bottom of the page was a list of countries for students to match with the location on the map. The photographs provided to OCR show that the teacher crossed out Israel and handwrote Palestine next to it. Community organization 1 provided OCR with a copy of a letter that the Principal sent to the school families on [Redacted content], acknowledging the incident, stating that it left "students feeling unsupported." The Principal wrote that the incident was "unacceptable" and the school was looking into it. The District provided OCR with witness statements, in which students in the class confirmed the allegation, and one student wrote that the teacher "fist bumped me when I said I already put Palestine." No documentation was provided by the District showing the outcome of the school's investigation.

*[Redacted content] Middle School*

The District provided OCR with a [Redacted content] HIBster Incident report alleging that Student 21 had experienced harassment for two years and that, as of [Redacted content], he did

Page 14 – OCR Complaint Number 03-24-1286

not feel safe returning to school. The report detailed the allegations submitted by Student 21's parent in which they reported that classmates drew swastikas and the Hitler salute on a paper left on Student 21's desk, posted a picture of Hitler in a group text with Student 21, and called Student 21 "Big nose," "Rich kid," and "Cracker." They also reported that Student 21 was put in a headlock and thrown into a trash can. The report states that Student 21 reported the incidents to a teacher and his parents discussed it at parent-teacher conferences, but no response was taken by school staff until the parents notified the Principal. The email documentation shows that the District facilitated a transfer for Student 21 to a new school in [Redacted content]. The District also arranged for extensions for Student 21 to complete work, facilitated the transfer of grades and coded Student 21's absences the last few weeks at the school as excused.

*[Redacted content] School*

### [Redacted content] Incident

The District provided OCR with documentation showing that a teacher at [Redacted content] School emailed school administrators in [Redacted content] to report that a student and his friend group "decided to dress up like Nazis, with a swastika tied around each of their arms, spewing fake German and hailing Hitler through the hallways." She informed them that the students were also overheard asking if they should pass the teacher's room to "freak her out," as she is Jewish. In subsequent emails, the teacher reported that the same group of students drew swastikas in another teacher's class, who did nothing in response but to tell them to keep it in the classroom, and students were doing the Hitler salute as they exited the class. The documentation shows that the Principal conducted parent conferences with the perpetrators and had each do a reflection assignment. The main perpetrator was also asked to do a restorative circle with the teacher.

### [Redacted content] Incident

The District's documentation shows that the same teacher sent another email to the Principal and school staff in [Redacted content], to report additional antisemitic incidents, but no specificity was provided regarding the nature of the incidents. The email documentation shows, however, that the perpetrator was required to write the teacher a letter of apology, and he was suspended. School staff also participated in a meeting with the teacher and advocacy organization 2. As a result of that meeting, the teacher created a behavior plan for the perpetrator, with the assistance of school staff, but the emails show that because he was unable to follow the plan, the perpetrator's schedule was changed in [Redacted content].

### [Redacted content] Incident

The District provided OCR with email documentation showing that a different teacher emailed the Principal in [Redacted content], regarding a student who drew "KKK" and a swastika onto a desk with nail polish. The email documentation shows that the Student was issued a suspension and her mother was required to come in for a parent meeting. Also in [Redacted content], a different teacher emailed the Principal to report that a swastika was drawn on a paper, under where it was written "Jews unite," with a Star of David. The teacher also wrote in his email that

Page 15 – OCR Complaint Number 03-24-1286

earlier in the year he found a swastika on a crumpled post-it note. The documentation shows that the school was unable to identify the perpetrator(s).

*[Redacted content] School*

### [Redacted content] Incident

The District provided OCR with a HIBster Incident report regarding social media messages directed towards a Jewish student (Student 19) on [Redacted content]. The District provided screenshots of the messages, in which a classmate wrote to Student 19:

> "I also find it funny how you mention being jewish and using the 'you're anti semitic' line when you're not even that educated about your own history. I'm Sorry but you don't even know 1 in Yiddish…. If you didn't already get it the first time it was mentioned, using 'you're antisemitic/ableist' as a response to poc jokes like as if it's the same thing is so crazy… You don't have to face the possible threat of being hate crimed or being put in danger because you are literally a white person with Eurocentric features. Don't relate being jewish to this because it is most definitely not the same either."

According to the report, the climate manager conducted an investigation and interviewed multiple students and held parent conferences. The District website explains that climate managers are housed in the Office of School Climate and Culture, which provides support to school leaders and staff, including professional development, school-based coaching, planning, and assistance with using data to improve learning environments. The climate manager and other school staff met with Student 19's family on [Redacted content], a safety plan was created for Student 19, and all students were advised not to communicate with each other. The safety plan called for Student 19 to go directly to class every day, and provided the name and location for individuals in the school should Student 19 feel concerned for their safety. The safety plan also stated that the counselor would conduct a check-in every two weeks and that all staff members had been alerted to the existence of the safety plan.

### [Redacted content] Incident

The District provided OCR with documentation of complaints made to District and school staff regarding an assembly that took place in [Redacted content]. Specifically, on [Redacted content], a parent emailed the Principal to state that she learned that there was a mandatory student assembly that week about 'Palestinian resistance efforts,' with another scheduled for [Redacted content]. The parent expressed concerns that the assembly content was antisemitic and asked the Principal to cancel the assembly. While the Principal responded, clarifying that the assembly was not mandatory, another parent replied that even if there was an opt-out for students, that placed the burden on students to find out what material would be shared at an upcoming assembly before it happens and then request an exemption, putting them in an uncomfortable position of asking for an opt-out. Further, although the Principal explained that the assembly included a student project that "compared the historical use of art in resistance movements for African Americans in the United States and Palistenians [sic] in the Middle East" and did not "mention Jewish people or speak to the promotion or encouragement of Palestinian resistance," the parent

Page 16 – OCR Complaint Number 03-24-1286

explained that it did not matter that Jewish people were not mentioned, as the video showed "Jewish people wearing yarmulkes… the image made clear that the people, from whom resistance was being promoted, encouraged, and praised, were Jewish." She wrote: "The inference from this…parallels were made between the resistance movement of African Americans in America, and the resistance movement of Palestinians, is that Jewish people are the oppressors from whom resistance is necessary. This narrative is antisemitic and dangerous."

The documentation shows that the project was created by two high school students who completed an assignment for their African American history class, taught by Teacher 1. Teacher 1 chose their art project as an entry for the Black History Month assembly in [Redacted content], and it was approved by the Principal. Publicly available information reflects that the District received numerous objections about the assembly from Jewish staff members, parents and community groups. As a result, the assembly for [Redacted content] was cancelled. As explained in more detail below, this incident generated multiple social media posts by District staff members, that became the subject of hundreds of email complaints from community members.

*[Redacted content] School [Redacted content]*

The District provided OCR with a HIBster report that Student 11 filed against Student 10 on [Redacted content], alleging that Student 10 made false allegations that Student 11 posted antisemitic material on their Instagram account. In the report, Student 11 asserted that Student 10 was targeting them for false allegations because they are Arab American. The report shows that Student 10 was disciplined for making false allegations about Student 11 to another student and with staff.

The documentation provided by the District shows that Student 10's parent filed an appeal of the discipline, asserting that Student 11 and others had been engaging in pervasive harassment against Student 10 and their sibling based on their shared Jewish ancestry, and in her appeal, included an extensive list of contacts that she had made at the school since [Redacted content], reporting the harassment and asking for assistance and support. She also wrote in the appeal that, due to the bullying and harassment, Student 10 was being treated for [Redacted content], had missed many days in school, [redacted content]. The documentation shows that on [redacted content], the Office of Student Rights and Responsibilities granted the appeal in favor of Student 11 [redacted content].

The District provided email documentation showing the school sought assistance to mediate between Students 10 and 11, and their friends, even before Student 11 filed their complaint. For example, school staff consulted with an Equity Coach to organize a "student healing circle" on [Redacted content], in response to "bullying and harassment as it relates to Jewish and Palestinian students." Student 10's sibling attended the healing circle and sent an email to the Equity Coach thanking her for her efforts and stating that they were experiencing difficulties as a Jewish student, particularly in light of a protest that took place on [Redacted content] when students made offensive posts to social media and carried signs in the hallway. They wrote that it was unfortunate the creation of these signs took place within the classrooms and that students were told if they didn't attend the walkout they were "Islamophobic," and "racist." In addition, the email documentation shows that in early [Redacted content], the school organized an anti-

Page 17 – OCR Complaint Number 03-24-1286

bullying assembly program and, on [redacted content], the Principal requested support from the Equity Coach for Student 10.

*[Redacted content] School [redacted content]*

The District provided OCR with a HIBster Incident report from [Redacted content], involving Teacher 12 and Student 9. According to the report, on November 1, Student 9 asked Teacher 12 if she was Jewish, and when Teacher 12 said yes, Student 9 said, "Heil Hitler," in a hushed tone. Teacher 12 asked Student 9 to repeat herself and she then shouted, "HEIL HITLER!" The report states that the climate manager spoke to all parties, but that "bullying and harassment was unfounded." The District provided no documentation of how it made its determination or of its investigation of the incident.

*[Redacted content] School*

Community organization 1 provided OCR with documentation regarding an incident that occurred at the School on [Redacted content], involving a former student who is Jewish. The documentation shows that he visited friends at the School in [Redacted content], and was accused of "trashing" the school prayer room and verbally assaulting Muslim girls who were inside. The email documentation shows, however, that the student's parent wrote to District administrators, denying the accusation, and stating that in a confrontation with a group of girls who asked the Jewish student what he was doing in the prayer room, he responded that he was a proud Zionist, said "Am Yisrael Chai," and did a Horah dance. The parent informed District administrators that the incident had been made public on social media and that there was an "incredible amount of hate posted on social media against [her son]," including an Instagram account with the school's logo that displayed the name of her son and his friends involved in the altercation, pictures of their social media accounts, and threatening messages. She also reported to District administrators that teachers were posting about the incident on their social media accounts, and discussing the incident at public Board meetings, making false accusations against the student and his friends, and also identifying them by name. She wrote, "This online harassment, including posts made by teachers within the Philadelphia School District is unacceptable, dangerous, and only serves to further inflame a situation that never occurred."

Even though staff discussed the incident at public Board meetings, and the incident was referred to in widely circulated social media posts, the only documentation provided by the District regarding this incident is a copy of a letter that the Principal sent to the school community on [Redacted content]. She wrote that an incident occurred late in the end of the school year in which allegations of harassment were made by students against other students on the basis of discrimination. She wrote that the School was investigating but also that "rumors spread on social media have exacerbated claims beyond the allegations that were reported," which were creating a substantial disruption and may result in disciplinary consequences.

*[Redacted content] School*

Community organization 1 provided OCR with a photograph of a swastika and "Fuck Biden" that were drawn on a wall at [Redacted content] School in [Redacted content]. The District

Page 18 – OCR Complaint Number 03-24-1286

acknowledged to OCR that this incident occurred and provided OCR with a copy of a message that the Principal sent to the school community on [Redacted content] addressing "a number of incidents that go against [the goal to ensure everyone feels safe and welcomed]."

*[Redacted content] School*

The District told OCR that on [Redacted content], a Jewish teacher notified school staff that she discovered a swastika drawn on a desk in her room. The District told OCR that the Dean of Students investigated but was unable to identify the perpetrator. The desks were cleaned and the swastika was removed, but soon thereafter, at the end of [Redacted content], the "school found a student in her class with a swastika drawn on a post it note." The District told OCR that this student was suspended and the school arranged a meeting with his parents upon his return. Nonetheless, the District acknowledges that in [Redacted content], swastikas were again found on desks in the same classroom. Each time, the school took pictures, investigated, cleaned the desks, but were unable to identify the responsible individuals.

3. Complaints Against Staff

The Complainant, community organization 1 and advocacy organization 2 provided OCR with voluminous emails sent by community organization 1, other community organizations, city council people and other District parents to District administrators since [Redacted content] regarding social media postings and other conduct of Teachers 1, 2, 3 and 4, the Assistant Superintendent and the Director [redacted content] (the Director). OCR asked for all emails that the District received regarding complaints about these staff members, and in response, the District produced over 8,000 relevant emails. During an interview with the Chief, she told OCR that several reports filed against staff members were referred to an external law firm for review. In a June 2024 email from an attorney with the external law firm to the Deputy, Employee and Labor Relations (the Deputy), the attorney explained that "[t]here are several layers of analysis 1) policy violation 2) applicability of Title VI… and 3) a "Pickering Test" analysis involving a review of the rights of public employees…." As explained in more detail below, while the Chief provided OCR with general information regarding the law firm's findings for Teachers 1, 2 and 3, in response to OCR's request for each investigative report, the District refused, citing attorney-client privilege.

*Assistant Superintendent*

The District provided OCR with emails showing that it received multiple complaints after the Assistant Superintendent made posts on her public Facebook page about Israel in November 2023, in which she referred to the IDF as a "terrorist organization," that killed hundreds of civilians, doctors, nurses and newborns at a hospital. Public sources show that the Assistant Superintendent resigned as a member of the school board for a different district; however, complaints directed to the District continued regarding her role at the District. For example, in [Redacted content], a staff member emailed District administrators regarding their concerns about the Assistant Superintendent's posts, stating: "This was the second time in six weeks a colleague of mine accused the Jews of being genocidist. I cannot fully convey to you how upset I

Page 19 – OCR Complaint Number 03-24-1286

felt hearing that someone who is my highest leader… expressed such a dangerous and false accusation so publicly against my cultural group." [Redacted content]

*Director [redacted content]*

The District, Complainant, and community organization 1 provided OCR with emails showing that the District received hundreds of email complaints about the Director regarding his public social media posts, participation in school-sponsored professional development events and curriculum selection since [Redacted content]. The emails sent by the Complainant, community organization 1 and other community members reflect that they complained about social media posts by the Director in which he liked or responded to Teacher 1's posts, as described below, and also made his own posts in which he repeatedly referred to Israel as a "terrorist state," encouraged teachers to teach "the truth" about Palestine, and made derogatory references to "Zionists." Community organization 1 also sent an email to District administrators in [Redacted content], expressing concern that just days after October 7, the Director purchased copies of a book on the "colonization" of Palestine for his entire team. In [Redacted content], hundreds of community members sent boilerplate emails of complaint to District administrators regarding the Director's social media posts, stating that he was "creating a hostile environment for Jewish students and teachers of SDP…without recourse."

The documentation provided by the District also shows that at least two teachers complained to District administrators about the Director's conduct. For example, Teacher 5 submitted an Employee Discrimination and Harassment Reporting Form in [Redacted content], stating that the Director was wearing a large Palestinian flag pin on his shirt, which was "extremely triggering and threatening symbolism." Teacher 6 also submitted an Employee Discrimination and Harassment Reporting form in [Redacted content], regarding the pin worn by the Director, stating: "it reminds us Jews of the recent massacre committed against our people," and that it was "inappropriate," "insensitive," "triggering" and "hurtful."

The District provided OCR with emails showing that in [Redacted content], Teacher 5 sent an email to the Title IX/EEO Investigator appointed to investigate Teacher 5's complaint, reporting that the Director was wearing both a Palestinian pin and Keffiyeh, and in her emails to the Title IX/EEO Investigator expressed that she did not feel safe in the workplace due to the Director's attire, and due to his social media posts. Teacher 5 sent several emails to the Title IX/EEO Investigator asking for updates regarding her complaints, and the internal email documentation shows that the Title IX/EEO Investigator forwarded them to her supervisor, the Deputy, stating: "if this woman does not leave me alone, I will be filing a harassment complaint on her!!!" OCR interviewed the Chief, who said that Teacher 5's communications were appropriate and not a threat, and as such, the Chief counseled the Title IX/EEO Investigator regarding expectations and how to manage complainants.

The District and community organization 1 provided OCR with a copy of an email that community organization 1 sent to District administrators in [Redacted content], complaining about the Director's participation in a school-sponsored professional development program for District staff in which an invited speaker referred to Zionists as "exterminators" of Palestinians

Page 20 – OCR Complaint Number 03-24-1286

and that Zionists were bombing Palestinians because of their belief that Palestinians are "vermin."

In [Redacted content], the Deputy emailed the Director to inform him that the Office of Employee and Labor Relations (ELR) was commencing an investigation into the "the allegation of use of District resources to spread hate that involves you." She advised the Director that the District assigned an external law firm to conduct the investigation. The District provided documentation showing that the external law firm scheduled an interview of the Director for [Redacted content].

[Redacted content] However, the District also provided OCR with a copy of an undated Investigative Report completed by the external law firm, summarizing an investigation of the Director "regarding allegations of staff misconduct and policy violation related to antisemitism, ethnic and racial discrimination due to his online social media postings, two school-sponsored events and curriculum selection." OCR notes that the Investigative Report makes no mention of the complaints filed by Teacher 5 and 6. [Redacted content] The Report concluded however, that there was no other evidence that the Director's behavior intentionally bullied or harassed any students or teachers in a manner that was severe and pervasive, such as to create a hostile learning environment, as none of the members of community organization 1 consented to participate in the investigation of the Director through interviews.

*Teacher 1*

Following the cancellation of the [Redacted content] assembly at [Redacted content] School, described in more detail above, Teacher 1 began posting to her public Instagram page her objections to the District's "censorship" of her students. Many community members reported these posts as antisemitic via email to District administrators. For example, in one post, Teacher 1 wrote: "After pressure from Zionist organizations the school district removed the video from all future assemblies stating that it was anti-Semitic." Teacher 1 also reposted: "Does it not scare you? The choke hold that zi*n*sm has not only in Palestine…but over the biggest institutions and people. What does this tell you of the level of decay and corruption?"

The email documentation provided by the District and community organization 1 shows that community organization 1 and other District parents sent District administrators voluminous, almost daily emails complaining about the posts from [Redacted content] through the end of the school year, asserting that Teacher 1 was posting antisemitic content that was creating a hostile environment for Jewish students, teachers and families. Community organization 1 also sent emails to District staff regarding the conduct of Teacher 1 at a subsequent student assembly at [Redacted content] School in late [Redacted content], in which she stood on stage with her students and asked the audience why they were upset about the art project that was cancelled but "not about the four-month oppression and genocide that they are facing." Community organization 1 provided OCR with a video of the assembly in which Teacher 1 is observed stating, "was it really the quote-unquote antisemitism that made you uncomfortable or was it the truth…" Community organization 1 complained to District administrators in the email that Teacher 1's conduct created a hostile environment for Jewish students and staff present at the

Page 21 – OCR Complaint Number 03-24-1286

assembly. Community organization 1 also provided a weblink to the video of this incident to the external law firm hired by email [Redacted content].

Many of Teacher 1's posts were liked or reposted by Teacher 2, 3 and the Director. For example, in another [Redacted content] post by Teacher 1, she wrote: "Free Palestine, Free Palestine, Free Palestine. Another Educator Misconduct Complaint to the Pennsylvania Department of Education and Another Dismissal. What's the end goal here? … I guess I can't expect anything less from Zionist genocide supporters. Zionism is Racism. Give them People Back Their Land," with the comment, "Happy Start to the 2024-2025 school year." Teacher 2 reposted Teacher 1's post, with the comment, "SO MUCH LOVE to [Teacher 1] and all my other comrades in the fight. Fuck all those who are trying to get those of us who speak out against a literal genocide in trouble. For real. FUCK YALL."

In [Redacted content], community organization 1 sent an email to District administrators regarding a post by Teacher 1 in which she identified, by name, the Complainant and the organizers of community organization 1, and wrote:

> "Part 1. I asked y'all nicely to leave me alone. I asked y'all nicely to keep my name out y'all mouth.
> Now, I'm taking the gloves off. Y'all been harassing me for almost a year. Writing 10 page letters to the US Congress, Governor Shapiro, Philly City Council and The School District. Reporting me to Canary Mission (like I give AF).
> Y'all are bullies and you're made because I won't take it lying down.
> I'm not going to be silenced.
> I'm not going to quit.
> I'm not taking my account private unless I want to and I don't want to.
> You can report me to the Department of Education 10 million times.
> I'mma still talk my [poop emoji].
> So now what? Keep eating your time and energy up on me. What you want to happen won't.
> Zionism is Racism
> Zionism is White Supremacy
> Israel is Committing a Genocide
> And who gone check me?"

That same day, Teacher 2 and Teacher 3 liked the post and Teacher 2 also reposted Teacher 1's post to his public Instagram account and wrote the following comment: "These are some disgusting, cowardly, genocide supporting fools. They thought they could hide. SMH [shaking my head]." The next day, Teacher 1 posted to her public Instagram account, "Blacked owned [gun emoji] shops in or near Philly? Asking for a friend."

The Complainant reported the posts to District administrators via email on [Redacted content], as did the other members of community organization 1. They wrote that Teachers 1 and 2 were engaging in harassment of their families, and retaliation for filing the OCR complaint. They

Page 22 – OCR Complaint Number 03-24-1286

expressed fear for their safety and the safety of their children, who attended District schools. [Redacted content]

While the District provided OCR with many of the email complaints the Complainant, community organization 1 and others sent to it, no documentation was provided regarding the District's response to the concerns raised by these individuals. However, in an interview with OCR, the Chief explained that the investigation of Teacher 1's social media posts was referred to an external law firm, who concluded their investigation in [Redacted content]. According to the Chief, the law firm determined that Teacher 1 did not engage in religion or national origin discrimination or harassment [redacted content]. OCR requested a copy of the external law firm's findings, but the District invoked attorney client privilege and has refused.

[Redacted Paragraph]

*Teachers 2, 3 and 4*

The District and community organization 1 provided OCR with voluminous email complaints submitted against Teachers 2, 3 and 4 due to their public social media postings since [Redacted content]. Specifically, the emails show that community members complained that Teacher 2 made posts to their Instagram account referring to Israel as a "European colony," that invaded, colonized and stole land; referred to Israel as engaging in genocide and apartheid; referred to Israel engaging in organ theft; encouraged "native resistance" to end colonization; referred to "Zionist" families at the District as "outside agitators;" and more. In another Instagram post the Complainant and community organization 1 complained about to District administrators, Teacher 2 wrote, "These Zionists are no different from the swarms of white supremacist spectators cheering on the public lynchings of over 3,000 Black people," and "White people decided to land-grab in Palestine… White people declared Jews belong in a newly created colony called 'Israel' … Can we be honest now."

Community organization 1 also submitted various email complaints to District administrators about posts made by Teacher 3 since [Redacted content], including a photo of McDonalds on fire with a link to a list of Jewish-owned businesses to boycott. Teacher 3 wrote on the post, "Inspiring me to start a 2024 vision board." In another post complained about, Teacher 3 posted a photograph of a drawing of Mickey Mouse saying, "Remember kids: The IDF trains American Police!"

Community organization 1 also submitted various email complaints to District administrators about posts made by Teacher 4 since [Redacted content], including a post that he made on X in which he wrote, "Googles 'Yiddish for lmao' #phled" in reply to a newspaper article about the complaint filed with OCR. In another post in response to the article, he reposted, "Let's not be confused about this complaint, this is a group of racist white parents trying to get black teachers and staff fired, for fear that their children will learn the truth. (that their parents are racist.)"

In [Redacted content], District administrators received thousands of boilerplate emails of complaint regarding the Director and Teachers 1, 2, 3 and 4, with regard to their public social media posts. The emails characterized the posts as antisemitic and stated that teachers and

Page 23 – OCR Complaint Number 03-24-1286

administrators "continue to spread, condone, promote, encourage and fail to intervene, in attacks against Jewish students and teachers. As a result, SDP schools are running rampant with antisemitism and violence against Jews, including numerous documented incidents of swastikas on school property, students chanting 'Heil Hitler,' and incidents of physical violence against students identified as Jews. Jewish students and teachers have become targets of ridicule, harassment, hostility and retaliation, and yet, THE DISTRICT HAS REMAINED SILENT." In another wave of emails on [Redacted content], hundreds of community members emailed District administrators regarding the conduct and social media posts of the Director, and Teachers 1, 2, 3, 4 and additional staff members, citing again to their conduct and posts that the emails characterized as antisemitic. The emails stated that the posts and conduct had resulted in a "rapid uptick of violence against Jewish students and teachers" in the District, citing to numerous incidents of swastikas on District property and many of the incidents detailed in this letter, above, which the emails stated were not being addressed by the District. The emails stated, "SDP Jewish students and teachers are experiencing antisemitism, hate, and violence on a scale they never imagined."

OCR interviewed the Chief on August 28, 2024, who told OCR that the investigation of the complaints about the social media posts of Teachers 2 and 3 were referred to an external law firm. While the investigation has been completed, the Chief has not yet been made aware of the determination. The Chief told OCR that an investigation has not been initiated against Teacher 4, due to "capacity." She told OCR that Teacher 4 will be referred for an investigation in the next group of referrals to the external law firm.

**LEGAL ANALYSIS**

The evidence the District has produced to date confirms that it received repeated, extensive notice of harassment based on shared ancestry that could create a hostile environment, as well as notice that the Complainant and some teachers and students alleged experiencing retaliation. Based on the information the District has produced to date – and refused or failed to produce – OCR has Title VI compliance concerns, however, that the District has not demonstrated its fulfillment of its Title VI obligations to evaluate whether a hostile environment existed based on the information about which it had notice and if so that it took steps reasonably designed to eliminate any such hostile environment and prevent its recurrence. For example, the District produced no information reflecting its evaluation of whether a hostile environment resulted for Jewish students when a teacher (Teacher 1) stood on stage at a school assembly, criticized a District choice – responsive to concerns raised with the District that that assembly's planned content could create a hostile environment for Jewish students – not to hold an earlier scheduled assembly, and asked the student audience "was it really the quote-unquote antisemitism that made you uncomfortable or was it the truth?" This incident involved a teacher in a position of authority and power over all students in the school, criticizing values expressed by students and their families, during a school-wide assembly, raising an inference of the operation of a hostile environment for affected students – yet the District has produced no evidence reflecting its evaluation of that question or responsive steps it has taken to ensure affected students are aware of its efforts reasonably calculated to ensure their equal access to education. Likewise, because the District has declined to provide OCR information regarding what it asked an external law firm to evaluate regarding Teacher 2's social media posts referring to "Zionist" families in the

Page 24 – OCR Complaint Number 03-24-1286

District as "outside agitators" and stating "These Zionists are no different from the swarms of white supremacist spectators cheering on the public lynchings of over 3,000 Black people," OCR has no basis to conclude that the District has fulfilled its Title VI obligation to evaluate whether a hostile environment resulted for students from this teacher's posts and if so, whether the District took step reasonably designed to redress one.

OCR is also concerned that the District provided no documentation of incidents of which it had notice from the Complainant, community organization 1 and advocacy organization 2, including: swastika graffiti, complaints about flyers at a bake sale, the incident involving a "Palestinian Freedom Fighter" costume for Halloween and an image on social media of an Israeli flag with trash written on it, all at [Redacted content] School; the email from the teacher in [Redacted content] to District staff at [Redacted content] School complaining of multiple antisemitic incidents, including a swastika drawn onto a white board; the incident involving a Jewish student at [Redacted content] School; and the incident involving a former student at the [Redacted content] in [Redacted content]. The District has a Title VI obligation to maintain records sufficient to allow OCR, and the District, to evaluate its fulfillment of its Title VI obligation to operate a nondiscriminatory environment, but the District has not produced such records and appears not to maintain them.

Last, OCR is concerned that District staff members engaged in retaliation against District parents for filing the OCR and other complaints of shared Jewish ancestry harassment. The evidence shows that after the Complainant and community organization 1 members engaged in a protected activity by filing the OCR complaint in March 2024, and submitting emails of complaint about shared ancestry harassment in the weeks and months that followed, Teacher 1 posted to her Instagram account in [Redacted content] the names of the Complainant and community organization 1. In the post, Teacher 1 specifically referenced the complaints made by the Complainant and community organization 1 to the District and to the Department of Education. Teacher 2 and 3 liked the post, and Teacher 2 reposted it to his Instagram account. The Complainant and the organizers of community organization 1 reported the posts to the District in [Redacted content], stating their belief that the post was retaliatory and causing them to fear for their safety and the safety of their children. Although one of the schools took steps to protect the safety of the Complainant's children, the District offered no other evidence of its assessment of whether the post was retaliatory, and if so, steps taken to address it.

## RESOLUTION AGREEMENT

Under Section 302 of OCR's Case Processing Manual, allegations under investigation may be resolved at any time when, prior to the conclusion of the investigation, the recipient expresses an interest in resolving the allegations and OCR determines that it is appropriate to resolve them because OCR's investigation has identified concerns that can be addressed through a resolution agreement. In this case, the District expressed an interest in resolving the allegations prior to the conclusion of OCR's investigation and OCR determined resolution was appropriate.

Pursuant to the Agreement, the District will:

- Issue and widely disseminate an anti-Harassment statement;

Page 25 – OCR Complaint Number 03-24-1286

- Review its policies and procedures to ensure that they adequately address the Title VI prohibition on discrimination based on race, color, and national origin, including discrimination based on a student's actual or perceived shared ancestry or ethnic characteristics, revise its policies and procedures accordingly, and submit the revised policies and procedures for OCR's approval;
- Develop or revise its procedure for documenting each report or complaint of harassment;
- Provide annual training to all administrators, faculty and staff on Title VI's prohibition of discrimination based on race, color, and national origin, including on the basis of shared ancestry and ethnic characteristics;
- Provide annual training to investigative staff to include a review of relevant District policies and procedures for complaints of discrimination on the basis of race, color, and national origin, including harassment on the basis of shared ancestry and ethnic characteristics, including instructions on how to conduct and document reliable and impartial investigations, a description of the steps the District will take in response to harassing behavior, and a statement that a student or parent/guardian must be provided with notice of the steps the District is taking in response to the notification;
- Provide an age-appropriate information program for all 6th through 12th grade students to address discrimination based on race, color, and national origin, including harassment based on shared ancestry and ethnic characteristics;
- Review its response to reports of discrimination and/or harassment on the basis of shared ancestry received during the 2022-2023 and 2023-2024 school years to ensure that the District made a determination regarding whether the alleged conduct created a hostile environment within the District's education program or activities;
- Conduct an audit of each school that serves any students in grades ranging from 6th through 12th grades to review the consistency of the application of and compliance with the District's policies and procedures regarding non-discrimination on the basis of race, color, and national origin, including harassment on the basis of shared ancestry and ethnic characteristics for the 2024-2025 school year;
- Administer a climate assessment to all students enrolled in the 6th through 12th grade after OCR reviews and approves the assessment, provide OCR with a report regarding its findings and steps taken in response to the findings, and promptly and fully address OCR's feedback; and
- Retain or designate one or more consultants with expertise on the issue of harassment of students based on national origin, including shared ancestry, to assist in the development and delivery of training and the climate survey and any other actions to prevent and address discrimination on the basis of shared ancestry.

**CONCLUSION**

When fully implemented, the Agreement will address the evidence obtained and the allegations investigated. OCR will monitor the District's implementation of the Agreement until the District is in compliance with the terms of the Agreement and the obligations under Title VI and its implementing regulations at 34 C.F.R. Part 100 that were at issue in the case.

Page 26 – OCR Complaint Number 03-24-1286

This concludes OCR's investigation of the complaint. This letter should not be interpreted to address the District's compliance with any other regulatory provision or to address any issues other than those addressed in this letter. This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. The Complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the District must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, or participates in an OCR proceeding. If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, we will seek to protect personally identifiable information that could reasonably be expected to constitute an unwarranted invasion of personal privacy if released, to the extent provided by law.

Thank you for your cooperation during the resolution of this complaint. If you have any questions, please contact Tashell Jenkins, Team Attorney, or Craig Ginsburg, Supervisory Attorney.

Sincerely,

/s/

Beth Gellman-Beer
Regional Director
Philadelphia Office
Office for Civil Rights

Cc:  Audrey L. Buglione, Esq, Deputy General Counsel (abuglione@philasd.org)
Dr. Tony B. Watlington, Superintendent (Superintendent@philasd.org)