**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KATHRYN HIESTER, *et al.*, Plaintiffs, | No. 2:25-cv-04502 |
| v. | |
| THE SCHOOL DISTRICT OF PHILADELPHIA *et al.*, Defendants. | |

**MEMORANDUM**

Plaintiffs John Hiester, Christopher Hiester, Kathryn Hiester, Meru Parmar, Catherine Parmar, Ratnadeep Parmar, and Jean Danowitz (as Guardian for M. Danowitz, a minor) filed this lawsuit against the School District of Philadelphia ("School District" or "SDP") and a number of school district officials (collectively "Individual Defendants"), seeking relief for violations of the Establishment Clause of the First Amendment, the Due Process Clause and liberty interest in reputation protected by the Fourteenth Amendment, and Title VI of the Civil Rights Act of 1964.

The crux of Plaintiffs' allegations is that the School District and its officials established a Muslim Prayer Room at one of its high schools, the Academy at Palumbo ("Palumbo"). Plaintiffs claim that the room was restricted to Muslim students, and that they were unfairly disciplined by the Defendants for entering the Prayer Room because they are not Muslim. The Plaintiffs also allege that the School District caused, and then failed to respond to, their harassment by other Palumbo students. They allege that this harassment became so severe that they were forced to relocate out of the school district at significant personal expense.

Currently before this Court are two motions to dismiss: one filed by the School District and three of its Officials, and the other filed by two SDP schoolteachers named under Count II of the Plaintiffs' Amended Complaint. For the reasons set forth below, the School District's motion to dismiss is granted in part and denied in part. The schoolteachers' motion to dismiss is granted in its entirety.

## I. Background

### A. The Parties

Plaintiffs John Hiester and Meru Parmar ("Student Plaintiffs") are students who attended Palumbo, a magnet high school operated by SDP, during the 2023–24 school year. (ECF No. 17 ¶¶ 26, 30).

Plaintiffs Kathryn and Christopher Hiester are the parents of Student Plaintiff John Hiester and sue on their own behalf. (*Id.* ¶ 28).

Plaintiffs Catherine and Ratnadeep Parmar are the parents of Student Plaintiff Meru Parmar and sue on their own behalf. (*Id.* ¶ 32).

Plaintiff M. Danowitz is a minor and former Palumbo student who was not enrolled in SDP schools at the time of the events in controversy. (*Id.* ¶ 29).

Plaintiff Jean Danowitz is M. Danowitz's mother and sues on his behalf. (*Id.* ¶¶ 92, 93).

Defendant SDP is an agency of the Philadelphia city government. (*Id.* ¶ 35).

Defendant Richard Gordon IV was Assistant Superintendent of SDP at the time of the events in controversy. (*Id.* ¶ 36).

Defendant Kiana Thompson is and was at all times relevant hereto principal of Palumbo. (*Id.* ¶ 37).

Defendant Rashida Stamps was at all times relevant hereto Dean of Student Conduct at Palumbo. (*Id.* ¶ 38).

Defendant Kristin Luebbert was at all times relevant hereto a teacher working for Defendant SDP at The U School. (*Id.* at 12 ¶ 39).

Defendant Keziah Ridgeway was at all times relevant hereto a teacher working for Defendant SDP at Northeast High School. (*Id.* ¶ 40).

## B. Factual Allegations[1]

### 1. Prayer Room Incident

The final days of the Palumbo school year are generally quite an informal affair, with teachers regularly allowing students to leave class, coming and going as they please within the building. (*Id.* ¶ 54). On the third-to-last day of the school year—June 11, 2024—Plaintiff M. Danowitz decided to visit his old friends at Palumbo. Danowitz, who is Jewish, had attended Palumbo the previous school year and remained friendly with Palumbo students including Plaintiff John Hiester. (*Id.* ¶ 55). He and Hiester arrived at Palumbo together on the morning of June 11, entering the building through the main entrance. (*Id.* ¶ 56). They passed Palumbo's Principal, Kiana Thompson ("Defendant Thompson" or "Thompson") and Dean of Student Conduct Rashida Stamps ("Defendant Stamps" or "Stamps") on their way in, and went through Palumbo's standard security screening. (*Id.* ¶¶ 56–58). Danowitz was admitted into the building without objection. (*Id.* ¶ 58). His entrance was recorded by Palumbo security cameras. (*Id.* ¶ 115–117).

Once inside, Hiester and Danowitz joined Plaintiff Meru Parmar and several other friends in the school's computer lab. (*Id.* ¶ 59). The group ("the Boys") then made their way to the library

[1] The following facts are set forth in the Amended Complaint and are viewed in the light most favorable to the Plaintiffs.

(*Id.* ¶¶ 60, 61), where an open door marked "Quiet Room" and decorated with a makeshift Palestinian flag caught their attention. (*Id.* ¶ 64). Believing that the room was open to all students, first Danowitz—then later Hiester and Parmar—went inside. (*Id.* ¶¶ 62, 65).

Inside the Quiet Room, the Boys found several female students seated at a table using their laptops, as well as Islamic religious decorations and Arabic signage adorning the walls. (*Id.* ¶¶ 65–73). One large sign welcomed people to the "Prayer Room" and wished them a "Happy Ramadan". (*Id.* ¶ 68). A laminated placard pinned to the wall contained "guidelines" from The Academy at Palumbo Muslim Student Association for use of the "Quiet Room." (*Id.* ¶ 73).

The Boys sat on the opposite side of the room from the female students, and one of them (a non-party to this suit) recorded an iPhone video as Danowitz said a short Jewish prayer in Hebrew. (*Id.* ¶ 74). The prayer elicited laughter from the female students and a short exchange during which the girls questioned why the Boys were in the room. (*Id.*) Danowitz responded that he had a First Amendment right to pray and was a proud Zionist; he also sang a short section of Am Yisroel Chai ("The People of Israel Live") and did a handstand. (*Id.* ¶ 75). As he left the room, he removed a laminated placard from the wall, setting it on the floor. (*Id.* ¶ 79).

**2. Immediate Aftermath**

The Boys faced immediate backlash to their actions in the Prayer Room. Within minutes, Hiester was bombarded by texts and calls from fellow students demanding to know Danowitz's whereabouts. (*Id.* ¶ 80). Unnerved by this reaction, Danowitz left the Palumbo building, followed by Hiester shortly thereafter; Parmar returned to the computer lab. (*Id.* ¶¶ 81, 84*)*. Throughout the day, Hiester received a continuous flood of threatening texts and phone calls from Palumbo classmates; one Muslim student (A.B.) who had previously assaulted Hiester called him 11 times. (*Id.* ¶ 81). The same student led a group into the computer lab to confront Parmar, angrily accusing

him of "trashing" the Prayer Room. (*Id.* ¶¶ 81–87). Feeling threatened, Parmar had his mother pick him up from school early. (*Id.* ¶ 88).

### 3. Investigation Initiated

Within hours of the incident, Palumbo administrators began taking witness statements, and Defendant Stamps notified Defendant Thompson of a "potential 'Hate Crime'" in the "Quiet Room/Prayer Room." (ECF No. 17-1 Ex. 5 at 7). Thompson subsequently contacted each of the Student Plaintiffs' parents. First, she called Hiester's parents to tell them that their son had left school early without permission. (ECF No. 17 ¶ 89). At his parents' urging, Hiester returned to school, where he was directed by Principal Thompson to fill out an Incident Report. (*Id.*). He admitted to entering the "Prayer Room" but denied that any harassment had occurred. (*Id.*). Before leaving school for the day, Hiester was confronted and threatened by A.B. and a group of other students in a first-floor bathroom. (*Id.* ¶ 90).

Defendant Thompson next called Plaintiff Danowitz's mother to tell her that her son had been accused of sneaking into Palumbo and harassing Muslim students. (*Id.* ¶ 92). The following morning, she called Plaintiff Parmar's father to inform him that a statement from his son was needed to address "serious accusations" of "harassment of girls "in the Prayer Room." (*Id.* ¶ 98). When Parmar arrived at school that morning, he was directed to Principal Thompson's office for questioning and to fill out an Incident Report. (*Id.* ¶¶ 99–102). Parmar maintained that he didn't "know of any incident" in the Prayer Room. (*Id.* ¶¶ 100–102).

### 4. Accusations Spread Online

Allegations that the boys had trashed the "Prayer Room" and harassed the Muslim girls in it spread quickly on social media. (*Id.* ¶¶ 94–96). By the day after the Prayer Room incident, June 12, 2024, numerous posts accusing the Boys of desecration and harassment were circulating, many

of which explicitly named the Boys and their social media handles. (*Id.* ¶¶ 94–96, 105–111). Hiester received a death threat via direct message from a student who explained, "[I don't] play with my religion." (*Id.* ¶¶ 105–108, 110). Palumbo students also began planning and promoting a walkout in protest of the alleged harassment and lack of disciplinary response by the Palumbo administration. (ECF No. 17-1 Ex. 6).

On the morning of June 12, 2024, Hiester and his mother, Kathryn, met with Defendants Thompson and Stamps and expressed their concern about the threats. (ECF No. 17 ¶ 97). Their concerns were brushed aside by the Defendants, who were more intent on questioning Hiester about the Prayer Room Incident. (*Id.*). They especially wanted to know why the Student Plaintiffs had entered the Prayer Room during "girls time." (*Id.*). Plaintiffs allege that during certain hours the Prayer Room was available exclusively to Muslim women. (*Id.*).

That evening, Kathryn Hiester sent a follow-up email to Defendant Thompson, updating her on the threats made against her son and informing her of the student walkout planned for the following school day. She asked for reassurances there would be increased security for her son as well as an expedited investigation into the Prayer Room incident. (*Id.* ¶ 113).

#### 5. Student Plaintiffs Suspended and Parents' Concerns Rebuffed by Palumbo Administration

Thompson shared Kathryn Hiester's email with SDP Assistant Superintendent Gordon ("Defendant Gordon"), who directed her to suspend the Student Plaintiffs for assisting Danowitz's "unauthorized entry into school property." (*Id.* ¶ 114). Thompson then informed the Hiester and Parmar parents ("Plaintiff families") that their children were suspended. (*Id.* ¶¶ 114, 115). The Plaintiff families were shocked that their concerns about their sons' safety were being shrugged aside and believed that the suspensions effectively validated the allegations made against them. (*Id.* ¶ 119). They resolved to visit Palumbo the following morning—June 13—to join a meeting

that a non-party family had scheduled with Defendant Thompson in the weeks prior to the Prayer Room incident. The meeting was originally scheduled to discuss the non-party family's concerns about antisemitism at Palumbo, but the non-party family welcomed Plaintiff families to join them. (*Id.*).

When the Plaintiff families arrived at Palumbo on the morning of June 13, Thompson refused to meet with them. (*Id.* ¶ 121). She insisted on meeting only with the non-party family who had originally scheduled the appointment and told the Plaintiff families to leave the school immediately. (*Id.)*. If they wanted to meet with her, Thompson said, they would have to schedule an appointment for a different day with the added condition that Defendant Gordon be present. (*Id.)*. When the Plaintiff families protested, Thompson called police to remove them from the building. (*Id.* ¶ 123). The responding officers informed the Plaintiffs that Palumbo had filed a police report against the Plaintiff Students earlier that morning. (*Id.* ¶ 125). The police report lists Defendant Thompson as the complainant and claims she stated that there was a "dispute with several students over a particular room designated for [a] particular religion and having a certain flag outside [the] room." (ECF No. 17-1, Ex. 2). Plaintiffs allege that this is proof that the school designated the room for Muslim students.

### 6. Plaintiff Families File Statements with the District

The Plaintiffs went directly from Palumbo to SDP's main administrative building to file statements about the Prayer Room incident and its fallout. (*Id.* ¶ 126). They also showed SDP Victim Assistance Specialists a video taken during the incident which contradicted many of the accusations lodged against Plaintiff students. (*Id.* ¶ 127). Despite Plaintiff Families filing statements, sharing video evidence, and making repeated appeals to Palumbo and SDP leadership, SDP did not publicly respond to the threats and accusations against Plaintiff students until August

19, 2024, when Defendant Thompson issued a letter to the Palumbo community. The letter stated that the investigation into the incident was ongoing, but emphasized that the kind of harassment the Student Plaintiffs were accused of committing was unacceptable. It also warned Palumbo students that there would be consequences for any students who used social media to "exacerbate claims beyond the allegations that were reported." (*Id.* ¶¶ 127–132).

Aside from the letter, the Plaintiff families' concerns were never addressed. On June 19, 2024, Kathryn Hiester requested a safety transfer for her son due to student threats and Palumbo administrators' dismissive reaction to her concerns; she never received a response. (*Id.* ¶¶ 143, 144). Parmar's mother, Catherine, also sent an email on June 16 expressing her concern that went unanswered. (*Id.* ¶ 145).

**7. Teacher Defendants Amplify the Accusations Against Student Plaintiffs**

Defendant Kristin Luebbert ("Luebbert") was an SDP-employed teacher at The U School at the time of the Prayer Room incident. (*Id.* ¶ 39). During the public comment section of a Philadelphia School Board meeting on June 13, 2024, she recounted the allegations against Plaintiff students as fact. (*Id.* ¶ 135). Luebbert claimed, among other things, that they had yelled they were proud Zionists, "invaded" the space, ripped things off the walls, and "grind[ed] . . . on the floor in an imitation of sex acts." (*Id.*). Luebbert subsequently posted a transcript of her remarks to X where defendant Keziah Ridgeway, then an SDP-employed teacher at Northeast High School who used the X handle "@teachkizzyteach," reposted them. (*Id.* ¶¶ 140, 141). Luebbert, using her Instagram account "@teacherinphilly," also shared a post from an account "@palumbo.positivity" that reiterated the accusations against, and explicitly named, Plaintiff students. (*Id.* ¶ 139). Neither Luebbert nor Ridgeway (collectively, "Teacher Defendants") taught at Palumbo or otherwise knew any of the Plaintiffs personally.

### 8. SDP's Formal Investigation

The investigation of the Prayer Room incident matter was assigned to an employee of SDP's Office of School Safety Investigation Unit, Steven Jefferson ("Jefferson"). (*Id.* ¶ 147). Summarizing the incident, Jefferson referred to the Plaintiff students and their (non-party) friends as "five Jewish male students," despite the fact that Hiester and Parmar are not Jewish. (*Id.* ¶¶ 148, 149). Jefferson never interviewed the Student Plaintiffs or Plaintiff families. (*Id.* ¶ 158). The investigation credited the secondhand accounts of students who did not directly witness the Prayer Room incident, despite Plaintiff Families showing SDP officials video footage that contradicted their accusations. (*Id.* ¶¶ 150–152, 154, 158, 167–169). On August 29, 2024, Defendant Thompson prepared two letters informing Plaintiff families that the SDP investigation had found that their sons committed harassment on June 11, 2024. (*Id.* ¶ 161). The letters were sent to the Hiester and Parmar families on September 6, 2024. (*Id.* ¶ 180).

The full investigative report that was eventually turned over to Plaintiffs' counsel contained no specific factual findings or analysis, merely the conclusion that that the harassment allegations were "founded." (*Id.* ¶¶ 163–65). A Harassment, Intimidation and Bullying Report ("HIBster Report") was prepared as part of the investigation by Jade Tuff, a Palumbo teacher who also served as the faculty advisor to the Academy at Palumbo Muslim Student Association (APMSA). (*Id.* ¶ 170). Plaintiffs allege that Palumbo administrators had granted authority over the Prayer Room to APMSA, creating a clear conflict of interest for Tuff. (*Id.*).

The HIBster report includes a "Principal's Summary" from Defendant Thompson. (*Id.* ¶ 174). In it, she opines that the incident in the Prayer Room was properly viewed in the context of an involved (but non-party) student's previous complaints about antisemitism at Palumbo.

Plaintiffs allege this shows that Thompson interpreted the alleged actions of Plaintiffs as "malicious" and Islamophobic "acts of revenge." (*Id.*).

#### 9. Parmar and Hiester Families Leave the School District

Plaintiff families allege that SDP's inaction, and skewed investigation, left them with no choice but to leave the school district. (*Id.* ¶¶ 178, 179). In the process, they incurred substantial expenses. (*Id.* ¶ 197). Although John Hiester and Meru Parmar have now graduated from high school, the Parmar family has a younger son who they hope to enroll in the SDP system provided the violations alleged by the complaint are redressed. (*Id.* ¶ 184).

### C. Plaintiffs' Claims

*Count I:* Plaintiffs allege that access to the Prayer Room was *de facto* restricted to Muslim students, and that by simply entering that space, the Student Plaintiffs were committing a transgression that would effectively excommunicate them from the Palumbo community. (*Id.* ¶ 62). The Plaintiffs also make the broader claim that Palumbo administrators had "incorporated Muslim religious practices into the school's official environment." (*Id.* ¶ 43). They point to prominent signage displayed during the 2023–24 school year wishing students a Happy Ramadan, and Palumbo faculty's facilitation of mass Ramadan prayers during school hours. (*Id.* ¶¶ 44, 45). On the strength of these facts, Plaintiffs allege that SDP, Thompson, Stamps, and Gordon (collectively, "SDP Defendants") violated the Establishment Clause of the U.S Constitution's First Amendment. They also allege that SDP Defendants substantially burdened Plaintiff M. Danowitz's free exercise of religion in violation of the First Amendment.

*Count II:* Plaintiffs allege that SDP Defendants and Teacher Defendants published substantially materially false statements about them, which led to the deprivation of their property

interest in education and right to attend SDP schools. Plaintiffs claim that this infringed upon their liberty interest in reputation under the Due Process Clause of the Fourteenth Amendment.

*Count III:* Plaintiffs allege that SDP Defendants perceived them as Jewish or associated them with individuals who were Jewish. They assert that SDP's subsequent suspension of the Student Plaintiffs was motivated by antisemitic animus, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. Plaintiffs also allege that SDP Defendants were deliberately indifferent to Palumbo students' antisemitic harassment of Student Plaintiffs, which created a hostile educational environment in violation of Title VI.

*Count IV:* Plaintiffs allege that SDP Defendants suspended Student Plaintiffs without first providing them with notice of the charges against them, a brief explanation of the evidence against them, and an opportunity to contest the charges. Plaintiffs claim that this violated their right to due process under the Fourteenth Amendment.

### D. Procedural History

Plaintiffs filed their initial complaint on August 6, 2025, and an amended complaint on January 6, 2026. (ECF Nos. 1, 17). Teacher Defendants filed a motion to dismiss the claims against them on January 27, 2026 and SDP Defendants did the same on February 10, 2026 (ECF Nos. 37, 43). Replies from the parties followed. (ECF Nos. 50, 55–57). The Court held a hearing on Defendants' motions on July 9, 2026 (ECF No. 62).

## II. Standard of Review

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must sufficiently plead facts that, if accepted as true and interpreted in the light most favorable to the plaintiff, "state a claim to relief that is plausible on its face." *McTernan v. City of York*, 577 F. 3d 521, 526, 530 (3d. Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A

claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Likewise, the tenet that a court must accept as true all the allegations in a complaint is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678. Pleadings that offer only "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III. Discussion

### A. Overview

#### 1. Count I

All Plaintiffs allege that the School District and its Officials violated the Establishment Clause by creating a Prayer Room on school grounds exclusively for Muslim students and by punishing the non-Muslim Student Plaintiffs for entering it. M. Danowitz also alleges that the School District and its Officials' Prayer Room policy substantially burdened his free exercise of religion. All Plaintiffs seek both damages and injunctive relief.

- *Damages:*
    - Because Plaintiffs do not allege that the School District had a policy or custom that was a proximate cause of the injury suffered, Plaintiffs' *Monell* claims against the School District are dismissed without prejudice.

    - In addition, because M. Danowitz was a trespasser at Palumbo and was not a member of the school community, he lacks standing to bring suit and his claims are also dismissed, with prejudice.
    - However, the Court finds it plausible that a reasonable jury could find that the School District Officials violated the Establishment Clause by disciplining Student Plaintiffs for entering the Prayer Room. The School District's Officials' claim that they are entitled to qualified immunity is unpersuasive. Thus, Plaintiffs' remaining claims for damages against the School District Officials survive dismissal.
- *Injunctive Relief:*
    - Plaintiffs' claims are dismissed with prejudice for lack of standing (Hiester Plaintiffs, Danowitz, and Meru Parmar) and mootness (Ratnadeep and Catherine Parmar).

**2. Count II**

Hiester Plaintiffs and Parmar Plaintiffs allege that the School District, its Officials, and Teacher Defendants infringed upon Student Plaintiffs' liberty interest in reputation under the Fourteenth Amendment and 28 U.S.C. § 1983.

First, because Plaintiffs do not allege that the School District had a policy or custom that was a proximate cause of the injury suffered, Plaintiffs' *Monell* claims against the School District are dismissed without prejudice.

Second, Plaintiffs allege that Teacher Defendants made materially false statements about them online and at an SDP school board meeting. Because Plaintiffs fail to allege that Teacher Defendants acted under color of state law, the claim against them is dismissed without prejudice.

Finally, Plaintiffs allege that SDP Defendants made materially false statements that stigmatized them and caused the deprivation of their property interest in education and right to attend school in the district of their residence. Since Plaintiffs fail to support the inference that SDP Defendants published a materially false statement about them, this claim is also dismissed without prejudice.

**3. Count III**

Student Plaintiffs first allege that the School District and its Officials violated Title VI of the Civil Rights Act of 1964 by disciplining Student Plaintiffs because they perceived them to be, or associated them with, Jewish people. Because Plaintiffs fail to allege the existence of plausible evidence of antisemitic animus on the part of the School District and its Officials, this claim is dismissed without prejudice, with leave to amend.

Student Plaintiffs next allege that the School District and its Officials were deliberately indifferent to Palumbo students' antisemitic harassment of them, creating a hostile educational environment in violation of Title VI. But Plaintiffs fail to allege the existence of evidence of the requisite inferences that a) Student Plaintiffs were subjected to antisemitic harassment by their classmates and b) the School District and its Officials were deliberately indifferent to this alleged harassment. Therefore, Plaintiff's deliberate indifference claim is dismissed without prejudice, with leave to amend.

Because individuals cannot be held liable under Title VI, Plaintiffs' claims against the School District Officials in their individual capacities are dismissed with prejudice.

**4. Count IV**

Student Plaintiffs allege that the School District and its Officials violated their right to due process under the Fourteenth Amendment by failing to provide them with notice of their

suspension, an explanation of the evidence against them, and the opportunity to contest the charges. First, because Student Plaintiffs fail to state a *Monell* Claim against SDP, the claim against the School District is dismissed without prejudice, with leave to amend.

However, Plaintiffs adequately plead that the School District Officials deprived them of due process. This Court finds that the right to due process for suspended students is so clearly established that the School District Officials are not entitled to qualified immunity. The claims against them under the Due Process Clause survive the motion to dismiss.

**B. Article III Standing**

Federal courts must assess their subject matter jurisdiction over a claim before reaching the merits. *Finkelman v. NFL,* 810 F.3d 187, 193 (3d Cir. 2016). To establish Article III standing, a Plaintiff must show that "(1) it has suffered an 'injury in fact' that is a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely as opposed to merely speculative that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–181 (2000).

**1. Hiester Plaintiffs Lack Standing for Injunctive Relief**

SDP Defendants argue that injunctive relief cannot redress Plaintiffs' injuries, since the Student Plaintiffs no longer resided in the SDP or attended SDP schools at the time this suit was filed. The Court agrees that the Hiester Plaintiffs, Meru Parmar, and M. Danowitz lack standing for injunctive relief, but disagrees as to Ratnadeep and Catherine Parmar.

The Third Circuit has recognized that "the principles of standing do not require a plaintiff to remain in a hostile environment to enforce [their] constitutional rights." *Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 481 (3d Cir. 2016). The plaintiff

in that suit had standing to seek injunctive relief despite refusing to enroll her child in the offending high school. *Id.* However, she continued to reside within the boundaries of the defendant school district and expressed a desire to re-enroll her child if the alleged Establishment Clause violation was remedied. *Id.* at 473–74. The Circuit concluded that injunctive relief could redress Plaintiffs' grievances by enabling the re-enrollment of her child. By contrast, in *Scicchitano v. Mt. Carmel Area Sch. Bd.*, Plaintiffs lacked standing to challenge to the dress code at a school they no longer attended and had not expressed an intention to return to, because injunctive relief could not redress their injury. 46 Fed. Appx. 667, 671 (3d. Cir. 2002).

Here, Plaintiff Hiester and his parents live outside of the SDP and have not expressed intention to re-enroll him in SDP schools if injunctive relief is obtained. Likewise, Meru Parmar and M. Danowitz have not expressed an intent to re-enroll in SDP schools. Therefore, because injunctive relief cannot redress their injury, they do not have standing to seek it. Accordingly, the Hiester Plaintiffs, M. Danowitz, and Meru Parmar's claims for injunctive relief under Count I of the Amended Complaint are dismissed, with prejudice, without leave to amend.[2] *See Dobrich v. Walls,* 380 F. Supp. 2d 366, 373 (D. Del. 2005) (finding no standing for injunctive relief where a Plaintiff left defendant school district due to an Establishment Clause violation and did not state an intent to re-enroll).

---

[2] When a motion to dismiss is granted, the court must then decide whether to grant leave to amend. The Third Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted. *See, e.g., Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000*); Dole v. Arco Chem. Co.*, 921 F.2d 484, 486 (3d Cir. 1990). However, a court need not grant leave to amend when it would be an exercise in futility. *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 879 (3d Cir. 2018) ("Leave to amend is properly denied if amendment would be futile, *i.e.*, if the proposed complaint could not 'withstand a renewed motion to dismiss.'") (*quoting Jablonski v. Pan. Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988)); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (recognizing that denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile).

Ratnadeep and Catherine Parmar have standing for injunctive relief since they allege that they maintain a residence in the SDP and plan to enroll their younger child in an SDP high school if the alleged Establishment Clause violation is cured.

**2. Ratnadeep and Catherine Parmar's Claims for Injunctive Relief are Moot**

SDP defendants also raise a mootness argument against injunctive relief. The mootness doctrine requires that the "personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Laidlaw,* 528 U.S. at 189. SDP Defendants argue that because Student Plaintiffs have now graduated from high school, their injury cannot be redressed by injunctive relief. Plaintiffs counter that the "capable of repetition, yet evading review" exception to the mootness doctrine applies. The Court disagrees.

An exception to the mootness doctrine applies to a category of cases that are capable of repetition yet evading review. For the exception to apply, "(1) the challenged action [must be] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [must be] a reasonable expectation that the same complaining party would be subjected to the same action again." *Brody v. Spang,* 957 F.2d 1108, 1113 (3d Cir. 1992). This is a "narrow exception that applies only in exceptional situations." *Hamilton v. Bromley,* 862 F.3d 329, 335 (3d Cir. 2017).

The present controversy is not the type of "exceptional situation" contemplated by the mootness exception. Palumbo's alleged Establishment Clause violation will not always evade review; for example, a Palumbo freshman challenging the establishment of the Muslim Prayer Room would enjoy a nearly four-year window for litigation during which their claims for injunctive relief could be heard. *See Donovan v. Punxsutawney Area Sch. Bd.,* 336 F.3d 211, 217 (3d Cir. 2003) (holding that the capable of repetition yet evading review exception did not apply when a school policy would not evade review if challenged by a student younger than the Plaintiff).

Plaintiffs are correct that the challenged action here is capable of repetition as to the Parmar parents since they have a younger child who still attends school within the SDP. *Id.* at 217 n.2; (ECF No. 17 at 51 ¶ 195). But since the Prayer Room Policy does not evade review, no exception to the mootness doctrine applies. Accordingly, Ratnadeep and Catherine Parmar's claims for injunctive relief under Count I of the Amended Complaint are dismissed with prejudice.

### 3. All Plaintiffs Except M. Danowitz Have Standing to Seek Damages

SDP Defendants argue that Plaintiffs lack standing to seek damages under Count I because SDP Defendants' alleged Establishment Clause violation did not proximately cause Plaintiffs' injuries. However, the SDP Defendants' argument overstates standing's causation requirement. To satisfy the requirement, Plaintiffs only need to show that their injury is "fairly traceable" to the defendant's conduct. The Third Circuit has interpreted the "fairly traceable" requirement to mean that an "indirect causal relationship will suffice" to establish standing. *Finkelman*, 810 F.3d at 193. The "fairly traceable" requirement "sets a lower bar than the showing of causation required on the merits." *Edmonson v. Lincoln Nat'l Life Ins. Co.,* 725 F.3d 406, 424 n.15 (3d Cir. 2013). Other circuits have defined the requirement as "something less than the concept of proximate cause." *See, e.g., Nova Health Sys. v. Gandy,* 416 F.3d 1149, 1156 (10th Cir. 2005).

Here, Plaintiffs allege that SDP's Establishment Clause violation caused Palumbo students to believe that the Prayer Room was exclusively for the use of Muslim students. They further allege that because the school fostered this belief, Palumbo students were outraged by Plaintiff students' incursion into the room and harassed and threatened Plaintiff students to the extent that they were forced to change school districts. This chain of causation is well pled by Plaintiffs, and drawing all inferences for the non-moving party, the Court concludes that the causation element of standing

for damages under Count I of the Amended Complaint is satisfied for all Plaintiffs except M. Danowitz.[3]

SDP Defendants also argue that Plaintiff M. Danowitz lacks standing to claim damages. The Court agrees and dismisses all claims for damages brought by M. Danowitz under Count I of the Amended Complaint. Because Danowitz was not a student at Palumbo and was, in fact, a trespasser on the Palumbo school premises at the time of this incident, he did not have the right to be inside the school at the time of the incident, and therefore he cannot demonstrate that he suffered a concrete, particularized injury:

> "A passerby who is not a member of a community . . . may not have an injury in fact sufficient to confer standing. This is because standing requires that the plaintiff has a concrete grievance that is particularized to him and that the plaintiff is not one simply expressing generalized disagreement with activities in a place in which he has no connection."

*Freedom from Religion Found. Inc.,* 832 F.3d at 478. If SDP Defendants had erected a Muslim monument on Palumbo's exterior which Danowitz, as a Philadelphian, passed, or otherwise made the Prayer Room so obtrusive that Plaintiff Danowitz confronted it without entering the school, he could claim standing. But there was no legitimate reason for him to enter the room, nestled deep inside a school which he no longer attended, without permission on June 11, 2024.[4]

**4. Remaining Plaintiffs May Seek Punitive Damages Against All Defendants Except for SDP**

[3] All Plaintiffs but M. Danowitz also have standing to seek nominal damages. Nominal damages "satisfy the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam v. Preczewski,* 592 U.S. 279, 292 (2021). SDP defendants concede as much in their Motion to Dismiss. (ECF No. 42 at 13).

[4] The Court recognizes that Plaintiffs allege that M. Danowitz passed Defendants Thompson and Stamps, as well as multiple security guards, without incident on his way into Palumbo on June 11, 2024. (ECF No. 17 ¶¶ 56, 58). But mere silence on their part does not amount to explicit permission to be on the school premises.

Neither municipalities nor defendants sued in their official capacities can be liable for punitive damages. *Judge v. Shikellamy Sch. Dist.*, 135 F.Supp.3d 284, 299 (M.D. Pa. 2015), *aff'd*, 905 F.3d 122 (3d Cir. 2018). Therefore, this court dismisses with prejudice the punitive damages claims made against SDP under each count of the Amended Complaint, as well as the punitive damages claims made against Defendants Thompson, Stamps, and Gordon in their official capacities under Count III.

Punitive damages are recoverable against school district employees in their individual capacity where their conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *R.G. v. Chichester Sch. Dist.,* No. 24-5333, 2025 LEXIS 25838 (E.D. Pa. Feb. 13, 2025) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Whether a defendant has acted with "the requisite mental state" to warrant punitive damages is "a fact-intensive issue usually reserved for the trier or fact." *Id*. Accordingly, at this stage the Court finds that all Plaintiffs but M. Danowitz have grounds to seek punitive damages against Defendants Thompson, Stamps, and Gordon in their individual capacities under Counts I, II and IV of the Amended Complaint, as well as against Teacher Defendants under Count II.

**C. *Monell* Claims**

Defendants argue that Plaintiffs fail to state a § 1983 *Monell* Claim against SDP in Counts I, II and IV of the Amended Complaint. "Municipalities cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978). Rather, to state a claim against a municipality under *Monell*, plaintiffs must allege a municipal "policy or custom" that was "the proximate cause of the injuries suffered." *G.S. v. Penn-Trafford Sch. Dist.*, 813 Fed. Appx. 799, 803 (3d Cir. 2020). Plaintiffs must also specify what the injurious custom or policy was. *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009). The Third

Circuit explained how a municipal policy and custom can be established in *Andrews v. City of Philadelphia*:

> "A government policy or custom can be established in two ways. Policy is made when a 'decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy, or edict. A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanently and well-settled' as to virtually constitute law."
>
> 895 F.2d 1469, 1480 (3d Cir. 1990).

***Count I:*** Here, Plaintiffs claim that "the Palumbo administration['s]" official policy was to restrict access to the Prayer Room to Muslims and that this proximately caused them to be harassed, threatened and ultimately driven from the school district. However, Plaintiffs do not allege, nor can the Court conclude, that the Palumbo administration had final decision-making authority to establish municipal policy. "Under Pennsylvania law, a school board may be the final policymaker with respect to some actions, while the school superintendent may be the final policymaker with regard to other actions." *G.S. V. Penn-Traffor Sch. Dist.,* 20-3281, 2023 U.S. App. LEXIS 17611, 2023 WL 4486667, at *3 & n. 29 (3d Cir. July 12, 2023) (non-precedential) (citing *McGreevy v. Stroup*, 413 F.3d 359, 368-69 (3d. Cir 2005)); *see also E.N. v. Susquehanna Twp. Sch Dist.*, No. 1:09-CV-1727, 2011 U.S. Dist. LEXIS 91316, at *8 (M.D. Pa. July 5, 2011) ("The final policy maker for a school district in Pennsylvania is typically the school board or the superintendent"); *Flood v. Sherk*, 400, F. Supp. 3d 295, 311 (W.D. Pa. 2019) (finding that a principal is not a final policymaker). The Plaintiffs do not allege that a final decisionmaker—such as SDP's superintendent or school board—delegated final policymaking authority to Palumbo administrators. Therefore, the Court finds that

Plaintiffs fail to state a *Monell* claim, and grants SDP's motion to dismiss Count I without prejudice.

***Count II*:** Plaintiffs also fail to state a *Monell* claim against SDP under Count II. The Amended Complaint does not point to a specific policy or custom that subjected them to injury. SDP clearly determined that Student Plaintiffs committed harassment (ECF No. 17 at 48 ¶ 180), but the Amended Complaint does not support the inference that this determination was ever published—or officially proclaimed—by the district. Accordingly, all claims against SDP under Count II are dismissed without prejudice.

***Count IV:*** Plaintiffs do not allege that the deprivation of due process they suffered resulted from a policy or custom of the SDP. Accordingly, all claims against SDP under Count IV are dismissed without prejudice.

**D. Count I**

**1. Plaintiffs State an Establishment Clause Violation Under 42 U.S.C. § 1983**

The Supreme Court requires that the Establishment Clause be interpreted by "reference to historical practices and understandings." *Id.* at 535 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014). To prevail on an Establishment Clause claim, a plaintiff must show that the challenged government action "resemble[s] a traditional hallmark of religious establishment." *Hilsenrath v. Sch. Dist. of the Chathams,* 136 F.4th 484, 486 (3d Cir. 2025). The Third Circuit has identified six of these hallmarks:

> "First, the government exerted control over the doctrine and personnel of the established church. Second, the government mandated attendance in the established church and punished people for failing to participate. Third, the government punished dissenting churches and individuals for their religious exercise. Fourth, the government restricted political participation by dissenters. Fifth, the government provided financial support for the established church, often in a way that preferred the established denomination over other churches. And sixth, the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function."

*Id.* at 491 (citing *Shurtleff v. City of Boston,* 596 U.S. 242, 286 (2022) (Gorsuch, J., concurring in the judgment)). To prevail on their Establishment Clause claim, Plaintiffs only need to show that SDP's Prayer/Quiet Room policy "resembles one" of these hallmarks. *Id.*[5]

Comparing the traditional hallmarks of religious establishment to policies adapted to a modern school setting requires "analogical reasoning." *Id.* (citing *Range v. Att'y Gen. United States*, 124 F.4th 218, 228 (3d Cir. 2024) (en banc). Here, Student Plaintiffs plausibly allege that Defendants Thompson, Stamps, and Gordon suspended them for entering the Muslim Prayer Room as non-Muslims. (ECF 17 ¶ 97). They also plausibly allege that they were suspended to pacify Palumbo students' outrage, thereby reinforcing the student body's perception that the Prayer Room was available to Muslim students only. (*Id*. at 97, 118, 119). In this respect, the defendants' actions resemble the fourth hallmark of religious establishment: "the government restrict[ing] political participation by dissenters." *Hilsenrath,* 136 F.4th at 491.

The Plaintiffs also plausibly allege that Defendants Thompson, Stamps, and Gordon used public resources to create the Prayer Room and prevent non-Muslim students from accessing it. (ECF 17 ¶¶ 62, 189). The room was on the grounds of a publicly funded school and was used during school hours. In this respect, Defendants' actions resemble the fifth hallmark of religious establishment: "the government provid[ing] financial support for the established church, often in a way that prefer[s] the established denomination over other churches." *Hilsenrath,* 136 F.4th at 491.

---

[5] Judge Phipps' concurrence in *Hilsenrath* says that the majority is unclear whether a challenged actions' resemblance of a single hallmark is dispositive. *Id*. at 494 (Phipps, J., concurring). However, the majority clearly says that the plaintiff must show only that the challenged action resembles *one* of the hallmarks of religious establishment. *Id*. at 491.

Drawing all inferences in favor of the Plaintiffs at the Motion to Dismiss stage, the Court concludes that Defendants Thompson, Stamps, and Gordons' actions plausibly resemble the fourth and fifth hallmarks of religious establishment.

**2. Defendants Thompson, Stamps, and Gordon Are Not Entitled to Qualified Immunity**

Defendants Thompson, Stamps, and Gordon argue they are entitled to qualified immunity in Count I. Immunity questions should be resolved "at the earliest possible stage in litigation," but on motion to dismiss, qualified immunity should bar the case only where "immunity is established on the face of the complaint." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Thomas v. Indep. Twp.*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001)). Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When determining whether qualified immunity applies, the Third Circuit asks 1) whether the plaintiff sufficiently alleges the violation of a constitutional right, and 2) whether the right was "clearly established" at the time of the official's conduct. *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016). Because qualified immunity is a defense, it is the defendants' burden to establish their entitlement to this immunity. *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir. 1989).

As discussed above, Plaintiffs have sufficiently alleged a violation of the Establishment Clause. Defendants argue that, nonetheless, the contours of the Establishment Clause were not clearly established in June 2024, when the events at controversy took place. The Supreme Court

cemented its "historical practices and understandings" Establishment Clause framework in its 2022 *Kennedy* decision; by the time of the Prayer Room incident in 2024, Defendants argue, the proper application of that framework and the resultant boundaries of permissible conduct remained unclear. *Kennedy*, 597 U.S. at 535.

Admittedly, Kennedy has blurred the line as to the constitutionality of private religious expression in public schools. *See id.* at 533 (instructing that the Establishment Clause and Free Exercise are not warring and finding that lower courts erroneously hold individuals Free Exercise rights in tension with the demands of the Establishment Clause). Defendants insist this case occupies this newly ambiguous constitutional terrain—that they did nothing more than allow students to pray in a neutral, nondenominational quiet space. This argument skirts the fact that Plaintiffs have plausibly alleged a much different set of facts. At the motion to dismiss stage, we are bound to credit Plaintiffs' version of events—specifically, the allegation that the defendants restricted access to the room to Muslim students. *Kennedy*'s application in such a scenario is clear.

When applying *Kennedy*'s "historical practices and understandings" framework, lower courts have consistently asked whether the challenged government action resembles any of the historical hallmarks of religious establishment. The hallmarks were applied this way within the Third Circuit, as well as in other circuits, as early as 2023. *See Hilsenrath v. Sch. Dist. of the Chathams*, 698 F. Supp. 3d 752, 761 (D.N.J. 2023); *Rogers v. United States HHS*, 696 F. Supp. 3d 193, 210 (D.S.C. 2023) (comparing challenged action with the six historical hallmarks of religious establishment). Therefore, it was clearly established by June 2024 that a school policy that resembled any of the hallmarks would violate the Establishment Clause.

While the facts of this case are novel, "the law may be clearly established . . . even if no court has previously held the specific conduct in question to be unlawful." *Safford Unified Sch.*

*Dist. No. 1. v. Redding*, 557 U.S. 364, 377 (2009); *see also Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 639 (3d Cir. 2015) (showing that a right is clearly established does not require Plaintiffs to "produce a case directly on point"). Therefore, we conclude that Defendants Thompson, Stamps and Gordon are not entitled to qualified immunity under Count I of the Amended Complaint.

The motion to dismiss Count I, with respect to the Establishment Clause claims against Defendants Thompson, Stamps and Gordon, is denied.

**3. Plaintiffs Fail to Allege a Free Exercise Clause Violation**

M. Danowitz is the only Plaintiff who brings Free Exercise Clause claims under Count I of the Amended Complaint. Since he lacks standing, Count I's Free Exercise claim is dismissed with prejudice.

**E. Count II: Liberty Interest in Reputation Violation Under 28 U.S.C. § 1983**

Plaintiffs allege infringement of their liberty interest in reputation by SDP Defendants and Teacher Defendants. The Court first addresses the claims against Teacher Defendants.

**1. Teacher Defendants**

Liability under § 1983 can only be imposed against parties who (1) deprive the Plaintiff of a constitutional right while (2) acting "under color of state law". *Harvey v. Plains Twp. Police Dep't,* 635 F.3d 606, 609 (3d Cir. 2011). Defendants act under color of state law when they "misuse . . . power, possessed by virtue of state law and made possible only because [they are] clothed with the authority of state law." *Mark v. Borough of Hatbro,* 51 F.3d 1137, 1150 (3d Cir. 1995) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). Courts have consistently found that teachers acting in their role as teachers act under color of state law. *Young v. Pleasant Valley Sch. Dist.*, 2010 U.S. Dist. LEXIS 119 at *35 (M.D. Pa Jan. 4, 2010). But a state official's "purely private acts which are not furthered by any actual or purported state authority are not acts under color of

state law." *Barna v. City of Perth Amboy*, 42 F.3d 809, 817 (3d Cir. 1994) (*citing D.T. by M.T. v. Ind. Sch. Dist. No. 16 of Pawnee Cty.*, 894 F.2d 1176 (10th Cir. 1990)).

The Amended Complaint alleges that Teacher Defendants "used their status as SDP teachers" to stigmatize the Plaintiffs. But the complaint doesn't support this inference; Teacher Defendants were not acting in their role as teachers when they commented on the Prayer Room incident. Defendant Luebbert repeated the allegations against the Student Plaintiffs during the public comments section of a Philadelphia School Board meeting. (ECF 17 ¶ 135). Like all citizens who speak during the public comments section of a municipal government meeting, Defendant Luebbert rose to speak as a private citizen.

Teacher Defendants also acted in their personal, private capacity when they amplified the allegations against Student Plaintiffs on social media. Posting on social media is not within the official capacity or responsibilities of a teacher regardless of whether their username identifies them with their profession. *See Pemberton v. Pappas*, 2024 U.S. Dist. LEXIS 101234 at *19 (D.N.J. Jun. 5, 2024) (holding that an on-duty police officer who stalked his victim in a marked patrol car did not act under color of state law, because he was pursuing purely private motives unconnected with his official responsibilities).

Posting on social media while representing oneself to be a teacher is not only possible for defendants who are "clothed with the authority of state law." *Mark,* 51 F.3d at 1150. Social media accounts and their associated usernames are free to all people on a first-come, first-serve basis. Any member of the public—teacher or not—can post under a username like the @teacherinphilly handle that Defendant Luebbert used.

The court sympathizes with Plaintiffs—Teacher Defendants publicly naming and shaming SDP students was deeply inappropriate—but will not stretch § 1983 liability beyond its well-defined limits.

Teacher Defendants are also entitled to qualified immunity. The doctrine of qualified immunity shields officials acting in their individual capacity. *Gordon v. Turner*, No. 4:25-CV-01875, 2026 LEXIS 88800, at *19 (M.D. Pa. Apr. 22, 2026). Plaintiffs sue Teacher Defendants in both their individual and official capacities. (ECF No 17 ¶¶ 39, 40). The Court concludes that Teacher Defendants are immune in their individual capacities because Plaintiffs do not sufficiently allege that they committed a constitutional violation.

Teacher Defendants' motion to dismiss is granted without prejudice, with leave to amend.

**2. SDP Defendants**

The well-pled facts in the Amended Complaint establish that Defendants Thompson, Stamps, and Gordon acted under color of state law while responding to the Prayer Room incident and disciplining Student Plaintiffs. Therefore, we turn to the substance of the liberty interest in reputation claim against them.

To state a claim for infringement of their liberty interest in reputation, Plaintiffs must satisfy the "stigma-plus" test. *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006). The "stigma" prong of the test requires the defendant to have published a substantially materially false statement that infringed upon the plaintiff's reputation, honor or integrity. *Ersek v. Springfield*, 102 F.3d 79, 83–84 (3d Cir. 1996). The "plus" prong of the test requires that the Plaintiff have been deprived of some additional liberty or property interest recognized by law. *Hill*, 455 F.3d at 236.

The claim at bar fails the stigma prong of the stigma-plus test. Under *Iqbal*, we must first separate the factual and legal elements of the claim, accepting all well-pled facts as true, but disregarding any legal conclusions. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

Formulaic recitations of the elements of a cause of action will not suffice to state a claim. *Twombly*, 550 U.S. at 555. Therefore, the Court disregards the Amended Complaint's conclusory assertion that the accusations of harassment against Student Plaintiffs were "publicly made, and publicly substantiated by each individual Defendant." (ECF 17 ¶¶ 202–3). The Court accepts as true Plaintiff's allegation that SDP Defendants published a letter addressing the allegations against the Plaintiffs on August 19, 2024. (*Id.* at 47 ¶ 176). The Amended Complaint contains no other specific factual allegations that SDP Defendants published materially false statements about Plaintiffs.

The second step under *Iqbal* is determining whether the August 19 letter is sufficient to support a plausible claim for relief. *Id.* at 211. Plaintiffs argue they were stigmatized by the letter because it substantiated the false harassment accusations made against them. (ECF 17 ¶ 177). Their argument is based on a selective reading of the letter—in particular, a short section that emphasizes Palumbo's "zero-tolerance policy for harassment or hate speech of any kind" and calling out as "unacceptable" the "type of discriminatory behavior" allegedly engaged in by Student Plaintiffs. (*Id.* ¶ 176).

In a vacuum, this language looks like a smoking gun but reading it in the context of the entire letter leads to a different conclusion. S*ee In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 ("a document integral to or explicitly relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment."). The letter's very first sentence refers to "*allegations* of harassment" (emphasis added). (ECF No. 17-1, Ex. 17). The letter goes on to inform readers that an investigation into the allegations is ongoing. (*Id.*). It then addresses the fact that Palumbo students' social media posts "exacerbated claims beyond the allegations that were reported" and threatens disciplinary action against any students found

responsible for such posts. (*Id.*). The letter makes no comment on Student Plaintiffs' guilt or innocence and attempts to dissuade the further spread of rumors about the incident.

From this evidence, the court cannot plausibly infer that SDP published substantially materially false statements about Student Plaintiffs. The rest of Plaintiffs' accusations of stigmatization under Count II are against Teacher Defendants, who are not state actors under § 1983 and whose conduct cannot be attributed to SDP Defendants. Accordingly, all claims against Defendants Thompson, Stamps, and Gordon under Count II of the Amended Complaint are dismissed without prejudice, with leave to amend.

**a. Qualified Immunity:**

Because Plaintiffs don't plausibly allege a constitutional violation under Count II of the Amended Complaint, Defendants Thompson, Gordon, and Stamps are entitled to qualified immunity. This is separate and sufficient grounds to dismiss the Count II claims against these defendants in their personal capacity.

**F. Count III: Title VI Claims**

Under the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Plaintiffs bring Title VI discrimination, and hostile environment claims against SDP defendants under Count III of the Amended Complaint.

**1. Individual Liability**

Individuals cannot be held liable under Title VI, and the Court therefore dismisses the claims against Defendants in their individual capacities, with prejudice. *Shannon v. Lardizzone*, 334 Fed. Appx. 506 (3d Cir. 2009). And as noted above, Plaintiffs have not made out a *Monell*

claim against SDP. The Court therefore turns to analysis of the Plaintiffs' Title VI claim against the School District Officials acting in their official capacity.

**2. Perceived Discrimination**

Title VI claims require a showing of intentional discrimination on the grounds of race, color, or national origin. *Alston v. Thomas Jefferson Univ. Hosps.* (Lexis Cite) (3d Cir. 2026). Most courts treat antisemitic harassment as racial discrimination under Title VI. *Landau v. Corp of Haverford Coll.*, 780 F. Supp. 3d 548, 557 (E.D. Pa. 2025) (*citing Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987)).

Plaintiffs claim is unusual since Student Plaintiffs, who allege they were the victim of antisemitic discrimination, are not Jewish. (ECF No. 17 ¶ 34). They argue that they were perceived to be Jewish. (*Id.* ¶ 148). The Court is not persuaded by this argument, which is grounded in the fact that the SDP investigator's report on the Prayer Room incident referred to the Student Plaintiffs and their non-party friends as "five Jewish male students." (*Id.*).

The SDP investigator is not a named defendant. His statement that Student Plaintiffs were Jewish does not necessarily mean that School District Officials perceived the Student Plaintiffs to be Jewish; the Amended Complaint even admits that Defendant Thompson "knew or should have known" that the Student Plaintiffs were not Jewish. (*Id.* ¶¶ 16, 149, 248). We acknowledge the possibility that Thompson thought the students were Jewish and told the SDP Investigator as much, but raising the mere possibility of misconduct is insufficient to state a claim under *Iqbal.* 556 U.S. at 678. The court finds it much likelier that the SDP Investigator mistakenly assumed that the

Student Plaintiffs were Jewish since their other friends who played a more prominent role in the Prayer Room incident were Jewish.

### 3. Associational Discrimination

In the alternative, Plaintiffs argue that they were victims of associational discrimination. (ECF No. 17 ¶ 220). They cite *Kengerski v. Harper* to support the contention that an individual who is not themselves a member of a protected class can nonetheless be discriminated against because of their association with a member of a protected class. 6 F.4th 531, 538 (3d Cir. 2021). In *Kengerski*, a white corrections officer was harassed by a white superior for having a black grandniece. The Third Circuit held that such harassment could violate Title VII.

It's not clear whether associational discrimination is cognizable under Title VI, but we need not reach this point. Assuming *arguendo* that associational discrimination is cognizable, Plaintiffs still fail to state a claim under Title VI because their pleadings don't support an inference of willful discrimination by SDP defendants.

Discrimination "can be shown with either direct or circumstantial evidence." *Astaraee v. Villanova Univ.*, 509 F. Supp. 3d 265, 270 (E.D. Pa. 2020) (*citing Blunt v. Lower Merion Sch. Dist.,* 767 F.3d 247, 275 (3d Cir. 2014)). Direct evidence is "evidence sufficient to allow the jury to find that the decision makers placed substantial reliance on [the plaintiff's protected characteristic] in reaching their decision." *Fakete v. Aetna, Inc.,* 308 F.3d 335, 338 (3d Cir. 2002). This includes "overt or explicit evidence which directly reflects discriminatory bias by a decision maker." *Astaraee*, 509 F. Supp. 3d. at 270 (*quoting Katchur v. Thomas Jefferson Univ.*, 354 F. Supp. 3d 655, 665 (E.D. Pa. 2019). When a Plaintiff relies on comments made by defendants for direct evidence, it's essential that the comments relate to the "decisional process." *Id.*

Here, the Plaintiffs allege that a statement made by Defendant Thompson in SDP's investigative report reflects discriminatory bias. Thompson stated that the father of one of the non-party boys involved in the incident "had emailed [her] [the week before the incident] with concerns of safety and antisemitism, and that email, in [her] personal opinion, lends context to this incident." (ECF No. 17-1, Ex. 5).

Even making all inferences in Plaintiffs' favor, the Court finds Thompson's statement insufficient to support a plausible inference of discrimination. Thompson's statement does not imply that she thinks the Student Plaintiffs are guilty of harassment. Nor does her statement hint at any harbored antisemitic animus. Thompson merely appears to have been divulging a relevant fact to the investigator; it was reasonable to believe that heightened religious tension at Palumbo lent context to the Prayer Room incident.

In any event, Thompson's comments don't pertain to her allegedly discriminatory suspension of Student Plaintiffs. The Student Plaintiffs were not suspended for their actions in the Prayer Room. They were allegedly suspended for accompanying an unauthorized visitor into Palumbo. (ECF No. 17 ¶¶ 114–15).

This reason, Plaintiffs argues, was a pretext designed to obscure Defendant's discriminatory motive. They proffer circumstantial evidence to support their claim. Plaintiffs may proffer circumstantial evidence to state a Title VI claim under the Supreme Court's *McDonnell Douglas* framework. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). The test requires a plaintiff to show that:

> "(1) She is a member of a protected class; (2) she suffered an adverse action at the hands of the defendant in pursuit of her education; (3) she was qualified to continue in her pursuit of her education; and (4) she was treated differently from similarly situated students who are not members of the protected class."

*Katchur,* 354 F. Supp. 3d at 666 (cleaned up). Defendants argue that Plaintiffs have not sufficiently pled the first and fourth element of the *McDonnell Douglas* test. We move directly to the fourth element because Plaintiffs inability to satisfy that element is dispositive.

Student Plaintiffs claim that they were treated more harshly than a similarly situated Palumbo student who is Muslim. (ECF No. 17 ¶¶ 81, 238). They allege that the proffered Muslim student was not punished for leaving Palumbo's campus during school hours without permission on June 11, 2024, whereas John Hiester was. (*Id.*). We accept this well-pled allegation as true; however, we cannot ignore the fact that Hiester was punished for more than just leaving campus without permission. Hiester was suspended for accompanying an unauthorized visitor, M. Danowitz, onto campus. Plaintiffs don't allege that the proffered Muslim student ever accompanied an unauthorized visitor onto campus.

To be similarly situated, students must "engage in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the[ir] . . . treatment . . . for it." *Doe v. Manor Coll.*, 479 F. Supp. 3d 151, 174 (E.D. Pa. 2020).

The proffered Muslim student's conduct is clearly distinguishable from Hiester's. Therefore, Hiester receiving a harsher punishment does not support an inference of antisemitism. Plaintiffs' claims of willful discrimination are dismissed without prejudice, with leave to amend.

**4. Deliberate Indifference**

Plaintiffs argue that SDP's deliberate indifference to antisemitic harassment created a hostile educational environment at Palumbo in violation of Title VI. A school district's deliberate indifference to the sexual or racial harassment of a student by another student can constitute sex or race discrimination under Title VI. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643, 119

S. Ct. 1661, 143 L. Ed. 2d 839 (1999). The Supreme Court identified six elements that a plaintiff must establish to hold a school district liable for deliberate indifference:

> "(1) the defendant receives federal funds; (2) sexual [or racial] harassment occurred; (3) the harassment occurred under 'circumstances wherein the recipient exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red],' (4) the funding recipient had 'actual knowledge' of the harassment; (5) the funding recipient was 'deliberately indifferent' to the harassment; and (6) the harassment was 'so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school.'"

*Williams v. Pennridge Sch. Dist.,* (Lexis Cite) (E.D. Pa. 2018) (*quoting Davis,* 526 U.S. at 19). Here, Defendants argue that Plaintiffs fail to establish elements two, three, five, and six. The Court agrees with Defendants as to elements two and five, both of which are sufficient to dismiss.

**a. Element Two: Plaintiffs Were Not Subjected to Antisemitic Harassment**

Defendants argue that the Plaintiffs were not subjected to antisemitic harassment by other students. The Court agrees that the pleadings do not support Plaintiffs' inference.

The Amended Complaint does contain substantial evidence of Palumbo students' engaging in antisemitic harassment. (ECF No. 17 ¶¶ 47, 49). However, it does not establish that the Student Plaintiffs were the *recipients* of this antisemitic harassment. The student-against-student antisemitism described by the complaint was directed at non-parties to this lawsuit.

Plaintiffs' contention that they received antisemitic threats and criticism after the Prayer Room incident is unsupported. The Student Plaintiffs were certainly harassed, but the harassment was not antisemitic in nature. The threats against Hiester and Parmar didn't target either students' perceived Judaism, or association with Judaism. Instead, the threats were clearly motivated by the allegation that the Student Plaintiffs had desecrated the Prayer Room and harassed its female Muslim occupants.

Palumbo students accused Student Plaintiffs, among other things, of "exclaiming that they are openly Zionist" and "destroy[ing] a sacred space during one of the most brutal genocides [referring to Palestine]." (*Id.* ¶¶ 105, 109). But unlike Judaism, Zionism is not a protected characteristic under Title VI. *See Landau* 780 F. Supp. 3d at 555 (emphasizing that anti-Israel speech is not intrinsically antisemitic, and rejecting a Plaintiffs' attempt to "sweep any and all criticism of Israel into the basket of antisemitism"). However vehement or crass, Palumbo students' disagreement with Student Plaintiffs' perceived political beliefs doesn't constitute antisemitic harassment.

**b. Element Five: The School District and Its Officials Were Not Deliberately Indifferent**

Schools are not held to be deliberately indifferent to harassment unless they behave in a clearly unreasonable manner. *Davis,* 526 U.S. at 648. Courts should refrain from second-guessing school administrators' disciplinary decisions, and in appropriate cases there is no reason why courts deciding a motion to dismiss cannot identify a response as not clearly unreasonable as a matter of law. *Id.* at 649.

In the aftermath of the Prayer Room incident, Palumbo administrators initiated an investigation, took statements from witnesses of the incident, communicated with the parents of the accused students, and ultimately rescinded the discipline against Student Plaintiffs. (ECF No. 17 ¶¶ 89, 92, 117). Before the beginning of the next school year, when Student Plaintiffs would have returned to Palumbo, Defendant Thompson sent a letter to the school community threatening disciplinary consequences against students who exacerbated the claims against Student Plaintiffs. (ECF No. 17-1, Ex. 17). Failing to stop harassment does not make a school's actions clearly unreasonable. *See Williams v. Jersey Shore Area Sch. Dist.*, 673 F. Supp. 3d 688 (M.D. Pa. 2023) (holding that a school was not clearly unreasonable despite its disciplinary response failing to stop

bullying); *Gabrielle M. v. Park Forest-Chicago Heights,* 315 F.3d 817, 825 (7th Cir. 2003) ("*Davis* does not require funding recipients to remedy peer harassment.").

The Court sympathizes with Plaintiffs. SDP was largely unresponsive to the legitimate concerns communicated by Hiester's and Parmar's parents. However, deliberate indifference is a high bar that the Amended Complaint does not clear.

Because the Amended Complaint does not support a plausible inference that the Palumbo administration willfully discriminated against the Plaintiffs, or that Plaintiffs were subjected to a hostile environment due to Palumbo administrators' deliberate indifference, Count III is dismissed without prejudice, with leave to amend.

**G. Count IV: Plaintiffs State a Claim for Deprivation of Due Process Under 42 U.S.C. § 1983**

The Amended Complaint alleges that Defendants Thompson, Stamps, and Gordon failed to provide Student Plaintiffs with adequate due process before suspending them. Under the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property without due process of law . . ." U.S. Const. amend. XIV, § 1. Property interests are typically created and defined by non-constitutional sources, like state law. *See Goss v. Lopez,* 419 U.S. 565, 572 (1975). Under Pennsylvania law, education is a statutory right, and students must be afforded all appropriate due process before being excluded from school. *See* 22 Pa. Code § 12.8(a)(2005); *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 149 ("On the basis of state law, Shuman has a legitimate claim of entitlement to a public education").

The process schools must provide to students depends on the length of the suspension they are facing. Pennsylvania law requires that students facing suspensions of up to ten days must be informed of the grounds for their suspension and given an opportunity to respond to the charges against them before the suspension takes effect. 22 Pa. Code § 12.6(b)(1) (2022). In *Goss*, the

Supreme Court established a virtually identical rule: because a suspension is "a serious event in the life of the suspended child," students must first be provided "an oral or written notice of the charges and, if [they] den[y] them, an explanation of the evidence the authorities have and an opportunity to present [their] side of the story." 419 U.S. at 581.

*Goss* does not require school disciplinarians to conduct formal hearings for suspensions of less than ten days. *Id* at 582. "In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Id.*

Here, Student Plaintiffs were neither provided notice of the charges against them nor given an opportunity to deny them before the suspension took effect. (ECF No. 17 ¶ 114). When Defendant Stamps and Thompson questioned Student Plaintiffs about the Prayer Room incident of June 11, 2024, they never asked how M. Danowitz obtained access to Palumbo. (*Id.* at 29 ¶ 118). Therefore, Student Plaintiffs were never given notice that they were alleged to have accompanied a trespasser on campus, nor were they provided an opportunity to contest that accusation.

At 10 p.m. the night before the Student Plaintiffs' suspensions took effect, Defendant Thompson notified their parents of the suspension and its grounds. She did not notify the students themselves. Providing written notice of suspension to a student's parents is required under Pennsylvania law, but it doesn't replace a disciplinarian's obligation to notify the excluded student themselves. 22 Pa. Code § 12.6(b)(1) (2022). Despite the suspension taking effect the following morning, Defendant Thompson refused to meet with the Student Plaintiffs and their parents when they arrived at Palumbo seeking an audience. (*Id.* ¶¶ 113–14, 120–24). This deprived the Student Plaintiffs of the opportunity to contest the allegations. (*Id.* ¶ 115).

In their motion to dismiss, SDP Defendants argue that a pre-deprivation hearing is not required when it is infeasible to do so, and the hearing subsequently occurs as soon as reasonably practicable. Defendants are correct that *Goss* created an exception to the "general rule [that] notice and hearing should precede removal of the student" for situations in which a student's "presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process." 419 U.S. at 582. But making all inferences for the Plaintiff, the Court concludes that it was feasible for SDP defendants to provide notice of the suspension and an informal hearing to Student Plaintiffs without endangering persons or property or disrupting the (then-concluded for the year) academic process.

Defendant Thompson suspended Student Plaintiffs on a Wednesday night. (ECF No. 17 ¶¶ 113–14). She could have consented to meet with Plaintiffs to provide notice and hearing when they came to Palumbo seeking to meet with her the next morning. Or, in a post-Covid world where remote learning is commonplace, Thompson could easily have arranged a video conference with the Student Plaintiffs. Accordingly, this Court denies Defendants Thompson, Stamps, and Gordon's motion to dismiss Count IV.

**1. Qualified Immunity**

Defendants Thompson, Stamps, and Gordon argue they are entitled to qualified immunity. The Court disagrees. The Plaintiffs have sufficiently alleged a violation of their constitutional due process rights, which are clearly established by both Pennsylvania statute and Third Circuit precedent. *See Colombo v. Neshannock Twp. Area Sch. Dist.*, 2025 LEXIS 47705 (W.D. Pa. Mar. 17, 2025) (emphasizing that a school must provide students with notice of charges and opportunity to respond before enforcing a suspension); *Eck v. Oley Valley Sch. Dist.*, 431 F. Supp. 3d 607, 627 (E.D. Pa. 2019) ("the process owed to Students is 'oral or written notice of the charges against

[them] and, if [they deny] them, an explanation of the evidence the authorities have and an opportunity to present [their] side of the story.'").

As noted above, the exception to the pre-suspension notice and hearing requirement is clearly limited to situations where providing process is infeasible. A reasonable actor in Defendant's position could not have believed that it was infeasible to provide notice and hearing to the Student Plaintiffs given their attempt to 1) meet with Defendant Thompson on the morning the suspension took effect and 2) the ease with which notice and hearing could have been provided remotely. *See Kelly v. Borough of Carlisle,* 622 F. 3d 238, 253 (courts assessing qualified immunity claims must "determine whether a reasonable state actor could have believed his conduct was lawful").

School District Officials' motion to dismiss Count IV of the Amended Complaint is denied.

**IV. Conclusion**

**Count I:** SDP Defendants' motion to dismiss is **GRANTED** with prejudice as to (1) the Hiester Plaintiffs' and Parmar Plaintiffs' claims for injunctive relief, and (2) Plaintiff Jean Danowitz's claims on behalf of M. Danowitz for injunctive relief and damages. SDP Defendants' motion to dismiss is **GRANTED** without prejudice as to SDP. SDP Defendants' motion to dismiss is **DENIED** as to the Hiester Plaintiffs' and Parmar Plaintiffs' claims for damages against Defendants Thompson, Stamps, and Gordon.

**Count II:** Defendants' motions to dismiss are **GRANTED** without prejudice.

**Count III:** SDP Defendants' motion to dismiss is **GRANTED** with prejudice as to Defendants Gordon and Thompson in their individual capacities. SDP Defendants' motion to dismiss is **GRANTED** without prejudice as to Defendants SDP, Gordon, and Thompson in their official capacities.

**Count IV:** SDP Defendants' motion to dismiss is **GRANTED** without prejudice as to SDP. SDP Defendants' motion to dismiss is **DENIED** as to Defendants Thompson, Stamps, and Gordon.

**IT IS SO ORDERED.**

**BY THE COURT:**

*/s/ John Milton Younge*

**Judge John Milton Younge**